1    VINCENT J. BELUSKO (CA SBN 100282)
     VBelusko@mofo.com
2    HECTOR G. GALLEGOS (CA SBN 175137)
     HGallegos@mofo.com
3    JONATHAN M. SMITH (CA SBN 292285)
     JonathanSmith@mofo.com
4    MORRISON & FOERSTER LLP
     707 Wilshire Boulevard
5    Los Angeles, California  90017-3543
     Telephone: 213.892.5200
6    Facsimile: 213.892.5454

7    JACK W. LONDEN (CA SBN 85776)
     JLonden@mofo.com
8    DIANA B. KRUZE (CA SBN 247605)
     DKruze@mofo.com
9    SHAELYN DAWSON (CA SBN 288278)
     Shaelyndawson@mofo.com
10   MORRISON & FOERSTER LLP
     425 Market Street
11   San Francisco, California  94105-2482
     Telephone: 415.268.7000
12   Facsimile: 415.268.7522

13   Attorneys for Defendants
     NIKON CORPORATION and NIKON INC.

14              UNITED STATES DISTRICT COURT

15              CENTRAL DISTRICT OF CALIFORNIA

16                    WESTERN DIVISION

17

| 18 CARL ZEISS AG and ASML NETHERLANDS, B.V., | Case No. 2:17-cv-07083 RGK (MRWx) |
|---|---|
| 19  Plaintiffs, | **DEFENDANTS NIKON CORPORATION AND NIKON INC.'S MEMORANDUM IN SUPPORT OF THEIR MOTION FOR JUDGMENT AS A MATTER OF LAW (CLOSE OF ALL EVIDENCE)** |
| 20  v. | |
| 21 NIKON CORPORATION, SENDAI NIKON CORPORATION, and NIKON INC., | Date:      December 13, 2018 Time:      8:30 a.m. Courtroom: 850, 8th Floor |
| 22  Defendants. | Hon. R. Gary Klausner |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ III

I.      INTRODUCTION ............................................................................................. 1

II.     THE STANDARD FOR GRANTING JUDGMENT AS A MATTER OF LAW UNDER RULE 50(A) ................................................................. 1

III.    PLAINTIFFS FAILED TO PROVE OWNERSHIP OF THE ASSERTED PATENTS ...................................................................................... 1

IV.     PLAINTIFFS FAILED TO PROVE COMPLIANCE WITH THE MARKING STATUTE FOR THE '163 PATENT .................................... 2

V.      PLAINTIFFS FAILED TO PROVE INFRINGEMENT OF THE '163 PATENT FOR UNIDENTIFIED NIKON PRODUCTS ..................... 2

VI.     PLAINTIFFS FAILED TO PROVE INFRINGEMENT OF CLAIM 16 OF THE '163 PATENT ....................................................................... 2

VII.    PLAINTIFFS FAILED TO PROVE INFRINGEMENT BY REPRESENTATIVE PRODUCTS FOR THE '335 PATENT ................. 4

VIII.   PLAINTIFFS FAILED TO PROVE INFRINGEMENT OF CLAIMS 1-3 OF THE '335 PATENT ....................................................................... 5

IX.     PLAINTIFFS FAILED TO PROVE INFRINGEMENT OF CLAIM 1 OF THE '312 PATENT ....................................................................... 7

X.      PLAINTIFFS FAILED TO PROVE INFRINGEMENT OF CLAIM 7 OF THE '017 PATENT ....................................................................... 9

XI.     PLAINTIFFS FAILED TO PROVE INFRINGEMENT OF CLAIM 30 OF THE '574 PATENT ..................................................................... 9

XII.    PLAINTIFFS FAILED TO PROVE DIRECT INFRINGEMENT BY NIKON CORP. ............................................................................................. 10

XIII.   PLAINTIFFS FAILED TO PROVE INDUCED INFRINGEMENT BY EITHER NIKON CORP. OR NIKON INC. .................................... 10

XIV.    PLAINTIFFS FAILED TO PROVE CONTRIBUTORY INFRINGEMENT BY EITHER NIKON CORP. OR NIKON INC. ....... 11

XV.     PLAINTIFFS FAILED TO PROVE WILLFUL INFRINGEMENT BY EITHER NIKON CORP. OR NIKON INC. .................................... 12

XVI.    PLAINTIFFS FAILED TO PROVE WILLFUL BLINDNESS BY EITHER NIKON CORP. OR NIKON INC. .................................... 12

XVII.   DEFENDANTS HAVE SHOWN THAT CLAIM 16 OF THE '163 PATENT IS INVALID ..................................................................... 13

XVIII.  DEFENDANTS HAVE SHOWN THAT CLAIMS 1-3 OF THE '335 PATENT IS INVALID ..................................................................... 14

# TABLE OF CONTENTS
### (continued)

Page

XIX.   DEFENDANTS HAVE SHOWN THAT CLAIM 1 OF THE '312
PATENT, CLAIM 7 OF THE '017 PATENT, AND CLAIM 30 OF
THE '574 PATENT ARE INVALID ....................................................... 15

XX.    PLAINTIFFS FAILED TO PROVE ANY SECONDARY
CONSIDERATIONS OF NON-OBVIOUSNESS.................................... 16

XXI.   PLAINTIFFS FAILED TO PROVE THAT THEY ARE ENTITLED
TO DAMAGES ................................................................................... 17

XXII.  DEFENDANTS HAVE SHOWN THAT SONY IMAGE SENSORS
ARE LICENSED ................................................................................. 21

XXIII. CONCLUSION.................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Akzo Nobel Coatings, Inc. v. Dow Chemical Co.*,
   811 F.3d 1334 (Fed Cir. 2016) ................................................................. 4, 7

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ........................................................................................ 1

*Anthony Co. v. Perfection Steel Body Co.*,
   315 F.2d 138 (6th Cir. 1963) ...................................................................... 21

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
   876 F.3d 1350 (Fed. Cir. 2017) .................................................................... 2

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
   598 F.3d 1336 (Fed. Cir. 2010) .................................................................. 15

*Boston Scientific Corp. v. Johnson & Johnson*,
   550 F. Supp. 2d 1102 (N.D. Cal. 2008) ...................................................... 17

*Creative Compounds, LLC v. Starmark Labs.*,
   651 F.3d 1303 (Fed. Cir. 2011) .................................................................. 10

*DePuy Spine, Inc. v. Medtronic Sofamor Danke, Inc.*,
   469 F.3d 1005 (Fed. Cir. 2006) .................................................................... 6

*Dow Chem. Co. v. Mee Indus., Inc.*,
   341 F.3d 1370 (Fed. Cir. 2003) .................................................................. 17

*DSU Med. Corp. v. JMS Co., Ltd.*,
   471 F.3d 1293 (Fed. Cir. 2006) .................................................................. 11

*Festo Corp. V. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*,
   535 U.S. 722 (2002) ................................................................................... 3, 8

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   563 U.S. 754 (2011) .................................................................................... 12

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
   136 S. Ct. 1923 (2016) ................................................................................ 12

*Impression Prods., Inc. v. Lexmark Int'l, Inc.,*
    137 S. Ct. 1523 (2017) ....................................................................... 23

*Johnson & Johnson Associates Inc. v. R.E. Serv. CO., Inc.,*
    285 F.3d 1046 (Fed. Cir. 2002) (en banc) ............................................ 5

