UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

CARL ZEISS AG, et al.,          )
                                )
            Plaintiffs,         )
                                )
        vs.                     )
                                )   2:17-CV-7083-RGK
Nikon Corporation, et al.,      )
                                )
            Defendants          )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

PM SESSION

Los Angeles, California

Monday, December 10, 2018

_____

AMY DIAZ, RPR, CRR, FCRR
Federal Official Reporter
350 West 1st Street, #4455
Los Angeles, CA 90012

*Please order court transcripts here:  www.amydiazfedreporter.com*

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

```
 1        APPEARANCES OF COUNSEL:

 2
          For the Plaintiffs:
 3

 4                    FISH & RICHARDSON P.C.
                      By:  Christopher S. Marchese, Attorney at Law
 5                    633 West Fifth Street, 2th Floor
                      Los Angeles, California 90071
 6
                      FISH & RICHARDSON P.C.
 7                    By:  Kurt L. Glitzenstein, Attorney at Law
                      One Marina Drive
 8                    Boston, Massachusetts 02210-1878

 9                    FISH & RICHARDSON P.C.
                      By:  Jennifer Huang, Attorney at Law
10                    60 South Sixth Street
                      Minneapolis, Minnesota 55402
11

12
          For the Defendants:
13
                      MORRISON & FOERSTER LLP
14                    By:  Vincent J. Belusko, Attorney at Law
                      707 Wilshire Boulevard
15                    Los Angeles, California 90017-3543

16                    MORRISON & FOERSTER LLP
                      By:   Diana B. Kruze, Attorney at Law
17                    425 Market Street, 32nd Floor
                      San Francisco, California 94105-2482
18
                      MORRISON & FOERSTER LLP
19                    By:  Hector G. Gallegos, Attorney at Law
                      2000 Pennsylvania Avenue NW, Suite 6000
20                    Washington, D.C. 20006-1888

21

22

23

24

25
```

DARRELL - DIRECT

1            THE COURT:  The record will reflect that all the

2    jurors are in their respective seats in the jury box, the

3    witness is on the witness stand.  Great today, everyone here

4    on time, ready to go, and we will have the afternoon session.

5    Right around 4:00 we will be excusing you, so I appreciate

6    your timeliness in this.

7            Counsel.

8            Remember you are under oath, sir.

9            MR. GALLEGOS:  Good afternoon, Your Honor.  If I

10   may, I would like to start with a housekeeping matter.  So on

11   Friday, Dr. Darrell discussed excerpts from JTX1623, and in

12   particular, pages 6, 7, 27 through 30, 353, 434 through 436,

13   609, 610, 612, 621, 623, 624, 629 through 633, 638, 639, 642

14   through 645, 1269 through 1272, 1276 through 1278, 1280,

15   1281, 1647, and 1648.

16           I would like to move these pages into the record,

17   and defendants would like to mark this as JTX1623D.

18           (Thereupon, Exhibit Number JTX1623D was received in

19   evidence.)

20           THE COURT:  Okay.  They will be received.

21           MR. GALLEGOS:  Thank you, Your Honor.

22           THE COURT:  Before you go ahead.  Sharon?

23           Okay.  You may continue, Counsel.

24                    CONTINUED DIRECT EXAMINATION

25   BY MR. GALLEGOS:

DARRELL - DIRECT

1    Q. Good afternoon, Dr. Darrell.

2    A. Good afternoon.

3    Q. Can we turn now to plaintiff's claim of infringement.

4         MR. GALLEGOS:  And let's display slide 67, which

5    shows the limitations of claims 15 and 16.

6    Q. Dr. Darrell, how does claim 16 relate to claim 15?

7    A. Claim 16 is a dependent claim on independent claim 15.

8         MR. GALLEGOS:  And please advance the slide.

9    Q. So why are words crossed out in these claims in this

10   slide?

11   A. Because these are all the elements of claim 16 and the

12   underlying claim 15 that are required to be there but are

13   missing from the Nikon products.

14   Q. Now, claim 15 recites a first filtering means and a

15   second filtering means.  What types of terms are these?

16   A. These are called "means plus function" terms.

17        MR. GALLEGOS:  So please display slide 69.

18   Q. What is the function recited in the claim that is

19   performed by the first filtering means?

20   A. Well, it's highlighted right there on the slide.  It's

21   kind of in patentese, but I'm just going to read it aloud for

22   the record.  "Identifying a plurality of image regions of

23   said input image that have a likelihood of containing said

24   target image pattern, correlate said input image with a

25   reference image pattern to select said image regions."

DARRELL - DIRECT

1    Q. What is the corresponding structure in the specification?

2    A. A linear matched filter, that is Box 56, as described in

3    the specification at column 7, lines 10 through 21, and 44

4    through 53.

5              MR. GALLEGOS:  Please show slide 70.

6    Q. Under the assumption that the first filtering means is a

7    means plus function term, what did Dr. Mundy identify as the

8    structure?

9    A. The same basically linear matched filter.  That is that

10   Box 56.

11   Q. To be clear, it was a linear matched filter that Dr.

12   Mundy identified, correct?

13   A. That's correct.  I believe Dr. Mundy just said "linear

14   matched filter."

15   Q. Does the linear matched filter in the patent

16   specification include a linear correlator?

17   A. It does.  The linear matched filter includes a linear

18   correlator as an essential step.

19             MR. GALLEGOS:  Please display slide 71.

20   Q. Does the Omron face detection correlate the input image

21   with a reference image pattern to select image regions?

22   A. It does not.

23             MR. GALLEGOS:  Your Honor, I move JTX1655 into

24   evidence.

25             THE COURT:  It will be received.

DARRELL - DIRECT

1          (Thereupon, Exhibit Number JTX1655 was received in

2     evidence.)

3          MR. GALLEGOS:  Please display slide 74.

4     Q. Dr. Darrell, on Friday, you explained why the Omron

5     technique is not linear.  Do the Omron papers further inform

6     your opinion that the accused Omron technique is nonlinear?

7     A. They do.  In addition to everything that we described on

8     Friday, or I discussed on Friday, there is also this lookup

9     table as part of the weak classifier.  And the week

10    classifier -- excuse me -- the lookup table is, itself,

11    nonlinear.

12         And the Omron papers here, the paper shown JTX1655,

13    show clear illustrations of the lookup table.  And this

14    figure shows the output as a function of the input for the

15    lookup table, and it's clearly nonlinear.

16    Q. And so to be clear, is this in addition to the

17    nonlinearity in the granule comparison you discussed last

18    week?

19    A. It is.  The granule comparisons, themselves, are also

20    very nonlinear.

21         MR. GALLEGOS:  So let's put up slide 56, please.

22    A. I apologize, I picked up a cold over the weekend.  So if

23    I sound funny, please bear with me.

24    Q. So Dr. Darrell, what do we see here in the slide?

25    A. This is, again, to review from what I presented on

DARRELL - DIRECT

1    Friday, the granule comparison, where this is very far down

2    in the computation of the Omron algorithm.

3         We're scanning windows to see if there is a face, or

4    not, in a window.  In each window, we run it through a

5    cascade.  The cascade has a series of layers.  Each layer has

6    a series of weak classifiers.  And each weak classifier is a

7    set of these granule tests.  So this is the -- really where

8    the pixels meet the road -- the rubber meets the road, if you

9    will, the granule comparison.

10        And the granule comparison is looking at a box

11   inside of the image region.  Here is a red box and a blue

12   box.  Those are the two granules.  And the comparison is this

13   less-than-or-equal-to operation to say, Is the average value

14   inside the red box less than or equal to the average value

15   inside of the blue box.  And the output of that is a zero or

16   one.  And that is a nonlinear function, because the output is

17   not proportional to the inputs.

18        MR. GALLEGOS:  Can we put up slide 72, please.

19    Q. And can you explain why the granule comparison is

20   nonlinear?

21    A. Because the output is not proportionate to the inputs.

22   As we saw on Friday, and I'm just refreshing here today, if a

23   linear function is one whose output is proportional to the

24   input, and a function that outputs a one, no matter how you

25   vary the inputs for a wide range of inputs, is decidedly

DARRELL - DIRECT

1    nonlinear.

2         So you can see the examples on the slide here.  The

3    less-than-or-equal-to function is a nonlinear function, and a

4    linear correlation step has to have a linear function.

5         MR. GALLEGOS:  Please put up slide 73, please.

6    Q. So in this slide, can you identify the nonlinearities in

7    the weak classifier?

8    A. This is the illustration of the weak classifier.  It's

9    grayed out in the background there.  The weak classifier in

10   this example had five granule tests.  Each one of those

11   granule tests, it has that nonlinearity, so each one of those

12   is nonlinear.

13        Then further, there is a sixth nonlinearity here in

14   the lookup table.  All of those bits from the five

15   less-than-or-equal-to functions form the index for the lookup

16   table.  And that is just, you just -- the index is just an

17   address.  It's like, Go to line 23, and you read off what is

18   line 23.  That is what a lookup table is.  It's no more

19   complicated than that.  And we saw an example of the lookup

20   table in the Omron table about three slides ago.

21        So the lookup table, itself, is nonlinear, in

22   addition to all of the nonlinearities in the granule

23   comparison.

24   Q. Can Omron's weak classifier be equivalent to a linear

25   matched filter?

DARRELL - DIRECT

1      A. No, it cannot.  It does not have the linear correlation

2      step.

3              MR. GALLEGOS:  I move JTX1655, pages 1 and 2, into

4      evidence.

5              THE COURT:  They will be received.

6              (Thereupon, Exhibit Number JTX1655, pages 1-2 was

7      received in evidence.)

8              MR. GALLEGOS:  Please display slide 75.

9      Q. Is there an additional reason why the Omron technique

10     does not meet the first filtering means limitation of claim

11     15?

12     A. Yeah.  It's missing the correlation image that is

13     required, as I discussed on Friday, because of how the

14     applicants distinguished their work from the prior art of

15     Moghaddam and others.  It's required that they actually

16     compute a correlation image.  And the correlation image is

17     not computed by the Omron code.

18             MR. GALLEGOS:  Please display slide 76.

19     Q. Why doesn't the Omron technique derive a correlation

20     image?

21     A. Well, two reasons.  There is a -- the coarse cascade does

22     compute a confidence value.  And whenever the confidence

23     value is above a threshold, at the end of the day, it will

24     record which locations are promising after the coarse

25     cascade.  But that confidence value is not a correlation

DARRELL - DIRECT

1    value, for all of the reasons that I just presented.  Excuse

2    me.

3            And further, there is no two-dimensional image

4    structure.  The only thing that is stored is a list of

5    confidence values.  It's not an image of confidence values.

6    And a confidence value is not a correlation value.  So there

7    is two big reasons why the Omron method does not have a

8    correlation image.

9            MR. GALLEGOS:  Please display slide 79.

10   Q. Dr. Darrell, is there another reason the output of the

11   Omron technique is not equivalent to a correlation image?

12   A. Well, it's not equivalent to a correlation image because

13   it doesn't follow the order of operations that the patent

14   applicants attested that their method requires.

15           The '163 patent has to have, first, the derivation

16   of a correlation image, and then identifying local maxima,

17   followed by selecting candidate regions.  That is the order

18   in which they said it was important to do in order to get

19   around the prior art.  So that is the only thing that their

20   patent can cover.

21           MR. GALLEGOS:  Please display slide 83, please.

22   Q. So let's now move on to the second filtering means.  What

23   is the function recited in claim 15 that is performed by the

24   second filtering means?

25   A. The second filtering means -- again, I'll be reading this

DARRELL - DIRECT

1    into the record.  "The function is screening said image

2    regions to select a candidate region that has a high

3    likelihood of containing said target image pattern, examine a

4    gray scale characteristic of said image regions as a

5    determination factor in selecting said candidate region."

6     Q. What is the corresponding structure in the patent

7    specification?

8     A. The nonlinear filter 66 that performs an algorithm

9    described at column 7, line 64, through column 8, line 7.

10          MR. GALLEGOS:  Please display slide 84.

11     Q. And what did Dr. Mundy identify as the structure for this

12    term?

13     A. Simply nonlinear filter.

14          MR. GALLEGOS:  Please display slide 87.

15     Q. Do you understand Dr. Mundy is asserting, in the Omron

16    technique, the first filtering means is implemented in the

17    coarse search, and the second filtering means is implemented

18    in the fine search?

19     A. I do understand that.

20     Q. What is wrong with that?

21     A. Well, as you can see here, figures that are actually from

22    Dr. Mundy's own opening expert report -- you can see it's

23    cited on the slide of what page numbers -- he shows these two

24    different parts of the patent, one of which is supposed to be

25    a linear matched filter, and the other -- with a linear

DARRELL - DIRECT

1    correlation step, and the other is supposed to be a nonlinear

2    filter.

3            But in his accusation, he points to exactly the same

4    structure that is replicated twice.  He points to the coarse

5    cascade and the fine cascade in the Omron code, which are

6    implemented with exactly the same flow chart and exactly the

7    same code.  And this really doesn't make any sense.  You

8    can't attack the same exact thing and, in one place, when

9    it's convenient, call it a linear correlator, and in the

10   other place, where it's convenient, call it a nonlinear

11   filter.

12   Q. So the record is clear, Dr. Darrell, is it correct that

13   in the Omron technology, the coarse cascade and the fine

14   cascade have the same structure?

15   A. They have the same structure, and they have the same

16   code.

