1                    UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3             HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4

5

6    CARL ZEISS AG, et al.,            )
                                       )
7              Plaintiffs,             )
                                       )
8                    vs.               )
                                       )   2:17-CV-7083-RGK
9    Nikon Corporation, et al.,        )
                                       )
10             Defendants              )
     _____)

11

12

13                 REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                            PM SESSION

15                     Los Angeles, California

16                   Tuesday, December 11, 2018

17

18

19          _____

20

21

22                    AMY DIAZ, RPR, CRR, FCRR
                      Federal Official Reporter
23                    350 West 1st Street, #4455
                      Los Angeles, CA 90012

24

25      *Please order court transcripts here:  www.amydiazfedreporter.com*


                AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1        APPEARANCES OF COUNSEL:

2

         For the Plaintiffs:
3

4                        FISH & RICHARDSON P.C.
                         By:  Christopher S. Marchese, Attorney at Law
5                        633 West Fifth Street, 2th Floor
                         Los Angeles, California 90071
6
                         FISH & RICHARDSON P.C.
7                        By:  Kurt L. Glitzenstein, Attorney at Law
                         One Marina Drive
8                        Boston, Massachusetts 02210-1878

9                        FISH & RICHARDSON P.C.
                         By:  Jennifer Huang, Attorney at Law
10                       60 South Sixth Street
                         Minneapolis, Minnesota 55402
11

12
         For the Defendants:
13
                         MORRISON & FOERSTER LLP
14                       By:  Vincent J. Belusko, Attorney at Law
                         707 Wilshire Boulevard
15                       Los Angeles, California 90017-3543

16                       MORRISON & FOERSTER LLP
                         By:   Diana B. Kruze, Attorney at Law
17                       425 Market Street, 32nd Floor
                         San Francisco, California 94105-2482
18
                         MORRISON & FOERSTER LLP
19                       By:  Hector G. Gallegos, Attorney at Law
                         2000 Pennsylvania Avenue NW, Suite 6000
20                       Washington, D.C. 20006-1888

21

22

23

24

25

VANNATTER - DIRECT

1              THE COURT:  The record will reflect that all the

2     jurors are in their respective seats in the jury box, the

3     witness is on the witness stand.

4              And, Counsel, you may continue.

5              MR. BELUSKO:  Thank you, Your Honor.

6              Your Honor, I would like to move JTX1778 into

7     evidence, and it's a physical exhibit.

8              THE COURT:  It will be received.

9              (Thereupon, Exhibit Number JTX1778 was received in

10    evidence.)

11             MR. BELUSKO:  May I approach?

12             THE COURT:  Yes.

13             THE WITNESS:  Thank you very much.

14    BY MR. BELUSKO:

15     Q. Mr. Vannatter, what is JTX1778?

16     A. That is a D4 camera, Nikon D4 camera.

17     Q. What contributes to getting great pictures, high-quality

18    images?

19     A. Um, there are many, many things, but I think you can

20    break it down into a very subset of features.  This is

21    obviously the lens.  When Nikon started a hundred years ago,

22    we were an optical manufacturer, and that is where our

23    expertise began, and that is where it is today.

24             So the first thing, when you are talking about what

25    takes a great picture, is you have to have good optics.  If

VANNATTER - DIRECT

1    this is not a good piece of glass, what is coming through

2    here will degrade the image quality dramatically.  The first

3    is optics.

4            The second thing is if you look through here, and

5    you watch what happens when you take the picture, there is a

6    mirror right there.  And that mirror will come up, and there

7    is a shutter that opens, and the sensor is sitting right

8    behind the shutter.  The sensor is the second thing that

9    determines a high-quality image.

10            The third thing is the imaging processing unit.  And

11   basically, that is the onboard computer.  So the processing

12   unit processes all the images coming in from the sensor and

13   creates the detail.  And those three things work in

14   conjunction with each other.  And then each camera has

15   picture control functions, that you can manipulate the image

16   and do certain things with.

17            So between those four things, that really determines

18   how high quality of an image you get coming out of any

19   camera.

20   Q. Well, what is ISO, and what is it used for?

21   A. ISO is related -- let me back up a little.  What happens

22   is when you -- when light is coming through this lens, you

23   will see the lens can open and close.  It's called the

24   aperture.  And at its widest point, it's letting a great deal

25   of light in.  When it closes down, it's letting very little

VANNATTER - DIRECT

1    light in.  So you have the amount of light coming through the

2    lens.

3         Number two, as I explained, when that mirror goes

4    up, that shutter opens and closes.  So when that shutter

5    opens, in this camera, it can open and close as long as

6    30 seconds, or it can open and close as fast as one

7    ten-thousandth of a second.

8         So these two things in every camera that you -- even

9    a smartphone, it's the amount of light coming through the

10   lens and how much the shutter opens and closes.  So if you

11   allow more light to come through the lens, the shutter will

12   open and close quicker.  If you close that lens down and less

13   light is coming through, the shutter will stay open longer.

14        So where the ISO comes in to play is the sensor --

15   the ISO is basically the sensitivity of the sensor.  So ISO

16   allows you to either dial it up -- and we call that a high

17   ISO.  And when you dial that up, the sensor becomes more

18   sensitive to light.

19        So if you are in a room like this, and I'm trying to

20   take a picture of you, and there is not a lot of brightness,

21   I may want to dial -- I could do a couple of things.  I could

22   open the lens up as far as it goes.  I can open the shutter

23   up.  And remember, at some point the shutter stays open too

24   long, and if I wiggle the camera, it will give me a blurry

25   picture.  So you have to have a fast enough shutter that it

VANNATTER - DIRECT

1    stops and creates a solid image.

2              The ISO, once I -- the shutter and the aperture

3    can't open enough to give me enough light, I can dial that

4    higher ISO to give me an add light.  In the same way, a low

5    ISO would be, I dial the sensitivity of the sensor down.  And

6    then if I were in too bright of lighting condition, it would

7    make the sensor less sensitive, and you would be able to take

8    the picture then.

9              So I hope that helps you understand.

10   Q. Are there ways to deal with extremely bright light

11   conditions, other than setting the camera to low ISO?

12   A. There are.  So if you are in an extremely bright,

13   high-lit condition -- and I would think of a snowy day, which

14   fortunately you don't have here, but back in New York we have

15   quite frequently now.  But snowy day and bright sunlight,

16   when you are squinting your eyes and you want to put your

17   sunglasses on, a similar situation.

18             So what you do is, the camera, you can control the

19   aperture and the shutter speed.  So you can take that

20   aperture, and you can close it down to its smallest point,

21   and then you can take the shutter speed and make it open very

22   fast, like one tenth of a second.

23             So between those two, most of the time you can

24   accommodate for bright light situations.  If you would be in

25   a situation where it wouldn't, you would then go to a lower

VANNATTER - DIRECT

1    ISO to make the sensor less sensitive.

2    Q. Is there anything else you can do, other than lower the

3    ISO?

4    A. There is one other thing.  If you look at this lens, it

5    actually has a lens hood on it, but there is screw-on

6    attachments.  They are called filters.  And you can screw on

7    what is called a neutral-density filter on the front of the

8    lens.  It works just like a pair of sunglasses.  It reduces

9    the amount of light coming in and allows you to take a

10   picture in bright light conditions.

11   Q. In connection with Nikon, do you believe that the

12   capability to set low ISO on a digital camera solved a

13   problem that existed for a long period of time?

14   A. Um, low ISO happens very infrequently, because it's

15   highly bright, brightly lit conditions.  And especially with

16   a camera like this, where you can shoot at a ten-thousandth

17   of a second.  It will open and close quickly.

18        You can accommodate that with shutter speed and

19   apertures, and you wouldn't need to go to an ultra-low

20   setting on your ISO.  I would say as far as feature-wise, no,

21   it is not something that is used frequently.

22   Q. Well, do you believe that the capability to set low ISO

23   on a digital camera drives demand for Nikon cameras?

24   A. No, it does not.

25   Q. Do you believe that the capability to set high ISO on

VANNATTER - DIRECT

1    digital cameras drives demand for Nikon cameras?

2     A. Now we are talking almost the opposite end of the

3    spectrum.  And I'm sure probably all of you have taken a

4    picture with your smartphone where you don't have enough

5    light.  And what happens?  The picture comes back dark.

6    There is no detail.  It can be grainy.  And that is what

7    happens in any camera.

8             So what you do in that case is, once again, you can

9    lower the shutter speed to allow more light to hit the

10   sensor.  You can open up the lens, which allows more light to

11   come through.  If those two don't work together, then you

12   dial up the ISO to a higher ISO.  And that combination

13   happens all the time.

14    Q. What are megapixels?

15    A. Megapixels, it's the building block of a picture.  In the

16   late 1980s, when digital cameras were first introduced, a

17   camera had one megapixel.  And a megapixel means that there

18   were one million pixels on that sensor.  We fast-forward to

19   today, and today we can have cameras that have 50 and 60

20   million megapixels.

21             So a megapixel is simply the number of pixels on the

22   sensor that allows for image quality.

23    Q. Well, do you believe that megapixel count drives demand

24   for Nikon cameras?

25    A. Um, in the late 1980s, that was true, and the first five

VANNATTER - DIRECT

1    years of digital cameras.  Because the first year, we had a

2    one-megapixel camera.  The next year, we had a two million,

3    and everybody would go, Ooh, I have a one megapixel -- one

4    million [sic] megapixel, but this one is double.  Then we

5    came out with four megapixel, and everybody went, Ooh, I have

6    to get rid of my two million and I have to buy a four

7    million.

8              As we got up to 16 and 20 and 40, it becomes -- the

9    megapixel race is kind of over.  And as a matter of fact,

10   this camera, which is our top-of-the-line camera used by

11   sporting professionals all over the world, has less

12   megapixels than our next less expensive camera.  And more

13   doesn't always mean better.  It's a combination of the things

14   that we talked about earlier that give you a good picture.

15   Q. What, if anything, does Nikon, Inc. do to market its

16   cameras?

17   A. We do various things.  We -- first of all, we are

18   100 percent responsible for the United States in marketing a

19   product.  We obviously have our own website.  We do print

20   advertising, we do digital advertising.  There is many

21   different avenues that we utilize to advertise our products.

22   Q. Does Nikon, Inc. do anything to market or advertise

23   specific features of its cameras?

24   A. As I explained earlier before lunch, brand is the most

25   important thing to us.  Whenever we do advertising, it's

VANNATTER - DIRECT

1    always we want to make sure that people see our product in

2    the best of light.  Highest of quality, great reputation,

3    great brand.  So all of our advertising, that pillar is at

4    the top to start our advertising campaigns.  And then once we

5    introduce new products with new features, we try to educate

6    the consumer as to what those features are.

7            And in advertising, any advertising executive will

8    tell you that -- take 100 percent of their budget, and they

9    will tell you that 10 to 20 percent of that budget is very

10   effective, and the other 70 to 80 percent is not so much.

11           They just don't know which part is effective and

12   which part is ineffective, so they have to continue to spend

13   the 100 percent.  It's a very, very challenging aspect of the

14   market in how you advertise.

15   Q. Well, is there a relationship between Nikon's advertising

16   and the features that drive demand?

17   A. Um, I think the relationship is -- it's very difficult to

18   equate.  There are many times where we will advertise a

19   feature that we think is effective, and that is really going

20   to be impacted into the marketplace, and the consumer doesn't

21   really care about that feature.  And other times, they really

22   take to that.  And it's really a challenge sometimes to know

23   what the consumer is going to do.

24   Q. Do Nikon representatives perform any demonstrations for

25   customers?

VANNATTER - DIRECT

1      A. Um, we have representatives throughout the country and

2      those people in the photo specialty channel.  And that

3      channel would be -- out here, there is Samy's camera, is a

4      common camera store out here.  In that channel, we do do

5      demonstrations.

6           Probably at Samy's, once or twice, maybe three times

7      a year, where consumers will come in.  And we'll have our

8      line of cameras out, and you can ask questions specifically

9      to someone who is employed by Nikon.  In the other channels,

10     like the Target and the Walmart, we do not do that there.

11          We may do it every once in a great while in a Best

12     Buy, but mostly it's geared to either photo specialty or,

13     like, the Consumer Electronics Show, that type of thing.

14     Q. Do Nikon representatives actually take pictures,

15     themselves, during these demos?

16     A. Um, they would not take pictures per se, but they would

17     carry pictures with them, usually on a computer, to show

18     results that the cameras do.

19          MR. BELUSKO:  Your Honor, I would like to move into

20     evidence JTX1706, which is another camera.

21          THE COURT:  Okay.  It will be received.

22          (Thereupon, Exhibit Number JTX1706 was received in

23     evidence.)

24          MR. BELUSKO:  May I approach?

25          THE COURT:  Yes.  Do you want the first camera back,

VANNATTER - DIRECT

1      or leave it up there?

2                  MR. BELUSKO:  We'll leave it up there, I think, for

3      now.  Thank you.

4                  THE WITNESS:  This one is a little bit easier.

5       Q. Mr. Vannatter, what is JTX1706?

6       A. Um, this camera would be a compact digital camera or a

7      point and shoot camera.  You remember I explained we had

8      point and shoot cameras, we had interchangeable-lens DSLRs

9      that had a mirror, and then we have mirrorless cameras.

10                 This falls in the line of a point and shoot camera,

11     which means I press the button here and take the picture.

12      Q. What are the characteristics of a point and shoot camera?

13      A. Point and shoot camera does not have interchangeable

14     lenses like this camera does.  Usually everything is

15     automated so it's easy to use.  And that is really what

16     attracts people.

17                 You can see, if I press the button here, this lens

18     will zoom.  So I can bring things way in and up close with

19     the telephoto lens, or I can go wide angle.  And so it's kind

20     of like one of these cameras that is easy to use, with not as

21     much feature sets.

22      Q. Is the Nikon P510 representative of all of Nikon's

23     compact cameras?

24      A. No.  Consumers have many different needs and wants in a

25     camera.  So, for example, you can't take this on the beach

VANNATTER - DIRECT

1      and get it wet, but we do have cameras that are waterproof

2      and shockproof.  So this is only one camera of many that we

3      manufacture and sell with different feature sets.

4       Q. Do you have an understanding of Nikon's market share in

5      the United States compact segment?

6       A. Nikon, currently our share hovers around 13 to 14 percent

7      of the total market.

8                MR. BELUSKO:  Your Honor, I would like to move into

9      evidence JTX1591, which is the user manual for that camera.

10               THE COURT:  Which pages of the user manual?

11               MR. BELUSKO:  There is going to be a number, but I'm

12     going to start at 47, Your Honor.

13               THE COURT:  Okay.  47 will be received.

14               (Thereupon, Exhibit Number JTX1591, page 47 was

15     received in evidence.)

16      Q. Let's go to page 47.  And what is shown on this page,

17     Mr. Vannatter?

18      A. So this is a P510 user instruction manual, and this page

19     is depicting the different shooting modes.  And those

20     shooting modes are right here on top of the camera, so it's

21     showing this dial on top of the camera.  And there are

22     basically -- if you go around the dial, there are 11

23     different shooting modes that you can use this camera for.

24      Q. And what is a shooting mode?

25      A. A shooting mode is, for a specific type of picture, you

VANNATTER - DIRECT

1    may want to put it into a specific type of mode.  Most

2    people -- if you look, there is a little green dial.  There

3    is a reason there is a green dial there.  That is the most

4    automated button.  And our research indicates that people put

5    it in the green mode, and they take off and they go, and they

6    point and shoot.  But there are other feature sets on here,

7    if available.  And there are 11 different functions on the

8    shooting modes.

9     Q. What are PSAM modes?

10    A. So you remember how I talked about shutter speed and

11    aperture and controlling those.  PSA and M modes allow you to

12    control the shutter speed and the aperture in this camera.

13           MR. BELUSKO:  Your Honor, I move in pages 78 to 80,

14    and I'm going to go to those next.

15           THE COURT:  Okay.

16           (Thereupon, Exhibit Number JTX1591, pages 78-80 were

17    received in evidence.)

18    Q. Let's go to page 79, if we can bring that one up, and ask

19    you, Mr. Vannatter, what is shown on page 79 of JTX1591.

20    A. So once you are in either the PSAM mode, where you can

21    control shutter speed or aperture, you can then drill down

22    into the next level of the menu.  And there is approximately

23    30 different functions here that the user would have

24    availability to change the settings of the camera.

25    Q. Okay.  What is AF area mode?

VANNATTER - DIRECT

1    A. So AF area mode, you can see at the bottom here, is one

2    of the subsets of the 30, and that is basically what focusing

3    modes the camera has when you are putting it in the PSAM

4    mode.  And you can see there are six different modes.  There

5    is face-priority, there is auto, there is manual, there is

6    center, there is subject tracking, and there is target AF.

7    Q. What is AF face-priority mode?

8    A. Face-priority mode is just what it says.  When you set

9    the camera to that mode, it now -- the camera searches for

10   faces in the view finder and is going to focus on those

11   faces.

12   Q. Do Nikon representatives use AF face-priority mode in

13   their demos?

14   A. I don't believe so.

15   Q. Do Nikon, Inc. employees, otherwise, use or test AF

16   face-priority mode?

17         MR. MARCHESE:  Objection.  Foundation, speculation.

18         THE COURT:  Overruled.

19         THE WITNESS:  No, they do not.

20   Q. Does Nikon encourage customers to use AF face-priority

21   mode?

22   A. I think when the camera was first introduced and that was

23   a new feature set coming out, we would certainly tell the

24   customer and try to educate them about it.  But in the

25   reality, if you say, Do people take it out of the green mode,

VANNATTER - DIRECT

1      go to PSAM, then dial down to the 30 different functions and

2      go to auto focus, and then go to face-priority, and then

3      allow the camera to set, no, they do not.

4       Q. Do you believe that AF face-priority mode drives demand

5      for any Nikon cameras?

6       A. No, I do not.

7       Q. Do you believe there would be any impact on sales if

8      Nikon were to remove AF face-priority mode from cameras?

9       A. There would be no impact.

10      Q. Okay.  Are there -- are there negatives about using AF

11     face-priority mode?