*Juicy Whip, Inc. v. Orange Bang, Inc.,*
    382 F.3d 1367 (Fed. Cir. 2004) .......................................................... 18

*Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.,*
    *Harris Press & Shear Div.,*
    895 F.2d 1403 (Fed. Cir. 1990) .......................................................... 17

*Quanta Computer, Inc. v. L.G. Elecs., Inc.,*
    533 U.S. 617 (2008) ............................................................................ 23

*Reeves v. Sanderson Plumbing Prods., Inc.,*
    530 U.S. 133 (2000) .............................................................................. 1

*Robocast, Inc. v. Microsoft Corp.,*
    No. 10-1055-RGA, 2014 WL 202399 (D. Del. Jan. 16, 2014) .......... 19

*Uniloc USA, Inc. v. Microsoft Corp.,*
    632 F.3d 1292 (Fed. Cir. 2011) .......................................................... 18

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.,*
    520 U.S. 17 (1997) ................................................................................ 5

*Warsaw Orthopedic, Inc. v. NuVasive, Inc.,*
    824 F.3d 1344 (Fed. Cir. 2016) .......................................................... 13

**Statutes**

35 U.S.C. § 271 ............................................................................... 10, 21

35 U.S.C. § 284 ............................................................................... 12, 17

**Other Authorities**

Fed. R. Civ. P. 50(a) ............................................................................... 1

Federal Rule of Evidence 403 ............................................................... 17

## I.    INTRODUCTION

Defendants Nikon Corp. and Nikon Inc. (collectively "Nikon") hereby move for an order granting judgment as a matter of law on issues relating to U.S. Patent Nos. 6,464,163 ("'163 Patent"), 6,731,335 ("'335 Patent"), 8,149,312 ("'312 Patent"), 8,625,017 ("'017 Patent"), and 9,728,574 ("'574 Patent"), (collectively, "Asserted Patents").  Nikon first moved orally for JMOL under Rule 50(a) at the close of Plaintiffs' case-in-chief on December 7, 2018, which the Court noted and said the motion was reserved.  This oral motion was reduced to writing and filed on December 10, 2018.  (ECF No. 480.)  At the close of all evidence on December 12, 2018, Nikon orally moved for JMOL, which is reduced to writing in this motion. On each of the issues addressed in Nikon's JMOL motions, Plaintiffs failed to present legally sufficient evidence to support their claims, and the Court should therefore enter judgment in Nikon's favor under Rule 50(a) of the Federal Rules of Civil Procedure.

## II.    THE STANDARD FOR GRANTING JUDGMENT AS A MATTER OF LAW UNDER RULE 50(A)

A motion for judgment as a matter of law ("JMOL") on a particular issue is proper where a reasonable jury could only find for the movant on that issue after the evidence has been fully presented.  *See* Fed. R. Civ. P. 50(a)(1).  In ruling on JMOL motions, courts apply the same standard as on summary judgment:  review the evidence of record, draw all reasonable inferences in favor of the nonmoving party, and determine whether the movant prevails as a matter of law.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)).

## III.    PLAINTIFFS FAILED TO PROVE OWNERSHIP OF THE ASSERTED PATENTS

As discussed in Nikon's initial JMOL motion, Plaintiffs failed to prove title to the Asserted Patents.  (ECF No. 480 at 9-10.)  Accordingly, the Court should

1   grant judgment as a matter of law that Plaintiffs do not own the Asserted Patents.

## IV.   PLAINTIFFS FAILED TO PROVE COMPLIANCE WITH THE MARKING STATUTE FOR THE '163 PATENT

4   As Defendants' expert Dr. Trevor Darrell explained, Hewlett Packard (HP)
5   sold licensed, unmarked digital cameras that practice the '163 Patent. (Dec. 10,
6   2018 A.M. Trial Tr. at 38:14-44:11 (discussing the HP Photosmart R725, R727,
7   R827, R927, and R967).) Plaintiffs presented zero evidence to rebut this
8   contention: they presented no evidence on marking in their case-in-chief, and failed
9   to carry their burden during rebuttal too. *Arctic Cat Inc. v. Bombardier*
10  *Recreational Prods. Inc.*, 876 F.3d 1350, 1366 (Fed. Cir. 2017) (Plaintiffs "bear[]
11  the burden of pleading and proving he complied with § 287(a)'s marking
12  requirement."). In fact, Plaintiffs' technical expert Dr. Joseph Mundy admitted that
13  he did not review any source code underlying any of the HP digital cameras that
14  Nikon asserted to practice the '163 Patent. (*See generally* Dec. 12, 2018 P.M. Trial
15  Tr.) Thus, the Court should grant judgment as a matter of law and exclude pre-
16  filing damages for any alleged infringement of the '163 Patent.

## V.   PLAINTIFFS FAILED TO PROVE INFRINGEMENT OF THE '163 PATENT FOR UNIDENTIFIED NIKON PRODUCTS

19  Plaintiffs' technical expert Dr. Mundy failed to identify the names for any of
20  the 43 products he believes to be infringing the '163 Patent, making it impossible
21  for a jury to conclude that these unidentified products infringe. Plaintiffs' failure in
22  their case-in-chief dooms their infringement allegation, as the jury has no basis to
23  identify which 43 products are at issue, much less conclude that these unidentified
24  products infringe the '163 Patent or assess damages for them. Thus, Nikon is
25  entitled to a judgment of no infringement of the '163 Patent for all 43 products.

## VI.   PLAINTIFFS FAILED TO PROVE INFRINGEMENT OF CLAIM 16 OF THE '163 PATENT

28  As discussed in Defendants' first JMOL motion, Plaintiffs accused the Nikon

cameras' ability to detect human faces but failed to prove infringement of at least the following limitations of Claim 15 of the '163 Patent: (1) "first filtering means"; (2) first filtering means that is "configured to correlate said input image with a reference image pattern"; (3) "a reference image pattern being indicative of said target image pattern"; (4) "second filtering means"; and (5) "image pattern detector." (*See* ECF No. 480 at 14-16; *see also* Dec. 10, 2018 Trial Tr. at 4:4-18:11.)  In addition, Plaintiffs did not prove at least the following limitations of Claim 16 of the '163 Patent: (1) "linear matched filter"; (2) "a linear convolution operation"; and (3) reference image pattern that is "representative of a human face." (*See id.*)

Moreover, an infringement theory under DoE is unavailable for the '163 patent because of prosecution history estoppel.  As Dr. Darrell explained, the applicant of the '163 Patent narrowed the scope of the pending claims to distinguish them from Baback Moghaddam's prior work.  (Dec. 7, 2018 P.M. Trial Tr. at 681:7-683:2.)  Specifically, the applicant argued that unlike Moghaddam, the '163 Patent derives a correlation image before identifying potential candidate regions. (*I.d.*)  "[W]hen an amendment is made to secure the patent and the amendment narrows the patent's scope," as here, prosecution history estoppel arises and the applicant is precluded from asserting infringement under DoE.  *Festo Corp. V. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 736 (2002), aff'd, 493 F.3d 1368 (Fed. Cir. 2007).