17           MR. GALLEGOS:  Can we put up slides that were

18   discussed with Dr. Mundy on Friday.  These are PDX439 and

19   PDX451.  Can we put them up side by side?

20   Q. What does this show?

21   A. These are slides that -- from Dr. Mundy's own

22   presentation that just further confirms the point that I'm

23   making.  He has two different parts of his presentation where

24   he's saying how the Omron code allegedly infringes the '163

25   patent, first for the -- the first filtering means, and then

717

DARRELL - DIRECT

1    for the second filtering means, he accuses the coarse search

2    of infringing the first filtering means, and the fine search

3    of infringing the second filtering means.

4            And it's very interesting to look at the codes side

5    by side.  I hope -- is this large enough for everyone to see?

6    Let's look at it like this.  If it isn't, we should blow it

7    up a little bit further.

8            Keeping it this way for right now, he pointed out

9    that the names of the functions change.  But that is like

10   changing the title of a document and having the same text

11   inside of the document.  The title -- those titles are

12   changing.  One is called "coarse" and one is called "fine."

13   Agreed, but the important part is that --

14           THE WITNESS:  If you could now clear that off the

15   screen, please.

16    A. The important part is the white part.  He highlighted all

17   the -- he colored the parts with just the titles of the

18   functions, and he left in white here the code.  And if you

19   look at it line by line, character by character, they are the

20   same on both slides.

21           I'll just read it off, like compare -- there is

22   first "define and compare AB."  It's the same on both sides.

23   And then the next line, this "N index equals compare AB" is

24   the same on both sides.  And the lookup table computation is

25   the same.

                            DARRELL - DIRECT

1          If you can remember the figure I just showed you

2    from a few slides ago, this is actually the code

3    corresponding to the figures that we have been talking about.

4    B minus A minus one less than zero is the same as B less than

5    or equal to A.  And that is what "compare AB" is, and it's

6    done several times.  And then here is the lookup table.  That

7    is that final lookup table that was on the bottom of the

8    figure.

9          So I -- you know, his slides are showing you that

10   it's the same thing being accused for two different

11   dramatically different parts of the patent.

12         MR. GALLEGOS:  Please display slide 85, please.

13   Q. Does the structure in the '163 patent specification for

14   the second filtering means include a contrast detector?

15   A. It does.  It requires that there be contrast values

16   greater than a threshold contrast.

17   Q. And does the fine search cascade in the Omron --

18   A. I couldn't hear you.  Could you repeat the question?  I

19   was coughing.

20   Q. I apologize, Dr. Darrell.  Does the fine search cascade

21   in the Omron method perform a comparison of contrast with

22   threshold contrast values?

23   A. It does not.  The confidence that is computed in the

24   Omron fine cascade is not computing a contrast value.  It's a

25   confidence value.

DARRELL - DIRECT

1          MR. GALLEGOS:  Please display slide 89.

2     Q. Let's take a look at the last limitation in claim 15.

3  Why is the image pattern detector crossed out in this slide?

4     A. Because the image pattern detector step is missing from

5  the Omron code.

6     Q. Do you agree with Dr. Mundy that the merge step is the

7  image pattern detector?

8     A. I don't.  What is being excerpted here is what Dr. Mundy

9  is claiming is the image pattern detector.  And if you

10  remember from the very beginning of my testimony, the whole

11  theory of the '163 patent is that it's a prefiltering method.

12  It's a two-stage prefiltering, with the two very important

13  different stages.

14          But it's a prefiltering method.  It's supposed to go

15  in front of an existing image pattern detector that

16  is expected to be something that already existed prior to the

17  '163 patent probably, although that is not a strict

18  requirement.  But it's a -- it's a stand-alone piece of

19  software that could run on its own.  You could take it and

20  run it on an image, and it would just be too slow.  Because

21  remember, the candidate selector is simply trying to tell the

22  image pattern detector where not to look.

23          So what is being pointed to here is a very, very

24  standard part of every image detector that had been built

25  before the '163 patent and has been used in every -- to my

DARRELL - DIRECT

1    knowledge, every detector since the '163 patent, which is

2    when you have a detector, you need a post-processing step to

3    clean up -- if you have too many boxes that are detected at

4    the same spot, you don't want to -- I'll have a detection

5    here and a detection here and a detection here.  You want to

6    clean that up by removing redundancy.

7            This step does not actually look at the pixels and

8    make any decision of what is inside of each of these boxes.

9    This step could not -- if you just took this code out on its

10   own, it could never run on an image.  So that is my main

11   comment here is the '163 patent requires the image pattern

12   detector to be able to run as a stand-alone entity on the

13   input image.  And the merge pattern detector step -- excuse

14   me -- the merge step, could never do that.  It would make no

15   sense.  It doesn't actually look at the pixels.

16           MR. GALLEGOS:  Please display slide 90.

17   Q. So, Dr. Darrell, what is your conclusion as to whether

18   the Nikon cameras with Omron technology satisfy the

19   limitations of claim 15 of the '163 patent?

20   A. They do not, because of all of the required elements that

21   are crossed out here.

22   Q. If we could go to slide 90 now -- or 91 -- I'm sorry --

23   which shows dependent claim 16 at the top.  What is your

24   conclusion regarding infringement of claim 16 by Omron face

25   detection in Nikon cameras?

DARRELL - DIRECT

1       A. Claim 16 further emphasizes the need for a linear matched

2       filter and a linear convolution operation.  As I've

3       discussed, those are not present.  And it further references

4       that the referenced image pattern is representative of a

5       human face.

6                MR. GALLEGOS:  Please display slide 92.

7       Q. Focusing on limitation reference image pattern being

8       representative of a human face, what did you conclude?

9       A. The patterns in the Omron code are not representative of

10      a human face.  They don't appear to be an average face, which

11      is what the patent suggested would be the appropriate use.

12      And if I had been building a correlation -- linear correlator

13      to detect a face in the 1990s, that is what we used.  That is

14      what you would normally use as an average face inside a

15      linear correlator.

16                This does not look -- this pattern shown on the

17      right here from Dr. Mundy's opening report, which was his

18      evidence of what -- that it looks like a face, this does not

19      look, to me, like a face.

20                MR. GALLEGOS:  Please display slide 93.

21      Q. And so you also show here on the right another image from

22      Dr. Mundy's report which Dr. Mundy claims is a correlation

23      kernel from the Omron code.  Is this one representative of a

24      human face?

25      A. Yeah, I'm not sure I would agree that it's a correlation

DARRELL - DIRECT

1    kernel, but I certainly don't think it's representative of a

2    human face.

3            MR. GALLEGOS:  Please display slide 94.

4    Q. Dr. Darrell, what is your ultimate conclusion as to

5    whether the Nikon cameras infringe claim 16 of the '163

6    patent?

7    A. Because they don't have the required elements of a

8    correlation image, correlation, a linear filter, being

9    representative of a human face, or the computation of a local

10   maxima, my conclusion is that Nikon cameras do not infringe

11   claim 16 of the '163 patent.

12           MR. GALLEGOS:  Take the slide down please.

13   Q. Dr. Darrell, your conclusion of noninfringement is based

14   in part on your review of the Omron source code for the

15   accused functionality; is that right?

16   A. That's correct.

17   Q. What is source code?

18   A. Source code is the human-readable instructions that

19   people write programs in to program computers to do useful

20   things.

21   Q. Does Omron provide its source code to Nikon?

22   A. I believe it does not.  I, um, was myself provided access

23   to the source code under very strict circumstances as part of

24   this litigation.  I was only provided hard copy, like a stack

25   of paper this big, that I -- that we were required not to

DARRELL - DIRECT

1    scan it or to digitize it or to put it in computers, and not

2    to allow any Nikon personnel to access it in any way.

3            That was part of the Court's order that I had to

4    follow.  My understanding, therefore, is that Nikon does not

5    have any access to the source code.

6    Q. Let's move on to the next topic.

7            MR. GALLEGOS:  Can we display slide 96.

8    Q. And the next topic is invalidity.  What did you conclude

9    as to the validity of claim 16 of the '163 patent?

10   A. I believe that claim 16 of the '163 patent is invalid.

11           MR. GALLEGOS:  Please display slide 97.

12   Q. Why did you conclude claim 16 is invalid?

13   A. It's both anticipated and obvious, due to all of the

14   elements that had been published in the prior art, as we'll

15   discuss in the following slides.

16   Q. And in your understanding, what is anticipation?

17   A. Anticipation is when all of those required elements in a

18   patent exist in a single piece of prior art.

19   Q. And in your understanding, what is obviousness?

20   A. Obviousness is when one or more pieces of prior art,

21   together with that -- the knowledge of that person of

22   ordinary skill in the art and the common sense that that

23   person would have, and the textbook knowledge that they might

24   have, it would be obvious for one of ordinary skill in the

25   art to combine one or more references with their common

                              DARRELL - DIRECT

1      sense.  And that everything would, then, be covered.

2              MR. GALLEGOS:  Can we have slide 98 on the screen,

3      please.

4       Q. What is the first prior art reference you considered in

5      your invalidity analysis?

6       A. The 1997 paper of Yow and Cipolla.

7              MR. GALLEGOS:  Your Honor, I move JTX1908 into

8      evidence.

9              THE COURT:  It will be received.

10             (Thereupon, Exhibit Number JTX1908 was received in

11     evidence.)

12      Q. What is JTX1908?

13      A. It's a paper by Yow and Cipolla published in a journal on

14     face detection.

15      Q. And if I refer to this as "the Yow '97 paper," you will

16     understand I'm referring to this paper?

17      A. Yes.

18      Q. What did you conclude after analyzing the Yow '97 paper?

19      A. That it anticipates and renders obvious the '163 patent

20     claim 16.

21      Q. Let's look at page 1 of JTX1908.  What is the title of

22     the Yow '97 paper?

23      A. "Feature-based human face detection."

24      Q. And is this prior art to the '163 patent?

25      A. Yes.

DARRELL - DIRECT

1          MR. GALLEGOS:  Please display slide 100.

2     Q. Does the technique in the Yow '97 paper disclose the same

3     idea as the later "163 patent?

4     A. Yeah.  It has the same idea.  It has a two-stage

5     prefiltering process, where the first stage includes linear

6     correlation and the second stage includes nonlinear gray

7     scale analysis.  And those are used to identify regions,

8     where later on an image pattern detector is applied.

9          MR. GALLEGOS:  Please display slide 101.

10    Q. Does the Yow '97 paper disclose a face detector to be

11    used after prefiltering?

12    A. The latter-stage image pattern detector is referred to as

13    an "attentive feature grouping" component of the Yow '97

14    paper.  And as is highlighted here, it employs a grouping

15    process to identify likely configurations of faces.

16         MR. GALLEGOS:  Your Honor, I move JTX1908, pages 1

17    and 4, into evidence.

18         THE COURT:  It will be received.

19         (Thereupon, Exhibit Number JTX1908 pages 1 and 4

20    were received in evidence.)

21         MR. GALLEGOS:  Please display slide 102.

22    Q. Dr. Darrell, did the examiner at the patent office

23    consider the Yow '97 paper before granting the '163 patent?

24    A. He did not.  You can see it's not in the list of

25    references cited that he considered.

DARRELL - DIRECT

1          MR. GALLEGOS:  Please display slide 103, which shows

2     the limitations of claims 15 and 16.

3     Q. Dr. Darrell, what is shown on the right-hand column on

4     this slide?

5     A. In the right-hand column is shown where in the Yow 1997

6     paper -- on which pages the required elements of claim 15 and

7     16 are found.

8          MR. GALLEGOS:  Let's go to slide 104, please.

9     Q. And at the top here, you will see that it shows the

10    preamble of claim 15, an image processing system for

11    detecting a target image pattern in an input image

12    comprising.

13         Dr. Darrell, what did you conclude here?

14    A. Of course, the preamble is met.  This paper proposes a

15    feature-based algorithm for detecting faces.

16         MR. GALLEGOS:  And please display slide 105.

17    Q. Did you compare the disclosure of the Yow '97 paper with

18    the constructions of first filtering means advanced by you

19    and Dr. Mundy?

20    A. I did.

21    Q. And what did you conclude?

22    A. That the first filtering means is present in Yow '97 on

23    page 4, where it refers to a computation that includes a

24    matched band pass filter, including a suitable filter that is

25    a -- what is called a second derivative Gaussian.  That is a

DARRELL - DIRECT

1    particular mathematical function that would be what would

2    comprise the filter.

3              MR. GALLEGOS:  Please display slide 106.

4     Q. Does Yow '97 disclose that the first filtering means is

5    configured to correlate said input image with a referenced

6    image pattern?

7     A. Yes, the filter does some filtering.  And you can see

8    that on page 4, where it refers to filtering the image with

9    that filter that we just described.

10    Q. Under your construction, does the corresponding structure

11   for the first filtering means also require that a correlation

12   be derived?

13    A. It does.  You need that correlation image, as I went

14   through and discussed about the fact that the applicants had

15   distinguished from the prior art.

16    Q. And where is that shown here?

17    A. That is shown in the word "Response," actually.  It says,

18   "Local maxima in the response."  That is referring to the

19   response of the matched band pass filter.  And it's

20   referring, for an example of the matched band pass filter, to

21   a prior version of their own work, Yow and Cipolla 35,

22   reference 35 in this paper.  So it's right there.