12      A. Most people -- in this type of camera, most people are

13     aware that there is a center area in the focus.  And when you

14     are in the green mode, you just simply press the shutter

15     release, and you hear that beep.  That is telling you it's

16     locked the focus.  I can then turn the camera and reposition

17     the camera, and then take the picture.  What happens in

18     face --

19           THE COURT:  Let me help you out.  We discussed this

20     prior.  Never point the camera at the jury.  If you take a

21     picture in court, you are violating the regulations here.

22           THE WITNESS:  Understood.

23           THE COURT:  You can describe it, hold it up, but you

24     never use the camera in the courtroom.

25           Go ahead, Counsel.

                          VANNATTER - DIRECT

 1              THE WITNESS:  Um, I'm trying to think where I was.

 2    Oh --

 3              THE COURT:  Okay.  We'll go to the next question and

 4    help you out.

 5              THE WITNESS:  I just want to finish this thought.

 6              THE COURT:  Sure.

 7              THE WITNESS:  So in face-priority, the challenge can

 8    be -- so, for example, if I was taking a picture of all of

 9    you, and I was in face-priority, it would detect your faces.

10    And the default setting is it's going to focus on the closest

11    face, so it's going to focus on her.  Where if I point the

12    camera at the center focus, and I want to focus on one of the

13    two of you, I can point the camera there, press halfway down,

14    then readjust the view finder and take the picture.

15              So it's challenging in face -- it's good when you

16    have one face.  When you add multiple faces, it becomes a

17    challenge of which face it's choosing.

18    Q. Okay.  Mr. Vannatter, you earlier talked about the D4,

19    which you have up there.  What is the D4S?

20    A. The D4S was simply the camera that replaced the D4 with

21    minor modifications.

22    Q. Does Nikon currently sell the Nikon D4 or the D4S?

23    A. Um, both of those cameras were discontinued in 2016, so

24    we do not any longer sell these cameras.

25    Q. And when did Nikon first sell the D4 in the U.S.?

VANNATTER - DIRECT

1    A. 2014, I believe.

2    Q. What customers did Nikon target with the D4 and D4S?

3    A. So this is strictly a professional user camera.  This is

4    targeted to the person who is making their living shooting

5    this camera.  And it's frequently used for fast-action,

6    high-speed photography.  And you will -- this camera actually

7    shoots at 10 frames a second.  So when I hit the shutter

8    release button, it can shoot 10 pictures in one second.

9         And when you see at sporting events, and you see at

10   NASCAR, somebody -- you see a car that is -- that has rammed

11   into another car and it's flying in the air, and it's upside

12   down in the air, and it's frozen time, that was probably shot

13   with a D4 or D4S, or currently the D5, because of the speed,

14   the auto focus.  And the high ISO allows you to dial up the

15   sensor to get those kinds of pictures.

16   Q. Well, what characteristics distinguish the D4 as Nikon's

17   flagship camera, at the time it was sold anyway?

18   A. Well, once again, speed, auto focus speed, motor drive

19   speed, high ISO capability, durability.  All of those things

20   that the demanding sports or journalist photographer needs is

21   in the D4 or the D4S.

22   Q. Is the Nikon D4 or D4S representative of all of Nikon's

23   DSLR cameras?

24   A. No.  Because, obviously, most people don't need this type

25   of quality of camera that has the spec and feature set.  So

VANNATTER - DIRECT

1    we make many different DSLRs with many different feature sets

2    that appeal to many different target audiences.

3     Q. Do you have an understanding of Nikon's market share in

4    the United States' DSLR segment?

5     A. I do.  We sell approximately four out of every 10

6    interchangeable-lens DSLR cameras in the United States.

7              MR. BELUSKO:  I would like to move, Your Honor,

8    JTX0449, which is the manual for the D4.  And I'll first go

9    to page 32.

10             THE COURT:  So you want to introduce page 32 of

11   that?

12             MR. BELUSKO:  Yes, Your Honor.

13             THE COURT:  It will be received.

14             (Thereupon, Exhibit Number JTX0449, page 32 was

15   received in evidence.)

16    Q. And we'll bring that up.  What is shown here?

17    A. This is the -- there we go.  This is actually the back of

18   the camera.  And it's showing the different buttons, and it's

19   describing the function of each of those buttons.

20    Q. What is item 12?

21    A. Item 12 is what is called the live view selector.  And

22   that, you just flip here, and then it will allow you -- what

23   happens is, in live view selector -- and it's used for video

24   shooting, is its main purpose -- the mirror that you saw

25   rises, and the screen will show up, the picture will show up

VANNATTER - DIRECT

1    back here.

2              And when you are shooting video with a camera that

3    has a mirror, the mirror can't be in the down position,

4    because it's shooting pictures all the time.  It's a moving

5    picture, where in still, the mirror raises and it records

6    that picture.

7              So the live view, you flip the switch, the mirror

8    pops up.  You are now -- you can't look at the optical view

9    finder anymore, you have to look at it back here, and it will

10   show up back here.

11    Q. Okay.

12              MR. BELUSKO:  Your Honor, I would like to move

13   JTX449, page 78, same manual.

14              THE COURT:  It will be received.

15              (Thereupon, Exhibit Number JTX449, page 78 was

16   received in evidence.)

17    Q. Let's go to that page, please.  What is shown here?

18    A. That is the focusing options that you have in live view.

19   And once again, live view is where most of the time a person

20   is going to be shooting video.

21    Q. What is auto focus?

22    A. We explained the lens, in an auto-focused camera, rather

23   than manually focus here, it auto focuses the lens itself.

24   The camera does that.

25    Q. Okay.

VANNATTER - DIRECT

1          MR. BELUSKO:  Your Honor, I would like to move page

2     79 of JTX0449.

3          THE COURT:  It will be received.

4          (Thereupon, Exhibit Number JTX0449, page 79 was

5     received in evidence.)

6     Q. Okay.  Let's go to that.  And what does this page show?

7     A. So once again, we are still in live view.  We have gone

8     to the focusing section.  And now we are drilling into what

9     kind of mode you would like to put the camera in.

10         And you have four choices.  You have face-priority,

11    which we discussed previously; wide area auto focus, which

12    takes in a wider area; normal area auto focus, which is the

13    center; and subject tracking, which means that if I'm a

14    sports photographer on the sidelines watching a football

15    player, it's trying to track that football player.

16    Q. What is face-priority AF?

17    A. Face-priority is just like -- very similar to this.  It's

18    looking for a face and focusing on the face.

19    Q. Do you have to be in live view to access face-priority

20    AF?

21    A. You do.  You cannot use the optical view finder and shoot

22    in the face-priority AF.

23         MR. BELUSKO:  I would like to move into evidence

24    JTX0449, page 143, of this manual.

25         THE COURT:  It will be received.

VANNATTER - DIRECT

1              (Thereupon, Exhibit Number JTX0449, page 143 was

2     received in evidence.)

3      Q. And what is shown on this page?

4      A. This is a chart.  And I explained earlier ISO

5     sensitivity, how you can dial the sensor up to make it more

6     sensitive to light, down to make it less sensitive.  Up would

7     be high, down would be low.  And this is just explaining how

8     you can manually adjust that.

9      Q. What is the ISO range of the D4?

10     A. Um, I think if you look in the second line, from settings

11    that range from ISO 100 to 12,800.  So from 100 to 12,800

12    would be the different ranges that this particular camera can

13    shoot in.

14     Q. Okay.  Now, how does that compare to ISO range of other

15    Nikon cameras?

16     A. If you take D5, which is the successor to this camera,

17    its range is much greater.

18              MR. BELUSKO:  Your Honor, I would like to move into

19    evidence JTX0423 and go to page 394 of that manual.

20              THE COURT:  That's the manual?

21              MR. BELUSKO:  Yes, it is, Your Honor.

22              THE COURT:  Yes.

23              (Thereupon, Exhibit Number JTX0423, page 394 was

24    received in evidence.)

25              THE WITNESS:  So this is a D5 user manual.

VANNATTER - DIRECT

1      Q. Go to page 394, please.

2      A. I think if you scroll down to the bottom of this page.

3    Yeah.  The next-to-the-last paragraph, it starts out ISO 100.

4    So if you remember, on the D4, the range was started the same

5    as the D5, which is ISO 100.  The D5, however, goes to

6    102,400, compared to, I believe it was, 10,800.  So it's --

7    the sensitivity of this chip is much greater than a D4.

8      Q. Okay.

9            MR. BELUSKO:  Your Honor, just for the record, may I

10   move in on JTX0449 and JTX0423, page 1, so it identifies

11   those?

12           THE COURT:  Yes.

13           (Thereupon, Exhibit Numbers JTX0449, page 1 and

14   JTX0423, page 1 were received in evidence.)

15           MR. BELUSKO:  Thank you.  Now I want to go back to

16   JTX0449, and I would like to move into evidence page 144 of

17   that D4 manual.

18           THE COURT:  It will be received.

19           (Thereupon, Exhibit Number JTX0449, page 144 was

20   received in evidence.)

21     Q. What is shown on page 144?

22     A. As opposed to manually changing the ISO, this chart, it

23   will show how you can set it in auto, and it will

24   automatically change the ISO.

25     Q. All right.

VANNATTER - DIRECT

1          MR. BELUSKO:  And I would move in page 145 of

2     Exhibit 0449, Your Honor.

3          THE COURT:  It will be received.

4          (Thereupon, Exhibit Number JTX0449, page 145 was

5     received in evidence.)

6     Q. Let's bring that up.  What is shown on this page?

7     A. This is the -- once again, the sensitivity control of the

8     ISO on a D4.

9     Q. Okay.  Now, does the camera ever select ISO below 100?

10    A. Um, it does not.  It can go as low as 100, but that is as

11    low as it will go in the auto mode.

12         MR. BELUSKO:  Your Honor, move into evidence page

13    146 of JTX0449.

14         THE COURT:  It will be received.

15         (Thereupon, Exhibit Number JTX0449, page 146 was

16    received in evidence.)

17         MR. BELUSKO:  Thank you.

18         Bring up that page, please.

19    A. There you go.  On the fourth line, it says the minimum

20    value for auto ISO sensitivity is set to ISO 100.

21    Q. Okay.  Now, do you believe that the capability to set low

22    ISO on the camera drove demand for the Nikon D4 or D4S

23    cameras?

24    A. So once again, low ISO, you are dealing with very, very

25    bright conditions.  And the answer to that question would be

VANNATTER - DIRECT

1    no, because that type of picture, in frequency, is very rare

2    compared to the other type, which is high ISO.

3    Q. Are there some people that want low ISO?

4    A. Um, photography is an art.  People are artistic.  There

5    are people that want -- of the features that we have, there

6    is somebody in the world that will find whatever feature we

7    have out there, that they love it.  So you can't discount

8    that ISO 100 is there.  But in the photography business,

9    whether you are an amateur or you are a professional, one

10   thing they all have in common:  They are all chasing light.

11        There is not enough light to take a great picture.

12   When you look at the sidelines of a football game -- and have

13   you seen the lenses that are, like, this big?  So the reason

14   why those lenses are this big is not because the guy wants to

15   carry around a 20-pound lens.  It's because that lens has

16   glass in it that is this big.  And guess what that allows the

17   camera to do?  Bring in more light from that lens that has a

18   lot of glass.

19        Everything you do in photography, you are chasing

20   light.  Give me more light.  Give me more light.  People pay

21   15, 20 thousand dollars for those long lenses, just so they

22   can stop action of a football player catching a pass.

23   Q. Are you familiar with the Nikon DF?

24   A. I am.

25   Q. How is that related to the D4 and D4S?

VANNATTER - DIRECT

1      A. The DF is of similar features to the D4 and the D4S, but

2      it was a retro design camera.

3      Q. Move on.  Do you believe that the capability to set low

4      ISO on a digital camera drives demand for the Nikon DF or any

5      other Nikon camera?

6      A. I do not believe that.

7      Q. Do you believe there would be any impact on sales if

8      Nikon were to remove the very low ISO mode?

9      A. I do not.

10     Q. Are you familiar with the Nikon D3100?

11     A. I am.

12     Q. When did Nikon first sell the D3100 in the U.S.?

13     A. Um, I believe it was 2013.

14     Q. Are you familiar with the Nikon D90?

15     A. I am.

16     Q. Okay.  And when did Nikon first sell the D90 in the U.S.?

17     A. I believe that was 2010.

18     Q. Does Nikon currently sell any mirrorless cameras?

19     A. We do.

20     Q. What -- and how many?

21     A. Um, we currently have two cameras, a Z6 and a Z7

22     mirrorless camera.

23     Q. And what are the competitors for those?

24     A. The main competitors are Sony and their Alpha series,

25     Fuji has the X series, and Canon has the Canon EOS R that

VANNATTER - DIRECT

1    they just recently introduced.  That is the three major

2    competitors to that system.

3        Q. Are you familiar with the Sony RX1 camera?

4        A. I am.

5        Q. Is that a competitive camera with any of Nikon's cameras?

6        A. The Sony RX1 is a compact camera, like this camera, with

7    a big sensor like this camera.  But it does not have

8    interchangeable lenses, where our mirrorless cameras have

9    large sensors, but interchangeable lenses.

10           So the Sony RX1 is really -- it's a very expensive

11    camera.  It's an niche product that -- and it does not

12    compete with the Z series mirrorless cameras.

13        Q. Are you familiar with the Leica Q camera?

14        A. Similar camera, a little bit more expensive than the Sony

15    RX1.  Compact camera, full-sized sensor, no interchangeable

16    lenses, very expensive.  And would be of similar -- there

17    is -- it really doesn't compete with the interchangeable lens

18    category.

19        Q. Are you familiar with the Zeiss ZX1 camera?

20        A. Through litigation, I am.

21        Q. Does Nikon compete against the Zeiss ZX1 camera?

22        A. In the 35 years that I have been doing this, I have never

23    competed against a Zeiss camera.  And when they enter this

24    very niche product that is a noninterchangeable compact

25    camera, full-frame sensor, and they are going to compete

VANNATTER - DIRECT

1    against Canon and Nikon and Sony, I can't imagine they will

2    have little impact.

3     Q. To your knowledge, has Nikon, Inc. ever knowingly

4    infringed the patent of another company?

5     A. No.  We -- to my opinion, no, but I always defer those

6    types of questions to my legal department.

7     Q. To your knowledge, has Nikon, Inc. ever encouraged

8    customers to infringe the patent of another company?

9     A. No, not to my knowledge.

10    Q. Are you aware of HP ever contacting Nikon, Inc. raising

11    concerns about Nikon infringing any patents that HP owned at

12    the time?

13    A. Um, no, HP never contacted me, nor anyone at Nikon, Inc.

14    Q. Are you aware of MagnaChip ever contacting Nikon, Inc.

15    raising concerns about Nikon infringing any patents that

16    MagnaChip owned at the time?

17    A. No, sir.

18    Q. Are you aware of Intellectual Ventures ever contending

19    that Nikon infringes any of the patents that are asserted in

20    this case?

21    A. No, they never contacted Nikon, Inc.

22    Q. And are you aware of ASML or Zeiss contacting Nikon, Inc.

23    to raise concerns about Nikon infringing any digital camera

24    patents before they commenced litigation last year?

25    A. They did not to Nikon, Inc.

VANNATTER - CROSS

1    Q. Okay.

2              MR. BELUSKO:  Pass the witness.

3              THE COURT:  Okay.  Cross?

4              MR. MARCHESE:  Thank you, Your Honor.

5                          CROSS-EXAMINATION

6    BY MR. MARCHESE:

7    Q. Good afternoon, Mr. Vannatter.

8    A. Good afternoon.

9    Q. We met before, at your deposition in late July, correct?

10   A. Correct.

11   Q. All right.  And so what I would like to do first is talk

12   about ISO, or ISO and megapixels, if we could.  And you

13   testified about -- I'm trying to paraphrase what you said.  I

14   think you said something to the effect that most people don't

15   care about low ISO, right?

16   A. Um, I don't know that I said people don't care about it.

17   I said that the number of times that it's utilized compared

18   to high ISO is much lower.

19   Q. You would agree that in your -- at least your testimony,

20   high ISO settings are more commonly used than low?  That's

21   what you say, right?

22   A. Yes.

23   Q. Okay.  And you also testified -- I think I wrote your

24   words down here -- about megapixels, and you used the term

25   "the megapixel race is over."  Do you remember that?

VANNATTER - CROSS

1      A. The megapixel race is over because, as I explained in my

2      earlier testimony, when you go from one to two, to two to

3      four, to four to eight, everybody is going, Ooh, it's double,

4      it's double.

5              Now you get very similar pictures, whether it's a

6      16 -- for example, this has 24 megapixels.  The D850 has 46

7      megapixels.  The professional is going to use this camera,

8      even though it has less megapixels.

9      Q. A very simple question:  You testified that the megapixel

10     race is over, correct?

11     A. Yes.

12     Q. Thank you.  Now, you just talked about the Nikon Z6 and

13     Z7, right?

14     A. Yes.

15     Q. They were actually just released to the public about

16     three or four weeks after I took your deposition.  It was

17     about, what, late August, September of 2018, correct?

18     A. Um, we introduced the cameras on August 21st.  The Z7

19     started shipping in late September; the Z6 just started

20     shipping two weeks ago.

21     Q. Right.  Now, and I -- when I took your deposition, you

22     testified that the Z6 would be about $2,000, and the Z7 about

23     $3,500, correct?

24     A. If you say so.  I don't recall, but that's approximately

25     right.

VANNATTER - CROSS

1     Q. Okay.  But that is -- that is a body only, no lens,

2     correct?

3     A. Yes, correct.

4     Q. Right.  And a lens, as we see here, a printout from

5     Nikon's web page, for a Z-type camera can run you about a

6     thousand bucks, right?

7     A. For -- not a camera, for a lens.

8     Q. Right.  Now we are talking about the Z6 at $3,000 and the

9     Z7 at, you know, $4,500, with one lens, correct?

10    A. Um, actually, that lens that you have listed up here, if

11    you buy that lens at the time with the Z6, it's $2,600.

12    Q. $2,600, Z6.  Another 8 or 9 hundred bucks on top, and we

13    are over $4,000 for the Z7, correct?