Even if Plaintiffs can rely on DoE, Plaintiffs failed to prove infringement because Plaintiffs' expert Dr. Mundy did not "establish equivalency on a limitation-by-limitation basis by particularized testimony and linking argument as to the insubstantiality of the difference between the claimed invention and the accused device . . . ."  *Akzo Nobel Coatings, Inc. v. Dow Chemical Co.*, 811 F.3d 1334, 1342 (Fed Cir. 2016) (citation and internal quotation marks omitted).  In fact, Dr. Mundy provided no element-by-element analysis of any equivalency between the accused

1   products and the claimed invention.  In contrast, Defendants' expert Dr. Darrell

2   explained that Omron's weak classifier cannot be equivalent to the claimed linear

3   matched filter of the "first filtering means," and that the output of Omron's face

4   detection technique cannot be equivalent to a "correlation image".  (Dec. 10, 2018

5   A.M. Trial Tr. at 8:24-9:2; 10:10-20).  Based on both experts' testimony, no

6   reasonable jury can find that the accused products infringe under DoE either.

7        Because Plaintiffs failed to carry their burden of proving infringement of

8   each and every limitation of Claim 16 for the Nikon products, Defendants are

9   entitled to a judgment as a matter of law on non-infringement as to Claims 16 of the

10   '163 Patent.

11   **VII.   PLAINTIFFS FAILED TO PROVE INFRINGEMENT BY**
**REPRESENTATIVE PRODUCTS FOR THE '335 PATENT**

12

13        Plaintiffs attempted to prove infringement of the '335 patent by

14   representative products, and claimed certain cameras were representative of the 25

15   accused cameras.  However, Plaintiffs' technical expert Dr. Richard Carley only

16   analyzed 8 of the 25 cameras, and presented no basis that the cameras he studied

17   were representative of others.  Ultimately at trial, he argued without any support

18   that the Df camera was representative of "Group 1 Cameras," including 17 other

19   cameras.  (Dec. 6, 2018 A.M. Trial Tr. at 270:13-271:13; Dec. 11, 2018 A.M.

20   848:2-849:20.)  Also, he presented evidence for only the D4, D4S, and Df for all

21   limitations of Claims 1-3.  (*Id.* at 264:6-290:1, 290:18-294:20; Dec. 11, 2018 A.M.

22   848:2-849:20.)  Dr. Carley did not and could not remedy any of these errors during

23   rebuttal.  Accordingly, judgment as a matter of law of non-infringement is

24   appropriate for the unexamined products and for unpresented products, and

25   Plaintiffs' infringement case should be narrowed to the Nikon D4, Df, and D4S

26   cameras for the '335 Patent.

27

28

## VIII.  PLAINTIFFS FAILED TO PROVE INFRINGEMENT OF CLAIMS 1-3 OF THE '335 PATENT

The Court already held in its Amended Summary Judgment Order that "the Accused Products cannot literally infringe." (ECF No. 305 at 14.) Thus, Plaintiffs must prove infringement under DoE in order to prevail.

However, Plaintiffs' DoE theory fails for six independent reasons. First, as discussed in Nikon's first JMOL motion, prosecution history estoppel precludes Plaintiffs from asserting infringement under DoE. (ECF No. 480 at 19.) During prosecution, applicants of the '335 Patent narrowed the scope of Claim 1 to distinguish it from the Guidash reference identified by the patent examiner. (Dec. 6, 2018 A.M. Trial Tr. at 302:24-310:16; Dec. 12, 2018 A.M. Trial Tr. at 828:20-831:21.)  Plaintiffs did not carry their burden to show that this amendment was made for a purpose other than patentability, and thus, cannot rely on DoE for alleged infringement. *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 33 (1997) (patent holder has burden to prove that prosecution history does not apply).

Second, Plaintiffs cannot apply DoE to cover accused products that allegedly keep transfer transistors off during a voltage readout because they have dedicated it to the public. Under the dedication rule, "when a patent drafter discloses but declines to claim subject matter . . . , this action dedicates that unclaimed subject matter to the public." *Johnson & Johnson Associates Inc. v. R.E. Serv. CO., Inc.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002) (en banc).  A patentee cannot apply DoE "to recapture subject matter deliberately left unclaimed . . . ." *Id.*  Here, Figure 5 of the '335 Patent shows that the transfer transistor M43 and M44 "keep on . . . a turn-off state and turn-off state, respectively . . . so that a reset voltage level is outputted" during sections C1 and C2. (JTX-0003, col.5 ll.54-56 & col.6 ll.12-15.)  However, none of the claims of the '335 Patent cover transfer transistors that "keep on a turn-off state" while the reset voltage level is outputted.  Indeed, steps (c) and (e) of

Claim 1, which is the only independent claim, require the active steps of "*turning off* the first and second transfer transistors . . . and outputting a reset voltage level . . . ." (JTX-0003, col.7 ll.58-60 & col.8 3-4 (emphasis added).)  Under the Court's construction, both the first and second transfer transistors must transition from on to off when the reset voltage level is output; remaining in the off state is not enough. (ECF No. 305 at 14.)  But because the patentee disclosed the idea of keeping the transfer transistors off during a voltage readout without claiming it, the patentee already dedicated this idea to the public.  Plaintiffs therefore cannot recapture this subject matter through Claim 1.  Accordingly, Plaintiffs are precluded from arguing that "turning off" a transistor is equivalent to "remaining in the off state."

Third, the "all elements" rule forecloses DoE when "a limitation would be read completely out of the claim—*i.e.*, the limitation would be effectively removed or 'vitiated.'"  *DePuy Spine, Inc. v. Medtronic Sofamor Danke, Inc.*, 469 F.3d 1005, 1017 (Fed. Cir. 2006).  Here, Plaintiffs cannot argue that the passive state of keeping a transistor on/off in the accused products (*i.e.*, doing nothing)  is equivalent to the claimed active step of turning a transistor on/off, because doing so would vitiate the limitations of "turning on" and "turning off" the claimed transistors.  (Dec. 11, 2018 A.M. Trial Tr. at 846:5-8.)

Fourth, Plaintiffs failed to prove that the accused products have at least three limitations of Claims 1-3: (1) the "turning on" and "turning off" sequence of steps (c), (d), (e), and (f) for all accused products because keeping a transistor on/off and turning a transistor on/off are substantially different; (2) "a reset transistor coupled between a power supply and the single sensing node" for the D5 and Nikon 1 series including the V1, V2, V3, J1, J2, J3, J4, S1, S2, and AW1; and (3) "fully depleting" the photodiodes under step (a) for all accused products.  (Dec. 11, 2018 A.M. Trial Tr. at 831:22-850:6; *see also* ECF No. 480 at 19-22.)   In particular, Plaintiffs did not offer sufficient link the insubstantiality of the difference between the claimed invention and the accused products. *See Akzo*, 811 F.3d at 1342.

For example, Dr. Carley presented no data showing that the photodiodes are fully depleted, which requires depleting the residual image charges below the "noise floor." (Dec. 6, 2018 A.M. Trial Tr. at 298:18-301:21, 301:5-7.) Indeed, Nikon engineer Shinsuke Sanbongi stated that Nikon allows residual image charges to be higher than the noise floor because "even if the photodiode is not completely empty, you can still get a good quality image." (Dec. 10, 2018 P.M. Trial Tr. at 81:12-82:2.) Based on this undisputed evidence that residual image charges above the noise floor can remain in the photodiodes, Plaintiffs cannot prove that the photodiodes become fully depleted.