23    Q. So let's take a look at JTX2085.

24              MR. GALLEGOS:  Which is in evidence, Your Honor.

25    Q. This is the Yow 1995 paper.  And if we could turn to page

DARRELL - DIRECT

1    3 of JTX2085.  What does this show?

2     A. You may have seen this.  Remember this from on -- excuse

3    me.  You may remember this from Friday.  We had shown this

4    earlier.  And, indeed, it's an example of a correlation

5    image.  The result of correlating a mouth-like filter, with

6    the input images on the left, to get the correlation images

7    shown in the middle.

8     Q. Would one of ordinary skill have known that the response

9    in the Yow '97 paper is a correlation image?

10    A. Absolutely, yes.

11    Q. And would one of ordinary skill have known that without

12   reading the earlier Yow '95 paper?

13    A. No, they would not have needed to read any paper.  They

14   would know that a response refers to the output of a

15   correlation, and the output of a correlation is an image.

16        MR. GALLEGOS:  Your Honor -- I'm sorry.  Your Honor,

17   I move JTX2085, page 1, into evidence.

18        THE COURT:  It will be received.

19        (Thereupon, Exhibit Number JTX2085, page 1 was

20   received in evidence.)

21        MR. GALLEGOS:  Please show slide 109.

22    Q. So, Dr. Darrell, under your construction, does the first

23   filtering means in claim 15 also require that the regions are

24   selected based on detecting a local maxima and a correlation

25   image?

DARRELL - DIRECT

1    A. That's right.  The requirement is, first, correlation

2    image, and then finding local maxima in the correlation

3    image, and then making sure that those local maxima are, you

4    know, high enough.

5         And local maxima is a very simple concept.  It's

6    looking around in a function to find a peak.  Not necessarily

7    the biggest value in the function, but just some value of the

8    function that is higher than all of its neighbors.  That is

9    all that it means.  And it's a very common image processing

10   operation where you are looking to find the brightest point

11   in some neighborhood.

12        And, indeed, it's present on page 4 of Yow '97,

13   where it explicitly refers to computing local maxima of the

14   response.  And it also shows examples of that on page 7, in

15   figure 8, where there are some boxes drawn on where the local

16   maxima were found.  And that is in the response image, not --

17   it's overlaid on the original image.

18        MR. GALLEGOS:  Please show slide 108.

19   Q. Does the Yow '97 paper disclose a reference image pattern

20   for correlation that is indicative of said target image

21   pattern?

22   A. It does.  It refers to the correlation target, which is

23   an elongated Gaussian that is representative of oriented

24   facial features.  And it names them; namely, the eyebrows,

25   eyes, nose, and mouth.

DARRELL - DIRECT

1          MR. GALLEGOS:  Please show slide 110.

2     Q. Did you compare the disclosure of the Yow '97 paper with

3     your and Dr. Mundy's constructions of the second filtering

4     means?

5     A. I did.

6     Q. What did you conclude?

7     A. That Yow '97 also discloses the second filtering means.

8     It searches around windows defined by the location of

9     interest points provided by the first filtering means.  The

10    windows that come out of the first filtering means are the

11    same size as the Gaussian derivative filter.

12          The Yow '97 method, on page 4, shows that it

13    computes gray-level variances.  And on page 10, that it uses

14    the Canny edge detector with an edge threshold set to zero.

15    And that's on page 10.  And on page 4, it shows the overall

16    structure of the second filtering means.  And I'm showing

17    here with my pointer each detected interest point would

18    define a region around it that is the size of the Gaussian --

19    the same size as the Gaussian derivative filter that is

20    mentioned up here.

21          And then within that window, Canny edge detection

22    would be computed, and that is a nonlinear contrast analysis

23    process.  And then finally, inside of that, detected features

24    and feature regions would be found.

25    Q. And to be clear, Dr. Darrell, does the Yow '97 paper

DARRELL - DIRECT

1    disclose that the nonlinear filter compares contrast values

2    with a threshold value?

3    A. It does on page 10.  I mentioned that it has a threshold

4    that is a hysteresis threshold that is incorporated in the

5    Canny edge finder.

6    Q. Now, if you assume the first filtering means and second

7    filtering means are not means plus function terms, are these

8    terms still disclosed in the Yow '97 paper?

9    A. They are.

10             MR. GALLEGOS:  Please display slide 111, which shows

11   the last limitation of claim 15, which begins with, "An image

12   pattern detector."

13   Q. So Dr. Darrell, what did you conclude regarding the Yow

14   '97 paper and this limitation?

15   A. The Yow '97 paper has an image pattern detector which

16   analyzes a set of feature points and employs a geometric

17   model to confirm whether or not a face is present at the

18   given location.

19             MR. GALLEGOS:  Please display slide 112, which shows

20   dependent claim 16.

21   Q. What did you conclude regarding the Yow '97 paper and

22   claim 16?

23   A. The main difference with claim 16 and 15 are the

24   additional mention of linear matched filter and linear

25   convolution operation, which we had already covered.  It then

DARRELL - DIRECT

1    further specifies that said reference image pattern is

2    representative of a human face.  Previously it had only been

3    representative of some target.

4            I had mentioned that the Yow paper, on page 3 and 4,

5    talk about the filter template that is a representative of

6    mouth and eyes and nose.  They are definitely representative

7    of a human face and parts of a human face, so they match --

8    they meet the limitation on claim 16.

9            MR. GALLEGOS:  Your Honor, I move into evidence

10   JTX1908, pages 1, 3, 4, 7, 10, 16, 22, and 23.

11           THE COURT:  They will be received.

12           (Thereupon, Exhibit Number JTX1908, pages 1, 3, 4,

13   7, 10, 16, 22 and 23 were received in evidence.)

14   Q. Dr. Darrell, did you evaluate whether the Yow '97 paper

15   would have enabled a person of ordinary skill to make and use

16   the subject matter in claim 16 of the '163 patent?

17   A. I did.  One of ordinary skill in the art could have

18   implemented the methods in the Yow '97 paper.  It was a paper

19   from a well-known group published in the well-available

20   venue.

21           It's clearly written.  It has the same technical

22   level or less than the '163 patent.  And so one of ordinary

23   skill in the art would have been able to implement the

24   methods as they are described in that paper.

25   Q. Would a person of ordinary skill have been able to

DARRELL - DIRECT

1    implement the disclosure of the Yow '97 paper without undue

2    experimentation?

3     A. Indeed.  One of ordinary skill in the art would have been

4    able to implement the method in the Yow '97 paper without

5    undue experimentation.

6            MR. GALLEGOS:  Please show slide 113.

7     Q. So, Dr. Darrell, what is your ultimate conclusion as to

8    whether the Yow '97 paper anticipates or renders obvious

9    claim 16 of the '163 patent?

10    A. It both anticipates and renders obvious claim 16 of the

11   '163 patent.  The first filtering means is present in Yow '97

12   in the matched band pass filter.  The second filtering means

13   is present in the edge detector.  The image pattern detector

14   is present in the face model in the attentive stage.  That

15   all -- that is all you need for anticipation.

16            It would have also have been obvious to one of

17   ordinary skill in the art to replace one of these elements

18   with something that they have from textbook knowledge.  Maybe

19   a slightly different kind of filter in the first stage, for

20   example.

21            MR. GALLEGOS:  Please show slide 114.

22    Q. Dr. Darrell, what is the next prior art reference you

23   considered in your validity analysis?

24    A. Yow's thesis.  The good news, it's going to be almost the

25   same as Yow '97, so hopefully it will be easy to understand

                        DARRELL - DIRECT

1    in light of what we have just gone through.  But it's a

2    slightly more complete version of the same document,

3    published in 1998.

4     Q. So let's look at the cover of the Yow thesis.  This is

5    JTX1909.

6         MR. GALLEGOS:  Which is in evidence, Your Honor.

7     Q. So what is the title of the Yow thesis?

8     A. "Automatic Human Face Detection and Localization."

9     Q. What is the date shown on the cover of the Yow thesis?

10    A. January '98.

11    Q. And if we could go to page 2, there is a copyright date.

12   What is that date, Dr. Darrell?

13    A. Also 1998.

14        MR. GALLEGOS:  Your Honor, I move JTX2080 into

15   evidence.

16        THE COURT:  It will be received.

17        (Thereupon, Exhibit Number JTX2080 was received in

18   evidence.)

19    Q. And Dr. Darrell, do you recognize Exhibit JTX2080?

20        MR. GALLEGOS:  Let's put it up.  There we go.

21    A. I believe it's an entry from the University of Cambridge

22   library catalogue.

23    Q. And does it tell you when the Yow thesis was approved?

24    A. It has notes, "Date approved, 7 March 1998."

25    Q. Is that 7 or 17 March 1998?

DARRELL - DIRECT

1    A. My apologies if I misspoke.  17 March 1998.

2              MR. GALLEGOS:  Your Honor I move JTX167 into

3    evidence.

4              THE COURT:  It will be received.

5              (Thereupon, Exhibit Number JTX167 was received in

6    evidence.)

7              MR. GALLEGOS:  If we could put that up.

8    Q. Dr. Darrell, what is this document, JTX167?

9    A. I believe this is an entry from the publication of the

10   University of Cambridge, the Recorder, if I recall correctly,

11   that is announcing the approval of the awarding of degrees.

12   And it says that in the case of degrees where dissertations

13   are required to be deposited in the university library, the

14   title of the dissertation is shown after the name of the

15   person by whom it was submitted.

16   Q. And if we could go to page 3, toward the bottom.  Do you

17   recognize a name and title near the bottom of this page?

18   A. Yes.  We can see the name and title that we have been

19   discussing, K.C. Yow.  I believe DOW is the name of the

20   college that he's at at the University of Cambridge, or an

21   abbreviation for it.  The title is "Automatic Human Face

22   Detection and Localization."

23   Q. Just so the record is clear, at page 1 again, Dr.

24   Darrell, do you see that this is the Cambridge University

25   Reporter issue of 22 April 1998?

DARRELL - DIRECT

1    A. I see that.

2            MR. GALLEGOS:  Your Honor I move JTX167, pages 1, 3,

3    and 4 into evidence.

4            THE COURT:  They will be received.

5            (Thereupon, Exhibit Number JTX167, pages 1, 3 and 4

6    were received in evidence.)

7            MR. GALLEGOS:  Please display slide 119, which shows

8    limitations of claims 15 and 16 of the '163 patent.

9    Q. Dr. Darrell, what is shown on the right column of the

10   slide?

11   A. Where in the Yow thesis all of the required elements of

12   claim 15 and claim 16 are present.

13           MR. GALLEGOS:  Please show slide 120, which shows

14   the preamble of claim 15 at the top.

15   Q. What did you conclude here?

16   A. The preamble is met in the same way as it was in Yow '97.

17   It's a method -- a feature-based algorithm for detecting

18   faces.  Certainly meets the preamble.

19           MR. GALLEGOS:  Please display slide 122.

20   Q. Did you compare the disclosure of the Yow thesis with the

21   constructions of first filtering means, advanced by you and

22   Dr. Mundy?

23   A. I did.  And with similar argumentation as we went through

24   for Yow '97, the first filtering means which is configured to

25   correlate said input image with a reference image pattern is

DARRELL - DIRECT

1    present in the Yow thesis.

2           As shown in the convolution output on page 47, and

3    in figure 2.4, that is the correlation image.  That includes

4    the linear correlation step.  Also this is mentioned on

5    figure 2.9, where it -- on page 58, where it refers to

6    matched band pass filtering.  And the operation of a local

7    maxima step on the output of the correlation step on the

8    correlation image is referred to on page 159 in the thesis

9    document.

10          MR. GALLEGOS:  Please display slide 123.

11   Q. Does the Yow thesis disclose a reference image pattern

12   for correlation that is indicative of said target image

13   pattern?

14   A. It's a target, because the elongated Gaussian derivative

15   filters are designed to detect facial features such as

16   eyebrows, eyes, nose, and mouth on page 33.

17          MR. GALLEGOS:  Please display slide 125.

18   Q. Did you compare the disclosure of the Yow thesis with

19   your and Dr. Mundy's constructions for the second filtering

20   means?

21   A. Yes.  The second filtering means is a nonlinear filter,

22   and that is met by the use of a Canny edge detector in Yow

23   thesis on page 56.

24   Q. Does the Yow thesis disclose examining a gray scale

25   characteristic in selecting candidate regions?

DARRELL - DIRECT

1        A. It does.  The Canny edge detector, it has the analysis of

2     a gray scale characteristic inside of it.  It looks at the

3     relative contrasts of different -- of image pixels in

4     different directions to decide where an edge is present in

5     the image.

6        Q. Let's go to slide 126, please.  In the Yow thesis, what

7     are the potential candidate regions on which edge detection

8     is performed?

9        A. The candidate regions are shown here.

10              Tempted to try and use this thing and see if it

11    works.  It works.  Wow.

12              And that is the neighborhood around the point.  I'm

13    trying to draw a square there, you will understand that.  And

14    the neighborhood is a window the size of the Gaussian

15    derivative filter.  And here is the filter here.  That is

16    this box here.  And I think I can hit "clear."  Okay.  Good.

17    Yeah.

18       Q. Thank you, Dr. Darrell.  Under your construction, does

19    this nonlinear filter need to compare contrast values with a

20    threshold value?

21       A. It does.  And the Canny edge detector includes a

22    characteristic threshold that is not illustrated on this

23    slide, but the Gaussian -- but the Canny edge detector

24    includes a threshold comparison step that is used to decide

25    whether or not the edge strength is above a threshold.