14    A. Exactly $4,000 for the Z7 with a 2470.

15    Q. Now, is the vice president of marketing and sales -- you

16    are familiar with Nikon, Inc.'s website, correct?

17    A. Yes, I think so.

18    Q. And you've seen advertising for the Z6 and the Z7,

19    correct?

20    A. Yes.

21    Q. All right.  Well, let's take a look at the advertising

22    for the Z6 and the Z7.  I took this off the Nikon, Inc. web

23    page.  And here we show the very first thing advertised is

24    megapixels, correct?

25    A. Yes.

941

VANNATTER - CROSS

1    Q. And the Z7 has 45.7 megapixels.  That is the number one

2    feature identified, correct?

3    A. Um, I don't know that it's the number one feature on this

4    chart.  It's shown as the megapixels first, but that doesn't

5    necessarily -- we are not saying that's the number one

6    feature.

7    Q. Megapixels first, correct?

8    A. In this chart, it is.

9    Q. Okay.  Z6 at 24.5-megapixels, right?

10   A. Correct.

11   Q. About half the price, right?

12   A. It's $2,000 to $3,400.

13   Q. Okay.  So significantly less expensive to get a Z6 with

14   half the megapixels, right?

15   A. There are other factors of why the Z7 is more expensive

16   than the Z6 besides megapixels.

17   Q. I think the advertising speaks for itself.  About half

18   the megapixels, correct?

19   A. Yeah, but if you look at this chart, you have 273 auto

20   focus points, compared to 493.  You've got an ISO range that

21   is greater on the Z6.  It shoots faster.  There is many

22   different variables.

23   Q. That was my next point.  I appreciate that.  The third

24   item here on the list is ISO range, correct?

25   A. Yes.

VANNATTER - CROSS

1    Q. And, in fact, the Z7 is advertised to go down to 64,
2    correct?
3    A. That is correct.
4    Q. And the Z6, which is about $1,400 less, down to a
5    hundred, right?
6    A. That is correct.
7    Q. And if we go into the other side of the range, the Z7's
8    high ISO maximum is 25,600, correct?
9    A. That is correct.
10   Q. The Z6, less expensive, higher ISO, correct?
11   A. That is correct.
12   Q. Now, on direct, you testified that Nikon's cameras had, I
13   think, dozens -- or hundreds of features.  Lots of stuff you
14   identified.  But of those many features you talked about on
15   your direct, Nikon has chosen to advertise both the number of
16   megapixels and the low ISO to show off its new full-frame
17   mirrorless cameras, correct?
18   A. Yes.
19   Q. Now, I've got a demonstrative up here, PDX1303.  Have you
20   met, Dr. Cunningham?
21   A. I have not.
22   Q. Dr. Cunningham is an expert who will testify for Nikon
23   here shortly, probably today.  He was asked at his
24   deposition, "Is the number of megapixels an important part of
25   an image sensor?"  He said, "I would say yes."

CUNNINGHAM - DIRECT

1            Then he was asked, "Are the number of megapixels an

2       important part of a digital camera?"  Answer, "Again, I would

3       say yes."

4            Do you disagree with him?

5        A. No, I would agree with him.

6            MR. MARCHESE:  Nothing further, Your Honor.

7            THE COURT:  Okay.  Redirect?

8            You may step down.  Thank you very much for coming

9       in.

10           THE WITNESS:  Thank you.

11           THE COURT:  Next witness.

12           MR. BELUSKO:  Nikon calls Dr. Thomas Cunningham.

13           THE COURT:  Okay.

14           THE CLERK:  Right here to be sworn, please.

15      THEREUPON:

16                       THOMAS CUNNINGHAM,

17      called in these proceedings and being first duly sworn

18      testifies as follows:

19           THE CLERK:  Thank you.  You may be seated.

20           Counsel, will you need these cameras with this

21      witness?

22           MR. BELUSKO:  No.

23           THE CLERK:  Okay.  May I please ask that you state

24      your full name for the record, and spell your last name.

25           THE WITNESS:  My full name is Thomas John

CUNNINGHAM - DIRECT

1      Cunningham.  Cunningham is C-u-n-n-i-n-g-h-a-m.

2                  THE COURT:  Thank you.  You may inquire.

3                  MR. BELUSKO:  Thank you, Your Honor.

4                        DIRECT EXAMINATION

5      BY MR. BELUSKO:

6      Q. Dr. Cunningham, are you here today to provide your

7      opinion with respect to whether or not the asserted claims of

8      the '312, '017, and the '574 patent are invalid or valid?

9      A. Yes, I am.

10     Q. Dr. Cunningham, do you have a set of slides today to

11     assist you in your presenting your opinions?

12     A. Yes, I do.

13     Q. Okay.  I'm going to bring up slide DDX5.2, please.  Can

14     you please briefly describe your educational background?

15     A. I earned my bachelor's degree from The Ohio State

16     University, summa cum laude and with distinction.  I earned

17     my master's at Ohio State the next year.  And then I entered

18     the graduate program at Yale University, and I earned my

19     Ph.D. from Yale.

20     Q. Dr. Cunningham, are you currently employed?

21     A. Yes, I am.

22     Q. Where?

23     A. I'm employed by the Jet Propulsion Laboratory.

24     Q. And what is the Jet Propulsion Laboratory?

25     A. The Jet Propulsion Laboratory, or JPL, is a federally

CUNNINGHAM - DIRECT

1    funded research facility.  It's run by Caltech, the

2    California Institute of Technology, on behalf of NASA, the

3    National Aeronautics and Space Administration.  And they are

4    the lead center for unmanned exploration of the solar system.

5    The recent -- the rovers that landed on Mars were built by

6    JPL.

7     Q. What is your responsibility at JPL?

8     A. I develop image sensors and integrate them into

9    spacecraft.

10    Q. How long have you been designing image sensors?

11    A. More than two decades.

12    Q. Do you have any patents related to digital imaging and

13   image sensors?

14    A. Yes, I do.  I'm a contributing author to 19 patents.

15    Q. Do you consider yourself an expert in the field of image

16   sensors?

17    A. Yes, I do.

18    Q. Dr. Cunningham, have you ever been retained as an expert

19   in patent matters before?

20    A. Yes, in one other matter.

21    Q. And you've testified before?

22    A. I have not testified in court, no.

23    Q. Okay.

24         MR. BELUSKO:  Your Honor, at this time we offer Dr.

25   Cunningham as an expert witness in the field of image sensors

CUNNINGHAM - DIRECT

1    and submit that he is qualified by reason of his education,

2    experience, and training to provide expert testimony

3    concerning image sensors and digital photography.

4             THE COURT:  He is qualified.

5             MR. BELUSKO:  Thank you.

6    Q. Let's bring up DDX5.3.  Let me ask you, Dr. Cunningham,

7    have you reached any conclusions regarding the validity of

8    the asserted claims of the '312, '017, and '574 patents?

9    A. Yes, I have.

10   Q. And what is your opinion?

11   A. It is my opinion that each of these asserted claims of

12   the respective patents are invalid for one or more reasons.

13   Q. Now, in determining invalidity here, did you consider the

14   level of ordinary skill in the art?

15   A. Yes, I did.

16   Q. And what is your opinion with respect to the level of

17   ordinary skill in the art?  And I'll bring up DDX5.4.

18   A. It's listed here.  I used the same definition as Dr.

19   Kleinfelder.  A person of ordinary skill in the art would be

20   a bachelor's degree in electrical engineering or related

21   field and at least several years of work experience, or a

22   master's degree, and at least two years of work experience.

23             Of course, a person with less education but much

24   more experience, or a person with less experience or greater

25   education would still qualify.

CUNNINGHAM - DIRECT

1    Q. And did you apply this level of skill of art in

2    undertaking your invalidity analysis here?

3    A. Yes, I did.

4    Q. Okay.  Before we get to your opinions on invalidity, I

5    would like to ask that you give us a little background on the

6    state of the art on image sensors that existed before the

7    Kwon patent application was filed.

8         Let me start by asking about an image sensor.  If I

9    could bring up slide DDX5.5.  And can you briefly describe,

10   what is an image sensor?

11   A. An image sensor is the thing inside of a camera that

12   turns the optical image into an electrical representation

13   that could either be displayed immediately or stored in a

14   memory chip for later display.

15        Get the mouse to work here.

16        So this is showing an image sensor.  And it

17   basically goes where the film used to go in an old film

18   camera.  It's behind the lenses.  So the lenses take in the

19   light and create a focused image onto this light-sensitive

20   area here.

21        And then, although this entire area is sensitive to

22   light, it's broken up into these small individual pixel

23   elements, or pixels.  And it can actually individually

24   measure the light on each one of these little -- light, and

25   the color sometimes, on each one of these, and then it reads

CUNNINGHAM - DIRECT

1    them out.  So it does a raster scan, just sort of zipping

2    through a row and column, reads one out in turn, so it sends

3    out what the image is.

4     Q. Let's go to DDX5.6.  And what is typically found in each

5    of those individual image sensor pixels?  And I've just used

6    a drawing from -- of a patent here to kind of help you

7    explain.

8     A. So this is sort of typical so-called 4T pixel, because it

9    has four transistors in it.  And each one of those little

10   picture elements will have this circuitry inside.  And the

11   photodiode is over here, marked "PD."  It's basically a

12   charge bucket, if you will.  When light comes in -- or first,

13   we -- this is made of silicon.  It's a semiconductor.  It has

14   some electrons, but not many.  And you actually sweep out the

15   free electrons it has.

16        When light comes in, it knocks loose more free

17   electrons.  And the brighter the light, the more electrons

18   you get, so the more charge you collect.  And again, the

19   photodiode acts as a charge bucket to collect that, as if you

20   put a pail out for collecting the rain that, kind of, again,

21   Dr. Kleinfelder showed.

22        This part, N plus, is called the sense node of the

23   floating diffusion.  It acts as kind of a measuring cup.  So

24   you take a -- I'll show this later.  You take what is in the

25   bucket and dump it in the measuring cup to see how much

CUNNINGHAM - DIRECT

1    you've got.  And then there -- this is a transfer transistor

2    that allows that transfer over, and there are three other

3    transistors.  And I'll explain what they do in a minute, as I

4    go through sort of a crude animation.

5            But again, a transistor is a voltage-controlled

6    switch.  So when the voltage goes high, the switch turns on.

7    When the voltage goes low, the switch turns off.

8    Q. Okay.  Let's go to slide DDX5.7.  And this is from the

9    '335 -- or, excuse me -- the JTX6, which is the '312 patent,

10   figure 2, at page 4.  That is already in evidence.

11           What does the top portion of this diagram represent?

12   A. So this, the whole diagram shows two pixels.  So before

13   we saw just one.  Here you are seeing one pixel on top of

14   another and joined together here at the data out.  And again,

15   it shows the -- basically, again, the 4T pixel.  It draws the

16   photodiode a little differently here.  It's just a box, where

17   the previous drawing they tried to show a structure.  But

18   it's basically the same.

19   Q. Okay.  Can we walk through that?

20   A. So then this is a blowup of that upper portion, the

21   one -- so this is concentrating on one pixel of the two

22   pixels shown.  And again, it has the photodiode transfer

23   transistor, reset transistor, source follower, and select

24   transistor.

25           And again, I'll say more about these in a second.

CUNNINGHAM - DIRECT

1    But the first thing that happens, if you will run through the

2    build, is, again, light comes in the photodiode, collecting

3    all this charge and holds it apart from everything, kind of

4    in a bucket.

5          And then if you go on to the next.  Then the voltage

6    on TX1 goes high, turning on the transfer transistor.  And

7    the charge gets pushed from the photodiode onto the sense

8    node.  That is, the bucket gets dumped into the measuring

9    cup.  And when that happens in a real measuring cup, the

10   level jumps.  Here, it goes from the charge, makes the

11   voltage jump.

12         And because these are electrons, which have a

13   negative charge, the voltage actually jumps down.  So the

14   voltage on this will shoot down.  And the more charge -- the

15   more light you get, the more charge you get.  The more charge

16   you get, the bigger voltage bump you get.

17         Then if you go on to the next build.  Then a

18   following step, you will turn on this select transistor, and

19   then that voltage that is on there will get pushed out

20   through here onto the data line.  This and the source

21   follower, it's configured a little differently.  The other

22   transistors are just simply switches.  The source follower

23   acts kind of like power steering.

24         It takes this signal, which can be moderately large,

25   but is weak.  And if you tried to dump it on the data bus by

CUNNINGHAM - DIRECT

1   itself, it is not strong enough to push it.  So the source

2   follower actually takes power from -- VDV is a voltage power

3   supply.  It actually uses it to kind of do a power steering

4   and drive that sensitively measured voltage onto the line.

5          And then this line will come down -- in some

6   sensors, it comes all the way out.  In more modern sensors,

7   it comes down to the bottom of the column.  And there is

8   usually a circuitry called an analog-to-digital convertor

9   that measures the voltage and converts it to a digital

10  number, and then the digital number gets pushed out.

11  Q. What are those references to TX1, RX1, and SX1 here?

12  A. They are the lines of the signals that control these

13  respective transistors.  So TX1 is the signal that controls

14  the transfer currents.  Again, when TX1 goes high, it puts a

15  high voltage.  Again, by "high voltage," I mean up to the

16  supply voltage, which may be 5 volts to 3.3 volts.  So you

17  put, say, 3.3 on it, it turns that transistor on.

18          RX is the signal that turns the reset transistor on.

19  And actually, let me come back to that.  And SX is the one

20  that turns on the select transistor that selects that pixel.

21  So it's going to select each pixel in turn.  And then, by the

22  way, when it's done reading it, it turns on this reset

23  transistor, and that sucks out the charge, returns the

24  voltage back to where it was so it's ready for the next

25  picture.

CUNNINGHAM - DIRECT

1    Q. Okay.  And is this what you call the 4T structure?

2    A. Yes.  This is a 4T structure because it has four

3    transistors, four Ts.  One, two, three, four.

4    Q. And how many photodiodes?

5    A. One photodiode.

6    Q. Okay.  Let's go on to slide DDX5.8.  And I want to ask

7    you, what is your understanding of the purported invention in

8    the Kwon patents?

9    A. This shows three pixels now, one, two, three.  Again, the

10   same as before.  Unfortunately, they, once again, changed the

11   picture of the photodiode on it.  They are different authors.

12   But this is the photodiode, again, the transfer transistor,

13   reset, source follower, and select transistor.

14        What is new of these transistors here, and here,

15   interconnecting a pixel with a pixel above it.  And what is

16   shown here in the graphic, what that does is interconnect

17   this sense node to that sense node.  And whenever it does

18   that -- whenever this -- whenever pixel N is selected, then

19   this transistor connects N to N minus one.  It's also turned

20   on.

21        And the importance of that, again, you've got this

22   sort of bucket charge, and you dump into the measuring cup.

23   The most signals you can read is when either the bucket fills

24   up and overflows or the cup overflows.  And in modern

25   designs, the cup is usually the more limiting thing.  So this

CUNNINGHAM - DIRECT

1    is basically like -- say you had two cups.  You now open a

2    little channel between them so it can run into both.  And

3    because of that, you can take twice or more -- something on

4    the order of twice the charge before it overflows.

5          So -- and when it does overflow, it doesn't damage

6    the imager, but it just maxes out.  So if you have ever seen

7    taking a picture where everything is just a uniform white and

8    there is no contrast, this would help you and get you back

9    some contrast.

10   Q. Okay.  And with respect to this, this is figure 4 of

11   JTX6, at page 6, correct?

12   A. Yes.

13   Q. Okay.  Now, does the structure shown in figure 4 here

14   allow the image sensor to selectively choose the sharing of

15   the sensing nodes?

16   A. No.  As you see, this is connected by a hard wire, so

17   that whatever voltage is on this transistor is on that

18   transistor.  If you put a high voltage and select this, this

19   gets turned on.  You can't independently turn this transistor

20   on without this, or turn this on more without that.

21         You can't select a transistor and leave it in the

22   low and -- oh, I should say that, that, again, by increasing

23   this, you gain that you can get more charge before it

24   overflows, but you pay a penalty for that.  It's because you

25   are now dividing it, it flows out.  So for a given amount of

CUNNINGHAM - DIRECT

1    charge, you get less of a bump.  It's less sensitive, but it

2    can take more.  So again, it's more suited for higher light

3    conditions, where you are not worried about the high

4    sensitivity, but you are worried about overflowing.

5    Q. Okay.

6         MR. BELUSKO:  Your Honor, I move -- JTX7 is the file

7    history.  I just want to refer to pages 35, 36, and 37.  It's

8    actually at 35036 to 35037 and 35049.

9         THE COURT:  They will be received.

10        (Thereupon, Exhibit Number JTX7, pages 35036, 35037

11   and 35049 were received in evidence.)

12        MR. BELUSKO:  Okay.

13   Q. Now, is it your understanding -- if we can bring those

14   up, just quickly.

15        MR. BELUSKO:  Your Honor, I'll figure the right

16   pages out.

17   Q. But is it your understanding that figure 4, in the

18   specification language of figure 4 found in the original '312

19   application as filed, is the same found in the patent that

20   issued here, JTX6?

21   A. Yes, that is my understanding.

22   Q. Okay.  And is that true for each of the patent

23   applications filed for the '017 and '574 patents, too?

24   A. Yes.  I wasn't able to compare word for word, but the

25   figures were definitely the same in all three patents, and as

CUNNINGHAM - DIRECT

1    in the patent as filed.  And the text, going kind of

2    paragraph by paragraph, it looked like they were all pretty

3    much a cut and paste.

4    Q. Okay.  Let's go to the next DDX, I believe -- let's see

5    what we've got here.  That is not it.  How about -- oh, here

6    it is.  PDX257, that is what I wanted to go to.

7               Now, you've seen this before?

8    A. Yes, I have.

9    Q. Is the dynamic range of a camera the same thing as ISO

10   range of the camera?

11   A. No, they are not.  The ISO, or ISO range, actually is a

12   carryover from film days.  It refers to how sensitive the --

13   originally, how sensitive the film is.  Here, how sensitive

14   the sensor is.  Or how sensitive it's set, if you can adjust

15   it.