Fifth, Plaintiffs failed to prove that the Aptina image sensors perform any of the claimed steps of Claims 1-3, because Plaintiffs did not show any timing charts illustrating how these sensors operate. (Dec. 11, 2018 A.M. Trial Tr. at 848:2-849:20; *see also* ECF No. 480 at 21-22.) Lastly, Plaintiffs failed to introduce any evidence of use of the claimed method, which forecloses both direct and indirect infringement of Claims 1-3.

Accordingly, judgment as a matter of law of no infringement of Claims 1-3 is appropriate.

## IX.   PLAINTIFFS FAILED TO PROVE INFRINGEMENT OF CLAIM 1 OF THE '312 PATENT

Plaintiffs have admitted that the D4, which is representative of the D4S and Df, does not literally infringe Claim 1 of the '312 Patent. (Dec. 6, 2018 A.M. Trial Tr. at 380:7-14; *see also* ECF No. 480 at 22-23.) Thus, Plaintiffs must prove infringement under DoE. However, that theory is unavailable to Plaintiffs due to prosecution history estoppel.

During the prosecution of the '312 Patent, the applicants amended pending Claim 1 to recite "the sensing node of the unit pixel in a *previous* scan line is selectively shared with a sensing node of a unit pixel in a *current* scan line in response to a line select signal of the current line." (JTX-0007 at 114 (emphases in

original).)  The amendment was made to distinguish the alleged invention from Published U.S. Patent Application No. 2005/01 10884 by Altice, Jr. ("Altice"), which, according to the applicants, did not disclose selective sharing of the floating diffusion node or such sharing based on a line select signal.  (*Id.*)  Also, the applicants made specific arguments to overcome the prior art based by asserting that the claims recite a previous scan line.  (*Id.*)  Because the applicants narrowed the scope of their alleged invention to overcome the patent examiner's rejection, prosecution history estoppel applies.  *See Festo Corp. V. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 736 (2002), aff'd, 493 F.3d 1368 (Fed. Cir. 2007)

Even if Plaintiffs can pursue DoE, Plaintiffs failed to carry their burden to show that the D4 infringes Claim 1 under DoE.  First, the D4 does not include "a line select signal" that causes selective sharing of a sensing node in a current scan line and a sensing node in a previous scan line under the proper construction of "line select signal."  (Dec. 11, 2018 A.M. Trial Tr. at 864:7-874:14.)  As the applicants represented to the patent examiner during the prosecution of the '312 Patent, "line select signal" means "the signal that selects the current scan line." (JTX-0007 at 116; Dec. 11,2018 A.M. Trial Tr. at 873:5-14.)  In comparison, the accused products (such as the D4) use two separate independent control signals to control the floating-diffusion switch and the select transistor.  They do not achieve the floating diffusion switching function in a substantially the same way to achieve substantially the same result as the '312 Patent.  (Dec. 6, 2018 P.M. Trial Tr. at 371:22-372:5; Dec. 11, 2018 A.M. Trial Tr. 874:2-14.)  Also, the D4 does not share sensing nodes between a current and a previous scan line.  The claimed sharing of sensing nodes between a current and a previous scan line is not equivalent to sharing sensing nodes between a current and next scan line as in the accused products.  (Dec. 6, 2018 P.M. Trial Tr. at 367:21-369:2; Dec. 11, 2018 A.M. Trial Tr. at 870:4-871:13.)  Thus, Plaintiffs have not sufficiently identified insubstantial

1  difference between the claimed elements and the accused products.  Therefore, no

2  reasonable jury can find that the accused products infringe by DoE.

3      Accordingly, Defendants are entitled to judgment as a matter of law of no

4  infringement of Claim 1.

## X.   PLAINTIFFS FAILED TO PROVE INFRINGEMENT OF CLAIM 7 OF THE '017 PATENT

7      Plaintiffs failed to prove at least the following limitation of Claim 7: "a

8  switching device configured to interconnect a first sensing node of a first sensing

9  pixel to a second sensing node of a second sensing pixel in response to a select

10  signal . . . ."   No literal infringement exists under the proper construction of "select

11  signal" because the D4's floating diffusion switch is not controlled by the "select

12  signal" (SEL signal).  Rather, it is controlled by a separate, floating diffusion switch

13  signal (FDSW signal).  (Dec. 6, 2018 P.M. Trial Tr. 361:18-23.)   Also, as

14  discussed above, prosecution history estoppel precludes any application of DoE.

15  Even if DoE is available, the D4 does not infringe Claim 7 of the '017 Patent for

16  the same reason as it does not infringe Claim 1 of the '312 Patent (*i.e.*, no "line

17  select signal" or "select signal").  (Dec. 11, 2018 A.M. Trial Tr. 874:19-875:9.)

18  Accordingly, judgment as a matter of law of no infringement of Claim 7 is

19  appropriate.

## XI.   PLAINTIFFS FAILED TO PROVE INFRINGEMENT OF CLAIM 30 OF THE '574 PATENT

22      Plaintiffs failed to prove at least the following limitation of Claim 30:

23  "generate . . . an output signal that is indicative of the photocharge generated at the

24  first pixel."  Dr. Subramanian opined that a pixel in the accused products has two

25  photodiodes.  (Dec. 6, 2018 P.M. at 386:19-387:21, 388:16-389:1; Dec. 11, 2018

26  A.M. Trial Tr. 875:24-876:1.)  But he never presented any evidence that the

27  accused products "generate . . . an output signal that is indicative of the photocharge

28  generated at" both photodiodes at that same pixel.  (*Id.*)  In fact, an output signal

indicative of photocharges from two photodiodes would result in an unusable image because it would require mixing photocharges for two different colors (*e.g.*, red, blue, and/or green).  (Dec. 11, 2018 A.M. Trial Tr. 876:17-877:17.)  Thus, the accused products do not and cannot output such signal.  (*Id.*)  Accordingly, Defendants are entitled to judgment as a matter of law of no infringement of Claim 30.

## XII.  PLAINTIFFS FAILED TO PROVE DIRECT INFRINGEMENT BY NIKON CORP.

Plaintiffs bear the burden of proving patent infringement.  *Creative Compounds, LLC v. Starmark Labs.*, 651 F.3d 1303, 1314 (Fed. Cir. 2011).  Direct infringement requires proof that Nikon "makes, uses, offers to sell, or sells [the accused products], within the United States or imports into the United States . . ." 35 U.S.C. § 271(a).

Here, Plaintiffs introduced no evidence during their case-in-chief that Nikon Corp., a Japanese entity, performs any act of direct infringement in the U.S.  The unrebutted testimony of Nikon's corporate representatives Messrs. Naoki Kitaoka and Bryan J. Vannatter show that Nikon Corp. does not make, use, offer to sell, or sell any accused products in the U.S. and does not import any accused products into the U.S.  (Dec. 8, 2018 P.M. Trial Tr. at 647:10-649:20; Dec. 11, 2018 A.M. Trial Tr. at 902:24-904:4.)  Thus, judgment as a matter of law of no direct infringement as to Nikon Corp. is appropriate.