DARRELL - DIRECT

1    Q. So would the Yow thesis disclose the first and second

2    filtering means even if they were not means plus function

3    terms?

4    A. They would.

5              MR. GALLEGOS:  Please show slide 127, which shows

6    the last limitation of claim 15, which begins with, "An image

7    pattern detector."

8    Q. What did you conclude with regard to the Yow thesis and

9    this limitation?

10   A. As we discussed in Yow '97, the attentive feature

11   grouping stage in Yow's work, and also described in Yow's

12   thesis, meets the limitation of the image pattern detector in

13   the '163 patent.  It is a grouping model that detects whether

14   or not the constellation of detected features satisfies the

15   detection of a face or not.

16             MR. GALLEGOS:  Please show slide 128, which shows

17   dependent claim 16.

18   Q. What did you conclude regarding the Yow thesis and

19   dependent claim 16?

20   A. The elongated Gaussians are not only targets, they are

21   also targets that are representative of human faces.  They

22   are representative of parts of human faces.  We often detect

23   faces by detecting eyes and mouths and noses and the like.

24             MR. GALLEGOS:  Your Honor I move into evidence

25   JTX1909, pages 1, 2, 4, 33, 46, 47, 48, 56, 58, 73, 78, and

DARRELL - DIRECT

1    159.

2              THE COURT:  They will be received.

3              (Thereupon, Exhibit Number JTX1909, pages 1, 2, 4,

4    33, 46, 47, 48, 56, 58, 73, 78 and 159 were received in

5    evidence.)

6    Q. Dr. Darrell, again, did you evaluate whether the Yow

7    thesis this time would enable a person of ordinary skill and

8    use to use the subject matter in claim 16 of the '163 patent?

9    A. I did.  The Yow thesis was a comprehensive, long document

10   that was well written, and one of ordinary skill in the art

11   would have been able to implement the ideas described therein

12   and create all of the devices described that would meet all

13   the limitations of the '163 patent.

14   Q. And would the person of ordinary skill have been able to

15   do so without undue experimentation?

16   A. Indeed.  One would have been able -- one of ordinary

17   skill in the art would have been able to implement all of the

18   ideas in this relatively clear and well-written Yow thesis

19   document without undue experimentation.

20             MR. GALLEGOS:  Please display slide 129.

21   Q. Dr. Darrell, what is your ultimate conclusion as to

22   whether the Yow thesis anticipates or renders obvious claim

23   16 of the '163 patent?

24   A. It both anticipates and renders obvious claim 16 of the

25   '163 patent.  The first filtering means is found in the

DARRELL - DIRECT

1    matched band pass filter.  The second is found in the edge

2    detector.  The image pattern detector found in the face model

3    in the attentive stage.  And that means that the thesis

4    anticipates.

5          It also would have been obvious for one of ordinary

6    skill in the art to replace one of these elements with a

7    textbook equivalent, such as a different filter.

8          MR. GALLEGOS:  So please show slide 130.

9    Q. In deciding whether the '163 patent claims were obvious,

10   did you consider whether there were any secondary

11   considerations of nonobviousness?

12   A. I did.

13   Q. And what did you conclude?

14   A. There were no -- there is a list of these secondary

15   characteristics that one considers in patent cases.  And none

16   of them were present, in my opinion.  There was no commercial

17   success of any embodiment of the '163 patent.  It was several

18   years after the '163 patent before face detection actually

19   worked.  And so that was when Viola-Jones came out.

20         The commercial success of the Nikon cameras is not

21   tied to any accused features.  There is no long-felt need for

22   face detection prefiltering of the type claimed in the '163

23   patent.  No failure of others to achieve the method claimed

24   in the '163 patent.  Prefiltering, running a Gaussian

25   correlation kernel in front of Rowley and Kanade was easy to

DARRELL - DIRECT

1    achieve.  There were no unexpected results, no copying by

2    others.  No licensing to third-parties, except to the back

3    license to HP, but that is not really a third party.  No

4    skepticism from industry that the '163 patent technique could

5    be achieved.

6              MR. GALLEGOS:  Please show slide 131.

7    Q. So, Dr. Darrell, to summarize, what is your conclusion

8    regarding infringement and validity of claim 16 of the '163

9    patent?

10   A. It's invalid, and not infringed.

11   Q. So, Dr. Darrell, let's move on to the last topic.

12             MR. GALLEGOS:  Can we have slide 132 on the screen,

13   please.

14   Q. Dr. Darrell, what does this slide show?

15   A. It shows a license that when the plaintiffs bought the

16   '163 patent from HP, they, HP, asked for and received back --

17   a license back, so that the -- so that HP could practice the

18   patent to make, have made, use, sell, offer for sale,

19   etcetera.

20             MR. GALLEGOS:  Please display slide 133.

21   Q. Dr. Darrell, what else were you asked to do in this case?

22   A. I was asked to assess whether or not certain HP cameras

23   actually practiced the '163 patent under Dr. Mundy's

24   theories.  And if they did, whether they were marked with the

25   '163 patent number.

DARRELL - DIRECT

1    Q. What cameras did you analyze?

2    A. The ones shown on this slide, the R725, 727, 827, 927,

3    967.

4    Q. What conclusion did you reach?

5    A. That they do practice the '163 patent under Dr. Mundy's

6    theories, and they are not marked.

7    Q. And just so the record is clear here, Dr. Darrell, when

8    you were reading from the slide, did you mean the HP

9    Photosmart R725, R727, R827, R927, and R967 cameras?

10   A. Yes.

11   Q. And how did you evaluate whether the HP cameras practiced

12   the '163 patent?

13   A. I evaluated various literature from HP, including

14   technical papers, marketing documents, and patents that

15   referenced these cameras.

16        MR. GALLEGOS:  Your Honor, I move Exhibit JTX1857

17   into evidence.  This is a physical exhibit.  May I have it

18   handed to the witness?

19        THE COURT:  Yes.

20        (Thereupon, Exhibit Number JTX1857 was received in

21   evidence.)

22   Q. Dr. Darrell, do you recognize Exhibit JTX1857?

23   A. I do.

24   Q. And what is it?

25   A. It's a Photosmart R827 camera.

DARRELL - DIRECT

1    Q. How do you recognize it?

2    A. It says "Photosmart R827" on the front of the camera.

3    Q. Dr. Darrell, do you see any patent numbers marked

4    anywhere on this camera?

5    A. I do not.  And I have not.

6         MR. GALLEGOS:  Your Honor, I move JTX1856, JTX1916,

7    and JTX2072 into evidence.

8         THE COURT:  They will be received.

9         (Thereupon, Exhibit Numbers JTX1856, JTX1916 and

10   JTX2072 were received in evidence.)

11        THE CLERK:  Could I get these three numbers again?

12        MR. GALLEGOS:  Sure.  JTX1856, JTX1916, and JTX2072.

13        THE CLERK:  Thank you.

14        MR. GALLEGOS:  Your Honor, so the record is clear, I

15   want to make sure that I did move Exhibit JTX1857 into

16   evidence.  It's the camera.

17        THE COURT:  Yes.

18   Q. Let's put up JTX1856.  What is JTX1856?

19   A. It's a brochure from HP describing the -- one of the

20   features of these cameras, called in camera "red eye

21   removal."  You can see the example here where the red eyes

22   are being removed.

23   Q. And did you review this in order to come up to a -- come

24   to a conclusion about whether the HPR827 practices the '163

25   patent?

DARRELL - DIRECT

1    A. I did review this document.  I also reviewed others.

2    Q. In what year does JTX1856 say the red eye removal was

3    implemented in these HP cameras?

4    A. 2006.

5    Q. Let's put up JTX1916.  What is JTX1916?

6    A. It's a paper by authors from Hewlett-Packard describing

7    the red eye removal technique.

8    Q. And did you also review this in order to form your

9    opinion about whether the HP R27 practices the '163 patent?

10   A. Yes.

11   Q. Let's put up JTX2072.  What is this document?

12   A. It's a patent by the same authors, also describing the

13   red eye removal technique.

14   Q. You also reviewed this in order to form your opinion

15   about whether the HPR827 camera practices the '163 patent,

16   correct?

17   A. I did.

18        MR. GALLEGOS:  Please show slide 135.

19   Q. Dr. Darrell, which claim of the '163 patent did you

20   compare against the HP digital cameras?

21   A. Claim 15.

22        MR. GALLEGOS:  Please show slide 142.

23   Q. What conclusion did you reach regarding the preamble of

24   claim 15?

25   A. It is certainly met.  The red eye removal technique is a

DARRELL - DIRECT

1    technique to find eyes and remove the red in the eyes.  And

2    that meets the preamble.

3            MR. GALLEGOS:  Please display slide 143.

4    Q. What did you conclude regarding the first filtering means

5    limitation of claim 15?

6    A. Now, under Dr. Mundy's theories, any weighting can -- of

7    features can meet the limitation here.  And in particular,

8    the filter shown in figure 1 is a filter in the red eye

9    detection technique that operates on a redness measure that

10   has already been computed.  It's a detection filter.  It's

11   shown in page 2 with weighting factors.  And under Dr.

12   Mundy's theory, this would meet the limitation of the first

13   filtering means.

14           MR. GALLEGOS:  Please display slide 144.

15   Q. What did you conclude regarding the second filtering

16   means?

17   A. That also under Dr. Mundy's theories, these would -- the

18   second filtering means would be met.  The HP white paper

19   specifically says that it uses Viola-Jones for a single-eye

20   verification step after initial candidate detection.

21           And so the single-eye verification step would meet

22   the limitations of the second filtering means under Dr.

23   Mundy's theories, because he believes that the Viola-Jones

24   algorithm meets the limitation of that element.

25           MR. GALLEGOS:  Please display slide 145.

DARRELL - DIRECT

1    Q. What is your conclusion regarding the image pattern

2    detector limitation?

3    A. The image pattern detection limitation is met by the

4    pairing verification stage, also under Dr. Mundy's theories,

5    in the HP white paper, and in the patent.  It talks about how

6    once eyes have been detected, pairs of eyes are attempted to

7    be found, to verify whether or not an eye is present.

8         If there is just a single red dot somewhere, that is

9    not an eye.  So this eye pair model is exactly -- not

10   exactly.  It's -- it meets the limitation that Dr. Mundy puts

11   forward for his theory of what an image pattern detector is.

12        MR. GALLEGOS:  Please display slide 146.

13   Q. Dr. Darrell, can you summarize how the HP cameras

14   practice claim 15 under Dr. Mundy's theories.

15   A. The first filtering means is met by the initial candidate

16   detection stage, where it tries to find the eye.  The second

17   filtering means is met by the single eye verification stage

18   that implements Viola-Jones.

19        And the image pattern detector stage is met by the

20   pairing verification step, where it's looking to find that

21   there are actually pairs of eyes that are essentially in the

22   right configuration.  That is all before the actual red eye

23   correction happens in this red eye system.

24        MR. GALLEGOS:  Your Honor, I move into evidence

25   JTX1856, pages 1, 2, 3, JTX1916, pages 1, 2, 3, and 4, and

DARRELL - CROSS

1    JTX2072, pages 1, 8, 9, and 19.

2           THE COURT:  They will be received.

3           (Thereupon, Exhibit Numbers JTX1856, pages 1, 2 and

4    3, JTX1916, pages 1, 2, 3 and 4 and JTX2072, pages 1, 8, 9

5    and 19 were received in evidence.)

6           MR. GALLEGOS:  Can we display slide 148, please.

7     Q. Dr. Darrell, what is your overall conclusion on whether

8    the HPR728, R727, R827, R927, and R967 cameras practice claim

9    15 of the '163 patent?

10    A. They do claim practice -- excuse me -- they do practice

11   claim 15 of the '163 patent under Dr. Mundy's theories.

12          MR. GALLEGOS:  Your Honor, I pass the witness.

13          THE COURT:  Cross-examination.

14          MR. GLITZENSTEIN:  Yes, Your Honor.

15          Good afternoon, ladies and gentlemen.

16                   CROSS-EXAMINATION

17   BY MR. GLITZENSTEIN:

18    Q. And good afternoon, Dr. Darrell.

19    A. Good afternoon.

20    Q. Now, just to set the table a little bit, Dr. Darrell.

21   Omron, the company Omron in Japan, makes the face detection

22   hardware and software that goes into the accused Nikon

23   cameras in this case, true?

24    A. That's true.

25    Q. And it's your testimony in this case, sir, that Omron's

DARRELL - CROSS

1    techniques are based on techniques published in a 2001 paper

2    by Viola and Jones, correct?

3    A. That's true.

4    Q. All right.

5            MR. GLITZENSTEIN:  Mr. Ang, can we get United States

6    patent 7526193 on the screen, please.  7526193.

7            Your Honor, this is a demonstrative.

8            THE COURT:  Okay.

9    Q. Now, it won't come as any surprise to you, Dr. Darrell,

10   that Omron has filed its own patents, right?

11   A. I don't think I've seen this patent before, but it

12   certainly wouldn't surprise me if Omron Corporation is filing

13   patents on the work that it does.

14   Q. All right.  Let me walk you through it, then.

15           MR. GLITZENSTEIN:  Mr. Ang, can we get the assignee

16   information blown up.

17   Q. This one shows that this is an Omron patent, right?

18   A. Yes.

19           MR. GLITZENSTEIN:  And, Mr. Ang, can we get the

20   foreign application priority data up as well.