16              So in the old days, again, there were fast films,

17   where you could run the shutter really quick if you are

18   worried about blurring.  But it had to be sensitive.  It

19   tended to use large grains and tended to be grainier.  If you

20   wanted a finer print, you went to slower, lower ISO film.

21   Sensors, it's somewhat different, but there is still that

22   concept of where -- what that range -- sensitivity range is.

23              The dynamic range is, at a given ISO setting for a

24   single picture, what is the brightest thing it will -- and

25   again, for this overflow, and what is the dimmest that you

CUNNINGHAM - DIRECT

1    will see.  Again, there is -- given the ADC circuitry, there

2    is a minimum voltage it can read before it just gets -- drops

3    down the noise.  So that is -- that ranged from the minimum

4    you can see to the maximum.

5     Q. Now, does the sharing scheme shown in figure 4 of the

6    '312 patent, which you went through, help improve the overall

7    dynamic range of the sensor?

8     A. No, it doesn't improve the dynamic range.  It really just

9    shifts it.  Again, it makes it less sensitive on the low end,

10    but able to take more charge on the high end.  But the

11    total -- the ratio, though, which is usually how dynamic

12    range is expressed, is unchanged.

13     Q. What about the ISO range of the sensor, does the claimed

14    invention of the Kwon patent improve the ISO range of a

15    camera?

16     A. It doesn't expand the ISO range.  It just shifts it to

17    lower.

18     Q. Well, other than sharing of sensing nodes, are there

19    other ways to improve the ability to capture images in a

20    bright light condition?

21     A. Yes.  I believe it was Mr. Vannatter, I believe, that

22    spoke to that.  The simplest is just putting a filter, like

23    sunglasses, that take the light down.  Other ways are using

24    the mechanical shutter speed.  Then beyond that, you can use

25    the electronic shutter speed, which can be done in some

CUNNINGHAM - DIRECT

1    imagers.  That can cut it down.  He said -- mentioned, I

2    think, one ten-thousandth of a second.  The electronics is

3    super fast.  You can go to microseconds.

4           You can also adjust the iris, although that has --

5    for photographers, that has some -- that changes things like

6    the depth of field.  So there are some reasons why they would

7    be reluctant to reach for that first.  But there definitely

8    are different ways to deal with high light level without

9    increasing -- decreasing your sensitivity.

10   Q. Okay.  Why don't we talk about your opinions on

11   invalidity.  Why do you believe the Kwon-asserted claims are

12   invalid?

13   A. I believe they are invalid for lack of written

14   description.

15   Q. Okay.  Let's bring up DDX5.9.  Now, in arriving at your

16   opinions regarding invalidity here, what materials did you

17   consider?

18   A. They are listed here.  I looked at quite a bit.  I looked

19   at the '312 patent, its file history and its cited prior art;

20   the '017 patent, the prior art; and the same for the '574.  I

21   looked at the parties' proposed claim constructions and the

22   Court orders -- also the Court orders and other related

23   motion papers.  I looked at various prior art references and

24   some Nikon marketing material.

25   Q. Okay.  Now, you stated that it was your opinion that all

CUNNINGHAM - DIRECT

1    of the asserted claims of the '312, '017 and '574 patents are

2    invalid for lack of written description, correct?

3    A. That's correct.

4    Q. What is your understanding of the written description

5    requirement?

6    A. It's basically that the specification must fully support

7    the claims; that is to say, the specification, which is the

8    figures, the text that describes the figures, and they

9    mention generally.  And the claims, as originally filed, must

10   fully describe the invention and -- as claimed.  And it must

11   show that the inventor truly and actually did invent -- that

12   is, in the legal language, possess -- the full scope of the

13   invention as claimed.

14          And I understand to do that, I'm to look, so-called,

15   within the four corners of the patent, as filed, and look at

16   it from the perspective of a so-called person of ordinary

17   skill in the art.

18   Q. Now, you mentioned the invention as claimed.  What are

19   you referring to?

20   A. I'm referring there to the language in the claims as the

21   file -- or patent is eventually issued, rather than as filed.

22   And also to any constructions -- the parties may have agreed

23   to construction, or the Court may impose one.  And for

24   example, in this case, the Court did impose a construction on

25   where terms involving the word "pixel" was used in the claims

CUNNINGHAM - DIRECT

1    of the '312, the '017, and the '574 patents.

2    Q. Let's bring up DDX5.10 here, please.  Now, are these the

3    pixel terms that have been construed by the Court?

4    A. This is the pixel terms specifically in the '312 patent.

5    They turn out to be related, but slightly different, in the

6    three patents.

7             Just on the '312, you here see where it's yellow

8    highlighted, "unit pixel," "unit pixel," "unit pixel."  And

9    within the given patent, it's used fairly consistently.

10   Q. Let's go to the next slide, DDX5.11, and this shows claim

11   7 of the '017 patent, which is JTX8.  And what does that show

12   for the pixel term?

13   A. Here they use the term "sensing pixels."  And again, they

14   use, in claim 7, "sensing pixel" consistently.

15   Q. And then we'll go to DDX5.12, and this shows claim 30 of

16   the '574 patent, JTX10.  And what terms are there?

17   A. Here you see, again highlighted in yellow, "first pixel,"

18   "second pixel," again consistently through the patent.

19   Q. What Court construction did you apply to the pixel terms

20   in the asserted claims?

21   A. If you will go on.

22   Q. Let's go to DDX5.13.

23   A. This is -- I understand that the Court construed all of

24   these claims:  "Unit pixel" in the '312; "sensing pixel" in

25   the '017; "first," second -- "second pixel," the Court has

CUNNINGHAM - DIRECT

1    construed a pixel as comprising one or more photodiodes in

2    the claims.

3     Q. And what did you determine about whether the

4    specification disclosed the full scope of the asserted

5    claims, applying the Court's claim construction?

6     A. Applying the Court's claim construction, I concluded that

7    the specification did not support this full scope of the

8    claims.

9     Q. Okay.

10    A. Specifically, it did not support more than one

11    photodiode.

12    Q. Let's go to slide DDX5.14.  Let's walk through the Kwon

13    specification.  This shows the '312 patent.  We are just

14    using that figure 2 at page 4.  And is it your understanding

15    that is the same figure that is in all of the patents?

16    A. Yes, that is my understanding.

17    Q. And that was the figure that was in the originally filed

18    applications as well, correct?

19    A. That's correct.

20    Q. Okay.  What does this show?

21    A. Again, this shows two typical pixels, here again, of the

22    prior art.  And it shows in the figure two pixels; two

23    photodiodes, one in each pixel.  So each pixel has one

24    photodiode in the figures.  Then, again, the associated text

25    that describes these figures.

CUNNINGHAM - DIRECT

1        You see, again, each pixel -- and marked 100 and

2   120.  Again, that is referring to these numbers.  Sorry.  The

3   100 and 120, that is the two pixels.  It says each is

4   configured with one photodiode.

5   Q. Okay.  Let's go to DDX5.15.  What about figure 4, does it

6   also support your conclusion that the specification disclosed

7   only one photodiode per pixel?

8   A. Yes.  So this is figure 4, and it's, again, the figure

9   that shows the purported invention with the extra transistor

10  connecting sense nodes.  And again, here again you see three

11  pixels, and they are marked N minus one, and an N plus one.

12       You see three photodiodes, with one photodiode in

13  each pixel, PD1, PD2, PD3, for photodiode 1, 2, and 3.  It's

14  not photodiode 1A, photodiode 1B in a pixel.  One photodiode

15  per pixel.  And similarly, over here, the three unit pixels.

16  Again, nothing here says anything more than one photodiode

17  per pixel.

18  Q. Let's go to the next slide.

19  A. Again, that is illustrated here.  Again, it says,

20  "Considering the constitution of the Nth row" -- again, this

21  is this Nth pixel -- "and its photodiode is PD2."  Referred

22  to a photocharge generator PD2 for receiving light and

23  generate photocharges.  Again, that is as light comes in and

24  liberates these electrons.

25       And here it goes on to say, "PD2 is configured with

CUNNINGHAM - DIRECT

1    a photodiode," indicating one.  So the text and the figures

2    are completely consistent.  Always says one photodiode per

3    pixel.

4      Q. Dr. Cunningham, did you also look at the claims of the

5    '312 patent as originally filed in reaching your opinion that

6    the written description supports only one photodiode per

7    pixel?

8      A. Yes, I did.

9      Q. Let's bring up DDX5.17.  And what does that show?

10     A. It shows a language that apparently has a special legal

11    meaning.  When it's written like this, it is apparently a

12    means plus function format.  And what that legally indicates,

13    it will say a means for doing something; that to describe

14    what that means -- what the structure that provides that

15    means, it -- this type of means plus function refers you back

16    to the things I just talked about, the figures and the

17    written text.

18           So it basically says, If you want to know what this

19    really is, go back to that.  And you have to find this part

20    where it talks about "for doing something" and match it up.

21    It says, You look for generating photocharge by absorbing

22    light.  You go back to the thing and say, What structure is

23    shown that does that?

24           And when you do that, and go back and look, just as

25    I've just shown with the figures in the text, you end up with

CUNNINGHAM - DIRECT

1      one photodiode per pixel.

2       Q. Let's go back just quickly to 5.16.  Which shows the

3      figure 4 and the description of figure 4 in --

4       A. So again, to find out what structure does this function,

5      we take that generating photocharge by collecting light and

6      we look back here, and, again, here it is.  Photocharge

7      generator for receiving light.

8              So that is the thing that does this means.  And it's

9      the structure.  And, again, it's one photodiode.

10      Q. Okay.  And then did you consider claims 7 and 14 of the

11      '312 patent as originally filed as well?

12      A. Yes, I did.

13      Q. Let's bring that up, DDX5.18.  And is that any different?

14      A. No.  And in this thing, 7 is another independent claim.

15      14 is a dependent claim, that -- as you see, of claim 7.  So

16      it depends on 7.  But here you see, again, this means plus

17      function.  Means for generating photocharge -- oh, did I do

18      that?

19              And then you look over here.  I may have lost my

20      highlighter.  Oh, there it is.  Again, the photocharge

21      generation means is A photodiode.  So everywhere, as filed,

22      it consistently referred to one photodiode per pixel:  In the

23      claims, in the figures, in the written part of the text that

24      described the figures.

25      Q. Okay.

CUNNINGHAM - DIRECT

1              MR. BELUSKO:  Your Honor, I would like to move in

2      JTX7, 19 to 21.  Those are the pages of the file history with

3      those original claims.

4              THE COURT:  It will be received.

5              (Thereupon, JTX7, pages 19-21 was received in

6      evidence.)

7              THE CLERK:  7, pages 19 to 21?

8              MR. BELUSKO:  Correct.  Thank you.

9      Q. Now, Dr. Cunningham, you understand that the Court here

10     has construed claim 1 of the '312 patent, for example, to

11     have a unit pixel that encompasses more than one photodiode.

12     Is that issued claim part of the original application as

13     filed here and, thus, part of the original written

14     specification?

15     A. No, it is not.

16     Q. Let's look at DDX5.19, if we may.

17             MR. BELUSKO:  And I should have moved, Your Honor,

18     JTX7, at page 261.  And I move that in.

19             THE COURT:  It will be received.

20             (Thereupon, Exhibit Number JTX7, page 261 was

21     received in evidence.)

22             MR. BELUSKO:  Thank you.

23     Q. What does this show?

24     A. This shows the amendments or changes, where they actually

25     went in and struck out this "means plus function" language

CUNNINGHAM - DIRECT

1    and changed it to language that is -- can be broader.  And

2    you see the strikeouts.  They knocked out the "photocharge

3    generation means," and put in this "photodiode configured"

4    language.

5    Q. Okay.  And was that -- and was that done years after the

6    original application?

7    A. Yes.  My understanding it was done at least four years

8    after the original patent had been filed.

9    Q. And is that the claim that was actually construed by this

10   Court as encompassing more than one photodiode?

11   A. That is my understanding, yes.

12   Q. So did the originally filed claim include more than one

13   photodiode?

14   A. No, it did not.

15   Q. Now, that's the '312 patent.  Let me direct you to the

16   '017 patent that was filed six years after the '312 patent

17   was filed.  Did it have its -- in its claims the photodiode

18   language that the Court has defined as having one or more

19   photodiodes?

20   A. Yes, it does.

21   Q. Let me bring up JTX8, which is patent claim 7.  It's on

22   page 10, I believe, of JTX8.

23          MR. BELUSKO:  And that's already in evidence, claim

24   7.

25   Q. Now, in doing your written description analysis with

CUNNINGHAM - DIRECT

1   respect to the '017 patent, JTX8, did you consider the claims

2   added to the '017 patent in 2012?

3    A. I looked at them.  And they do have, again, this "unit

4   pixel comprising," but I did not consider them as a part of

5   the patent as filed.

6    Q. Okay.  Let me ask you, you said "unit pixel"?

7    A. Oh, sorry, it's --

8    Q. "Sensing pixel"?

9    A. "Sensing pixel."  Sorry.  Just above line 15.

10    Q. And why didn't you consider them?

11    A. It was my understanding that it would be improper for me

12   to do so because the inventor of the patent did not submit a

13   signed declaration or oath.

14    Q. A new one, a new declaration?

15    A. A new -- one was submitted, but he did not, obviously,

16   submit it.  Or it is not clear that he submitted it.

17   Apparently what happened is they took a -- they photocopied

18   the original one.  He downloaded the original patent as

19   filed, and sent that in in place of a new -- starting a new

20   one.

21    Q. Let me show --

22           MR. BELUSKO:  Let me move, if I may, Your Honor,

23   JTX9, at pages 47 and 48.  That's part of the file history

24   here.

25           THE COURT:  They will be received.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

CUNNINGHAM - DIRECT

1          (Thereupon, Exhibit Number JTX9, pages 47-48 were

2    received in evidence.)

3          MR. BELUSKO:  Okay.

4     Q. Let me bring up those pages, and -- and if we can -- and

5    on the right, there seems to be a declaration?

6     A. Yes.

7     Q. What is the date of that?

8     A. So this is a declaration, but look at the date.  This is

9    from 2006.  This is the date of the original filing.  So this

10   looks like a Xeroxed copy of the original -- the '312 as

11   filed that was sent in with the '017.

12    Q. With the '312, you mean?

13    A. Sorry.  This was -- as I understand it, this was

14   originally submitted with the '312, but then it was reused in

15   the '017 patent.

16    Q. Okay.  So there was no new declaration submitted with the

17   '017, as you understand it?

18          MR. MARCHESE:  Objection.  Calls for speculation,

19   Your Honor.

20          THE COURT:  Sustained.

21    Q. Well, in doing your comparison of the '017 claim 7 to the

22   specification, the drawings, and the description, does it

23   support the more than one photodiode construction?

24    A. No.  Again, the figures and the written text are exactly

25   the same, as far as I could tell, between the three patents.

CUNNINGHAM - DIRECT

1    So nothing changes there.

2    Q. Okay.  Let's go on to the '574 patent that was filed even

3    later, in 2014.  And that is JTX10.

4            MR. BELUSKO:  If we could bring up JTX10, at page

5    11, and claim 30.

6    Q. Now, did you consider claim 30 as filed here in your

7    written description analysis?

8    A. No, I did not.

9    Q. Okay.  And why not?

10   A. Again, there was no declaration or oath submitted by the

11   inventor.  In fact, looking through the prosecution history,

12   there was a notation that the inventor actually refused to

13   sign.

14   Q. Okay.

15           MR. BELUSKO:  Your Honor, I would like to move

16   JTX11, at page 85.  That is the '574 file history.

17           THE COURT:  Yes.  It will be received.

18           (Thereupon, Exhibit Number JTX11, page 85 was

19   received in evidence.)

20           MR. BELUSKO:  Okay.  Bring that up, please.

21   Q. And is this what you are referring to?

22   A. Yes.  I believe there is -- you have a highlight, if you

23   go to the next -- but you see this box marked with the black,

24   "Inventor has refused to execute the oath for declaration

25   under 37CFR1.63."

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

CUNNINGHAM - DIRECT

1    Q. Okay.  So in connection with your written description

2    analysis, did the pixel terms as used in claim 30, which have

3    been construed as having one or more photodiodes, was the

4    "more than one photodiode" supported in the specification and

5    description?

6    A. No.  Again, with the claims not considered, looking back

7    to the '574 patent, again, it was exactly the same as for the

8    '017 and '312.  So once again, same figures, same text, do

9    not support more than one photodiode.

10   Q. So just to be clear, what is your opinion with respect to

11   the validity of the asserted claims of the Kwon patents in

12   view of the written description?

13   A. It is my opinion that all the asserted claims of each

14   respective patent are invalid.  That as construed by the

15   Court, and modified, the claims call for one or more -- or

16   map out a scope of one or more photodiodes, whereas the

17   written description, the specification, the claims as filed,

18   the figures and the text described in the figures clearly

19   only say one photodiode per pixel.  So it's one photodiode,

20   versus one or more.  They don't match.  The claims are

21   invalid.  The patents are invalid.

22   Q. When you said "the claims as filed," you only considered

23   the claims of the '312 patent as filed, right?

24   A. That's correct.

25   Q. Okay.

CUNNINGHAM - CROSS

1          MR. BELUSKO:  Pass the witness.

2          THE COURT:  Okay.  Cross?

3          MR. MARCHESE:  Thank you, Your Honor.

4                    CROSS-EXAMINATION

5    BY MR. MARCHESE:

6    Q. Good afternoon, Dr. Cunningham.

7    A. Good afternoon.

8    Q. You stated on your direct testimony that you believe the

9    asserted claims of the '312, '017, and '574 patents are

10   invalid for lack of written description, correct?

11   A. That's correct.

12   Q. Now, in order to convince a patent examiner to allow a

13   patent to issue, you have to -- you have to convince the

14   examiner that there is not a written description problem with

15   your patent, correct?

16   A. That's correct.

17   Q. And in your experience, patent examiners that you've

18   dealt with have largely been competent in technology,

19   correct?

20   A. That's correct.

21   Q. And you agree that examiners, in your experience, have a

22   reasonable understanding of the technology described in the

23   patent, correct?