## XIII.  PLAINTIFFS FAILED TO PROVE INDUCED INFRINGEMENT BY EITHER NIKON CORP. OR NIKON INC.

As discussed in Defendants' first JMOL motion, Plaintiffs have not proven induced infringement by either Nikon Corp. or Nikon Inc.  (ECF No. 480 at 19-20.) No evidence shows that Nikon "knew or should have known his actions would induce actual infringement . . . ."  *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1304 (Fed. Cir. 2006) (*en banc* in relevant part).  Nikon Inc.'s corporate

1   representative Mr. Vannatter testified he was not aware of the prior assignees of the

2   Asserted Patents ever notifying Nikon Inc., the only Nikon defendant selling the

3   Accused Products in the U.S., that it was infringing any of the patents they owned

4   at the time and/or any of the Asserted Patents.  (Dec. 11, 2018 P.M. Trial Tr.

5   937:10-25.)  Mr. Vannatter also testified he was not aware of Nikon Inc. ever

6   encouraging customers to infringe the patent of another company.  (*Id.* at 937:7-9.)

7   As explained in the previous section, Plaintiffs cannot even show that Nikon Corp.

8   directly infringed any of the Asserted Patents in the U.S.  Because no reasonable

9   jury can conclude the Nikon defendants actively encouraged customers to infringe

10  the Asserted Patents after learning of the patents, judgment as a matter of law of no

11  induced infringement for both Nikon Corp. and Nikon Inc. is appropriate.

12
13
### XIV.  PLAINTIFFS FAILED TO PROVE CONTRIBUTORY INFRINGEMENT BY EITHER NIKON CORP. OR NIKON INC.

14          Again, as discussed in Defendants' first JMOL motion, Plaintiffs have not

15  proven contributory infringement by either Nikon Corp. or Nikon Inc.  (ECF No.

16  480 at 20-21.)  Plaintiffs failed to prove: (1) the underlying direct infringement,

17  because Plaintiffs have no evidence that Nikon Corp. performs acts of infringement

18  in the United States; (2) Nikon Inc.'s knowledge of any of the Asserted Patents; (3)

19  that there are no substantial non-infringing uses for the Nikon products (which they

20  cannot, because the sensing nodes are only shared in ISO modes below 200 in the

21  cameras accused of infringing the '312, '017, and '574 Patents, and the accused

22  cameras accused of infringing the '163 Patent have numerous modes other than the

23  accused Face Priority Auto Focus mode); and (4) the accused products are not

24  components.  Because no reasonable jury can conclude the Nikon defendants

25  contributed to infringement, judgment as a matter of law of no contributory

26  infringement for both Nikon Corp. and Nikon Inc. is appropriate.

27
28

## XV.   PLAINTIFFS FAILED TO PROVE WILLFUL INFRINGEMENT BY EITHER NIKON CORP. OR NIKON INC.

As discussed in Defendants' first JMOL motion, Plaintiffs failed to prove that Nikon willfully infringed any of the Asserted Patents.  (ECF No. 480 at 21-23.)  In *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923 (2016), the Supreme Court instructed that willful infringement is "a 'punitive' or 'vindictive' sanction" that is "reserved for egregious cases of culpable behavior." *Id*. at 1932-35.  In order to be liable for willful infringement, pursuant to 35 U.S.C. § 284, the infringing conduct must be "willful, wanton, malicious, [in] bad-faith, deliberate, consciously wrongful [or] flagrant . . . ." *Id*. at 1932.

Plaintiffs have not offered any evidence showing that Nikon's conduct rises even close to the level of "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful [or] flagrant" conduct required by *Halo*.  Because the evidence demonstrated the opposite—namely that Nikon Inc. had no pre-suit knowledge of any of the asserted patents and that Nikon Corp.'s pre-suit conduct with respect to the asserted patents was in no way indicative of culpable behavior, judgment as a matter of law of no willfulness as well as no enhanced damages for both Nikon Corp. and Nikon Inc. is appropriate.

## XVI.   PLAINTIFFS FAILED TO PROVE WILLFUL BLINDNESS BY EITHER NIKON CORP. OR NIKON INC.

As discussed in Defendants' first JMOL motion, Plaintiffs failed to prove that Nikon was willfully blind.  (ECF No. 480 at 23-24.)  Willful blindness requires a defendant to take "deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011).  There is zero evidence that Nikon knew of a risk of wrongdoing or took deliberate actions to avoid learning of such risk.  Here, Nikon did not even have access to the source code for Omron's face detection software and hardware, which was produced under

1   a strict protective order in this case.  (Dec. 11, 2018, P.M. Trial Tr. at 722:21-

2   723:5.)  Given that Omron's face detection technology has now become "almost an

3   industry standard," Nikon had a reasonable belief that there would be no risk of

4   wrongdoing by using the technology.  (Dec. 8, 2018 P.M. 683:24-684:9.)  Because

5   Plaintiffs cannot meet the high burden for establishing willful blindness, the Court

6   should enter judgment as a matter of law in Nikon's favor on willful blindness.

7   *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 824 F.3d 1344, 1352 (Fed. Cir. 2016).

### XVII. DEFENDANTS HAVE SHOWN THAT CLAIM 16 OF THE '163 PATENT IS INVALID

10      Defendants have proven that the Yow 1997 paper entitled "Feature-based

11   Human Face Detection" (JTX-1908) and the Yow 1998 thesis (JTX-1909)

12   independently anticipate and render obvious Claim 16 of the '163 Patent.  (Dec.

13   10, 2018 P.M. Trial Tr. 723:8-741:7.)

14      The Yow 1997 paper was published before January 11, 1999, the filing date

15   of the '163 patent, and therefore is prior art.  (Dec. 10, 2018 P.M. Trial Tr. 724:24-

16   25.)  Like the '163 Patent, the Yow 1997 paper discloses a two-stage pre-filtering

17   process, where the first stage (*i.e.*, matched band pass filter) includes a linear

18   correlation and the second stage (*i.e.*, edge detector) includes non-linear gray scale

19   analysis, to identify regions where a face detector should be applied.  (*Id.* at 725:2-

20   8.)  And, the Yow 1997 explains that the pre-filtering process is followed by a face

21   detector.  (*Id.* at 725:9-15.)  Defendants expert Dr. Darrell explained in detail how

22   the Yow 1997 paper discloses each and every limitation of Claim 16.  (*Id.* at 726:3-

23   733:20.).  For example, the Yow 1997 paper discloses a "correlation image," and a

24   person of ordinary skill in the art would have understood that the "response" in the

25   Yow 1997 paper refers to such correlation image.  (*Id.* at 728:8-15.)  Dr. Darrell

26   also explained that it would have been obvious to one of ordinary skill in the art to

27   replace one of the claimed elements with what they had known already, such as a

28   slightly different filter for the first stage. (*Id.* at 733:7-20.)  Thus, Defendants have

1    shown that the Yow 1997 paper renders Claim 16 invalid.