21   Q. And, Dr. Darrell, you can see here that this is actually

22   based on two Japanese patent applications that were filed on

23   July 15, 2003, and September 10, 2003, true?

24   A. I'm not an expert in reading the front of patents.  But

25   you are definitely highlighting the dates July 15, 2003, and

DARRELL - CROSS

1    September 10, 2003, and it said, "Foreign application

2    priority data."

3     Q. And you see that those are -- there is the initials JP

4    next to those dates right?

5     A. Yes, the initials JP are present.

6            MR. GLITZENSTEIN:  And, Mr. Ang, can we highlight

7    the abstract, please.  Or -- I'm sorry -- show the abstract

8    blown up.

9     Q. And, Dr. Darrell, if we take a look at the first

10    sentence, we can see that this is a patent on face detection,

11    right?

12     A. Yes.  The first two words in the abstract of this patent

13    are "Face detection."

14     Q. All right.  And in your direct examination, sir, you

15    referred to the listing of references that were cited on the

16    face of the '163 patent to observe that the Yow paper from

17    1997 was not identified.  Do you recall that direct

18    testimony?

19     A. I do.  Not identified by the examiner.

20     Q. Let's go through a similar exercise with this Omron face

21    detection patent, Dr. Darrell.

22            MR. GLITZENSTEIN:  Now, Mr. Ang, can we get the U.S.

23    patent references blown up, please.

24     A. Can I get a hard copy of the patent?

25            THE COURT:  No, just answer the questions that are

DARRELL - CROSS

1   asked of you.  Okay.

2    Q. So you can see here that --

3          THE COURT:  If your attorney wishes to show you a

4   hard copy, he can do that.

5          THE WITNESS:  Okay.

6    Q. And you are familiar with the general layout of

7   information on a United States patent, right, Dr. Darrell?

8    A. Um, I'm not an expert -- I don't know what all the

9   different codes mean.  I don't know what code 56 means, but I

10  believe the References Cited part of the patent shows what

11  the examiner considered when issuing the patent.

12   Q. Fair enough.  So when you see here -- there is a list of

13  the U.S. patents, right?  It says that at the top?

14   A. Yeah.

15   Q. Okay.

16          MR. GLITZENSTEIN:  And, Mr. Ang, can we go to the

17  non-U.S. patents, please?

18   Q. And you see that in this case there were some non-U.S. or

19  some foreign patent documents cited as well, right?

20   A. Yeah.

21   Q. Okay.

22          MR. GLITZENSTEIN:  And then, Mr. Ang, can you go

23  directly below that, please?

24   Q. And we see that there are -- there is a listing of other

25  publications, right?

DARRELL - CROSS

1    A. Yes.

2    Q. All right.

3         MR. GLITZENSTEIN:  Now, Mr. Ang, can we go back,

4    please, to the list of U.S. patents that were cited in this

5    Omron face detection patent.

6    Q. And if we look down to the fourth item in this Omron face

7    detection patent, we see that there is a citation to the '163

8    patent in this lawsuit, right?

9    A. Yes, I see the patent 6463163.

10   Q. And you understand that to be the '163 face detection

11   patent that my clients are asserting in this lawsuit, right?

12   A. Yes.

13   Q. And you will see that there is an asterisk in that line.

14   Do you see that?

15   A. I do.

16   Q. And you know what that means, right?

17   A. Um, forgive me, I'm mostly a professor of computer

18   science.  I don't know what all of the legal terminology of

19   the asterisk means.

20   Q. Let me help you on this, sir.

21        MR. GLITZENSTEIN:  Mr. Ang, can we go down and blow

22   up to "The asterisk means."

23   A. Cited by the examiner.

24   Q. Cited by the examiner.  So the '163 patent, which was

25   filed on January 11th, 1999, was cited by the U.S. patent

DARRELL - CROSS

1    examiner in this Omron face detection patent, right?

2     A. Apparently so.

3     Q. All right.  Now, the Viola-Jones patent that you

4    discussed extensively in your direct examination, that was

5    not published until 2001, correct?

6     A. Thereabouts, yes.

7          MR. GLITZENSTEIN:  And, Mr. Ang, can we go back,

8    please, to the "Other Publications" section.

9     Q. And, Dr. Darrell, you can see here that the Viola-Jones

10   paper from 2001 was not cited in this 2003 Omron patent,

11   right?

12    A. It's not.  It doesn't appear on that list there.

13    Q. All right.

14          MR. GLITZENSTEIN:  Your Honor, at this time I would

15   move the admission of this as JTX2231.

16          THE COURT:  It will be received.

17          (Thereupon, Exhibit Number JTX2231 was received in

18   evidence.)

19          MR. GLITZENSTEIN:  Thank you, Your Honor.

20    Q. All right.  Let me take you, sir, to another Omron

21   patent.

22          MR. GLITZENSTEIN:  Mr. Ang, can we get 7912363 on

23   the screen, please.

24    Q. And I want to go through this same exercise.  We'll do it

25   a little more quickly this time.  This is another Omron

DARRELL - CROSS

1     patent, correct?

2      A. The assignee is Omron Corporation.

3      Q. And like the last one we looked at, this one, too, if you

4     look at the earliest date on the face, you will see July 15,

5     2003, right?

6      A. I'm sorry, where am I looking?

7           MR. GLITZENSTEIN:  Mr. Ang, can you help Dr.

8     Darrell, please.

9      Q. Right there, you see that?

10     A. Yes.  What was the question?

11     Q. So this is another Omron patent that is based on a filing

12    from 2003 in Japan, right?

13     A. Yes.

14     Q. All right.

15          MR. GLITZENSTEIN:  And again, Mr. Ang, can we get

16    the abstract blown up?

17     Q. And you see that this, too, is an Omron face detection

18    patent, right?

19     A. There are a lot of face detection patents.  And this is

20    one of them, yes.

21     Q. Right.  And there are a few more references cited in this

22    one.

23          MR. GLITZENSTEIN:  So, Mr. Ang, can we go, please,

24    to the U.S. patent documents?

25     Q. And again, here, sir, you see that the '163 patent that

DARRELL - CROSS

1    is being asserted in this lawsuit is item number 4, right?

2    A. I do.

3    Q. All right.  And this one does not have an asterisk,

4    right?

5    A. It does not appear to have an asterisk.

6    Q. That means it was cited by Omron and not the examiner,

7    right?

8    A. Apparently.

9    Q. Let's go to the "Other Publications" section here.  And

10   you can -- it's actually found on both the first and the

11   second page of this document.  We find it from the second

12   page as well.

13        And if we look at the other publications that were

14   cited, either by the examiner or by Omron in this Omron face

15   detection patent, here, too, the 2001 Viola-Jones paper is

16   not cited, right?

17   A. Well, it's not cited in that portion of the cover of this

18   paper.  It might be mentioned in the specification.  And I

19   would be very surprised if it isn't mentioned in this survey

20   paper.  If the survey paper was published in 2002, it would

21   be quite shocking if that survey didn't have it.  And it was

22   a survey from a group in China that may not have been that

23   advanced at the time.

24        But any survey published in 2002 would definitely

25   have covered Viola-Jones if it was a good survey.

DARRELL - CROSS

1     Q. All right.  Well, I'm sure if your lawyers want to ask

2     you about that, Dr. Darrell, they will.  I want to switch

3     subjects to the HP cameras that you discussed at the end of

4     your direct examination.

5              MR. GLITZENSTEIN:  Mr. Ang, can we get up Dr.

6     Darrell's slide --

7              Oh, Your Honor, I'm sorry.  Before I do that, I

8     would also move the admission of that patent, 7912363, pages

9     1 and 2.  I believe it would be JTX2232.

10              THE COURT:  It will be received.

11              (Thereupon, Exhibit Number JTX2232 was received in

12     evidence.)

13              MR. GLITZENSTEIN:  Thank you, Your Honor.

14              And now, Mr. Ang, let's go to DDX2133.  All right.

15     Q. And, Dr. Darrell, in your direct examination, you offered

16     the opinion that the five HP cameras shown here practiced the

17     '163 patent, right?

18     A. Under Dr. Mundy's theories, yes.

19     Q. I want to explore the basis for that opinion, sir.  So

20     let me start with what you didn't do, sir.  So whereas Dr.

21     Mundy, when he was explaining his views of infringement of

22     the '163 patent, and he showed the jury the source code, we

23     can agree that you have not shown the jury any of the source

24     code for any one of these five HP cameras, right?

25     A. I did not show the jury any source code for any of these

DARRELL - CROSS

1    five cameras.  It was simpler, and more direct, to use the

2    documentation that I used.  And I don't believe the source

3    code has been provided to me or to anyone in this litigation

4    for the HP cameras.

5     Q. It's interesting that you say that, sir.  You understand

6    that in United States patent litigation, it's possible to go

7    to a company, such as HP, and to get the source code from the

8    company, right?

9              MR. GALLEGOS:  Objection, Your Honor, foundation.

10             THE COURT:  Sustained.

11    Q. Dr. Darrell, you know that HP was actually deposed in

12   this case, right?

13    A. I have no idea.

14    Q. Were you here in the courtroom when testimony from an HP

15   witness was read to the jury?

16    A. I don't know if I was or wasn't.  I don't think I was.

17    Q. All right.  Well, suffice it to say that you did not

18   identify the testimony of anyone from HP, any witness in this

19   case, in connection with your analysis of these five cameras,

20   correct?

21    A. Can you restate the question?

22    Q. Certainly.  In forming your opinions about these five HP

23   cameras, you did not reference any HP testimony from this

24   lawsuit, true?

25    A. I don't recall -- I don't recall referencing any HP

                    DARRELL - CROSS

1    testimony.

2     Q. All right.  So let me turn to the things you did base

3    your conclusions on, sir.  You based your conclusions, as

4    reported in that slide, on three things.  There was an HP

5    Photosmart brochure, an HP white paper, and then an HP patent

6    about red eye correction, right?

7     A. That's true.

8     Q. Let me start with the patent, the red eye detection

9    patent.

10          MR. GLITZENSTEIN:  Mr. Ang, can we get JTX2072 up,

11   please?  All right.  If we can get the filing date blown up,

12   please, Mr. Ang.

13    Q. So this patent that you based your opinion on, sir, it

14   was filed in 2003, right?

15    A. Yes.  It appears that's true.

16    Q. And we can agree, can we not, that this HP red eye patent

17   doesn't refer to the '163 patent in this lawsuit, right?

18    A. I don't recall.

19    Q. You were asked at your deposition about whether there was

20   any reference to the '163 patent.  Do you recall that?

21    A. I don't.

22    Q. Let me ask a different question, then, Dr. Darrell.  The

23   '163 patent and this HP red eye patent, at that time they

24   were both owned by Hewlett-Packard, right?

25    A. I'm sorry, the -- can you ask the question again?

DARRELL - CROSS

1    Q. Sure.  This patent, the red eye detection patent from

2    Hewlett-Packard, was owned by Hewlett-Packard along with the

3    '163 patent at the time that this was filed, right?

4    A. That's true.

5    Q. All right.  And you didn't identify anything for the jury

6    in the red eye detection patent where it referred to the '163

7    patent, right?

8    A. I have not.

9    Q. Let me ask you about the white paper.

10       MR. GLITZENSTEIN:  Mr. Ang, can we get JTX1916 on

11   the screen, please.

12   Q. So this is the white paper that you also used to form

13   your opinions, right?

14   A. Yes.

15   Q. And this white paper was published in 2004, right?

16   A. I don't recall, but it's got to be on the surface of the

17   paper there.

18   Q. All right.  Well, let me help you out on that, sir,?

19       MR. GLITZENSTEIN:  Mr. Ang, can you blow up the

20   lower left-hand corner, please.

21   A. Perfect, yes.

22   Q. 2004, right, sir?

23   A. Yes.

24   Q. And you didn't show the jury anything in this white paper

25   that refers to the '163 patent, either, right?

DARRELL - CROSS

1      A. I don't recall doing that, no.

2              MR. GLITZENSTEIN:  Now, let's go back, Mr. Ang, to

3      DDX2133, please.

4      Q. Now, all five of these cameras, Dr. Darrell, they were

5      not launched until 2006, right?

6      A. I don't recall the specific launch date, but that sounds

7      plausible.

8      Q. You didn't identify a launch date for any one of these

9      five cameras before 2006, correct?

10     A. I don't recall doing so.

11     Q. Let me ask you about the red eye functionality that you

12     discussed in your direct.  That process of correcting red eye

13     was actually quite slow in these HP cameras, right?

14     A. I don't recall the speed.

15             MR. GLITZENSTEIN:  Mr. Ang, can we get up the --

16     let's get up JTX297.

17     Q. Have you reviewed the manuals for these cameras, sir?

18     A. I believe I did.

19     Q. All right.

20     A. But that was a long time ago.

21     Q. All right.  I have on the screen the manual for one of

22     the cameras that you identified.  It's the R967.  That is one

23     of the five, right?

24     A. Yes.

25             MR. GLITZENSTEIN:  All right.  Mr. Ang, let's go to

DARRELL - CROSS

1    JTX297, at 36, please.

2              THE CLERK:  Counsel, are you going to move that into

3    evidence?

4              MR. GLITZENSTEIN:  I will, yes.  Shall I do that

5    now?

6              THE CLERK:  They shouldn't be published until they

7    are in evidence.

8              MR. GLITZENSTEIN:  My apologies.  I do move the

9    admission of JTX297.