24   A. That's correct.

25   Q. Despite all this, you are offering the opinion that in

CUNNINGHAM - CROSS

1   this particular case the '312, '017, and '574 patents are

2   invalid based on the written description requirement,

3   correct?

4    A. That's correct.

5    Q. Well, let's turn to your opinions based on written

6   description, okay?  Sorry.  Caught you while you were

7   drinking.

8    A. Sorry.

9    Q. No, that's all right.  You offered the opinion in your

10   direct exam that the asserted claims are invalid, as I said,

11   because they lack written description in the patents

12   themselves, correct?

13   A. Yes.

14   Q. And you said that the written description requirement is

15   to be looked at from the perspective of a person of ordinary

16   skill in the art, right?

17   A. That's correct.

18   Q. And that person of ordinary skill in the art, you defined

19   the person, right?

20   A. Yes.

21   Q. And they've got some knowledge of the relevant prior art,

22   wouldn't you agree?

23   A. Um, certainly, yes.

24   Q. Now, as you said a moment ago, you agreed with me that in

25   order to get the patent, you have to convince the examiner

CUNNINGHAM - CROSS

1    that there is not a written description problem, right?

2     A. That's correct.

3     Q. And you are the technical expert in this case and not an

4    expert in patent law, correct?

5     A. That's correct.

6     Q. So that means in forming your opinions, you were told

7    what standard of law to apply, correct?

8     A. That's correct.

9     Q. Now, when you formed your opinions in this case, you

10   applied the legal understanding of the written description

11   requirement that the specification has to enable a person of

12   ordinary skill in the art to be able to make the invention,

13   correct?

14    A. No.  I did not.

15           MR. MARCHESE:  Can we have deposition at 135, 14 to

16   21, please.

17           MR. BELUSKO:  What page?

18           MR. MARCHESE:  The deposition, 135, lines 14 to 21.

19           MR. BELUSKO:  Line numbers?

20           MR. MARCHESE:  14 to 21.

21           THE COURT:  Okay, Counsel.

22           MR. BELUSKO:  There is an errata, Your Honor.

23   Should I bring that up on --

24           THE COURT:  Yeah, at the break.

25           MR. BELUSKO:  -- redirect?

CUNNINGHAM - CROSS

1          THE COURT:  Yeah.

2          MR. BELUSKO:  No objection.

3    Q. At your deposition, you gave the following answer to the

4    following -- or answers to the following questions:

5          Question:  "Your understanding of the written

6    description requirement is that the specification has to

7    enable a person of ordinary skill in the art to be able to

8    make the invention?"

9          Answer:  "That's correct."

10          Question:  "You have based your opinions in this

11    case on that understanding, correct?"

12          And the answer was:  "Yes."

13          You gave that testimony, correct?

14    A. Yes, I did.

15    Q. But that is the wrong legal standard, isn't it?

16    A. Yes, it is.

17    Q. In fact, after your deposition, as your counsel just

18    alluded to, you changed your testimony, right?

19    A. I corrected my testimony.

20    Q. Changed your testimony, and you stated what law you

21    applied.  You changed it to state a different standard,

22    correct?

23    A. I corrected my testimony to reflect the correct standard.

24          MR. MARCHESE:  Mr. Ang, could I have the

25    demonstrative PX1110.

CUNNINGHAM - CROSS

1    Q. Sir, at the bottom of this demonstrative is the answer

2    you gave, "That is correct," on the left, in this errata

3    sheet.  "Errata" means error, right?

4    A. Yes.

5    Q. And on the right-hand side is what you changed it to,

6    correct?

7    A. Yes.

8    Q. And I counted that up, and I think it's more than

9    80 words.  From two to more than 80; is that right?

10   A. That's correct.

11   Q. Now, speaking of your deposition, you also testified

12   under oath that you disagreed with the Court's claim

13   construction for the term "unit pixel," correct?

14   A. Yes.

15   Q. But you changed your sworn testimony on that issue, too,

16   didn't you?

17   A. I corrected that testimony as well.

18        MR. MARCHESE:  Can we have PDX1109, please.

19   Q. Sir, you were asked:

20        Question:  "You disagree with the Court's

21   construction that a unit pixel could include one or more

22   photodiodes, correct?"

23        And your answer was:  "That's correct."

24        And then you changed it to say that you do not

25   disagree with the Court's construction, correct?

CUNNINGHAM - CROSS

1    A. That's correct.

2    Q. And you did that after your deposition, right?

3    A. Yes.

4    Q. And you made those changes in consultation with lawyers,

5    correct?

6    A. No, I did not.

7    Q. You made the changes in these words all on your own, and

8    came up with all those words, correct?

9    A. Yes.

10   Q. That's your testimony?  All right.

11         Let's turn to the substance of your written

12   description argument.  The claim language in question is

13   "unit pixel," correct?

14   A. That's correct.

15   Q. Okay.  And as we've seen in your direct testimony, and

16   just now, the Court construed that term to include one or

17   more photodiodes, right?

18   A. That's correct.

19   Q. Now, you are aware, having sat here and watched Dr.

20   Kleinfelder testify, that the '335 patent is also in this

21   case, right?

22   A. Um, yes.

23   Q. And you already said that in order to determine written

24   description under your -- the new standard, the different

25   standard that you are now applying, that you have to consider

CUNNINGHAM - CROSS

1     that from the perspective of a person of ordinary skill in

2     the art, right?

3        A. That's correct.

4        Q. And that person would have a reasonable understanding of

5     the relevant prior art, correct?

6        A. Yes.

7        Q. And the technology for the '312 patent is image sensors,

8     would you agree?

9        A. Would you repeat the question?

10       Q. The technology for the '312 patent family is image

11    sensors?

12       A. That's correct.

13       Q. And the same is true for the '335 patent, right?

14       A. I didn't spend a lot of time, again, other than the

15    introduction.  It seems to be image sensors, but I'm not

16    really that familiar with the '3 -- sorry, what -- '335.

17       Q. '335.

18             THE COURT:  It's time for the afternoon break.

19    We'll see you back here in 15 minutes.  Admonish you not to

20    discuss the case among yourselves or with anybody else.

21    We'll see you back here in 15 minutes.

22             (Thereupon, the jury retired from the courtroom.)

23             (Thereupon, there was a brief recess.)

24             THE COURT:  Okay.  The record will reflect all the

25    jurors are in their respective seats in the jury box, the

CUNNINGHAM - CROSS

1    witness is on the witness stand, and we are in

2    cross-examination.

3              Counsel.

4              MR. MARCHESE:  Thank you, Your Honor.

5              Mr. Ang, can we pull up PDX1115.

6    Q. Before we broke, Dr. Cunningham, we were talking about

7    the '335 patent.  And here, you can see the '335 patent was

8    filed back in 1998, right?

9    A. Yes.

10   Q. That's seven years before the '312 patent was filed,

11   correct?

12   A. Yes.

13   Q. And it's true that the -- if you could -- excuse me,

14   before I ask this question -- withdrawn.

15             MR. MARCHESE:  Could I have PDX1116.

16   Q. It's true that the '335 patent discloses unit pixels,

17   right?

18   A. Yes.

19   Q. And the unit pixel in this sentence we are looking at

20   here includes photodiodes, plural, correct?

21   A. That's correct.

22   Q. And that is on the very first page of the patent, right?

23   A. Yes.

24             MR. MARCHESE:  Could I have PDX1117, please.

25   Q. In fact, the '335 patent discloses a unit pixel with two

CUNNINGHAM - CROSS

1   photodiodes, correct?

2    A. Sorry, can you repeat that question?

3    Q. The '335 patent discloses a unit pixel with two

4   photodiodes, correct?

5    A. Yes.

6    Q. And that is an example of a unit pixel with more than one

7   photodiode, correct?

8    A. Yes, it is.

9    Q. Just as the Court construed the term "unit pixel,"

10  correct?

11   A. Yes.

12   Q. And in forming your opinions in this case, you did not

13  even review the '335 patent before you formed those opinions,

14  correct?

15   A. That's correct.

16   Q. So in forming your opinions that you've offered here

17  today that the '312 patent family is invalid for lack of

18  written description, you had not even taken the '335 patent

19  into consideration, correct?

20   A. That is correct.

21   Q. Even though it's an image sensor patent, correct?

22   A. That is correct.

23   Q. And even though you are supposed to consider a written

24  description from the perspective of a person of ordinary

25  skill in the art who would know about image sensor art,

CUNNINGHAM - CROSS

1   correct?

2    A. That's correct.

3    Q. And also in forming your opinions in this case, you did

4   not speak with Dr. Kleinfelder, who just testified, who is

5   Nikon's other expert on the '312 patent family, right?

6    A. That's correct.

7    Q. And you were not even aware of Dr. Kleinfelder's '411

8   patent, which we saw presented earlier today, correct?

9    A. That's correct.

10   Q. Now, as a person who holds himself out as an expert in

11   the field of the '312, '017, and '574 patents, you would

12   agree with me, would you not, that it's reasonable for the

13   same term in the same patent to have the same meaning,

14   correct?

15   A. Sorry, will you repeat that question?

16   Q. As a person who holds himself out as an expert in the

17   field of the '312, '017, and '574 patents, it's reasonable

18   for the same term in the same patent to have the same

19   meaning, correct?

20   A. Not necessarily, no.

21   Q. Sir, "unit pixel" is used in the specification of the

22   '312 patent, correct?

23   A. Yes.

24   Q. In the original filing, correct?

25   A. Yes.

CUNNINGHAM - CROSS

1    Q. And "unit pixel" is in the claims of the patent that are

2    at issue here, correct?

3    A. Yes.

4    Q. And those have been construed to be one or more

5    photodiode, correct?

6    A. That's correct.

7    Q. As a person who holds himself as an expert in the field

8    of the '312, '017, and '574 patents, it's reasonable for the

9    same term in the same patent to have the same meaning,

10   correct?

11   A. No.  I do not agree with that.

12            MR. MARCHESE:  Could I have the deposition, please,

13   at page 120, lines 4 through 8.

14            MR. BELUSKO:  Which lines?

15            MR. MARCHESE:  120, 4 through 8.

16            MR. BELUSKO:  No objection.

17            MR. MARCHESE:  Can you blow it up, please, Mr. Ang,

18   4 through 8.

19   Q. Sir, at your deposition, you were asked this question and

20   gave the following answer:

21            Question:  "As a person who holds himself out as an

22   expert in the field of the '312, '017, and '574 patents, it

23   is reasonable for the same term in the same patent to have

24   the same meaning, correct?"

25            Answer:  "I would agree with that."

CUNNINGHAM - CROSS

1           That was your testimony, correct?

2      A. Yes.

3      Q. Now, I want to just briefly talk about this declaration

4   that you mentioned with respect to Mr. Kwon, the inventor.

5   Do you remember talking about that?

6      A. Yes, I do.

7      Q. Now, you are not a patent lawyer, right?

8      A. I'm not a patent attorney.

9      Q. Not an expert in patent law?

10     A. I'm not an expert in patent law.

11     Q. You are not an expert in patent office procedure?

12     A. I'm not an expert in patent office procedure.

13     Q. Not an expert in patent office prosecution, are you?

14     A. No.

15     Q. Now, regardless of whether or not Mr. Kwon signed a

16   renewed oath or declaration, the patent office is still

17   charged with assessing the written description, would you

18   agree?

19     A. I believe so, but I'm not certain.

20     Q. And the patent office did analyze the written description

21   requirement for each of the patents at issue in this case,

22   all three of them, correct?

23     A. That's correct.

24     Q. And ultimately, the patent office agreed there was

25   sufficient written description for all three, correct?

CUNNINGHAM - CROSS

1    A. Yes.

2            MR. MARCHESE:  Two questions, and then I will pass

3    the witness.

4    Q. You've never worked for a digital camera company, have

5    you?

6    A. No.

7    Q. You've never done any market research into the digital

8    camera industry, correct?

9    A. No, I have not.

10   Q. And you are not personally experienced with the needs or

11   preferences of avid or professional photographers, right?

12   A. That's correct.

13   Q. Yet you provided testimony about ISO and the cameras and

14   so on and so forth that you provided in your direct, correct?

15   A. Yes.

16           MR. MARCHESE:  Thank you.  Nothing further.

17           THE COURT:  Counsel?

18           MR. BELUSKO:  No questions.

19           THE COURT:  You may step down.

20           Next witness.

21           MS. KRUZE:  Your Honor, Nikon calls Mr. Toto from

22   Sony by deposition.

23           THE COURT:  Okay.

24           MS. KRUZE:  And I would like to move into evidence

25   JTX383, at page 1, that is the Sony subscription agreement;

1    JTX384, which is less than 10 pages, an e-mail to Mr. Toto

2    regarding the license; JTX385, at pages 1 through 3, and 12

3    through 14, which is a license with IIF and Sony; JTX387, at

4    pages 1, 3, 19, and 106, which is an agreement side letter;

5    JTX388, which is less than 10 pages, which is a web portal

6    search for Sony's license; and then finally, as JTX2239,

7    Mr. Toto's deposition transcript, the pages that will be read

8    to the jury.

9              MS. RANKS:  Objection, Your Honor.

10             THE COURT:  Basis?

11             MS. RANKS:  Not part of the deposition testimony.

12             THE COURT:  I'm sorry?

13             MS. RANKS:  Not part of the deposition testimony.

14             THE COURT:  I don't know if it is or not.

15             MS. KRUZE:  He'll be testifying about the license,

16   yes, sir.

17             MS. RANKS:  Not the pages she mentioned.

18             THE COURT:  Does he testifying to the actual pages

19   you mentioned?

20             MS. KRUZE:  About the license agreement, yes.

21             THE COURT:  No, the actual pages.

22             MS. KRUZE:  Is he saying "page 106," for example,

23   no, but is he testifying to the substance of that, yes.

24             THE COURT:  Okay.  I'm going to allow it in subject

25   to a motion to strike.  And you can take down -- if something

```
 1        is not mentioned in the deposition, it will be stricken.
 2                   MS. RANKS:  Thank you.
 3                   THE COURT:  This is a video?  Excuse me.  Let's cut
 4        it off.  This is a video that you are --
 5                   MS. KRUZE:  Yes.
 6                   THE COURT:  Okay.  The clerk just mentioned that you
 7        wanted the transcript of the video?
 8                   MS. KRUZE:  Yes, the pages.
 9                   THE COURT:  No, that will not come in.  The video
10        itself can be an exhibit.
11                   MS. KRUZE:  Okay.  That is JTX --
12                   THE COURT:  Yes.  Okay.  Thank you.
13                   (Thereupon, the video was played.)
14                   MS. KRUZE:  Your Honor, Nikon calls Julie Davis to
15        the stand.
16                   THE COURT:  Before you do, is there any motion to
17        strike any of those documents?  And if so, which one?
18                   MS. RANKS:  At least 385.  The transcript is a
19        little bit different than what we had exchanged.
20                   THE COURT:  We've already stricken the transcript.
21                   MS. RANKS:  I'm sorry, sir, what was played on the
22        video was a little bit different than what I was expecting to
23        be played.  There are some additional pages.  If I could get
24        back to you.
25                   THE COURT:  We'll deal with it later.
```

DAVIS - DIRECT

1                    Next witness?

2                    MS. KRUZE:  Your Honor, Nikon calls expert Julie

3     Davis to the stand.

4                    THE COURT:  Okay.

5                    THE CLERK:  Good afternoon.  Right here to be sworn,

6     please.

7                    THE WITNESS:  All right.

8                    THE CLERK:  Raise your right hand.

9     THEREUPON:

10                        JULIE L. DAVIS,

11    called in these proceedings and being first duly sworn

12    testifies as follows:

13                   THE CLERK:  Thank you.  You may be seated.  May I

14    please ask that you state your full name for the record, and

15    spell your last name.

16                   THE WITNESS:  My name is Julie L. Davis.  Davis is

17    spelled D-a-v-i-s.

18                   THE CLERK:  Thank you.

19                   THE COURT:  You may inquire.

20                        DIRECT EXAMINATION

21    BY MS. KRUZE:

22     Q. Could you please introduce yourself to our jury?

23     A. You've heard my name, Julie Davis.  I work for a firm

24    called Davis & Hosfield Consulting.

25     Q. Why are you here today?

DAVIS - DIRECT

1      A. I have been asked to address the amount of damages that

2      Nikon should pay if you were to find that any of the patents

3      in this case are both valid and infringed.

4      Q. Have you prepared slides?

5      A. I have.

6            MS. KRUZE:  Your Honor, permission to display them

7      to the jury?

8            THE COURT:  Yes.

9            MS. KRUZE:  Mr. Christopher, if you could bring up

10     DDX9.1.

11     Q. What type of work do you currently do, Ms. Davis?

12     A. The work that I do is almost all in the context of

13     litigation matters like this.  Specifically, patent

14     infringement cases, for that matter.  And so my job is to

15     determine the amount of damages involved.

16           Over the years I've also been involved helping

17     companies work out their IP strategies and how to handle

18     their patent portfolios.

19     Q. What is your educational background?

20     A. I grew up in Kansas, so I attended Kansas State

21     University.  I have a degree in accounting, in 1978.

22     Q. Did you earn any honors?

23     A. I did.  I graduated first in my class, and I also

24     received a degree -- or an award for the highest score in the

25     state on the CPA exam.

DAVIS - DIRECT

1    Q. Can you give the jury a brief summary of your career?

2    A. Briefly, after I graduated from K-State, I went to Kansas

3    City and joined one of the largest international accounting

4    firms at the time.  It was called Touche Ross.  It's now part

5    of Deloitte.  I was there for nine years as part of the audit

6    practice, auditing the financial statements of a variety of

7    different kinds of companies.

8           When I moved to Chicago, I joined one of the other

9    large international accounting firms called Arthur Andersen.

10   At the end of my 15 years there, I was in charge of the

11   worldwide intellectual asset consulting practice.  That

12   practice was eventually sold to KPMG, yet another one of the

13   large accounting and consulting firms.  And I had a similar

14   role there.

15          And then in 2003, a number of my colleagues and I

16   started a new firm.  I am the "Davis" of Davis & Hosfield.

17   Q. How many years have you been involved in determining

18   damages in cases like this one?