2         Also, the Yow 1998 thesis is prior art because it was approved by the

3    University of Cambridge on March 17, 1998, and the University's Reporter dated

4    April 22, 1998, shows that the thesis was deposited in the university library.  (*Id.* at

5    733:22-736:1.)  Dr. Darrell described how the Yow 1998 thesis discloses and

6    renders obvious each and every element of Claim 16, including the first filtering

7    means, second filtering means, and face detector.  (*Id.* at 736:7-741:7.)  For

8    example, he explained that the Yow 1998 thesis discusses the use of "elongated

9    Gaussian derivative filters to detect facial features such as eyebrows, eyes, nose and

10   mouth," and that this corresponds to a "reference image pattern representative of a

11   target image pattern."  (*Id.* 737:11-16 & 739:16-23.)  Thus, Defendants have shown

12   that the Yow 1998 thesis also renders Claim 16 invalid.

13        Based on either of these two references, Defendants are entitled to a

14   judgement as a matter of law that Claim 16 is invalid.

15   **XVIII.    DEFENDANTS HAVE SHOWN THAT CLAIMS 1-3 OF**
     **THE '335 PATENT IS INVALID**
16

17        Defendants have proven that claims 1-3 of the '335 Patent are obvious in

18   view of U.S. Patent 5,955,753 ("Takahashi"; JTX-2049) and applicants' admitted

19   prior art.  (Dec. 11, 2018 A.M. Trial Tr. at 850:11-862:23.)   Takahashi is prior art

20   to the '335 Patent.  (*Id.* at 850:23-851:7; *compare* JTX-2049 *with* JTX-0003.)

21        Defendants' expert Dr. Stuart Kleinfelder discussed in detail how Takahashi

22   discloses the same pixel layout as the preamble of Claim 1 and the method steps (b)

23   through (f) of Claim 1.  (*Id.* at 854:21-855:15; 856:17-859:17.)  He further noted

24   that the applicants' admitted prior art discloses the full depletion step in step (a) of

25   Claim 1.  (*Id.* at 852:24-854:2.)  And he explained that a person of ordinary skill

26   would have been motivated to incorporate the full depletion step into Takahashi so

27   that residual charges remaining on the photodiodes are erased and will not corrupt

28   the next picture.  (*Id.* at 855:21-856:16.)  Dr. Kleinfelder also explained that Claims

2 and 3 of the '335 Patent are disclosed in Takahashi and the applicants' admitted prior art.  (*Id.* at 859:23-861:21.)  Thus, the Court should enter judgment as a matter of law that Claims 1-3 of the '335 Patent are invalid.

### XIX.   DEFENDANTS HAVE SHOWN THAT CLAIM 1 OF THE '312 PATENT, CLAIM 7 OF THE '017 PATENT, AND CLAIM 30 OF THE '574 PATENT ARE INVALID

Defendants have proven that Claim 1 of the '312 Patent, Claim 7 of the '017 Patent, and Claim 30 of the '574 Patent are invalid for lack of written description. (Dec. 11, 2018 P.M. Trial Tr. at 957:10-969:24.)

A patent's specification must contain a written description of the claimed subject matter to objectively demonstrate to a person of skill in the art that the applicant actually invented or possessed, the claimed subject matter at the patent application's filing.  *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1352 (Fed. Cir. 2010).  Under the Court's claim construction, the term "unit pixel" in the '312 Patent, "sensing pixel" in the '017 Patent, and  the terms "first pixel" and "second pixel" in the '574 Patent encompass one or more photodiodes rather than just a single photodiode.  (3221 ECF No. 438.)

However, the applications that led to the issuance of these three patents provide no support for the use of one *or more* photodiodes per pixel.   As this Court previously stated, "an embodiment with multiple photodiodes in a unit pixel is not hinted at or suggested anywhere in the specification." (3221 ECF No. 438 at 3-4.) For example, Defendants' expert Thomas Cunningham explained in detail that Figures 2 and 4 only disclose a pixel with one photodiode. (Dec. 11, 2018 P.M. Trial Tr. at 960:3-962:3.)

Moreover, the claims of the '312 Patent as originally filed on January 31, 2006 did not cover a multi-photodiode pixel.  For example, Claim 1 recited "a photocharge generation means for generating photocharges by absorbing an external light."  (JTX-0007 at 18.)  Because this is a means-plus-function limitation, the scope of Claim 1 was limited to the disclosed single-photodiode

1    pixel structure.  (Dec. 11, 2018 P.M. Trial Tr. at 962:4-963:9.)  Similarly, Claim 7,

2    another independent claim, recited "a photocharge generation means for generating

3    photocharges" which also corresponded to a single photodiode pixel structure.  (*Id.*

4    at 963:10-24; JTX-0007 at 19-21.)  Claim 14 further clarified that the "photocharge

5    generation means is a photodiode."  (*Id.*)  Thus, the originally filed claims only

6    included one photodiode per pixel. (*Id.* at 965:12-14.)  The same is true for the '312

7    Patent for which the applicant submitted the same signed declaration, and the '574

8    Patent for which the applicant refused to execute the oath for declaration.  (*Id.* at

9    965:15-969:25.)

10       A person of ordinary skill in the art would not have found that the named

11   inventor possessed the concept of a multi-photodiode structure at the time the

12   patents were filed.  Accordingly, Defendants are entitled to a judgment as a matter

13   of law that Claim 1 of the'312 Patent, Claim 7 of the '017 Patent, and Claim 30 of

14   the '574 Patent are invalid for lack of written description.

## XX.   PLAINTIFFS FAILED TO PROVE ANY SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS

17       Plaintiffs failed to prove any secondary considerations of non-obviousness

18   that would be relevant to the obviousness analysis for the Asserted Patents.

19   Plaintiffs did not introduce any evidence of:  industry praise; commercial success

20   tied to the accused functionalities; long-felt need for the accused functionalities;

21   failure of others; unexpected results; copying by others; licensing to third parties

22   (except for the license-back to HP for the '163 Patent); and skepticism from the

23   industry that other data could be added to a single still image.  (*See, e.g.*, Dec. 10,

24   2018 P.M. Trial Tr. 741:8-742:5; Dec. 11, 2018 A.M. Trial Tr. 862:2-15.)  In

25   particular, the Nikon products' commercial success has nothing to do with the

26   accused features.  Instead, customers of Nikon products look for the brand name,

27   which stands for high optical performance, image quality, and reliability.  (Dec. 7,

28   2018 P.M. Trial Tr. 649:12-651:24; *see also* Dec. 11, 2018 P.M. 902:1-5.)

Therefore, the Court should enter judgment as a matter of law that there are no secondary considerations of non-obviousness to consider in analyzing obviousness of the asserted claims of the Asserted Patents.

## XXI.  PLAINTIFFS FAILED TO PROVE THAT THEY ARE ENTITLED TO DAMAGES

As discussed in Defendants' first JMOL motion, even if the jury finds infringement of a valid patent, Plaintiffs failed to present a legally sound basis for the jury to award reasonable royalty damages.  (ECF No. 480 at 24-25.)  Although there is a presumption of damages when infringement is proven, "[t]he patentee must . . . prove the amount of damage."  *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co., Harris Press & Shear Div.*, 895 F.2d 1403, 1406 (Fed. Cir. 1990).  "The reasonably royalty analysis involves an approximation of the market as it would have hypothetically developed, and this, 'in turn, requires *sound economic and factual predicates*.'"  *Boston Scientific Corp. v. Johnson & Johnson*, 550 F. Supp. 2d 1102, 1120 (N.D. Cal. 2008) (citation omitted).  Indeed, "[t]he district court's obligation to award some amount of damages 'does not mean that a patentee who puts on little or no satisfactory evidence of a reasonable royalty can successfully appeal on the ground that the amount awarded by the court is not 'reasonable' and therefore contravenes section 284.'"  *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1382 (Fed. Cir. 2003) (quoting *Lindemann*, 895 F.2d at 1407).  "Where the record lacks any evidence of a reasonable royalty rate, the Federal Circuit has approved of awarding 'zero damages' because the statute 35 U.S.C. § 284 requires the award of a reasonable royalty, but to argue that this requirement exists even in the absence of any evidence from which a court may derive a reasonable royalty goes beyond the possible meaning of the statute."  *Boston Scientific Corp.*, 550 F. Supp. 2d at 1120 (quoting *Lindemann*, 895 F. 2d at 1407) (quotation marks omitted).