10             THE COURT:  It will be received.

11             (Thereupon, Exhibit Number JTX297 was received in

12   evidence.)

13             MR. GLITZENSTEIN:  Thank you, Your Honor.

14             Mr. Ang, can we go to JTX297, at 36.

15   Q. There is a discussion, Dr. Darrell, on this page of the

16   manual about removing red eyes, right?

17   A. I see that.

18   Q. All right.

19             MR. GLITZENSTEIN:  And then if you go, Mr. Ang,

20   directly below the first note at the top, and blow that up.

21   Q. All right.  And, Dr. Darrell, the manual here does say

22   that the red eye removal process takes a few seconds, right?

23   A. It does say that.

24   Q. And that is an accurate statement, right?

25   A. It's an accurate statement that the manual does state

DARRELL - CROSS

1    that, yes.

2    Q. Well, and that is, in fact, how long it takes for the red

3    eye process in these cameras to work, right?

4    A. I presume so.  That's what the manual says.

5    Q. But you don't know, sir?

6    A. I don't have -- I didn't time the process myself.

7    Q. All right, Dr. Darrell.  I want to return to the issue of

8    Omron.  And you were here in court when Dr. Mundy discussed

9    the Omron code that runs on the accused Nikon cameras, right?

10   A. Yes.

11   Q. Okay.  And do you recall that Dr. Mundy in his testimony

12   discussed some Omron source code called Pine?

13   A. Yes.

14   Q. And in particular, he discussed Pine2?

15   A. I don't recall which particular -- what he said in which

16   lines, but he definitely talked about the Pine hardware

17   implementation.

18        MR. GLITZENSTEIN:  Mr. Ang, let's get Dr. Mundy's

19   slide PDX434 up on the screen here.

20   Q. All right.  And so does this refresh your recollection,

21   Dr. Darrell, that Dr. Mundy discussed Pine2 as part of his

22   analysis?

23   A. And Pine4 and Pine5.

24   Q. In particular, he concluded that Pine is the thing that

25   satisfies the first filtering means of claim 15, right?

DARRELL - CROSS

1    A. I believe that is true, yes.

2    Q. Now, you haven't offered an opinion in this case on what

3    Pine is, correct?

4    A. I'm sorry, I didn't hear the first word.  You say I did

5    or didn't?

6    Q. You have not offered an opinion in this case on what

7    Pine2a is, correct?

8    A. Pine2A?

9    Q. Yes.

10   A. Um, I don't recall.  I believe I have referred to Pine as

11   one of the hardware implementations used in the Omron

12   software, and it sits alongside the PARFAIT implementation,

13   which is another hardware implementation, and the OKAO

14   implementation, which is the software implementation.

15        You would have to refresh my memory as to which

16   specific file names were responsible for which specific

17   functionality.

18   Q. Let me try this, Dr. Darrell.  You are aware that the

19   Pine version of the Omron hardware face detection code is

20   present in 30 of the 43 Nikon accused cameras in this case,

21   right?

22   A. I don't remember the specific number.  I do remember that

23   Pine has the majority of the hardware implementation, so that

24   number sounds plausible to me.

25   Q. And in this case you provided us with an expert report

DARRELL - CROSS

1    that sought to set out your conclusions in this case, right?

2     A. I did.

3     Q. All right.  And then we took your deposition, right?

4     A. Yes.

5     Q. And just we took your deposition about a week after you

6    gave us that report regarding Omron, right?

7     A. I can't remember the dates, but that could be true.

8     Q. Sounds about right?

9     A. It's been a busy year.

10    Q. And you testified at that time that you were not even

11   familiar with Pine in the produced Omron code, correct?

12    A. My -- are you referring to in my deposition?

13    Q. I am, sir, yes.

14    A. I recall being asked about a specific Pine module, and I

15   didn't know what -- I didn't recall what a specific module or

16   version of that module was.  So I -- I believe I didn't know

17   what you were talking about when you asked me that question.

18           MR. GLITZENSTEIN:  Your Honor, may I publish Dr.

19   Darrell's deposition testimony, 184, lines 2 to 5?

20           MR. GALLEGOS:  If I may have a moment, Your Honor?

21           THE COURT:  Sure.

22           (Pause in proceedings.)

23           MR. GALLEGOS:  Sorry, Counsel, what line?

24           MR. GLITZENSTEIN:  Page 184, lines 2 through 5.

25           MR. GALLEGOS:  No objection, Your Honor.

DARRELL - CROSS

1                    THE COURT:  You may publish.

2                    MR. GLITZENSTEIN:  Thank you, Your Honor.

3                    We are in technical difficulties.  May I use the

4          Elmo?

5                    THE COURT:  Yes.

6                    MR. GLITZENSTEIN:  Thank you, Your Honor.  We've got

7          it.  Technical difficulties solved.  All right.

8                    THE COURT:  Let's take down the Elmo, then.

9                    MR. GLITZENSTEIN:  All right.

10    Q. And, Dr. Darrell, at your deposition in this matter, you

11         gave the following answer to the following question:

12                   Question:  "For example, are you familiar with Pine

13         in the Omron produced code?"

14                   Your answer.  "I am not familiar with that."

15    Q. Now, I want to ask you about some of the details of Pine.

16         That is a -- that is a source code or a hardware description

17         language called Verilog.  That is what it's written in,

18         right?

19    A. I think if you looked earlier in the testimony, you asked

20         me about a specific Pine module.

21                   THE COURT:  If counsel wants to ask you about that,

22         he can.  If your attorney wishes to ask you about that, he

23         can, too.

24                   THE WITNESS:  I thought he asked me earlier.

25                   THE COURT:  It has to be question and answer.

DARRELL - CROSS

1          THE WITNESS:  No problem.

2      Q. You are aware, sir, that Pine is written in a language

3    called Verilog, right?

4      A. Yes.

5      Q. You, sir, have not written any Verilog code, correct?

6      A. I have not written any Verilog code myself.  I have been

7    working with a team that wrote Verilog code.  One of the

8    startups that I worked with and was on the founding team at

9    the company interval before I went to be a faculty member at

10   MIT was making hardware stereo, and they were building their

11   hardware implementations in Verilog.

12          I didn't write the code myself.  I was working on

13   higher-level code.  I worked on top of that underlying

14   hardware substrate.  So it was true testimony at my

15   deposition that I didn't program in Verilog.  And I still

16   don't program in Verilog, but I can figure out what is going

17   on.

18          THE COURT:  Next question, Counsel.

19          MR. GLITZENSTEIN:  Thank you, Your Honor.

20     Q. Let me continue with some of the details of Pine2, Dr.

21   Darrell.  In your direct, you discussed Dr. Mundy's slide

22   PDX444.

23          MR. GLITZENSTEIN:  Mr. Ang, can we get that up on

24   the screen, please.

25     Q. Do you recall that testimony, sir?

DARRELL - CROSS

1      A. I recall the slide.

2      Q. And do you recall in particular discussing the

3      mathematical formula there that is -- let's see if Mr. Ang

4      can highlight it for us.

5              Do you recall discussing that formula in your

6      direct?

7      A. I do.

8      Q. And there is a less-than sign in there, right?

9      A. There is.

10     Q. So mathematically, that is known as an inequality, right?

11     A. That would be true in a programming language.  It would

12     be also known as a less-than function.

13     Q. All right.  Let me ask you about the expression to the

14     left of that less-than sign.  That would be B minus A minus

15     1, correct?

16     A. That's what it says, yes.

17     Q. And the calculation of B minus A minus 1 is linear, true?

18     A. That portion of the computation, of course, is linear.  B

19     minus A minus 1, it's followed by A less than operator, which

20     is nonlinear.

21     Q. And, sir, you are aware of mathematical functions called

22     "linear inequalities," right?  You've heard that expression?

23     A. In a programming language?

24     Q. As a matter of mathematics, sir, you've heard that term

25     before, right?

DARRELL - CROSS

1    A. I have.  But the correct interpretation of what is

2    happening in the code --

3              THE COURT:  Let me stop you at this time.

4              It is time for our afternoon break, so I'm going to

5    give you 15 minutes.  Remember the admonishment not to

6    discuss the case among yourselves or with anyone else or form

7    or express any opinions about the matter until it's submitted

8    to you and you retire to the jury room.  I'm going to be

9    talking to the attorneys a little bit.  Okay.

10             (Thereupon, the jury retired from the courtroom.)

11             THE COURT:  The record will reflect the jurors have

12   left the courtroom.  You may have your seats now.  To help

13   you out, as a witness, it's a little different than

14   explaining things.  As a witness, it's just a question and

15   answer.

16             And so if counsel asks you a question, and you don't

17   think it's fully explained, you've answered the question but

18   you want to go into more detail, wait for your attorney to

19   ask that question.  Otherwise, that is where you get the

20   objection of not responsive, or we haven't asked this.

21             So try to keep it question and answer.  And if your

22   counsel wishes you to expand on it, he'll ask you on

23   redirect.  I know it's tough being a witness.

24             THE WITNESS:  Trying to be as truthful as possible.

25             THE COURT:  That's fine.  But the explanations don't

DARRELL - CROSS

1    come, and the flow of the case doesn't come from the

2    witnesses.  That comes from the attorneys, as to what they

3    want.  They may not care about the rest of the answer; they

4    may care a great deal.  You have to wait for them.  That's

5    the way the system works.

6             Okay.  We'll be in recess.

7             (Whereupon, there was a brief recess.)

8             THE COURT:  The record will reflect that all the

9    members of the jury are in their respective seats in the jury

10   box and the witness is on the witness stand.

11            And, Counsel, you may continue your cross.

12            MR. GLITZENSTEIN:  Mr. Ang, can we get Dr. Darrell's

13   slide on the screen, please.

14   Q. Dr. Darrell, I want to ask you some questions about Yow.

15   You are aware, sir, that claim 16 requires that there be a

16   reference image pattern being representative of a human face,

17   right?

18   A. That's true.

19   Q. And the thing that you testified on direct with regard to

20   that claim feature is what you referred to as an elongated

21   Gaussian, right?

22   A. Elongated Gaussian derivative filters to detect facial

23   features, such as eyebrows, eyes, nose, and mouth.

24   Q. Your slide 16 didn't actually show a picture of that to

25   the jury.  So let me --

DARRELL - CROSS

1          MR. GLITZENSTEIN:  Mr. Ang, can we go to Dr.

2     Darrell's slide 2.17, please.

3      Q. So Friday, you showed this slide.  And the thing on the

4     left is that elongated Gaussian, right?

5      A. Correct.

6      Q. All right.  And specifically, that is a second derivative

7     Gaussian filter, true?

8      A. That's correct.

9      Q. Okay.  And Dr. Darrell, we can agree, can we not, that

10    standing alone, that second derivative Gaussian filter is not

11    representative of a human face, right?

12     A. I wouldn't agree with that.

13          MR. GLITZENSTEIN:  Your Honor, may I play a video

14    clip from Dr. Darrell's deposition?  This is found at page

15    131, line 8, through 132, line 6.

16          MR. GALLEGOS:  No objection, Your Honor.

17          THE COURT:  You may play it, Counsel.

18          MR. GLITZENSTEIN:  Thank you, Your Honor.

19          (Thereupon, the video was played.)

20     Q. And, Dr. Darrell, there are, in fact, major problems with

21    Yow's use of a second derivative Gaussian filter, true?

22     A. I don't believe I've testified to that.

23     Q. Hum.  You were asked on direct examination about whether

24    Yow was enabling.  Do you recall that?

25     A. I don't specifically recall that.

DARRELL - CROSS

1   Q. Okay.  Well, in point of fact, there are two major

2   problems in Yow with using a second derivative Gaussian

3   filter, true?

4   A. Using -- I'm sorry.  I don't quite understand the

5   question.

6   Q. It's -- I'll try again, sir.  It is true, is it not, that

7   there are two major problems in Yow with using the second

8   derivative Gaussian filter?

9   A. Problem with respect to what?

10  Q. Sir, are you aware that Yow actually discusses that there

11  are two major problems with using the second derivative

12  Gaussian filter?

13  A. I don't recall that text, as I sit here today.

14  Q. And in providing your -- sorry, I didn't mean to talk

15  over you.  But in providing your testimony on direct with

16  regard to Yow, you never explain that there are any problems

17  at all with Yow, right?

18  A. I don't believe there are any major problems with Yow.

19  Q. You don't?  Okay.

20       MR. GLITZENSTEIN:  Mr. Ang, can I see, please,

21  JTX1909.  Let's show the cover page first.

22  Q. Dr. Darrell, this is the cover page of the Yow thesis

23  that you testified about, right?

24  A. That's correct.

25  Q. Okay.  And the Yow thesis is a longer and more complete

DARRELL - CROSS

1    version of the 1997 Yow paper, right?

2     A. That's true.

3         MR. GLITZENSTEIN:  So, Mr. Ang, let's go, please, to

4    the text, spanning from pages 47 to 48, please, of the Yow

5    thesis.  And let's start, Mr. Ang, with the bottom portion of

6    one -- I'm sorry -- of page 47.  And we can just get that

7    blown up, please, nice and big.  Sorry, the bottom of page

8    48.  Yeah.  Right there.  Perfect.

9     Q. Okay.  So, Dr. Darrell, the Yow thesis states, and I

10   quote, "The two major problems with using the second

11   derivative Gaussian filter are" -- do you see that?