19   A. At least 31 years now.

20   Q. And how many cases have you worked on as a damages expert

21   in patent cases?

22   A. For patent infringement cases specifically, it would be

23   somewhere between three and four hundred.

24          MS. KRUZE:  Your Honor, I move to qualify her in the

25   field of patent damages and reasonable royalty analysis.

DAVIS - DIRECT

1            THE COURT:  She's qualified.

2     Q. You were asked to determine damages in this case.  Did

3     you make any assumptions?

4     A. I did.  I had to start with the assumption that the

5     patents were valid and infringed.  Otherwise, there would be

6     no damages to talk about.

7     Q. What investigation did you do?

8     A. My colleagues and I started our work on this case early

9     this year.  What we did was to review the deposition

10    testimony and the documents that have something to do with

11    the damages issues in this case.  We prepared a number of

12    analyses, and we documented that in a written report.  I have

13    also been here in the courtroom to either hear the testimony

14    that you have heard, or I have read that testimony.

15    Q. Did you form an opinion on damages?

16    A. I did.

17    Q. And what did you conclude?

18    A. What I concluded is summarized on the next slide.  And

19    that is that the damages would be measured as a reasonable

20    royalty.  There would be a lump sum on a per-patent basis.

21    So for the '163 patent, that would be an amount of $370,000.

22    For the other four patents, that would be $250,000 each.  So

23    that would be a total of a $1,370,000.

24    Q. How did you go about calculating damages?

25    A. What I did was to follow a commonly used methodology

DAVIS - DIRECT

1    which requires us to picture a hypothetical negotiation

2    taking place between the hypothetical licensor and the

3    hypothetical licensee, at the time of the first infringement,

4    so that they can determine how much should be paid for the

5    right to use that patented technology.

6     Q. Which parties would be at that hypothetical negotiation

7    table that you mentioned?

8     A. There would actually be two different negotiations,

9    because one of them has to take place with the owner of the

10   '163 patent, which was HP, Hewlett-Packard, and the other one

11   would take place with IV.  Nikon would be on the other side

12   of the table in each of those negotiations.

13    Q. What are the dates of those two negotiations?

14    A. The negotiation with HP would take place in September of

15   2008, and the negotiation with Intellectual Ventures, which

16   we have called "IV" in this trial, would take place in

17   September of 2010.

18    Q. Are there rules for determining damages?

19    A. There are.  They are referred to as the Georgia-Pacific

20   factors.  They are called that because they came out of a

21   case years ago that involved the Georgia-Pacific Corporation.

22            There are 15 of those factors.  The most important

23   one is the one that pictures that hypothetical negotiation,

24   and the other 14 are really just considerations that need to

25   be addressed as part of that negotiation.

DAVIS - DIRECT

1    Q. Did you consider all 15 factors?

2    A. I did.

3    Q. And what facts are the most important here?

4    A. Well, I think if you want to determine the outcome of a

5    hypothetical negotiation, what better starting point than the

6    outcome of a real-world negotiation.  And that is what I

7    think is going to be the most important facts in this case.

8    Q. And why are those sales histories so important?

9    A. Well, once again, we don't need to imagine what would

10   have happened if we can tell what really did happen in the

11   real world.  So that is what I focused on to begin with, is

12   to look at what happened when HP owned the '163 patent and

13   chose to sell it, and likewise, what happened when IV owned

14   the other four patents and chose to sell them.

15   Q. Let's start with the HP '163 patent.  What is the sales

16   history of that patent?

17   A. That patent was sold by HP to Tarsium, the name that

18   you've heard in this trial, in 2012.

19   Q. And if that was a 2012 transaction, how is it relevant to

20   a 2008 hypothetical negotiation?

21   A. We are to assume that the hypothetical negotiators back

22   in 2008 had access to the same facts and circumstances that

23   we now know.  That is referred to in the law as the book of

24   wisdom.

25           MS. KRUZE:  Your Honor, permission to move into

DAVIS - DIRECT

1    evidence JTX311, which is already in evidence, but pages 4

2    through 13, 17 through 18, and 32, which the witness will be

3    discussing.

4            THE COURT:  They will be received.

5            (Thereupon, Exhibit Number JTX311, pages 4-13, 17-18

6    and 32 were received in evidence.)

7            THE CLERK:  Could you give me those pages again?

8            MS. KRUZE:  4 through 13, 17 through 18, and 32.

9            THE CLERK:  And the exhibit number?

10           MS. KRUZE:  JTX311.

11           THE CLERK:  Thank you.

12   Q. So what was included in that 2012 HP sale?

13   A. What you see here on the screen is a snapshot of what was

14   included.  That particular agreement, as you see here,

15   included 14 different patents or patent applications.  And

16   they are listed on the right-hand side of the screen.  That

17   is from Exhibit A to that agreement.

18   Q. Did that sale include the '163 patent?

19   A. It did.

20   Q. How much did HP charge for that bundle of patents?

21   A. That entire list of patents was sold for a total of

22   $5.2 million.

23   Q. So what does that work out to be per patent?

24   A. On a per-patent basis, that is about $370,000 each.

25   Q. And for that $370,000, did HP sell or license the '163

DAVIS - DIRECT

1    patent?

2      A. It sold the patents outright.  So the total ownership was

3      transferred over to Tarsium at that time.

4      Q. Can you explain to the jury the difference between a sale

5      and a license?

6      A. A sale is a little bit like if you were to buy a movie

7      from Amazon, and the difference between that and a license is

8      a license allows you to use the technology, or in the case of

9      a movie, to rent the movie from Amazon.  And ordinarily you

10     would pay less to rent something than you would to buy it.

11     Q. What would our negotiation be for here?

12     A. In this case it would be for a license, which would be

13     similar to a rental of that licensed technology.

14     Q. So unlike a sale, HP would be free to license it to

15     others?

16     A. Yes.  If HP had licensed to Nikon, it could continue to

17     license to other camera companies after that, because it

18     would continue to own that patent.

19     Q. What does that tell you about the $370,000 sale amount?

20     A. I think that what that tells you is that the $370,000 is

21     a cap on what someone would be willing to rent.  If you are

22     willing to buy it -- if somebody is willing to buy it for

23     $370,000, or willing, like HP was, to sell it for $370,000,

24     surely they would license it for the same amount.

25     Q. You heard Dr. McDuff tell the jury that HP, for some

DAVIS - DIRECT

1    reason, would have demanded millions from Nikon, right?

2    A. I heard that.

3    Q. But when HP sold these patents to Tarsium for $370,000,

4    did they have Nikon in mind?

5    A. Yes, they definitely did.

6    Q. And how do you know that?

7    A. I know that because --

8         MR. MARCHESE:  Objection, Your Honor.  Motion in

9    limine.

10        THE COURT:  I'm sorry.

11        MR. MARCHESE:  Motion in limine two.

12        THE COURT:  Sustained.

13        MS. KRUZE:  There's a carveout for damages.

14        THE COURT:  Sustained.

15   Q. What does the HP-Tarsium contract say in this case?

16   A. In this particular case, it lists Nikon as an unlicensed

17   designated company.  It's the only company with that

18   characterization, and it would have made clear to HP that

19   Nikon -- or that Nikon could be licensed by Tarsium or a

20   target of litigation.

21   Q. Was Nikon the only company in that special category?

22   A. Yes, it was.

23        MR. MARCHESE:  Objection, Your Honor.  Motion in

24   limine number two.

25        THE COURT:  Sustained.  Oh, no, overruled.  Go

DAVIS - DIRECT

1    ahead, Counsel.

2              MS. KRUZE:  Thank you.

3    Q. Was Nikon the only company in that special category?

4    A. It was.

5    Q. Is the price HP charged Tarsium, this $370,000, relevant

6    to what HP would have charged Nikon?

7    A. Yes.  I think if Nikon had come knocking on the door, it

8    would have been willing -- HP would have been willing to

9    license to Nikon for the same amount of money.

10   Q. Let's talk briefly about the value of these 14 HP patent

11   assets.  Why did you value them equally, in other words, just

12   divide by 14?

13   A. Well, some of these are U.S. patents and some are foreign

14   patents.  But in this particular case, we know for sure that

15   Tarsium was interested in acquiring the foreign patents, and

16   so they placed a value on those patents.

17   Q. And what about from HP's perspective, did HP value them

18   equally?

19   A. HP did value them equally.

20   Q. How do you know that HP valued them the same?

21   A. Because we heard that in the testimony of the HP witness

22   yesterday, Mr. Reich.  As we see here on this screen, he was

23   asked whether each patent had the same value, and he said,

24   "We didn't distinguish among the patents."

25   Q. Was there also correspondence you reviewed from HP?

DAVIS - DIRECT

1    A. Yes, there was.  There was correspondence between HP and

2    Tarsium during the course of their negotiations.  That e-mail

3    correspondence reflects this same view.

4    Q. So that further supports your opinion?

5    A. It does.

6         MS. KRUZE:  Your Honor, move to admit JTX312, pages

7    1 through 6, and permission to display to the jury, which is

8    the e-mail we are discussing.

9         THE COURT:  Okay.

10        (Thereupon, Exhibit Number JTX312, pages 1-6 were

11   received in evidence.)

12   Q. Is this the e-mail you are referring to, Ms. Davis?

13   A. This is a document that has several different e-mails,

14   and this is the one that we are looking at, yes.

15   Q. This is an e-mail from HP to Robert Pressman, from the

16   plaintiff's side?

17   A. Yes, it is.

18   Q. And what did HP say in this e-mail?

19   A. What you will see on the next page is a table, at the top

20   of the page, that shows the price tag that HP intended to

21   charge, dependent upon the number of patents.

22        So what is clear from this exchange is that it

23   didn't really matter which patents Tarsium chose from the

24   list, the price tag would vary only on the number of patents

25   chosen.

DAVIS - DIRECT

1      Q. So no matter which patents were chosen, if there were two

2      patents, it would be X amount; three patents, Y amount;

3      etcetera?

4      A. That's right.

5      Q. Can you provide the jury with an example for the average

6      consumer of that kind of pricing?

7      A. Well, as an average consumer, one would walk into a

8      grocery store and you see a bin at the end of the aisle where

9      they say, Pick any ten items for $10.  That is the idea.  It

10     doesn't really matter which items you pick.  They are each

11     going to be -- they are going to total $10 when you end up

12     with ten items.

13     Q. And the '163 patent was one of those patents in this

14     list, correct?

15     A. It was.

16     Q. What does this tell you about what HP thought about the

17     '163 patent?

18     A. Well, I think we know that HP thought it was a surplus

19     patent, and it had no greater value than any of the others in

20     this particular list.

21     Q. Did you see any documents or any evidence in this case

22     that suggests that HP placed a higher value on the '163

23     patent than $370,000?

24     A. No.  And I have reviewed all the HP documents that

25     reflect this particular transaction.

DAVIS - DIRECT

1      Q. Now, the plaintiff's attorney in his opening statement

2      implied that somehow Tarsium got a really good deal from HP.

3      Is there any evidence to support that argument?

4      A. There is not.

5      Q. What about from the plaintiff's perspective, did the

6      plaintiffs also divide the total price by the number of

7      patents?

8      A. They did.  We saw that in the deposition testimony you

9      saw played yesterday of Mr. Zeiler from Zeiss.

10      Q. Is this the testimony you are referring to?

11      A. It is.  And as he answers the question at the bottom of

12      that screen, "I simply divided the total amount we paid by

13      the number of patents we acquired."

14      Q. Plaintiffs did that internally, correct?

15      A. Yes, that is how they kept their own books and records.

16      Q. And is plaintiff's equal division consistent with your

17      methodology?

18      A. Yes.  It supports the way I went about doing it.

19      Q. Is plaintiff's internal accounting consistent with what

20      Dr. McDuff wants this jury to believe?

21      A. No.  That's not the way he approached it.

22      Q. You heard Dr. McDuff criticize this, saying, Well, that

23      is just an accounting thing.  How do you respond to that?

24      A. Well, as an accountant, I have to take offense to that.

25      Accountants can't just willy-nilly make up numbers.  They

DAVIS - DIRECT

1   have to use a reasonable basis.  And that is what Mr. Zeiler

2   chose to use.  So I think that makes sense, that it would be

3   the same thing we would choose to do as part of this case.

4   Q. In the Tarsium deal, did HP ask for a lump sum?

5   A. Yes.

6   Q. In this case, do you think a lump sum or a running

7   royalty is appropriate?

8   A. I think HP would act in the hypothetical negotiation just

9   like they acted in the real world.  They would want their

10  money upfront, so they'd ask for a lump sum.

11  Q. In considering the license for the '163 patent, did you

12  also evaluate the relationship between HP and Nikon?

13  A. I did.

14  Q. Focusing on HP, what type of company is HP?

15  A. HP, Hewlett-Packard, is a company we all know, a large

16  sophisticated company.  They had been selling cameras for

17  some time.  They had invented this technology.

18  Q. Did they have every incentive to make as much money as

19  they could?

20  A. Of course.

21  Q. And did HP know the value of the '163 patent?

22  A. You would certainly expect that they did.  Their own

23  inventors were the ones who invented the technology.

24  Q. Did HP know about Nikon when it did this deal?

25  A. Yes, of course.  HP had actually been collaborating with

DAVIS - DIRECT

1    Nikon for several years, and it would have been familiar with

2    Nikon's products.

3     Q. And Nikon sales are public, correct?

4     A. Yes.  That, in fact, is available on the Internet.

5     Q. You heard Dr. McDuff's opinion that plaintiff somehow got

6    a good deal because HP's stock price was low.  Do you recall

7    that testimony?

8     A. I heard that.

9     Q. Assuming that is true, does that change your opinion?

10     A. No, not at all.  If, in fact, HP was in dire straits, you

11    wouldn't expect them to give away their crown jewels, if that

12    is what this was.  You would expect them to be demanding

13    whatever value they thought it was worth.  And they

14    apparently got what they thought it was worth.

15     Q. And in 2012, when Dr. McDuff claims that HP was allegedly

16    in financial trouble, do you know what HP's annual sales

17    were?

18     A. I recall it to be over $120 billion.

19     Q. In sum, Ms. Davis, what is your opinion about damages for

20    the '163 patent?

21     A. I think if you want to know the outcome of the

22    hypothetical negotiation for the '163 patent, we should look

23    to the real world, and HP accepted $370,000 for that patent

24    from Tarsium.  We should expect them to ask for the same

25    amount from Nikon.

DAVIS - DIRECT

1    Q. Let's move now to the sales history of the '335 and the

2    '312 patent family with IV.

3         MS. KRUZE:  And, Your Honor, if I could move to

4    admit pages 1 through 9, 16 through 18, and 27 of JTX315,

5    which is the IV/Tarsium sale agreement, which is already in

6    evidence.

7         THE COURT:  It will be received.

8         (Thereupon, Exhibit Number JTX315, pages 1-9, 16-18

9    and 27 were received in evidence.)

10        MS. KRUZE:  Thank you.

11   Q. So turning to this transaction, what was included in the

12   2014 IV-to-Tarsium sale?

13   A. As you see on this screen, this is a snapshot of the

14   agreement between IV and Tarsium.  On the right-hand side of

15   the screen is the list of the 16 different patents and patent

16   applications that were included in that deal.  On the

17   left-hand side you see an excerpt of the language that shows

18   the price tag of $4 million in total.

19   Q. And did that sale include the '312 or Kwon patent family?

20   A. It did.

21   Q. And the '335 patent asserted here?

22   A. Yes.  It was actually a patent application at the time.

23   Q. So for those 16 patent assets for $4 million, what is

24   that per patent?

25   A. On a per-patent basis, that would be $250,000.

DAVIS - DIRECT

1          And I'm sorry, I misspoke.  I said that the '335 was

2     a patent application at the time.  It was not.  The '574 was

3     at the time.

4     Q. Thank you for that clarification.  And for that $250,000,

5     did IV sell or license the patents?

6     A. This is another situation where IV, like HP, sold the

7     patents outright.

8     Q. What does that tell you here?

9     A. Well, once again, one would expect that to be a cap on

10    the amount that they would expect someone to pay to simply

11    use the technology, rather than to own the technology.

12    Q. Is the price IV charged Tarsium relevant to what IV would

13    have charged Nikon in this hypothetical negotiation?

14    A. Yes.  I think IV would have accepted the same amount from

15    Nikon, if Nikon had come knocking on the door.

16    Q. Let's talk briefly about the value of these 16 IV patent

17    assets.  Why did you value them at $250,000 per patent asset?

18    A. Once again, there are 16 different patents and

19    applications involved in that bundle.  Some are U.S. patents,

20    some are foreign.  But because these are international

21    companies, foreign patents have value, and so I think you

22    should divide by all 16.

23    Q. And what about the evidence from IV in this case?  Did

24    you review that?

25    A. I did.  I reviewed the information that IV had prepared

DAVIS - DIRECT

1    when they acquired these patents back in early 2009, and they

2    placed a valuation on at least two of the four patents that

3    we are here to talk about.

4              MS. KRUZE:  Your Honor, move to admit JTX238, pages

5    1 through 7; and 608, pages 1 through 2, which are the

6    documents she is discussing.

7              THE COURT:  They will be received.

8              (Thereupon, Exhibit Numbers JTX238, pages 1-7 and

9    JTX608, pages 1-2 were received in evidence.)

10   Q. And are these the documents that you were mentioning?

11   A. Yes.  This is an excerpt from the documents that came

12   from the Intellectual Ventures files that show the valuation

13   they placed on two of those four patents.  The one on the

14   left-hand side is the '335 patent.  IV valued that internally

15   at $100,000.  And the right-hand side of the screen is the

16   value placed on the '312 patent, and it was valued at $50,000

17   by IV.

18   Q. The same question as I asked you with HP:  Did you see

19   any documents, any evidence that suggests that IV placed a

20   higher value on these patents than $250,000?

21   A. No, not for these four patents.

22   Q. And is there any evidence to support the notion that

23   Tarsium got some sort of deal that Nikon wouldn't get?

24   A. No.  In fact, quite the opposite.  I think Mr. Kosiara

25   from IV testified that there was no special deal.