Here, Plaintiffs' damages expert Dr. McDuff presented damages theories that

are entirely unsupported by the record or are contrary to well-established law. First, Dr. McDuff presented a summary of the royalties he calculated, but the Court did not allow into evidence, as hearsay and Federal Rule of Evidence 403, his methodology for how he calculated these royalties over time by type of accused product. (Dec. 6, 2018 P.M. Trial Tr. at 433:2-18.) Likewise, the Court did not allow into evidence his royalty calculations by Asserted Patents and specifically for the '163 Patent by type of accused camera. (Dec. 7, 2018 A.M. Trial Tr. at 487:17-488:10.) Second, although Dr. McDuff allegedly analyzed Nikon's accused product sales under *Georgia-Pacific* factors 8 and 11, the Court did not allow into evidence, for the same above reasons, the purported revenues, units, and gross profits of Nikon compact, mirrorless, and DSLR cameras that Dr. McDuff compiled. (Dec. 6, 2018 P.M. Trial Tr. at 438:20-439:10.) Third, even though Plaintiffs and Dr. McDuff provide no evidence that lens sales are driven by, or functionally related to, any accused functionality as required by law, Dr. McDuff improperly included "lens adjustment" to Plaintiffs' initial royalty rates due to Plaintiffs' claim that Nikon's lens sales are relevant to damages. *Juicy Whip, Inc. v. Orange Bang, Inc.*, 382 F.3d 1367, 1371 (Fed. Cir. 2004).

Dr. McDuff admits that he "used Nikon financial data to summarize the royalty base" used to calculate the ultimate royalty amount from the hypothetical negotiation. (Dec. 7, 2018 A.M. Trial Tr. at 487:17-488:3.) However, the underlying "Nikon financial data" and methodologies for calculating the ultimate royalty amount are not in evidence. Plaintiffs' failure to provide any evidentiary support for their damages amount is fatal and not sufficient to sustain an award of damages. And it "cannot help but skew the damages horizon for the jury . . . ." *Uniloc USA, Inc. v. Microsoft Corp*., 632 F.3d 1292, 1320 (Fed. Cir. 2011) (granting a new trial after plaintiff's expert presented damages numbers to the jury that were based on legally flawed theories because of inaccurate numbers). Because of fundamental defects in Plaintiffs' reasonable royalty, the Court should

Case No. 2:17-cv-07083 RGK (MRWx)
Defs.' Mot. For JMOL (Close of All Evidence)
la-1404788

18

1    grant judgment as a matter of law on damages.

2         Alternatively, if the jury finds infringement of a valid patent and the Court

3    does find that the Plaintiffs should be awarded reasonable royalty damages,

4    Plaintiffs' proposed royalty amount from the hypothetical negotiation is improperly

5    calculated and should not be followed.  Critically, Dr. McDuff ignored the most

6    reliable, objective evidence of the fair market value of the hypothetical license at

7    issue:  the actual sale prices that Plaintiffs paid IV and HP for their respective

8    patent portfolios.  In this case, Plaintiffs are asking the jury for nearly $24 million

9    to compensate for Nikon's alleged infringement of five patents that Plaintiffs

10   acquired from third parties years prior to Plaintiffs filing the Complaint in this case.

11   However, Plaintiffs paid only a small portion of their claimed damages amount

12   when acquiring the asserted patents, which were among more than two dozen

13   patents and patent applications that Plaintiffs acquired in those sales.  The facts

14   surrounding Plaintiffs' purchase of those patents and patent applications are highly

15   relevant to the jury's determination of a reasonable royalty, but Dr. McDuff chose

16   to ignore and/or mischaracterize them. *See Robocast, Inc. v. Microsoft Corp.*, No.

17   10-1055-RGA, 2014 WL 202399, at *2 (D. Del. Jan. 16, 2014) (finding that the

18   sale of comparable patents "serves as a relevant data point in determining the value

19   which the parties to the hypothetical negotiation would place on technologically

20   similar patents").  As such, Dr. McDuff's determination of the royalty amount lacks

21   one of the most highly relevant data points and is therefore flawed.

22        In direct contrast, Nikon's damages expert Ms. Julie Davis accurately

23   calculated a royalty amount that accounts for the most relevant factors determining

24   the fair market value of the hypothetical license.  Plaintiffs paid $5.2 million to HP

25   for fourteen patents and patent applications, including the '163 patent.  (Dec. 11,

26   2018 P.M. Trial Tr. at 991:12-22.)  Ms. Davis presented evidence from the

27   deposition of HP's corporate representative Ariel Reich that HP did not

28   "distinguish among the patents" in response to a question about whether "each

patent had the same value." (*Id.* at 994:17-995:5.)  Moreover, Dr. Andreas Zeiler, the Vice President of Intellectual Property at Plaintiffs' affiliate who played a central role in acquiring each of the asserted patents agreed with HP's calculation. Particularly, Dr. Zeiler testified at trial by deposition that Plaintiffs also had divided these patents equally by "simply divid[ing] the total amount we paid by the number of patents we acquired." (*Id.* at 997:5-15.)  Despite Dr. McDuff's assertion that HP was unaware of Nikon at the time of sale to Plaintiffs and would have demanded far more from Nikon in a hypothetical negotiation, the HP sales agreement actually listed Nikon in a special category—an unlicensed designated company. (*Id.* at 993:15-22, 994:3-9.)  Thus, Ms. Davis concluded that in the hypothetical negotiation between HP and Nikon, the royalty amount should be calculated as both HP and Plaintiffs had calculated it—by dividing the HP patents equally, which results in ~$370,000 for the '163 patent. (*Id.* at 999:19-25.)

Next, Ms. Davis presented evidence that Plaintiffs paid $4 million to IV for sixteen patents and patent applications, including the '335, '312, and '017 patents, and the patent application leading to the '574 patent. (*Id.* at 997:5-15.)  Like the purchase of the HP patents, Dr. Zeiler confirmed that Plaintiffs divided the value of the IV patents equally. (*Id.* at 1003:13-17.)  Ms. Davis even presented evidence from IV documents that indicated IV's belief that the '335 and '312 patents were worth $100,000 *or less*. (*Id.* at 1002:10-17.)  Despite Dr. McDuff's assertion that IV was unaware of Nikon at the time of sale to Plaintiffs and would actually demand far more from Nikon in a hypothetical negotiation, Ms. Davis testified that IV was actually in litigation at the time with Nikon and had asserted *other* image sensor patents before the parties settled and agreed to a license where IV licensed over 20,000 patents for about $600 per patent. (*Id.* at 1004:24-1005:25.)  Thus, Ms. Davis determined that the royalty amount should be calculated as Plaintiffs and other third parties had calculated it—by dividing the IV patents, which results in ~$250,000 for each of the '335, '312, and '017 patents, and the patent application

1  leading to the '574 patent.  (*Id.* at 1006:1-5.)