12    A. I do.

13    Q. All right.  And continuing on, one of the problems

14   associated with using a second derivative Gaussian is that it

15   results in something called a combinatorial explosion, right?

16    A. I'm sorry, what was the question?

17    Q. Well, one of the problems with using the second

18   derivative Gaussian filter is that it results in a

19   combinatorial explosion, right?

20    A. What Yow is most likely saying here is, if you used it in

21   a naive way, the problem would be -- the two major problems

22   would be as listed here, one of which would be the large

23   number of false feature candidates that would cause a

24   combinatorial explosion.  "Combinatorial explosion" refers to

25   if you have too many false positives, you have to examine too

DARRELL - CROSS

1    many pairs or triplets of things.

2      Q. And that is bad, right, a combinatorial explosion?

3      A. Right.  I'm sure if we read the rest of the document, we

4    would see how he overcomes it.

5      Q. Sure.  Dr. Darrell --

6           THE COURT:  Please.

7      Q. -- please focus on my question.

8           THE COURT:  Answer the question that is asked, and

9    try not to expand and add things that counsel aren't asking

10   you.  It's very simple.  It's a question and answer.  They

11   may not be interested in your explanation of things that have

12   nothing to do with where they want to go.

13          THE WITNESS:  Okay.

14          THE COURT:  This is not your chance to try to

15   convince the jury that you are right or anything else.  It's

16   a question-and-answer process.  So listen carefully to the

17   question, and answer the question.  Your attorney can ask you

18   further follow-up questions if they feel it's appropriate.

19          THE WITNESS:  I'm trying to give the most accurate

20   answer I can.

21          THE COURT:  No, your job as a witness is to answer

22   the questions asked of you, not to say, Well, they may not

23   explain this, so I want to explain everything else, and I

24   want to talk to you about the next half-hour, explaining my

25   answer.  That is not your job.

DARRELL - REDIRECT

1           Answer the questions that are asked of you.  If your

2    attorney wants you to explain it, that's fine.

3           Go ahead, Counsel.

4           MR. GLITZENSTEIN:  Thank you, Your Honor.

5    Q. Dr. Darrell, the second major problem that Yow identifies

6    with using a second derivative Gaussian filter is that it

7    causes, quote, inter-feature measurements to be inconsistent

8    and unreliable, correct?

9    A. Yow -- correct, Yow states that as a problem of the

10   second derivative Gaussian filter.

11   Q. And that is bad, too, right, sir?

12   A. It's a major problem, according to Yow.

13          MR. GLITZENSTEIN:  Thank you, Dr. Darrell.  No

14   further questions.

15          Pass the witness.

16          THE COURT:  Redirect.

17                    REDIRECT-EXAMINATION

18   BY MR. GALLEGOS:

19   Q. Hello again, Dr. Darrell.

20   A. Hello.

21   Q. Let's step through some of the discussion you just had

22   with opposing counsel.  Plaintiff's counsel showed you, at

23   the beginning, two Omron patents.  Do you recall that?

24   A. I do.

25   Q. And those Omron patents issued -- were issued by the

DARRELL - REDIRECT

1    patent office, even though the patent office knew of the '163

2    patent at issue in this case, right?

3     A. Apparently so.

4     Q. So the patent office concluded that the Omron patented

5    inventions were different from the invention of the '163

6    patent, correct?

7            MR. GLITZENSTEIN:  Objection, Your Honor.  Calls for

8    a legal conclusion, lack of foundation.

9            THE COURT:  Sustained.

10           MR. GALLEGOS:  Can we put up PDX444.

11    Q. So this has been shown to the jury a couple of times, at

12   least, now, Dr. Darrell.  Just to clarify, this is the source

13   code implementation for OKAO; is that correct?

14    A. I believe so.

15    Q. And do you understand -- actually, let's highlight the B

16   minus A minus 1 less than zero.  Do you understand that Dr.

17   Mundy points to this entire operation as supposedly being

18   linear?

19    A. I do.

20    Q. And do you agree with that?

21    A. No, it's not linear.  It has two steps, one of which is

22   decidedly nonlinear; therefore, it's nonlinear.

23    Q. Again, what was your point about the inequality that is

24   in this operation?

25    A. The inequality in a programming language is a function.

DARRELL - REDIRECT

1    So this is a function that takes two arguments, compares

2    them, and returns a zero or a 1.

3     Q. And next, Dr. Darrell, you were asked about questions and

4    answers that took place during your deposition regarding

5    Pine.  Do you recall that?

6     A. I do.

7     Q. And you were shown a portion of your deposition

8    transcript at page 185?

9     A. Yes.

10           MR. GALLEGOS:  And so I would like to put up, Your

11    Honor, part of the transcript at page 186, under the doctrine

12    of completeness.

13           THE COURT:  Okay.  Any objection?

14           MR. GLITZENSTEIN:  No, Your Honor.

15           THE COURT:  Go ahead.  You may publish it.

16           MR. GALLEGOS:  Thank you, Your Honor.

17           And in particular, if we could highlight lines 11

18    through 17, or blow them up.

19     Q. And do you see here, Dr. Darrell, you were asked, "Do you

20    have an understanding of what Pine means?"

21           And you responded, "Well, Pine, I -- I don't know

22    exactly what the variable name or module name means, but this

23    is the module that has the structures that is performing the

24    weak classifiers in Dr. Mundy's lingo."

25           Do you recall that testimony now?

DARRELL - REDIRECT

1      A. I do.

2      Q. And what were you referring to there?

3      A. Well, I -- I believe earlier in the questioning, I was

4      asked to refer to a specific Pine element.  I think it was

5      Pine2D4 or something like that, and I didn't know exactly

6      what Pine2D4 was.  And so that is what led to the following

7      questions.  But I did know that Pine was the module that was

8      performing the weak classifiers, which is the most important

9      thing.

10          It's also worth noting that the overall structure

11     and function of these different implementations, Pine,

12     Parfait, and OKAO, are agreed by both sides to be equivalent.

13     And therefore, there is no meaningful difference between

14     them.

15     Q. Thank you, Dr. Darrell.  And lastly, you were asked some

16     questions about the Yow thesis.  Do you recall that?

17     A. Yes.

18     Q. And you were asked about some -- two major problems using

19     the second derivative Gaussian filter.  Do you recall that?

20     A. Yes.

21     Q. So in the Yow thesis, how does the author, Yow, deal with

22     these two supposed major problems?

23     A. I don't remember -- I haven't re-read that thesis in the

24     last few weeks, but my expectation, if you read the following

25     pages, he would say you couldn't just use an elongated

DARRELL - REDIRECT

1      Gaussian alone to detect faces; it would have two major

2      problems, and probably more, so you need all of the rest of

3      the ideas in his thesis to make it work.

4       Q. So, for example, with regard to -- with regard to one of

5      the problems using the second derivative Gaussian filter is

6      that the case that a second filter is employed, a Canny edge

7      detector?

8       A. That's correct.

9       Q. And did you discuss that in your direct examination?

10      A. I did.

11      Q. And with regard to the inter-feature measurements, do you

12     recall that?

13      A. Not specifically.

14              MR. GALLEGOS:  Pass the witness, Your Honor.

15              THE COURT:  Okay.  Recross?

16              MR. GLITZENSTEIN:  No, Your Honor.

17              THE COURT:  You may step down.  Thank you for coming

18     in.

19              May this witness be excused?

20              MR. GALLEGOS:  Yes, until our rebuttal, Your Honor.

21              THE COURT:  Okay.  You are excused at this time.  We

22     may see you again.  Good afternoon.

23              MS. KRUZE:  Nikon calls Robert Pressman to the stand

24     via deposition, and moves into evidence JTX2233.

25              THE COURT:  Okay.

```
 1                    (Thereupon, Exhibit Number JTX2233 was received in

 2          evidence.)

 3                    MS. KRUZE:  Thank you.

 4                    (Thereupon, the video was played.)

 5                    MS. KRUZE:  Your Honor, at this time Nikon calls

 6          Wolfgang Singer by deposition, and moves into evidence

 7          JTX2234, pages of his depo testimony.

 8                    (Thereupon, Exhibit Number JTX2234 was received in

 9          evidence.)

10                    (Thereupon, the video was played.)

11                    MS. KRUZE:  Your Honor, at this time Nikon calls

12          Michael Kaschke, an employee from the plaintiffs, via

13          deposition, and enters into evidence JTX2235, pages of the

14          deposition transcript.

15                    THE COURT:  Okay.

16                    (Thereupon, Exhibit Number JTX2235 was received in

17          evidence.)

18                    MS. KRUZE:  Thank you, Your Honor.

19                    (Thereupon, the video was played.)

20                    MS. KRUZE:  Your Honor, at this time Nikon calls

21          Andreas Zeiler, also by deposition, and move into evidence

22          JTX2236, pages from his deposition transcript.

23                    THE COURT:  Okay.

24                    (Thereupon, Exhibit Number JTX2236 was received in

25          evidence.)
```

1                    MS. KRUZE:  Thank you.

2                    MR. GLITZENSTEIN:  Your Honor, if I may have a

3       moment.  Just a few housekeeping issues while we are waiting.

4                    THE COURT:  We are through with that witness, right?

5                    MR. BELUSKO:  Yes, Your Honor.  We are bringing in a

6       live witness.

7                    THE COURT:  Counsel?

8                    MR. GLITZENSTEIN:  Two issues, Your Honor.  It was

9       noted to me that with regard to the pages of the Yow thesis

10      that I examined Dr. Darrell on at the end of cross, pages 47

11      and 48, they are not yet in evidence, and I would move them

12      in.

13                   THE COURT:  They will be received.

14                   MR. GLITZENSTEIN:  Thank you, Your Honor.  And I

15      would also move in the video of Dr. Darrell's video

16      deposition that I played.

17                   THE COURT:  It will be received.

18                   MR. GLITZENSTEIN:  Thank you, Your Honor.

19                   THE COURT:  Next witness?

20                   MR. BELUSKO:  Your Honor, the next witness will need

21      translation, and Ms. Yuka Teraguchi will examine.

22                   THE CLERK:  This is our same interpreter?

23                   MR. BELUSKO:  Yes.

24                   THE CLERK:  This witness's name?

25                   MS. TERAGUCHI:  His name is Mr. Shinsuke, last name

```
 1        S-a-n-b-o-n-g-i.

 2                 THE CLERK:  Thank you.

 3                 MS. TERAGUCHI: Thank you.

 4                 THE COURT:  Swear the interpreter -- been sworn in.

 5                 THE CLERK:  She's the same one.

 6            May I ask the witness please to state his full name

 7        for the record, and spell his last name.

 8                 THE WITNESS:  My name is Shinsuke Sanbongi, and the

 9        last name is spelled S-a-n-b-o-n-g-i.

10                 THE COURT:  Ladies and gentlemen of the jury, let me

11        remind you again that the evidence comes from the mouth of

12        the interpreter, not the witness.  So if any of you speak

13        Japanese, it has to come from the interpreter, not what you

14        might hear from the witness, okay?

15            Okay.

16                 THE CLERK:  May I ask the witness please to raise

17        his right hand.

18        THEREUPON:

19                            SHINSUKE SANBONGI,

20        Called in these proceedings and after having been first duly

21        sworn testifies as follows:

22                 THE CLERK:  Thank you.

23                 THE COURT:  And again, get as close to the

24        microphone as you can so we can hear you.  Okay.

25                 MS. TERAGUCHI: Good afternoon.  Your Honor, may I
```

SANBONGI - DIRECT

1    proceed?

2             THE COURT:  Yes, please.

3                      DIRECT EXAMINATION

4    BY MS. TERAGUCHI:

5     Q. Good afternoon, Mr. Sanbongi.  Please state your full

6    name.

7     A. It's Shinsuke Sanbongi.

8     Q. Where do you work?

9     A. I work at Nikon Corporation.

10    Q. What do you do at Nikon Corp?

11    A. I develop image sensors.

12    Q. Are you a manager?

13    A. I'm sorry.

14    Q. I apologize.  Please proceed with your answer.

15    A. I'm the development department manager for image sensors.

16    Q. How long have you worked on image sensors?

17    A. Approximately 20 years.  And that is 13 years at Nikon,

18   and then before that I worked at Pentax for about seven

19   years, also a camera company, on image sensors.

20    Q. Who manufactures the image sensor for Nikon digital

21   cameras?

22             THE INTERPRETER:  I had to clarify the name that he

23   mentioned.

24    A. Mostly Sony, but also Aptina, and Toshiba and Lunesis.

25             MS. TERAGUCHI: Could you please show PDX338?  Your

SANBONGI - DIRECT

1    Honor, this is a slide the plaintiffs have previously put up.

2              THE COURT:  Yes.

3    Q. Mr. Sanbongi, I want to ask you about the D3300, D5300,

4    D5500, D5600, D750, D810, D810A, D500 and the 7500.  Do these

5    cameras have Sony image sensors?

6    A. Yes, they do.

7    Q. Would you please put the slide down.  Who designed the

8    internal circuitries of these Sony image sensors?

9    A. They were -- the internal circuits were all designed by

10   Sony.

11   Q. Who designed the pixel layout of the Sony image sensors?

12   A. The pixel layout was also designed by Sony.

13   Q. What input did Nikon give to Sony with respect to these

14   Sony image sensors?

15   A. Nikon submits specifications to Sony on image sensors.

16   Q. What do you mean by "specifications"?

17   A. For example, it would include the number of pixels that

18   we need for the image sensors, and also the image quality

19   that we require.