DAVIS - DIRECT

1    Q. Was the IV and Tarsium transaction an arm's length

2    transaction?

3    A. Yes, according to Mr. Kosiara.  And I think that is

4    evident from the documentation as well.

5    Q. Can you explain that term to the jury?

6    A. "Arm's length"?

7    Q. Yes.

8    A. "Arm's length" means that you have two different parties

9    who are not related.  So if you and I were to enter into a

10   deal, we don't know each other, we have no reason to pass one

11   another special favors.  That would be the case between IV

12   and Tarsium.

13   Q. Now let's turn to the plaintiffs again.  What did the

14   plaintiffs do internally when it came to the IV patents?

15   A. Once again, as Mr. Zeiler explained in the deposition

16   clip yesterday, they handled the IV patents exactly like they

17   handled the HP patents, and they divided them equally.

18   Q. And is what the plaintiffs did behind closed doors

19   consistent with Dr. McDuff's methodology?

20   A. No.  He has not handled it that way.

21   Q. Is it consistent with yours?

22   A. Yes.

23   Q. In the Tarsium sale, did IV ask for a lump sum?

24   A. Yes.

25   Q. And in this case, do you think a lump sum is appropriate?

DAVIS - DIRECT

1      A. Yes.  I think IV would ask, in the hypothetical

2      negotiation, for the same sort of arrangement that they got

3      in the real world, and that would be a lump sum.

4      Q. Did you look to the relationship between IV and Nikon in

5      determining damages for these four patents, the '312 patent

6      family and the '335?

7      A. I did.

8      Q. What type of company is IV?

9      A. IV is a company that purchases patents, and then either

10     licenses them, sells them, or litigates them in order to

11     generate revenues.

12     Q. Did they make their money off patent valuations?

13     A. Yes, they do.  That is the way they make money.  They do

14     not manufacture and sell products.

15     Q. And did IV know about the value of the '335 and '312

16     patent family?

17     A. Yes.  As we saw on the screen earlier, they actually had

18     included that in their internal evaluations.

19     Q. Would they have charged Nikon the same $250,000 per

20     patent that they charged Tarsium?

21             MR. MARCHESE:  Objection, Your Honor.  Speculation,

22     foundation.

23             THE COURT:  Sustained.

24     Q. Did IV know about Nikon when it did this deal?

25     A. Yes, it did.

                          DAVIS - DIRECT

1      Q. And what about the relationship between IV and Nikon

2    specifically at the time?

3      A. At the time IV entered into the deal with Tarsium, IV was

4    already in litigation with Nikon, as you heard earlier this

5    week.  And so what we know is that IV had sued Nikon on a

6    number of image sensor patents, and it involved many of the

7    same camera models that are at issue in this case.

8           So if IV really believed that any of these other

9    four patents were of particular value to Nikon, I would have

10   expected them to have either included those in the lawsuit or

11   certainly discussed them with Nikon at the time.

12     Q. So --

13     A. If they believed it was worth millions of dollars, as Dr.

14   McDuff believes.

15     Q. Does IV sue a lot of companies?

16     A. Yes, it does.  It has sued several dozen companies.

17     Q. And how did that lawsuit end?

18           THE COURT:  Sustained.  If you want to state the

19   objection, that is fine, but it's --

20     Q. Do you know how much IV licensed its bundle of patents to

21   Nikon for?

22     A. I do.

23     Q. And how much was it per patent?

24     A. It was less than $600 a patent.  There were about --

25   there were over 20,000 patents included in that license.

DAVIS - DIRECT

1     Q. In sum, Ms. Davis, what is your opinion as to reasonable
2     royalty damages for the IV patents?
3     A. I think IV would have asked, in the hypothetical
4     negotiation with Nikon, for the same amount of money they
5     asked for from Tarsium, about $250,000 each.
6     Q. Let's switch gears.  Did you evaluate the life of the
7     patents in determining damages?
8     A. Yes, I considered that.
9     Q. And do you know when the '163 patent expires?
10    A. I know it expires next month.
11    Q. What about the '335 patent, when does that expire?
12    A. I'm aware that one expires in May of 2019.
13    Q. Are you aware of Nikon's license defense?
14    A. I am.
15    Q. And did you review any deposition testimony about it?
16    A. Yes.  I reviewed Mr. Toto's deposition, which we just
17    saw.
18    Q. Is this the deposition testimony you are referring to?
19    A. Yes, that is what we just heard.
20    Q. Is Dr. McDuff charging Nikon for sensors that Sony has
21    already paid for?
22    A. Yes.
23    Q. Assuming the license applies, how does this affect your
24    damages number?
25    A. It does not affect my number, because I think my lump sum

                          DAVIS - DIRECT

1    would remain the same.  It would affect Dr. McDuff's number,

2    though.  It would cut it in half, roughly.

3      Q. Let's talk briefly about marking.

4             MS. KRUZE:  If you could bring up the timeline.

5      Q. How did the '163 patent end up with the plaintiffs?

6      A. The --

7             MR. MARCHESE:  Objection, Your Honor.  Motion in

8    limine.

9             THE COURT:  Sustained.

10            MR. MARCHESE:  Thank you.

11     Q. How much of Dr. McDuff's damages come from before this

12   lawsuit?

13     A. About 80 percent.

14     Q. And what is your understanding of when patent damages

15   begin in a case like this one?

16     A. My understanding is that patents [sic] would begin when

17   notice was provided.  My understanding is that Nikon believes

18   that there was no notice prior to the timing of this lawsuit,

19   when the lawsuit was filed.

20     Q. And notice can be given either by an infringement letter

21   or by marking, correct?

22            MR. MARCHESE:  Objection, lack of foundation.

23            THE COURT:  Sustained.

24     Q. Did the plaintiffs provide an infringement letter here?

25     A. No.

DAVIS - DIRECT

1    Q. Did the plaintiffs mark the HP patents, or did HP mark

2    those cameras?

3    A. No.

4    Q. And under Dr. McDuff's running royalty theory, how much

5    would plaintiffs receive given their failure to mark?

6    A. I'm sorry.  Say that again, please?

7    Q. Under Dr. McDuff's running royalty theory, how much would

8    plaintiffs receive given this failure to mark the HP

9    patent -- cameras?

10              MR. MARCHESE:  Objection, argumentative.

11              THE COURT:  Overruled.

12              THE WITNESS:  If we were measuring damages under Dr.

13   McDuff's theory, it would be only $1.6 million after the

14   complaint was filed.

15   Q. And under your calculation?

16   A. It would still be $370,000.

17   Q. Speaking of Dr. McDuff, do you think his overall damages

18   amount is reasonable?

19   A. I do not.

20   Q. Why not?

21   A. It's not consistent with what happened in the real world.

22   I think we have to place a value on what happened in the real

23   world.

24   Q. And why are those real-world transactions so important?

25   A. They are important, in part, because of common sense, but

DAVIS - DIRECT

1    they are also required as part of the Georgia-Pacific

2    analysis.  The first two factors in a Georgia-Pacific

3    analysis require us to look at other agreements that were

4    executed in the real world.

5     Q. Dr. McDuff says that HP and IV, for example, would have

6    charged 40 times more in negotiation with Nikon.  Does this

7    make sense to you?

8     A. It does not.

9     Q. Can you provide an example of that from the real world?

10    A. Well, if we were to take, for example, the HP patent

11   numbers, if you knew that I was willing to sell a house for

12   $370,000, would you expect me to want to rent it to you for

13   10 million?  Wouldn't you think that I would give you the

14   same deal to rent it?  I think that is what would be expected

15   in the real world.

16         MS. KRUZE:  Mr. Christopher, can you please pull up

17   PDX611.

18    Q. This is a slide that was displayed during Dr. McDuff's

19   testimony.  Does this look familiar to you?

20    A. It does.

21    Q. He said that those real-world transactions between HP and

22   IV were not relevant, and showed this slide.  Do you agree

23   with the summary that he's provided here?

24    A. I do not agree.  I think that both parties to each of the

25   transactions that involve Tarsium believe those patents were

DAVIS - DIRECT

1    valid.  Clearly, HP and IV did, because they owned them.

2    Tarsium believed they did because they did a lot of due

3    diligence.  They had three different law firms involved to

4    determine that they were valid, and they believe they were

5    infringed.

6         And I think it was apparent, both from publically

7    available information, and for IV, from information available

8    through the lawsuit that they had filed, what the extent of

9    use of these patents was.  Or they could have figured that

10   out.  So I think this kind of information was known or

11   knowable, to the extent that they needed to know it in order

12   to place a value on the patents.

13        MS. KRUZE:  Could you please pull up slide DDX9.2.

14   Q. In summary, why do you think that this number that you

15   are proposing is reasonable?

16   A. I think we should be looking at the real-world

17   transactions, where the parties that Nikon would have had to

18   negotiate with, HP and IV, did deals in the real world.  And

19   the amount that they charged for the patents at the time,

20   seems to me, would be the amount they would charge Nikon.

21   Q. One last question.  If the jury were to determine that

22   the patents were either not valid or not infringed, what

23   would the damages be?

24   A. Both Dr. McDuff and I would agree that the damages would

25   be zero.  Nothing that we would have had to say would be

DAVIS - CROSS

1      important to you at all.

2                    MS. KRUZE:  Thank you, Ms. Davis.

3                    THE COURT:  Okay.  Cross-examination?

4                    MR. MARCHESE:  Thank you, Your Honor.

5                               CROSS-EXAMINATION

6      BY MR. MARCHESE:

7       Q. Good afternoon, Ms. Davis.

8       A. Good afternoon.  Nice to see you again.

9       Q. Nice to see you.

10                   The parties to a hypothetical negotiation assume the

11     patents are both valid and infringed, true?

12      A. Yes, they do.

13      Q. And that is because by the time a reasonable royalty is

14     computed, we will have gone all the way through -- in any

15     case, in fact, where there is litigation -- all the way

16     through to the point where a jury has reached a verdict of

17     validity and infringement, correct?

18      A. That is definitely correct.  I think the real reason that

19     the parties assume the patents are valid and infringed is

20     because that is what I understand the law to require as part

21     of an assumption in the hypothetical negotiation.

22      Q. Right.  The law requires that the parties assume the

23     patents are valid and infringed.  And by the time you get to

24     a reasonable royalty computation when you are a jury, you've

25     found the patents to be valid and infringed, correct?

                              DAVIS - CROSS

1        A. That's correct.

2        Q. And HP, when it made its deal, you are not aware of any

3      evidence that the '163 patent, or any other asset that it

4      transferred, had been deemed valid and infringed by a court

5      of law, correct?

6        A. I agree.  There had been no court of law involved as of

7      that time.

8        Q. And as to IV, in terms of all the assets they

9      transferred, you are not aware of any evidence that any of

10     those assets, including the four patents involved in this

11     case, had been deemed valid and infringed by a court of law,

12     correct?

13       A. Not by a court of law, I agree.

14       Q. Now, in a real-world transaction, the negotiators are not

15     required to assume that the patents are, with certainty, both

16     valid and infringed, correct?

17       A. I agree with that.

18       Q. Now, in this particular case -- you've already testified

19     to this, we heard your direct testimony -- you've based your

20     royalty on the patent sales agreements, correct?

21       A. I have, among other things, but I think that is the most

22     important factor.

23       Q. You believe the most important factor for damages is the

24     patent sale agreement between HP and the patent sale

25     agreement from IV, correct?

DAVIS - CROSS

1    A. Between HP and Tarsium and IV and Tarsium, yes.

2    Q. They are the most relevant, correct?

3    A. I agree with that.

4    Q. You are not an expert in valuing patents for purposes of

5    sale, correct?

6    A. I don't do that kind of work, I agree with that.

7    Q. Now, you had a slide that you showed testimony from Dr.

8    Zeiler, correct?

9    A. I did.

10   Q. And he's a Zeiss employee, as far as you know, right?

11   A. Yes.

12   Q. Okay.

13        MR. MARCHESE:  Could I have slide number 7, please.

14   Q. All right.  Well, let's take a look here in a second at

15   slide number 7.  This is a slide that you showed during your

16   testimony, correct?

17   A. I did.

18   Q. Now, you are aware, aren't you, that what you put on this

19   slide is not Dr. Zeiler's full answer to this question?  He

20   continued his answer, but you cut it off from your slide,

21   correct?

22   A. You could add it.  I think it's the same message.

23   Q. Let's take a look at it.  Let's look at slide number 8.

24   The continuing portion I've highlighted in yellow, you did

25   not show that in your slide, did you?

DAVIS - CROSS

1      A. I did not.

2      Q. And he stated, "And for that purpose, I did not have any

3   look at the specific patents, and I did not have any specific

4   valuation information."  Correct?

5      A. He did.

6      Q. Do you have any reason to disagree with that testimony?

7      A. No, not at all.

8      Q. So Mr. Zeiler said he didn't even look at the specific

9   patents, right?

10     A. He apparently didn't believe it was necessary for

11  accounting purposes.

12     Q. And he says he didn't have any specific valuation

13  information, right?

14     A. I agree.

15     Q. Now, for the purposes of -- withdrawn.

16          In conducting a valuation to set a price used in a

17  transaction for a patent, one would look at the patent from a

18  technical perspective, which could include validity and

19  infringement; one would look at the size of the market;

20  evaluate the potential for design-around; and consider the

21  benefits of the patent.  Correct?

22     A. I think that would be among those things considered for a

23  valuation.

24     Q. You didn't do any such valuation for most of the HP

25  patents and most of the IV patents that were transferred,

DAVIS - CROSS

1   because you didn't even look at many of them, correct?

2    A. I don't have the expertise to look at those other patents

3    and determine their relative value.

4    Q. In the HP transaction, you testified that there were 14

5    assets transferred, correct?

6    A. That's right.

7    Q. Only one of those was the '163 patent, right?

8    A. That's right.

9    Q. And you don't have the expertise to conduct evaluation as

10   to the other assets, correct?

11   A. I believe we have already discussed two of those other

12   assets at another time.

13   Q. Ma'am, there is a number of patents in the HP transaction

14   that you have never even looked at, correct?

15   A. That's right.

16   Q. And there is a number of patents in the IV transaction

17   that you've never even looked at, correct?

18   A. I agree.  That would be outside my expertise.

19   Q. I want to ask you briefly about the IV/Nikon lawsuit.

20   You talked about that, right?

21   A. I did.

22   Q. And in that, IV sued Nikon for infringement of ten

23   patents, correct?

24   A. Yes.

25   Q. Ten involving, and including, image sensor patents,

DAVIS - CROSS

1       right?

2        A. Yes.

3        Q. And that lawsuit, as you testified, resulted in a

4       settlement, correct?

5        A. It did.

6        Q. Nikon agreed to pay IV for the patents, right?

7        A. For a license to the entire portfolio of over 20,000

8       patents, yes.

9        Q. The lawsuit involved ten patents, correct?

10       A. The lawsuit did, but the license involved 20,000 or more.

11       Q. And in the agreement, the settlement agreement, Nikon

12      paid $12 million to IV, right?

13       A. It did, for the license agreement, yes.

14       Q. And that is before any of those 10 patents had been

15      deemed valid or infringed by a court of law, correct?

16       A. I would agree with that.

17       Q. They had not gone through a trial, right?

18       A. That's right.

19       Q. And so if we take the 12 million, and we divide by 10

20      patents that had not been deemed valid and infringed by a

21      court of law against Nikon, we would have 1.2 million per

22      patent, right?

23       A. That is the math, but it doesn't matter what that math is

24      because the number of assets involved in the license

25      agreement that the $12 million paid for was over 20,000.

DAVIS - REDIRECT

1    Q. And Nikon paid that $12 million to IV as a single lump

2    sum payment, correct?

3    A. It did.

4         MR. MARCHESE:  Thank you.  I have nothing further.

5         THE COURT:  Redirect?

6                    REDIRECT-EXAMINATION

7    BY MS. KRUZE:

8    Q. Ms. Davis, you were asked about an assumption of validity

9    and an infringement, do you recall that?

10   A. I do.

11   Q. In the sale for $370,000 and $250,000, did the parties

12   also assume these patents were valid?

13   A. Yes.  And there was a fair amount of work done by Tarsium

14   as due diligence to determine that those patents were valid.

15   Q. And does the contracts specifically say something about

16   validity?

17   A. Yes.

18   Q. What about infringement?  Did plaintiffs look at Nikon's

19   infringement when buying the HP or IV patents?

20   A. Yes.  That was part of the due diligence efforts.

21   Q. And again, is Nikon specifically listed in the parties'

22   contracts?

23        MR. MARCHESE:  Objection, Your Honor.  Motion in

24   limine number two.

25        THE COURT:  Sustained.

DAVIS - REDIRECT

1    Q. You were asked about Mr. Zeiler's testimony.  And counsel

2    highlighted a portion saying, "I didn't do any specific

3    valuation" right under the fact that he just divided equally.

4    Does that change your opinion in any way?

5    A. No.  That suggests that if he believed a specific

6    valuation was necessary, because the patents were differing

7    in value, then he would have had to do that for accounting

8    purposes.  But he apparently didn't believe it was necessary.

9    Q. Plaintiff's counsel also asked you if you had done a

10   technical evaluation of the other HP or IV patent assets.

11   Did Dr. McDuff do that analysis?

12   A. No.  I don't think either one of us had the technical

13   background to do that.

14   Q. Because you're damages experts, not technical experts,

15   correct?

16   A. That's fair to say.

17   Q. Last question, Ms. Davis.  With respect to the IV/Nikon

18   license, how many patents were included in that license,

19   approximately?

20   A. Actually, it was close to 25,000, but it was definitely

21   over 20,000.

22   Q. And what does that work out to be per patent that IV

23   charged Nikon in the real world?

24   A. Less than $600 per patent.

25             MS. KRUZE:  Thank you, Ms. Davis.

                              DAVIS - REDIRECT

1           THE COURT:  Okay.  Redirect?

2           MR. MARCHESE:  No, Your Honor.

3           THE COURT:  You may step down.  Thank you very much.

4           Next witness.

5           MR. BELUSKO:  Your Honor, we rest.

6           THE COURT:  Okay.  Rebuttal witness?

7           MR. GLITZENSTEIN:  Yes, Your Honor.  Before that,

8    plaintiffs do have motions under Rule 50A.