2      In sum, Ms. Davis properly concluded that the damages should be measured

3  as a reasonably royalty that would be a lump sum on a per patent basis as indicated

4  above, *i.e.*, $1.37 million total.  Because Dr. McDuff's analysis is fundamentally

5  flawed, Ms. Davis's analysis should be followed.

6  ## XXII. DEFENDANTS HAVE SHOWN THAT SONY IMAGE SENSORS ARE LICENSED

7

8      Nikon has proven that Sony image sensors, which are incorporated in certain

9  Accused Products, cannot infringe the '335 Patent because Sony Corporation has an

10  express license to make and sell products and technologies that practice the '335

11  Patent.  Infringement results when someone "*without authority* makes, uses, offers

12  to sell, or sells any patented invention." 35 U.S.C. § 271 (emphasis added).

13  Because a patent license grants authority to practice a claimed invention, it operates

14  as a "complete defense to an action for infringement." *Anthony Co. v. Perfection*

15  *Steel Body Co.*, 315 F.2d 138, 141 (6th Cir. 1963).

16      There is no dispute that in 2010, Sony Corporation of America and its

17  affiliates, including Sony Corporation, obtained a patent license from an affiliate of

18  IV to patents and patent applications that it purchased from MagnaChip, including

19  the '335 patent.  (*See, e.g.*, JTX-0383, JTX-0385, JTX-0387, JTX-0388.)  The

20  terms of that patent license agreement expressly granted a license to those patents

21  and patent applications, including the '335 Patent "to make (including the right to

22  practice methods, processes and procedures), have made (subject to Section 2(c)),

23  use, sell, offer for sale, import, and otherwise distribute and dispose of Licensed

24  Offerings during the Term." (JTX-0385 at 3.)  "'Licensed Offerings' means

25  products, services, or technologies made, used, imported, offered for sale, sold,

26  distributed or otherwise disposed of during the Term hereof, by Subscriber and/or a

27  Subscriber Affiliate that in the absence of this Agreement would infringe, whether

28  directly or through inducement of or contribution to infringement by another, at

1    least one valid and enforceable claim of a Patent . . . ." (*Id.* at 2.)

2         Although Plaintiffs argue otherwise, Sony image sensors incorporated in

3    Nikon cameras do not fall under the "No Foundry Rights" provision of the license

4    agreement, which excludes from the definition of Licensed Offerings "any products

5    . . . manufactured, produced or provided by Subscriber (or its Affiliate) on behalf of

6    a third party (A) from designs received in a substantially completed form from that

7    third party . . . ." (*Id.* at 4.)  Particularly, Nikon established that Nikon does *not*

8    provide Sony with image sensor designs "in a substantially completed form" as

9    defined in the provision for the excluded "foundry or contract manufacturing

10   activities." (*Id.*)  Mr. Shinsuke Sanbongi, who is a manager in Nikon's department

11   responsible for image sensor development, testified that Nikon provides

12   specifications to Sony Corporation with requirements like the number of pixels and

13   quality of the outputted images, but that Sony Corporation designs the internal

14   circuitry and pixel layout of these image sensors without any instruction from

15   Nikon.  (Dec. 10, 2018 P.M. Trial Tr. at 783:7-784:15.)  Indeed, Mr. Peter Toto,

16   Sony Corporation of America's corporate representative, testified that Sony

17   Corporation or another affiliate "do all or substantially all of the semiconductor

18   design, including image sensor design" in response to a question about Sony's sale

19   of image sensors to Nikon.  (JTX-2239 at 71:15-72:01.)  Plaintiffs, including Dr.

20   Carley, cannot dispute these facts.[1]

21        Because the "No Foundry Rights" provision does not apply, Sony image

22   sensors are undoubtedly "Licensed Offerings."  Assuming that Sony image sensors

23   infringe the '335 Patent (they do not), Sony image sensors constitute products or

24   _____

         [1] The Nikon image sensor article from a third party author Mr. David
25   Etchells does not change these facts.  In fact, Mr. Etchells testified that after the
     publication of the article, he realized that he was unsure about the word "design,"
26   did not know if Nikon actually designs the internal circuitry of image sensors, and
     had not seen anything or learned from Nikon whether Nikon does so.  (Dec. 7, 2018
27   A.M. Trial Tr. at 546:22-547:12; 556:10-14.)

28

1   technologies that were made and sold by Sony Corporation, and would infringe

2   directly and indirectly in the absence of the license.  Under the ordinary and usual

3   meaning of the license agreement's terms, the Sony image sensors qualify as

4   "Licensed Offerings," and therefore their operation cannot result in infringement.

5       Mr. Toto confirmed the Sony affiliates' license to the '335 Patent via

6   undisputed testimony by deposition.  Particularly, he testified that Sony

7   Corporation, Sony Corporation of America, and other affiliates have been licensed

8   to the '335 Patent from at least 2010 to the present, and that Sony understood and

9   believed that the license extended to products made and sold by Sony affiliates,

10  including Sony Corporation.  (*See* JTX-2239 at 29:16-30:02, 30:09-30:15, 32:15-

11  33:04, 33:19-34:09, 38:20-39:07, 43:06-44:01, 44:06, 64:05-64:08.)

12      As a licensee, Sony is authorized to "sell, offer for sale, import, and

13  otherwise distribute and dispose of Licensed Offerings."  (JTX-0385 at 3.)  A

14  licensee's sale of a licensed product exhausts all of the patentee's rights in that

15  product.  *Impression Prods., Inc. v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523, 1535

16  (2017); *see also Quanta Computer, Inc. v. L.G. Elecs., Inc.*, 533 U.S. 617, 628–630

17  (2008).  "The purchaser and all subsequent owners are free to use or resell the

18  product just like any other item of personal property, without fear of an

19  infringement lawsuit."  *Impression Prods.*, 137 S. Ct. at 1529.  Here, Nikon is and

20  was free to purchase Sony's licensed image sensors, incorporate them into its

21  cameras, and then sell its cameras to consumers who can use the products, all

22  without fear of an infringement lawsuit from the patent owner.  Because no jury

23  could find that Sony image sensors are not licensed as to the '335 Patent, the Court

24  should grant judgment as a matter of law for Nikon cameras accused of infringing

25  the '335 Patent.

26  **XXIII.   CONCLUSION**

27      For the foregoing reasons, Nikon requests that the Court grant judgment as a

28  matter of law in favor of Nikon.

1

2   Dated:          December 13, 2018        Respectfully submitted,

3                                           JACK LONDEN
                                            VINCENT J. BELUSKO
4                                           MORRISON & FOERSTER LLP

5

6                                           By:  */s/ Vincent J. Belusko*
                                                 Vincent J. Belusko
7
                                            Attorneys for Defendants
8                                           NIKON CORPORATION;
                                            AND NIKON INC.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28