20   Q. After Nikon gave those specifications to Sony, how much

21   more design work does Sony have to do?

22              MR. GLITZENSTEIN: Objection, Your Honor, foundation.

23              THE COURT:  Sustained.  Lay the foundation.  Or the

24   next question, either one.

25              MS. TERAGUCHI: I'm sorry?

SANBONGI - DIRECT

1          THE COURT: Either lay the foundation or ask another

2     question.

3     Q. Mr. Sanbongi, are you aware how much design work Sony

4     does on these image sensors?

5     A. So when Sony receives the specifications from Nikon, they

6     will start with the internal, designing the internal

7     circuitry.  So since they are starting from the very

8     beginning, it takes quite a long time.  So if I were to

9     compare it to a car, it would be as if Nikon had asked Sony

10    to design a car that can -- to develop a car that can go

11    200 miles an hour.  And so in response, Sony would have to

12    develop an engine that can go 200 miles per hour.  So that

13    would take a long time.  Sony -- sorry -- Nikon does not

14    provide any instructions on how that engine should be

15    designed.

16    Q. Mr. Sanbongi, are you familiar with residual images?

17    A. May I repeat my question?

18    Q. Are you familiar with residual images?

19          THE INTERPRETER:  Resid --

20    Q. R-e-s-i-d-u-a-l?

21    A. Yes, I am.

22    Q. What are residual images?

23    A. After a photo is taken, there remains on the photodiode

24    that is in the pixel -- that is in the image sensor pixels, a

25    photocharge.  A photocharge remains.  And then that

SANBONGI - DIRECT

1   photocharge will appear on the next photo that is taken.

2    Q. Does Nikon test the image sensors to see if there are any

3   residual images?

4    A. Yes, we do test them.

5    Q. How does Nikon do that?

6    A. First we will do a visual examination to see if it passes

7   Nikon's quality standards, and then we will also do a

8   quantitative analysis.  And we use this quantitative test to

9   set a tolerable level of residual image and confirm whether

10  or not there is a residual image that is lower than that

11  maximum acceptable level or not.

12   Q. How do those maximum levels of residual images compare

13  with the noise floor?

14          THE INTERPRETER:  Compare with the what?

15          MS. RANKS: Noise floor.

16          THE INTERPRETER:  Noise floor?

17          THE WITNESS:  It could be said that the residual

18  image is higher than the noise floor.

19   Q. Does Nikon check if the photodiodes ever become

20  completely empty?

21   A. We do not.

22   Q. Why not?

23   A. Because even if there is a small amount of photocharge

24  remaining in the photodiode, you can still have a high

25  quality image.  So another way to say it is that even if

SANBONGI - DIRECT

1      the -- even if the photodiode is not completely empty, you

2      can still get a good quality image.

3        Q. Mr. Sanbongi, what are readout modes?

4              THE INTERPRETER:  I'm going to ask him to repeat his

5      answer.

6              THE WITNESS:  It indicates how much it is reading --

7      how the photodiode is reading the photocharge.

8        Q. Is photodiode the one that is reading out the

9      photocharge?

10       A. It indicates how the image sensor is reading the

11     photocharge from the photodiode.

12       Q. How can you change the readout mode?

13       A. There is a metal pin that is mounted on the outside of

14     the image sensor.  And this metal pin is connected to other

15     parts within the inside of the camera.  And so based on the

16     signals coming from the other parts in the camera, you can

17     change -- the readout mode can change.

18       Q. If you change the readout mode, does that impact any of

19     the signals inside the image sensors?

20       A. There are many different -- there is a variety of

21     manufacturing signals that are in the image sensor that come

22     from the image sensor.  I'm sorry.  I said manufacturing

23     signals, it should have been control, control signals.  So if

24     you change the readout mode, then it is possible that there

25     would be -- it would affect the control signals that come

SANBONGI - DIRECT

1    from the image sensor.

2    Q. Mr. Sanbongi, how do you know that?

3    A. Well, I've worked for 20 years on image sensor

4    technology, so it's based on my experience.

5    Q. What readout modes does the D4 camera have?

6    A. It has still image and video image modes.

7    Q. How many readout modes does the D4 camera have for still

8    images?

9    A. The D4 has an ISO of -- it can support an ISO from 100

10   all the way to 12,800.  And if it's under ISO 200, then it

11   would be in FD relation mode.  And then if it's in the ISO

12   modes from 200 to 12,800, then it does not use the FD link

13   mode.  And the FD link mode is where -- I'm sorry -- where

14   one photodiode has two floating diffusion.

15   Q. You mentioned FD relation mode.  Is that the same as or

16   different from FD link mode?

17           THE INTERPRETER:  This is the interpreter using two

18   different terms in English for the same term in Japanese.  So

19   I'll confirm that he used the same word in Japanese to mean

20   FD relation.

21           THE COURT:  Okay.

22           MS. TERAGUCHI: Thank you.  No further questions.

23           THE COURT:  Cross-examination?

24           MR. GLITZENSTEIN: Yes, Your Honor.

25                         CROSS-EXAMINATION

SANBONGI - CROSS

1    BY MR. GLITZENSTEIN:

2     Q. Good afternoon, sir.

3          MR. GLITZENSTEIN: Your Honor, at this time I would

4    move the admission of JTX68.

5          THE COURT:  It will be received.

6          (Thereupon, Exhibit Number JTX68 was received in

7    evidence.)

8     Q. Can we publish, please, pages 23 and 24.

9          Mr. Sanbongi, in the course of this litigation we

10   requested that Nikon identify the persons most knowledgeable

11   about the layout and function of the image sensor.  And, sir,

12   Nikon in response identified two gentlemen:  Mr. Shima and

13   Mr. Mori.  Are you aware of that, sir?

14    A. I do know Mr. Shima and Mr. Mori.

15    Q. And are you aware, sir, that you have never been

16   identified in this case as a person having knowledge about

17   the layout and function of any Nikon image sensor?

18    A. Could you say -- repeat your question?

19    Q. Certainly.  Are you aware, sir, that you have never been

20   identified by Nikon in this case as someone having knowledge

21   of the layout and function of any Nikon image sensor?

22    A. I don't know the chronology of these things.

23          MR. GLITZENSTEIN: Your Honor, I move the admission

24   of pages 23 to 25 of JTX 68.

25          THE COURT:  They will be received.

SANBONGI - CROSS

1            MR. GLITZENSTEIN: Thank you, Your Honor.

2            (Thereupon, Exhibit Number JTX68, pages 23-25 were

3       received in evidence.)

4       Q. Mr. Sanbongi, you know a Mr. David Etchells, true?

5       A. Yes.

6       Q. And you are aware that Mr. Etchells wrote an article

7       about Nikon's processes for designing its sensors for its

8       digital cameras, true?

9       A. Yes, I know that he wrote an article, or articles.

10      Q. Can we get JTX178 at page 1 on the screen?

11            And this is Mr. Etchells' article, true?

12      A. Yes.

13      Q. And Nikon sponsored the creation of that article, true?

14      A. Yes.

15      Q. And in fact, sir, you reviewed a draft of this article

16      before it was published, true?

17      A. Yes, I read a draft.

18      Q. All right.  And, sir, on behalf of Nikon, you cannot

19      point to anyplace in Mr. Etchells' article that is an error,

20      true?

21      A. You are saying I cannot point to an error?

22      Q. Correct.

23      A. Well, I read the article in draft form in Japanese, and

24      the final version was in English, which I am not very good

25      at.  So I just skimmed it briefly on the -- online.  So I

SANBONGI - CROSS

1    can't answer that clearly.

2              MR. GLITZENSTEIN: Your Honor, may I publish a

3    passage from Mr. Sanbongi's deposition, page 56, lines 16

4    through 21?

5              MS. TERAGUCHI: No objection, Your Honor.

6              THE COURT:  Yes, counsel.

7              MR. GLITZENSTEIN: Thank you, Your Honor.

8     Q. Mr. Sanbongi, at your deposition, you gave the following

9    testimony in response to the following question.

10             "Question" --

11             THE COURT:  Well, wait and let her translate that

12   for you.

13             THE COURT:  Okay.

14             "Question.  And on behalf of Nikon, you cannot point

15   me to a single specific place in the Nikon sensor article

16   that is incorrect?  Is that true?"

17             "Answer. I cannot point you to a -- someplace that

18   is in error."

19             And Mr. Sanbongi, you were, in fact, Nikon's

20   designated spokesperson to speak at deposition about

21   Mr. Etchells' article, true?

22    A. Yes.

23    Q. And Nikon didn't seek to mislead the public in any way

24   with regard to what was in Mr. Etchells' article, true?

25    A. No, they were not misleading anyone.

SANBONGI - REDIRECT

1          MR. GLITZENSTEIN: Thank you, sir.  No further

2     questions.  Pass the witness.

3          THE COURT:  Okay.  Redirect?

4          MS. TERAGUCHI: Yes, Your Honor.

5                    REDIRECT-EXAMINATION

6     BY MS. TERAGUCHI:

7      Q. Mr. Sanbongi, are you familiar with Mr. Mori?

8      A. Yes.

9      Q. Have you ever worked for Mr. Mori?

10     A. Yes.

11     Q. And have you assumed his position?

12     A. Yes.

13     Q. Mr. Sanbongi, have you ever reviewed a draft of

14     Mr. Etchells' article?

15     A. Well, the final version was, I just skimmed it online

16     because of my English is not very good.

17     Q. How about its draft version?

18     A. I did read the draft version, yes.

19     Q. Did you identify any errors in the draft version?

20     A. Yes, there were several places that were mistaken in the

21     draft.

22     Q. And did you identify those errors?

23     A. The one that I recall is that there was some areas that

24     were related to manufacturing, and that was something that

25     Etchells had believed that, had imagined that Nikon had done,

SANBONGI - REDIRECT

1   which Nikon does not do any manufacturing.  So I asked

2   Marketing to -- I asked them to make the change.

3   Q. And do you know if those corrections are reflected in the

4   final version of the article?

5   A. I -- my English isn't good, so I don't know what the

6   final version said, and I did not have the chance to confirm

7   what was in the final version.

8            THE COURT:  Ladies and gentlemen, it's 4:00.  We'll

9   break at this time.  We are going to come back in tomorrow

10  morning at 8:30, which means you are going to be in about

11  8:15.  Okay.  See you back at that time.

12           Somebody asked the clerk, and we don't -- we, you

13  know, what the status of the case is.  You know, it proceeds

14  depending on what evidence comes in, but I think that you can

15  count on the fact that the evidence will be over sometime by

16  Wednesday, okay?  So with that, that gives you a little bit

17  of feeling as to where we are on the case.

18           Remember the admonishment not to discuss the case

19  among yourselves or anyone else, or form or express any

20  opinions on the matter until it's submitted to you and you

21  retire to the jury room.  Have a pleasant evening.  We'll see

22  you about 8:15 in the morning.

23           Okay.  We'll be in recess.

24           (Thereupon, the jury retired from the courtroom.)

25           (Thereupon, the Court was in recess.)

```
1                      *****      *****      *****

2

3       I certify that the foregoing is a correct transcript from the

4       record of proceedings in the above-titled matter.

5

6

7

8       --------------------------

9

10      Amy C. Diaz, RPR, CRR              December 10, 2018

11      S/  Amy Diaz

12

13       Exhibit Number JTX1623D                          707

14       CONTINUED DIRECT EXAMINATION                     707

15       BY MR. GALLEGOS

16       Exhibit Number JTX1655                           710

17       Exhibit Number JTX1655, pages 1-2               713

18       Exhibit Number JTX1908                           724

19       Exhibit Number JTX1908 pages 1 and 4            725

20       Exhibit Number JTX2085, page 1                  728

21       Exhibit Number JTX1908, pages 1, 3, 4, 7, 10, 16,   732

22       22 and 23

23       Exhibit Number JTX2080                           734

24       Exhibit Number JTX167                            735

25       Exhibit Number JTX167, pages 1, 3 and 4         736
```

1    Exhibit Number JTX1909, pages 1, 2, 4, 33, 46,         740

2    47, 48, 56, 58, 73, 78 and 159

3    Exhibit Number JTX1857                                  743

4    Exhibit Numbers JTX1856, JTX1916 and JTX2072            744

5    Exhibit Numbers JTX1856, pages 1, 2 and 3,              748

6    JTX1916, pages 1, 2, 3 and 4 and JTX2072, pages

7    1, 8, 9 and 19

8    CROSS-EXAMINATION                                       748

9    BY MR. GLITZENSTEIN

10   Exhibit Number JTX2231                                  753

11   Exhibit Number JTX2232                                  756

12   Exhibit Number JTX297                                   761

13   REDIRECT-EXAMINATION                                    774

14   BY MR. GALLEGOS

15   Exhibit Number JTX2233                                  779

16   Exhibit Number JTX2234                                  779

17   Exhibit Number JTX2235                                  779

18   Exhibit Number JTX2236                                  779

19   SHINSUKE SANBONGI                                       781

20   DIRECT EXAMINATION                                      782

21   BY MS. TERAGUCHI

22   CROSS-EXAMINATION                                       787

23   BY MR. GLITZENSTEIN

24   Exhibit Number JTX68                                    788

25   Exhibit Number JTX68, pages 23-25                       789

1     REDIRECT-EXAMINATION                                      791

2     BY MS. TERAGUCHI

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25