9           THE COURT:  You may reserve those, yes.

10          MR. GLITZENSTEIN:  Thank you, Your Honor.  Your

11   Honor, as plaintiff's first rebuttal witness, we recall

12   Dr. L. Richard Carley.

13          THE COURT:  Okay.

14          THE CLERK:  Go ahead and put you under oath again

15   since you were excused.

16   THEREUPON:

17                       LARRY RICHARD CARLEY,

18   called in these proceedings and being first duly sworn

19   testifies as follows:

20          THE CLERK:  Thank you.  You may be seated.  Please

21   restate your name for the record, and spell your last name.

22          THE WITNESS:  Larry Richard Carley, C-a-r-l-e-y.

23          THE COURT:  You may inquire.

24          MR. MUKHERJI:  Thank you, Your Honor.

25                       DIRECT EXAMINATION

CARLEY - DIRECT

1    BY MR. MUKHERJI:

2     Q. Dr. Carley, welcome back.

3     A. Thank you.

4     Q. Were you here in court earlier today when Dr. Kleinfelder

5    testified about the validity of the '335 patent?

6     A. Yes, I was.

7     Q. What is your opinion regarding validity?

8     A. My opinion is still that the claims 1, 2, and 3 of the

9    '335 patent are all valid.

10    Q. And do you have slides today?

11    A. Yes, I do.

12         MR. MUKHERJI:  Can we put up the first slide, 502,

13    please.

14    Q. Remind us, what is the '335 patent's invention?

15    A. The '335 patent's inventive aspect is a combination of a

16    structure for the pixel of a camera and a method for

17    operating that pixel.

18    Q. What is the structure part of the combination?

19    A. The structure part, as I described last week, is a way of

20    sharing a single sense node and several transistors amongst a

21    number of photodiodes.

22    Q. What is the method part?

23    A. The method part is a particular way of handling residual

24    unwanted charges, and a way of sequencing the multiple

25    photodiodes so that they can all get their outputs through a

CARLEY - DIRECT

1       single sensing node.

2        Q. Now, did you hear Dr. Kleinfelder testify that the

3       structure is not part of the '335 patent's invention?

4        A. Yes, I did.

5        Q. Do you agree with him?

6        A. Not at all.

7        Q. What part of the claim is it?

8        A. It's over half of claim 1, if you look at the claim.

9        Q. And do the claims define the invention of a patent?

10       A. Yes.  The claims are where we look to see what is being

11      claimed as the invention.

12       Q. And let's look at what the patent, itself, says.  Now,

13      what is the patent's title, which we see on the slide?  What

14      does that tell us?

15       A. The title also tells me it's a combination of a sensor

16      architecture, having common outputting transistors and a

17      method for driving that sensor architecture.

18       Q. Okay.

19              MR. MUKHERJI:  Can we pull up GTX3, please, the '335

20      patent.  And can we also go to column 2, lines 63 to 67.

21       Q. And we saw this passage earlier today on Dr.

22      Kleinfelder's cross-examination, right?

23       A. Yes, we did.

24       Q. What is the patentee doing here?

25       A. Well, the patentee is describing what they think the

CARLEY - DIRECT

1    summary of their invention is.

2    Q. And what is the summary that the '335 patent gives of its

3    invention?

4    A. Well, just as I said, they highlight it being a

5    combination -- "The present invention here is providing an

6    image sensor that reduces chip area by decreasing the number

7    of transistors for a pixel array, along with a method for

8    driving that sensor."

9    Q. And is that there at the bottom of the screen, line 64?

10   A. Yes.

11   Q. Professor, did you --

12        MR. MUKHERJI:  Could we go back to slide PDX503,

13   please.

14   Q. Did you apply the same understanding of a person of

15   ordinary skill in the art for validity as for infringement?

16   A. Yes, I did.

17        MR. MUKHERJI:  Next slide, please.  Actually, turn

18   off the slides.

19   Q. Let's talk about Dr. Kleinfelder's validity analysis.

20   What is the fundamental problem with his validity analysis?

21   A. Well, Dr. Kleinfelder pulls a step out of the background

22   of the patent and tries to insert it into the Takahashi

23   reference, and assumes that inserting that step in there will

24   result in a working system.

25   Q. Is that technically correct?

CARLEY - DIRECT

1    A. Not in this case.  The Takahashi background patent that

2    he used is very complex, and it's not clear that you can just

3    take a step from some other device, insert it in a way that

4    would make sense to a person of ordinary skill in the art.

5    Q. And let's turn to Takahashi.  Now, first of all, does Dr.

6    Kleinfelder even contend that Takahashi discloses all the

7    limitations of claim 1?

8    A. No.  He has conceded that Takahashi does not disclose

9    full depletion.

10   Q. Can you remind us what full depletion is?

11   A. That's just, remember, emptying out the photodiodes

12   before we take a picture, so there is no charge left in the

13   photodiode buckets.

14         MR. MUKHERJI:  Pull up slide PDX320, please.

15   PDX320, from the opening.  Let's go back to PDX504, please.

16   Q. Professor, what are the sources of unwanted charge that

17   full depleting addresses?

18   A. You could -- if you recall, there were two kinds that I

19   talked about last week.  There is leftover charge from a

20   previous image, and that gives you that ghosting that we see

21   in the upper image here.  And there is also dark current,

22   which is noise that happens even when the camera is covered,

23   and that can accumulate and create that speckling image we

24   see in the bottom picture here.

25   Q. Are those called residual charges and dark current we

CARLEY - DIRECT

1   talked about?

2    A. Yes.

3    Q. Now, does Takahashi have its own different way of dealing

4   with these same unwanted charges?

5    A. Yes.  The Takahashi reference takes a completely

6   different approach.  It, instead, builds precision-engineered

7   components that allow it to prevent those charges from being

8   collected in the photodiodes in the first place.

9    Q. So there is no need to empty them out, because they don't

10   exist, right?

11   A. Correct.  That is the Takahashi approach.

12   Q. Now, referring to the Takahashi abstract, let's talk

13   about residual charges.  What does Takahashi say about that?

14   A. In the abstract, he says that the charges that are

15   generated in the photodiodes, that is what is collected in

16   the bucket, when they are being read out, they are fully

17   transferred, completely, into the sense node.

18   Q. What does that mean for residual charges?

19   A. That means there isn't any residual left in the

20   photodiode, if we fully transfer it out when we read it out.

21   Q. And referring to Takahashi column 8, what does Takahashi

22   say about that current?

23   A. He says that the structure that he discloses suppresses

24   the dark currents.

25   Q. Now, what does this mean about Takahashi's components?

CARLEY - DIRECT

1    A. Well, it means that those components have to be very
2    precisely engineered in order to create these two effects.
3    Q. How does this affect the manufacturing process of
4    Takahashi's pixel?
5    A. It does require that the manufacturing process precisely
6    controls the doping levels in the semiconductor substrate at
7    various depths.
8    Q. Let's take a look, Professor, at Takahashi structure.
9         MR. MUKHERJI:  Next slide, please.
10   Q. At a high level, what element of Takahashi does figure 9
11   show?
12   A. Well, this is the pixel, but his circuits are very
13   structural, and so he shows a cross-sectional picture of what
14   the transistors and photodiodes look like, as well as the
15   extra transistors needed for the readout.
16   Q. Can you point out the key components.
17   A. The main thing is that cross-sectional blob at the middle
18   of the picture there.  We can see that key structure is the
19   innovative aspect that I was referring to.
20   Q. Let's talk about how this pixel operates.  What is the
21   state of the photodiode we see here?
22   A. So in this particular state right now, we have just --
23   we've got a past image that we are just about to read out
24   that is stored in the photodiode.
25   Q. And what are the blue dots that we see in the photodiode?

CARLEY - DIRECT

1    A. They are representing charge that was put there by the

2    light.  So the bucket -- that is like the water in the bottom

3    of my beaker in the photodiode.

4    Q. Now, what does the green curvy line represent?

5    A. Well, that is an electrostatic energy barrier that keeps

6    the charge from moving over into the sense node, which is the

7    middle structure there.  And it -- like, if you think of the

8    beaker of water, it's like the wall of the beaker of water.

9    The water sloshes back and forth, but it can't go over the

10   wall.

11   Q. Now, in this precisely engineered Takahashi system, what

12   happens when the transfer transistor is switched on?

13   A. When the transfer transistor is switched on, it pushes

14   down that barrier, as we see in the slide.  It pushes it down

15   so low that the charge just goes downhill.  The water flows

16   downhill and flows into the sense node in this picture.

17   Q. And what does that mean for residual charges, again?

18   A. That is -- like I said at the beginning, that is a way of

19   totally removing all, or substantially all, of the residual

20   charges from the photodiode as the end -- when you are

21   reading out the picture.

22   Q. Now, if Takahashi had used a less precisely engineered

23   photodiode, what would have happened?

24   A. If the -- right, if the engineering wasn't perfect, and

25   the control voltages weren't just right, some amount of the

CARLEY - DIRECT

1    charge would have been left in the photodiode at the end of

2    the readout phase.

3     Q. And that would be residual?

4     A. That would generate those residual images we have seen

5    before.

6     Q. Now, let's talk about the precision-engineered components

7    themselves.  What is special about the photodiode and the

8    transfer transistors?

9     A. Well, as you can see in that cross-section, the transfer

10   transistor and the photodiode are, like, butted together.

11   They are a single structure that is precisely engineered in

12   order to carry out this full emptying of the photodiode.

13    Q. How do you know they are a single structure or combined

14   components?

15    A. There is not a wire between them.  That is the easiest

16   way to tell.  The charges flow right through the transfer

17   transistor and land in sensing node with no wires.  It's

18   all just one structure.  Charge moves through that structure.

19   It has to be engineered as a single structure.

20    Q. Professor, would it have been obvious to add a method

21   step of fully depleting, to Takahashi?

22    A. Well, no.  In my opinion, it would have been unnecessary,

23   because Takahashi provides a different way of dealing with

24   the same issues that fully depletion method step deals with

25   in the '335 patent.

CARLEY - DIRECT

1    Q. Would it have even been feasible to substitute

2    Takahashi's precisely engineered structure with a fully

3    depleted method step?

4    A. No.

5    Q. And what would -- moving to figure 9 again.  What would

6    be left if you did make such a substitution?

7    A. Well, to replace it with a conventional photodiode, I

8    would first have to rip out the transfer transistors and the

9    coupled -- that complete coupled structure of the photodiodes

10   and transfer transistors and throw them away.  And then I

11   would have to replace them with conventional photodiodes and

12   try and bring the method in.  It would be like designing a

13   whole sensor from scratch all over.

14   Q. That would be an easy thing to do?

15   A. No.  It would be a very, very hard thing to do.  And

16   certainly not something a person of ordinary skill in the art

17   at the time would have undertaken lightly.  They would have

18   felt that it was an infeasible approach.

19   Q. Would it have sort of ripped out the heart of the pixel?

20   A. It would have been ripping out the heart of Takahashi's

21   pixel and starting all over.

22   Q. What would this have meant, the substitution, for the

23   manufacturing the sensor?

24   A. Well, we would have to develop a completely new

25   manufacturing process, because the manufacturing process that

CARLEY - DIRECT

1    we had in Takahashi's design was tailored to build that

2    precisely layered structure.

3     Q. Would that have been difficult?

4     A. Developing a semiconductor manufacturing process, a new

5    semiconductor manufacturing process is always difficult.

6    It's expensive, it takes a lot of time.

7     Q. And does Takahashi tell you that you should substitute

8    its precisely engineered components?

9     A. No.

10    Q. Does it tell you how you can do that?

11    A. No, it does not.

12    Q. Would it have been feasible for a person of skill in the

13   art to do that?

14    A. No, it would not have been.

15    Q. Now, would there even have been any value in adding a

16   fully depleting step to Takahashi?

17    A. In my opinion, it could have actually been

18   counterproductive.

19    Q. Why is that?

20    A. Well, if we look at the Takahashi patent on column -- or

21   column 7, we actually see that it talks a lot about this TV

22   scan.  What he means by "TV scan," if you read carefully, is

23   video.  So he's directed his -- most of the effort on this

24   image sensor to a video scanning.

25    Q. And why, then, would --

1              THE COURT:  Let me interrupt at this time.  Ladies

2      and gentlemen, it is 4:00.  So we are going to break for the

3      evening.  Remember the admonishment not to discuss the case

4      among yourselves, with anyone else, or form or express any

5      opinions about the matter until it's submitted to you and you

6      retire to the jury room.

7              As far as logistics go, we will be finishing the

8      testimony tomorrow, which means you should get the argument

9      and instruction and everything else, it should be in your

10     hands at least by Thursday morning.  So just giving you an

11     outline as to where we are.

12             So we are going to see you back here tomorrow

13     morning at?  You guys have been golden the last three days.

14     So I'm counting on you tomorrow.  You can be excused at this

15     time.  If you leave quietly, because I've got to talk to the

16     attorneys.

17             (Thereupon, the jury retired from the courtroom.)

18             THE COURT:  Record will reflect the jury has left

19     the courtroom.  And you may have seats.

20             You may step down, also.

21             THE WITNESS:  Thank you, Your Honor.

22             THE COURT:  Somebody wanted to talk about logistics,

23     as far as tomorrow.  Let me talk to you a little bit about

24     that.  Tomorrow we'll be coming in -- we'll be finishing the

25     testimony tomorrow morning.  I'll talk to you about the

```
 1    instructions and tell you what instructions we are going to

 2    be giving.

 3            We'll probably start the argument tomorrow afternoon

 4    at 1:00.  Just so you can relax and not worry about -- get

 5    too much pressure, we will not start argument before 1:00

 6    tomorrow.  So even if we finish early tomorrow, and let's

 7    assume you both rest tomorrow morning, we are not going to go

 8    into instructions -- or, excuse me -- argument at least until

 9    the afternoon.  Just a second.

10            Normally -- in the last trial, we gave you about an

11    hour of argument.  This time, at least an hour and

12    15 minutes.  So we are going to increase that on it.  I will

13    tell each side, if they want, I'll give you a 10-minute

14    warning before you get towards the end.  Sometimes you don't

15    want it, sometimes you do want it.  If you want it, I'll give

16    it to you so you will know.

17            MR. BELUSKO:  I would like it.

18            THE COURT:  Okay.  Counsel?

19            MR. GLITZENSTEIN:  Same, Your Honor.

20            THE COURT:  Okay.  There is one issue that I think

21    has to be discussed, and that is, I see -- and I don't know

22    what is going to be called tomorrow as far as witnesses or

23    not, but I see one witness that has indicated is going to be

24    called by deposition, which is one I've already indicated

25    that I'm not going to allow a deposition, is going to have to
```

```
1    be live testimony.  That was a live witness earlier in the

2    trial.

3         So I just want you to know that, that I probably

4    would not be permitting that tomorrow.

5         Anything else you have before we take a break?

6         MR. GLITZENSTEIN:  Yes, Your Honor.  Just rebuttal,

7    from plaintiffs.  Any constraints on rebuttal that I should

8    be aware of in terms of duration, for reserving rebuttal

9    time?  For closing arguments, I'm sorry.

10        THE COURT:  Oh, no, you can do that anyway.  If you

11   like, you can have five minutes and then save the rest of the

12   time for rebuttal, or you can do -- now, as far as -- and you

13   bring up an interesting question.  If you want me to tell you

14   on the initial argument -- let's say you plan and you want to

15   do, you know, 50 minutes and 20 minutes.  If you want me to

16   give you a 10 minutes before the 15 minutes, let me know and

17   I can do that on the initial also.  Okay?  Okay.

18        See you back, then, tomorrow at -- why don't you

19   come in about 8:00 or 8:15, in case there is any problems.

20   We'll see you back at that time.

21        (Thereupon, the Court was in recess.)

22             *****    *****    *****

23

24

25
```

1

2      I certify that the foregoing is a correct transcript from the

3      record of proceedings in the above-titled matter.

4

5

6

7      --------------------------

8

9      Amy C. Diaz, RPR, CRR              December 11, 2018

10     S/  Amy Diaz

11

12

13      Exhibit Number JTX1778                              912

14      Exhibit Number JTX1706                              920

15      Exhibit Number JTX1591, page 47                     922

16      Exhibit Number JTX1591, pages 78-80                 923

17      Exhibit Number JTX0449, page 32                     928

18      Exhibit Number JTX449, page 78                      929

19      Exhibit Number JTX0449, page 79                     930

20      Exhibit Number JTX0449, page 143                    931

21      Exhibit Number JTX0423, page 394                    931

22      Exhibit Numbers JTX0449, page 1 and JTX0423, page   932

23      1

24      Exhibit Number JTX0449, page 144                    932

25      Exhibit Number JTX0449, page 145                    933

1        Exhibit Number JTX0449, page 146                   933

2        CROSS-EXAMINATION                                   938

3        BY MR. MARCHESE

4        THOMAS CUNNINGHAM                                   943

5        DIRECT EXAMINATION                                  944

6        BY MR. BELUSKO

7        Exhibit Number JTX7, pages 35036, 35037 and 35049   954

8        JTX7, pages 19-21                                   964

9        Exhibit Number JTX7, page 261                       964

10       Exhibit Number JTX9, pages 47-48                    967

11       Exhibit Number JTX11, page 85                       968

12       CROSS-EXAMINATION                                   970

13       BY MR. MARCHESE

14       JULIE L. DAVIS                                      985

15       DIRECT EXAMINATION                                  985

16       BY MS. KRUZE

17       Exhibit Number JTX311, pages 4-13, 17-18 and 32     991

18       Exhibit Number JTX312, pages 1-6                    995

19       Exhibit Number JTX315, pages 1-9, 16-18 and 27      1000

20       Exhibit Numbers JTX238, pages 1-7 and JTX608,       1002

21       pages 1-2

22       CROSS-EXAMINATION                                   1011

23       BY MR. MARCHESE

24       REDIRECT-EXAMINATION                                1017

25       BY MS. KRUZE

```
 1     LARRY RICHARD CARLEY                              1019

 2     DIRECT EXAMINATION                                1019

 3     BY MR. MUKHERJI

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```