1                           UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3                   HONORABLE R. GARY KLAUSNER, U.S. DISTRICT JUDGE

4


5
         CARL ZEISS AG, et al.,              )
6                                            )
                      Plaintiffs,            )
7                                            )
                           vs.               )
8                                            )   2:17-CV-7083-RGK
         Nikon Corporation, et al.,          )
9                                            )
                      Defendants             )
10       _____)

11

12
                         REPORTER'S TRANSCRIPT OF PROCEEDINGS
13
                                   PM SESSION
14
                             Los Angeles, California
15
                         Wednesday, December 12, 2018
16

17

18
                         _____
19

20

21

22                          AMY DIAZ, RPR, CRR, FCRR
                            Federal Official Reporter
23                          350 West 1st Street, #4455
                            Los Angeles, CA 90012
24

25          *Please order court transcripts here:  www.amydiazfedreporter.com*

```
 1        APPEARANCES OF COUNSEL:

 2

          For the Plaintiffs:
 3

 4                        FISH & RICHARDSON P.C.
                          By:  Christopher S. Marchese, Attorney at Law
 5                        633 West Fifth Street, 2th Floor
                          Los Angeles, California 90071
 6
                          FISH & RICHARDSON P.C.
 7                        By:  Kurt L. Glitzenstein, Attorney at Law
                          One Marina Drive
 8                        Boston, Massachusetts 02210-1878

 9                        FISH & RICHARDSON P.C.
                          By:  Jennifer Huang, Attorney at Law
10                        60 South Sixth Street
                          Minneapolis, Minnesota 55402
11

12
          For the Defendants:
13
                          MORRISON & FOERSTER LLP
14                        By:  Vincent J. Belusko, Attorney at Law
                          707 Wilshire Boulevard
15                        Los Angeles, California 90017-3543

16                        MORRISON & FOERSTER LLP
                          By:   Diana B. Kruze, Attorney at Law
17                        425 Market Street, 32nd Floor
                          San Francisco, California 94105-2482
18
                          MORRISON & FOERSTER LLP
19                        By:  Hector G. Gallegos, Attorney at Law
                          2000 Pennsylvania Avenue NW, Suite 6000
20                        Washington, D.C. 20006-1888

21

22

23

24

25
```

1          THE COURT:  Okay.  The record will reflect that the

2    jurors are all in their respective seats in the jury box.

3          Ladies and gentlemen, we've heard all the evidence

4    now.  This is what you are to use to determine what the facts

5    of the case are.  At this time, both counsel are going to get

6    a chance to argue the case to you, and it's important that

7    you listen to this.

8          Now, obviously, what they say during their argument

9    is not evidence.  You understand that.  You've got the

10   evidence from the witnesses.  If they say something that

11   disagrees with the way you remember it, it's your memory that

12   controls.  Nobody is going to be trying to mislead you or say

13   something that is improper.  It's going to be how they

14   remember the testimony, and it may be different from how you

15   remember it.  It's your memory of the evidence that controls

16   on this.

17         We are going to start with the opening statement

18   from the plaintiff, then we'll have the statement by the

19   defense.  And then since the plaintiff has the burden, they

20   have what we call a rebuttal at the end.  So what we are

21   going to do a little bit different as far as timing is

22   concerned, because we don't want to interrupt these

23   arguments, the plaintiff is going to make their argument

24   first, then we'll take a recess, and then we'll come back

25   here and hear the closing argument and the rebuttal.

1                    So the second session may be a little longer than

2           the first session, but I think it's going to work a lot

3           better that way.

4                    Okay.  Counsel, ready to proceed?

5                    MR. GLITZENSTEIN:  Yes, Your Honor.  Thank you.

6                    THE COURT:  Thank you.

7                    MR. GLITZENSTEIN:  Ladies and gentlemen, good

8           afternoon.

9                    This case presents three simple truths.  Nikon

10          wrongly took my client's patented inventions without paying

11          for them and without permission.  Those patented inventions

12          form the basis for numerous key features in dozens and dozens

13          of Nikon digital cameras.

14                   And as you've seen, they have reaped sales in the

15          United States for those cameras of billions and billions of

16          dollars.  And it is wrong for Nikon to profit from the use of

17          my client's inventions without fair and reasonable

18          compensation.  That is all we seek.

19                   Now, as the evidence on these issues has been

20          presented to you since last Tuesday, we have done our utmost

21          to provide you with the information that you would need in a

22          full, fair, and forthright manner.  My clients expect nothing

23          less of me and my team.  And I hope that you see it the same

24          way.

25                   Now, as I turn to the evidence, I will from time to

1     time note numerous inconsistencies in what you have heard

2     from Nikon and its witnesses.  Over the course of this trial,

3     we have heard Nikon witnesses disagree with other Nikon

4     witnesses.  We have heard Nikon witnesses disagree with

5     documents.  We have heard Nikon witnesses even disagree with

6     their own prior testimony.

7          Why is that relevant?  Well, one of the roles of the

8     jurors is to find the facts.  And your ability to do that in

9     a courtroom is no different than your ability to do that in a

10    classroom or in a living room.  Okay?  And when you are

11    right, it's easy to be consistent.  In fact, it's natural to

12    be consistent.  But when you are wrong, those inconsistencies

13    pile up, one after another, and they catch up with you.  And

14    they have caught up with Nikon here.

15         Now, what explains Nikon's pervasive inconsistencies

16    in this case?  I think Nikon's own damages expert summed it

17    up best yesterday when she said if Nikon had knocked on the

18    door of Hewlett-Packard, or if Nikon had knocked on the door

19    of Intellectual Ventures.  The problem with that is the word

20    "if."  Nikon didn't knock on any of those doors.  As you've

21    heard, Nikon knew about these patents, found them well before

22    my clients even learned of them.  Okay?

23         What did they do?  This is an important question in

24    this case.  What did Nikon do to avoid infringing those

25    patents once it learned of them?  You've seen all the

1       evidence.  Record's closed.  And you know the answer.

2       Nothing.  They did nothing.  They didn't show you any

3       analysis of those patents that justified them ignoring them.

4       They didn't talk to their suppliers.

5              You've heard now the evidence that they buy sensors

6       from Toshiba and Sony and Aptina and a whole bunch of other

7       companies.  They didn't talk to them, okay?  They didn't ask

8       them for information.  They didn't go to Omron.  You've heard

9       about Omron as well, extensively.  They didn't even let their

10      own employees know what they had found.

11             After they learned of these patents and they

12      launched camera after camera, they kept designing camera

13      after camera, nobody ever said, Hey, watch out, be careful.

14      Avoid these patents.  Now, why not?  We don't know.  We don't

15      know.  Nikon hasn't explained.  Maybe they just thought they

16      wouldn't get caught.

17             But what we do know is they knew about the patents

18      and they took their chances on these patents.  Nikon failed

19      to do the right thing when they could have done the right

20      thing.  And we called them on it.  And that, ladies and

21      gentlemen, inevitably leads to the sorts of inconsistencies

22      that you have seen throughout this trial.

23             Starting with the issues.  Ownership.  Does Nikon

24      seriously contest that my clients own these patents?  Did you

25      hear anything about that, for example, in Nikon's opening

1    statements?  Test your memory on that.  Check your notes.

2         Did Nikon put up any witnesses to say, Hey, hold it?

3    No.  What you heard was the testimony of Mr. Pressman, who

4    explained chapter and verse what happened, what he did, and

5    what the documents show.  Okay?  Why would they do that?  Why

6    would they make us prove an issue or put the evidence in to

7    prove an issue if they weren't really going to challenge it?

8         Well, you know, if you are concerned about the

9    substance, if you don't have good arguments, if you know you

10   are confronted with inconsistencies in your case, a good

11   strategy is to, you know, put us to our burden -- which they

12   can do -- but put us to our burden and make us spend the time

13   on those issues before we get to the substance.  We did it,

14   and we have clearly proven that we own these patents.

15        Turning first -- I'm going to do these in the same

16   order that you heard the testimony in this case.  I won't

17   switch anything up on anybody.  I'm going to start with the

18   sensor patents, and I'll finish off on the patents with the

19   -- the face detection patent that you heard so much about.

20        And I'll start with the '335 patent.  And very

21   briefly, this is the patent that reduces the number of

22   components and has also an inventive method, resulting really

23   in two benefits, one qualitative and one quantitative.  So as

24   Dr. Carley explained -- and no one from Nikon disagreed with

25   his math.  As Dr. Carley explained, when you use this

1    invention, you get a lot of benefits, one of which is you can

2    reduce -- should you choose to do so, you can reduce the size

3    of the sensor.  That results in a cost savings.

4         So he said the average savings is 10.7 percent.

5    That is exactly the figure I told you in opening, if anybody

6    recalls, and it's exactly what the evidence now shows.  And

7    that is a benefit that comes from the structural part of the

8    claim, that long preamble that you've seen over and over

9    again in the case.

10        There is also another benefit, a qualitative

11   benefit, which is reflected in the image quality.  And you've

12   seen these images throughout the case as well.  And with this

13   invention, you reduce the residual charge, which has these

14   negative impacts of either seeing a ghost of an old image on

15   your picture or this speckling from this concept called dark

16   current.

17        I will just note, again, the evidence is in.  Nikon

18   hasn't disagreed that these are real problems and that these

19   problems are addressed using the patented method.  Okay?  And

20   image quality -- as your own common sense tells you, image

21   quality is, of course, critical for the digital camera

22   business.  Nikon prides itself on that.  And it's able to

23   achieve high image quality, including because of inventions

24   such as the '335.

25        With regard to the infringement of the '335 patent

1    -- just to summarize what you've seen and heard, Nikon sells

2    many different cameras.  And as you've heard, many of them

3    use different -- different image sensors.  What I have shown

4    here is just a real brief overview, just to sort of give you

5    a little bit of a roadmap to what you've seen in terms of the

6    evidence.

7          There are two sensors where we have shown that there

8    is an equivalence in the way that they operate to the claim.

9    These are the sensors where there are two transistors sort of

10   connected one after the other.  And as Dr. Carley explained,

11   having those two transistors really is equivalent to having a

12   single transistor and, therefore, being directly coupled.

13         But really, the focus of Nikon's defense to this

14   patent was not those two transistors, and not those two

15   sensors.  It really was the -- this issue of fully depleting.

16   Okay?  And the second issue being these transistors being

17   turned on and turned off.

18         And on this issue, Nikon's expert was Dr.

19   Kleinfelder, testified yesterday.  And on this issue what

20   fully depleting means, the good news here is the experts

21   agree.  They agree that fully depleting means bringing the

22   amount of charge that is left in the photodiode down to what

23   is called the noise floor.  Only Dr. Carley, then, went ahead

24   and defined what that was.  But the bottom line is the

25   experts agree on what this means.

1    So that poses a question.  What do Nikon sensors do?

2    So we asked Nikon.  That's what we can do in discovery.  We

3    said, Tell us who your image sensor -- your internal image

4    sensor designers and sort of their internal engineering

5    experts are.  We asked them that.  And they responded with

6    two, and only two, names when we initially asked this

7    question.  And they said, it's Mr. Shima and Mr. Mori, okay?

8    So the way this works is we have to go and ask them

9    questions.  We have to fly to Japan to do that.  So we went

10   and we took the depositions of Mr. Shima and Mr. Mori.  And

11   we asked, of course, Mr. Shima.  You heard his testimony last

12   week played in -- or read in, excuse me, by deposition.

13   And we asked him what his responsibility was with

14   regard to image sensors.  And I want to just draw your

15   attention to the -- to what he said in response, which leaves

16   no surprise as to why Nikon identified him as its -- sort of

17   its spokesperson on these issues.

18   Mr. Shima said that his responsibility is to design,

19   verify, and make into the form of a chip circuit that

20   satisfies the specifications that are demanded.  So this guy

21   knows the inner workings of Nikon image sensors.

22   So we went to Japan, and we asked Mr. Shima that

23   question.  And you may recall his testimony.  His testimony

24   was that -- we asked him, we said, Well, what happens when

25   you reset the photodiode?  And his words were, "emptied out."

1    Okay?  He said that that that photodiode is emptied out of

2    charge.  And he said it over and over again.  Actually, we

3    played a number of pieces of his testimony.

4          Yet, despite this, Dr. Kleinfelder says, No.  No, I

5    disagree that those photodiodes are fully depleted.  Okay?

6    Another inconsistency.  A key inconsistency, really, with

7    regard to -- with regard to this issue that Nikon says they

8    don't do.

9          So just to capture all this.  And I've got just one

10   quote from Mr. Shima on the top.  He agreed.  He said, Yes,

11   one purpose of the reset phase is to empty out.  And yet

12   despite that, Mr. Kleinfelder offered his testimony on that

13   witness stand that that limitation is not met by Nikon.  That

14   is a clear inconsistency.  Mr. Kleinfelder is disagreeing

15   with Mr. Shima.

16         And yet when we asked further -- we asked

17   Mr. Kleinfelder, we said, Well, hey, as between you and

18   Mr. Shima, kind of who knows best how Nikon's image sensors

19   work?  And at that point he said, Well, I would be hesitant

20   to disagree with Mr. Shima.  So inconsistency there.

21         It also raises the question that why, then, did

22   Nikon just not call Mr. Shima and have him explain what he

23   meant by that?  All we can do is take his deposition and show

24   you his transcript, read his transcript to you.  Nikon, of

25   course, could bring him.  He's their own witness.  They

1        brought a few other witnesses here, of course, to provide

2        testimony.  But instead of bringing him, trying to explain

3        this, they said, No, no, no, we are going to bring an expert,

4        and we are just going to have them disagree with our guy.

5              And there was another contradiction, an internal

6        contradiction in what you heard yesterday from Dr.

7        Kleinfelder that I wanted to draw out.  In effect, Dr.

8        Kleinfelder even has disagreed with himself on this issue of

9        full depletion.

10              What do I mean by that?  On the one hand, as I just

11       said, he says that the Nikon image sensors do not fully

12       deplete.  Well, what is interesting is when he presented to

13       you his invalidity argument where he was combining some

14       things from the '335 patent with the Kleinfelder -- with,

15       excuse me, the Takahashi reference, he actually pointed to

16       the '335 patent for sort of the evidence on full depletion.

17              So on the one hand, he points to the patent and says

18       that is an example of full depletion.  Well, what is in the

19       patent is exactly what Nikon does, as Dr. Carley explained.

20       And again, hereto, Dr. Kleinfelder didn't attempt to explain

21       this inconsistency, though it is a fundamental inconsistency.

22       You can't say this term means one thing for validity purpose,

23       but means something completely different when it comes to

24       infringement.

25              All right.  And then the last issue on the '335

1   patent from an infringement perspective is this whole issue

2   of the transistors turning on and then turning off.  And Dr.

3   Carley explained this.  I'm not going to reiterate his

4   testimony.  He was clearer than I can be, for sure.

5        But the bottom line, so to speak, that I would draw

6   your attention to on this issue is, as Dr. Carley explained

7   this morning, whether you turn on these transistors, you

8   know, during that phase or just right before the phase, or

9   turn them off before, it just doesn't matter to anybody.  It

10  doesn't matter from a technical perspective, it doesn't

11  matter from an engineering perspective, and it just doesn't

12  matter from a user's perspective.

13       You've heard no testimony that the image is better

14  or worse if you do it differently.  And so he's explained

15  from a -- you know, from his perspective why these are

16  equivalent.  But the bottom line is there is no manifestation

17  of any difference at all in these sensors.

18       '335 validity issues.  This concerns that Takahashi

19  patent I mentioned a moment ago.  One place to start, which

20  is the burden of proof when it comes to validity.  Now, I

21  expect that you will be instructed on the law with regard to

22  the burden of proof for patent invalidity, which requires

23  that invalidity be proven by what is called "clear and

24  convincing evidence."  And I expect that you will be

25  instructed on what that term means when you receive the jury

1      instructions.

2              And the point I want to note, though, is Dr.

3      Kleinfelder, when he offered his opinions that this claim is

4      invalid, never even said that -- never even informed you what

5      the burden was.  He never said that he had even applied the

6      burden when he reached his conclusions.  He just simply said,

7      Well, I think it's invalid.  He never told you -- was he

8      applying a different standard?  We don't know, because he

9      never said it.

10             And Dr. Cunningham, when he offered his opinions

11     yesterday on invalidity, he, too, never explained the burden

12     that he applied.  And Dr. Darrell, when he offered his

13     opinions on invalidity on Monday, likewise, never even said

14     what burden that he applied.  And it is a clear and

15     convincing burden.

16             But moving past the burden, to the substance.

17     Again, check your memory.  Check your notes on this issue.

18     But Dr. Kleinfelder did not even explain to you why someone

19     would take these two different pieces and tear one apart and

20     put it back together.  And, you know, there was just no

21     explanation whatsoever from Dr. Kleinfelder on that issue.

22             On the flip side, Dr. Carley certainly explained in

23     great detail why not, why you wouldn't do this.  And he

24     explained that it's unnecessary.  Again, I won't belabor the

25     testimony.  You've heard it recently.  But as he explained,

1    that the Takahashi reference, it uses really finely

2    engineered components that don't actually have this problem

3    of unwanted charge.  So it's a completely different way to

4    avoid having the problem in the first place.  Why would you

5    tear apart a perfectly good image sensor if it doesn't have

6    the problems that the '335 patent was designed to address?

7    You wouldn't.

8              It's unfeasible as well.  It's not as though you can

9    -- these are very precisely designed components.  You can't

10   just unplug one thing and plug something else in.  As he

11   said -- I think his words were to the effect that you would

12   have to cut the heart out of Takahashi.  You basically have

13   to throw away the invention and start with a fresh sheet of

14   paper.  So it wouldn't make any sense.

15             And then lastly, as he explained, it would be

16   counterproductive, of course, because when you do this, it

17   takes longer to collect an image.  And given that Takahashi

18   was all about video -- recording video at a high frame rate,

19   you wouldn't want to do it.

20             So, again, when you look at the evidence, they

21   didn't say why.  We told you why not.

22             Another point on the '335 patent.  You heard a lot

23   of testimony about a reference called Guidash.  And this was

24   from last week.  Dr. Carley was asked a lot of questions

25   about Guidash and the role that it played in prosecution of

1    this patent.  But what Dr. Kleinfelder said was quite

2    interesting.  He said that Guidash and Takahashi, as far as

3    the structure is concerned, they are the same.  Okay?

4            Why do I note that?  Well, Guidash was cited.  Not

5    only was it cited, but as you saw when the defendants were

6    cross-examining Dr. Carley, the Guidash reference was

7    discussed quite extensively during the prosecution.

8            When you step back and think about this, that means

9    the patent office had Guidash, which Dr. Kleinfelder says has

10   all the hardware pieces.  And they had, of course, the

11   discussion in the patent itself, which Dr. Kleinfelder points

12   to and says, Well, that is where I can find, you know, these

13   reset aspects of the method.  So the patent office had

14   everything.  And yet the patent office, having all that

15   information, concluded, nonetheless, that the patent was to

16   be granted.

17           Okay.  Moving on to license.  So this is an issue

18   that only concerns the '335 patent.  And, you know, the sort

19   of -- what Nikon is basically saying is -- or what they

20   are asking you to believe is that they don't design their own

21   sensors.  They just go to Sony and basically say, Give us

22   what you got.  And therefore, those sales from Sony are

23   governed by this license.  Okay?

24           That is as I've heard it, and I'm sure counsel for

25   Nikon will disagree with me if I understand their theory

1      wrong.  But at least that is my understanding of it.

2             But what it comes down to, ladies and gentlemen,

3      here is the key -- one of the keys, is Nikon has got to

4      convince you that they don't design their own sensors.  Okay?

5      But Nikon has a problem with that, and you saw this unfold

6      last week and a little bit this week.  The problem that Nikon

7      has with that is that they have spent a lot of money saying

8      exactly the opposite publically.

9             And this is the whole issue -- or one of the issues

10     concerning Mr. Etchells and his article.  So we subpoenaed

11     Mr. Etchells to appear here at trial.  He did appear here

12     last Friday, and you heard about the work that he did.

13            What you heard was Nikon, you know, essentially

14     hired him.  Right?  And they said -- and I put it on the

15     slide here, but it's in evidence.  This was the contract.

16     And they said, We want to basically -- I'm paraphrasing,

17     okay?  But basically, The world thinks that we don't do our

18     own sensor design, and that is wrong, and we want to make

19     sure the world understands that we design our own sensors.

20            And so they invited Mr. Etchells to Japan to observe

21     their facilities.  They asked him to draft an article, which

22     he did.  Mr. Etchells shared a draft of that article with

23     Nikon, and it said all sorts of things.  And again, I won't

24     repeat the evidence that all came in last week, but, you

25     know, in the very first paragraph of the article, which is

1      JTX178, Mr. Etchells sort of sums it all up by saying Nikon

2      designs its own sensors from the ground up.  Okay?

3            So a fundamental inconsistency with the position

4      that Nikon is taking now.  Which is basically, We don't do

5      any of our own design work.

6            Now -- and it's not just that.  I mean, he went on

7      and on.  It's a multi-page article with a lot of detail to

8      it.  And as you may recall, he's an engineer himself.  He

9      went to school, got his master's here at UCLA in

10     semiconductor manufacturing.  So this guy knows what he's

11     talking about.

12            But it wasn't just that he published the article.

13     He then ran it by Nikon, and Nikon engineering.  They

14     reviewed it, they approved it.  You heard yesterday from

15     Mr. Sanbongi that it was also approved by Nikon legal and

16     also approved by Nikon marketing.  Okay?

17            But, again, this is now -- what was really their

18     objective, which was to tell the world, Hey, we do our own

19     stuff, we do our own homework, design our own sensors, now

20     that's a problem for them in this case.  Because they want to

21     tell you, No, no, we don't do any of that design work.  Okay?

22            That is a fundamental inconsistency.  This is Nikon

23     contradicting its own message, right?  Its own article, the

24     thing it sponsored, paid $23,000 for, the thing it approved.

25     It now says -- they are effectively -- there is nothing in

1    there that is accurate.  Mr. Etchells said Nikon designs its

2    own sensors from the ground up.  And you heard on Monday from

3    Mr. Sanbongi that, Well, it's like if we wanted a race car,

4    and we say we want a race car that will go 200 miles an hour.

5    Fundamental inconsistency.

6            And you heard, actually, a couple of things on

7    Friday from Mr. Etchells.  One is he didn't change his

8    view -- he did express to you that he changed his view about

9    what was in that article, what he said.  But two points.  Two

10   points I hope you heard from him.  One, he didn't change his

11   view on what the article -- what his own article said until

12   after we called him.  Until after we contacted him and asked

13   him, you know, to just to explain his article to us.

14           And number two, that he was never, um -- that he has

15   never taken any steps to retract his article, to pull it off

16   the web or anything like that.  So it's still out there.  So

17   even though he says here in court, you know, My article is

18   wrong, he hasn't taken any steps that would be in any way

19   consistent with that.

20           Okay.  Let me turn to the next -- this is the family

21   of three patents that we have been discussing together.  We

22   call them the '312 family.  They call them -- the defendants

23   call them the Kwon.  This is the one about selectively

24   increasing storage capacity.  And just to remind on what this

25   one is about.  So qualitatively, this is a sensor design that

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1       allows you to capture more charge in a very bright light

2       condition, and then you can switch the transistor off, and

3       that helps you improve image quality in a low light setting.

4              And again, I want to emphasize here, you know, we

5       have shown you the images here.  We've tried to illustrate,

6       since these are cameras, what is the real-world impact.  And

7       we are at the end of the evidence, and nobody has disagreed.

8       Nobody has said, Oh, that isn't actually an accurate

9       representation of what happens if you don't handle these

10      charge issues correctly.

11             And then, what is the result of that?  Well, it's

12      this I-S-O or ISO issue that you've heard so much about.  And

13      as a consequence of their infringement, Nikon's D4, D4S, and

14      DF cameras, which are the only three accused of infringing

15      this patent, they have a much wider range of ISO, both high

16      and low.  And I'll come back later.  There has been sort of a

17      -- some inconsistencies as well with regard to the importance

18      of low ISO.  I'll come back to that later.

19             But I do want to touch first on this issue of what

20      are the infringement issues about here?  Okay.  So we've got

21      two of the patents.  And the '312 patent, you've heard a lot

22      about.  And the issue there, and it's sort of, in a nutshell,

23      is the claims talk about -- it talks about borrowing some

24      storage.  It talks about borrowing storage from a previous

25      pixel.  Okay?  I'm paraphrasing.

1        In fact, what Nikon does is it uses the next -- it
2   uses the subsequent, right?  Instead of going left, it goes
3   right, effectively.  And then there is an issue with regard
4   to the signal that is used to turn that transistor on and off
5   that will allow for the sharing.
6        So let me just break those down.  So this issue of
7   previous versus subsequent.  Let me address that one first.
8   So here, too, this is sort of a, you know, what is under the
9   hood of an image sensor question.  Right?  How does it work
10  internally.  So here, too, we went and we asked Mr. Shima.
11  We asked Mr. Shima how it works.
12       And, you know, again, he's their internal
13  development guy.  And we asked him, we said, Well, would it
14  matter if you were to do this connection to a subsequent line
15  instead of a previous line?  And his testimony was very
16  clear.  He said, Either could be done, either is okay.  And
17  that aligns 100 percent with what Dr. Carley explained, why
18  it just doesn't matter.  You can go left, you can go right,
19  you can go up, you can go down, however you want to think
20  about it.
21       Here, too, we have a fundamental disagreement --
22  internal disagreement at Nikon.  Dr. Kleinfelder testified
23  expressly that he disagrees with Mr. Shima on this -- on this
24  material issue.  You heard his testimony yesterday, which
25  I've captured here on this -- on this slide.  And this was on

1    his direct examination.  He says, Well, what about

2    Mr. Shima's testimony about these things being the same in

3    his opinion?  Do you agree with that?  Dr. Kleinfelder's

4    response was, No, I don't, on direct examination.

5            We then came back and asked him, and said, Well,

6    hey, as between you and Mr. Shima, who knows more about this?

7    And he said, Well, I would be hesitant to say I know more.

8    So again, here, too, Nikon has a fundamental internal

9    disagreement.  They have one witness, their expert here,

10   disagreeing with their own guy back in Japan.

11           Another inconsistency.  Another core inconsistency.

12   And again, again, begging the question, why not bring

13   Mr. Shima here to explain himself?

14           All right.  That is the first issue, only concerns

15   one of the three patents.  And then there is the second

16   issue, which concerns the '312 and the '017, and it's this

17   issue of the select signal.  And just to distill this down,

18   this is a question of whether there is any requirement even

19   in the claim that you use the same signal for one transistor,

20   called a select transistor, as you do for the transistor that

21   connects these storage capacities.

22           Now, sort of point one is the claim actually doesn't

23   even say that there is a select transistor required.  But

24   even beyond that, you know, here, too, no one has explained

25   why this even matters.  There has been no testimony on that.

1        And, in fact, Dr. Carley has clearly said it just doesn't

2    matter.

3            And when you look at the -- this is one of these

4    timing diagrams that you've seen a ton of in this case.  When

5    you look at this, I have shown you at the bottom,

6    highlighted, the select signal, and at the top what is called

7    FDSW.  That is the signal that turns this transistor -- the

8    sharing transistor, if you want -- on and off.

9            And, you know, your eyes will tell you that it's the

10   same signal during this portion of the timing diagram.  It's

11   the same signal.  So whether that select signal comes in on

12   one wire or two wires is absolutely irrelevant.  The circuit

13   operates in exactly the same way.

14           And that brings me to the other patent, the '574

15   patent.  And as you may have noted yesterday in Dr.

16   Kleinfelder's testimony, he originally -- this wasn't his

17   theory.  He didn't offer any -- he offered a theory on this

18   claim that was rejected by the Court.  And so what you heard

19   with regard to this last piece of the claim, this is claim 30

20   of the '574 patent, this is a brand-new argument that they

21   brought to this trial.  That was the testimony from Mr. --

22   Dr. Kleinfelder, excuse me, yesterday.

23           I mean, you know -- and as our expert, Dr.

24   Subramanian was questioned about this last week, and as he

25   explained quite clearly, you know, there can be multiple

1       photodiodes or just one photodiode.  There is no restriction

2       to having only one photodiode in this claim.  And then as

3       practiced, only one of those photodiodes is actually active

4       at any time.

5               What about invalidity, invalidity of this patent?

6       These patents, excuse me.  Well, here you've heard one, and

7       only one, theory.  This is the issue of written description

8       you heard about yesterday from defendant's other expert on

9       validity, Dr. Cunningham.  Dr. Cunningham.

10              Now, and what you heard was his testimony that he

11      didn't apply the right legal standard when he rendered his

12      opinions.  We asked him at his deposition what he based his

13      analysis on.  He said -- he told us what it was.  And then

14      yesterday at trial, he testified, No, that was -- I used the

15      wrong legal standard.  What I told you at my depo was the

16      wrong legal standard.

17              Not only did he apply the wrong legal standard on

18      this issue, he didn't consider the key evidence.  What is the

19      issue here?  They say that a unit pixel, as that term is used

20      in the '312 family of patents, lacks written description and

21      support because the patent only includes -- only shows one

22      pixel.

23              But the evidence, though, shows that people with

24      skill in the art knew full well that a unit pixel could have

25      multiple photodiodes.  And you only have to look as far as

1       the other sensor patent in this case to see that.  The '335

2       patent, which we spent all this time on, that patent shows a

3       unit pixel, calls it a unit pixel, and it has two

4       photodiodes.  Okay?

5               So Dr. Cunningham didn't even look at that in

6       forming his opinion that the claim is invalid.  And I just

7       want to sort of remind, again, I expect that you will be

8       instructed that the standard of proof here is clear and

9       convincing evidence.  And on that -- and he didn't even

10      bother to look at the other sensor patent in this lawsuit.

11              The other thing he didn't do was he didn't talk to

12      Dr. Kleinfelder about Dr. Kleinfelder's own patents, which we

13      showed as well.  His '411 patent shows that there are

14      actually four photodiodes per pixel.  Okay?  Again, that,

15      too, is something that Dr. Cunningham did not even consider

16      in forming his opinions in this case.  He says he wasn't even

17      aware of it.

18              And then beyond that, you saw this yesterday, he

19      repeatedly changed his testimony.  You know, he told us at

20      his deposition what legal standard that he applied.  He gives

21      us an errata that gives us all this detail now.  He says,

22      Yes, I told you that that was the standard, and now I'm

23      telling you it's this 80-word, you know, legalese standard.

24      That is what I -- that is my errata.

25              He also said that he -- at his deposition, he

1   disagreed with the Court's construction, and then he says,

2   Well, I don't disagree.  Now he changed his story in multiple

3   respects.

4          All right.  Turning to the last of the patents, the

5   '163 patent.  This is the fast face detection patent, fast

6   and accurate.  So as Dr. Mundy explained, you know, fast is

7   important.  And I think, you know, that -- use your common

8   sense as to why, but, I mean, when you are taking pictures,

9   fast, obviously, is important.

10         And Dr. Mundy explained his analysis last week to

11  you.  And he said, I've analyzed the '163 patent, and it's

12  ten times faster than the algorithm that came before it.  10

13  times.  Okay?  I wanted to start there, because -- to

14  underscore the significance of this patent.

15         You've heard a lot about other face detection

16  technologies.  Nikon has never came back -- Dr. Darrell, for

17  example, who is their expert on this patent, never came back

18  and disagreed with that and said, No, Dr. Mundy got his math

19  wrong.  I don't think it would be, you know, 10X.  It would

20  be 5X.  So there is no challenge to Dr. Mundy's analysis on

21  that.  And so it is a substantial and groundbreaking

22  innovation set forth in the '163 patent.

23         Nor did Nikon dispute that the patent works.  I

24  mention that because you've heard a lot of testimony over the

25  last few days about the Yow thesis.  And the Yow thesis was

1    -- and paper were from just a little bit before.  Well, the

2    paper was.  There's really not much evidence about the

3    thesis.  But set that aside.

4         The point is, you've heard that the Yow thesis had

5    its share of major problems.  I'll comment more on that.  But

6    it is -- it is, um -- should be of note that all of this --

7    the prior work that you've seen had all these problems, and

8    yet the '163 patent really emerged and had a working

9    technique that was 10 times faster than the prior work.

10        Now, in terms of the evidence on this, there is a

11   lot of detail here.  This is the one with the hardware and

12   the software.  But, you know, the point of this slide, what I

13   would like to reinforce here is, you know, we showed you the

14   code.  We had Dr. Mundy walk through the code, explain how it

15   works, explain how it works in relation to the hardware.  We

16   put up the evidence and put up the detail for you to see.

17        All right.  So what does Nikon say?  Well, they said

18   a lot of things, but the two areas that seem to emerge from

19   their examination of Dr. Darrell are -- they say, Well, we

20   don't have a reference image pattern that is representative

21   of a human face.

22        Now, I'm going to show you a number of these, and

23   these were extracted either by Dr. Mundy, our expert, or from

24   Omron's code.  And this is just one example.  This is

25   actually the reference image pattern that Dr. Mundy showed

1      you in his direct examination.  And then he showed, you know,

2      by overlaying it with the woman here on the right, showed how

3      it's representative of a human face.

4              And then he went on and he said, Well, and actually,

5      because people can be oriented in all sorts of different

6      directions, you need kind of a library of these different

7      patterns so that you can capture people.  And he showed you

8      this article from Omron, which has kind of almost a key,

9      right?  You can see the little, you know, head, and then you

10     can see the different orientations.  And it will indicate why

11     that pattern is representative.

12             So just contrast this with what Dr. Darrell did in

13     his testimony about this issue.  Number one, Dr. Darrell did

14     not even try to offer an opinion as to why the thing in the

15     green box there on the left is not representative of a face.

16     He didn't even address Dr. Mundy's testimony on that issue.

17             And then Dr. Mundy also showed this other image in

18     his testimony, the woman on the right.  And you are looking

19     at her right -- right side of her face.  And you can see, if

20     you take a look, just sort of focus at the black-and-white

21     boxes there.  Okay?  That is the representative -- I'm

22     sorry -- reference image pattern.

23             So when Dr. Darrell addressed this -- he did address

24     it.  He addressed it in this bottom slide here.  And that is

25     the pattern on the right, okay?  But look at what he compared

1    it to.  He compared it to somebody who was looking in the

2    opposite direction as the woman that this was actually, you

3    know, tailored to.  So the woman, this is looking at the

4    right side of her face, and he shows us essentially the left

5    middle part of this gentleman's face in this image.  So he

6    just didn't really even address the evidence in this case on

7    this important issue.

8         And then there is this -- returning to this issue of

9    inconsistency and disagreement.  On this issue of what is

10   representative of a human face, Dr. Darrell's opinions are

11   internally inconsistent.  I'll just -- I mean, you know, a

12   picture is worth a thousand words.  I mean, he suggests,

13   anyway, that the image on the left is not representative of a

14   human face, but the thing on the right, which kind of looks

15   like a, you know, flying saucer, is.  We'll get a little bit

16   later to his testimony on these points.  But that, in and of

17   itself, is another inconsistency.

18        Now, the other area where you heard a lot of

19   testimony, a lot of discussion, including as recently as this

20   morning, is on this issue of linearity.  When you strip away

21   all this, actually, it seems like there is agreement on this

22   point now, which is that there are linear aspects to the

23   calculations that are used in the thing that Dr. Mundy has

24   identified as the first filtering means.

25        And I just had excerpted some testimony from Dr.

1   Darrell from Monday -- not "Mundy" -- that says that, Yeah,

2   that portion of the computation, of course, is linear.  And

3   he was saying that with reference to the portion that is B

4   minus A minus one.

5            So again, there, I think, you know, there was a lot

6   of discussion, but at the end of the day, Dr. Darrell, you

7   know, conceded on cross-examination that, yes, that portion

8   at least is linear.

9            Okay.  Viola-Jones.

10           THE COURT:  About 45 minutes into it.

11           Ladies and gentlemen, I've told the attorneys -- we

12  talked before, and I told them I would give them an

13  indication of time as they go through.  I don't mean to

14  interrupt them, but this helps them as their argument goes.

15           As I say, you've used about 45 minutes.

16           MR. GLITZENSTEIN:  Thank you, Your Honor.

17           You've heard this issue of Viola-Jones.  Very

18  simply, yes, Omron uses an implementation of Viola-Jones.

19  Viola-Jones, in turn, uses the '163 patent, which predates

20  all of this stuff.  And Dr. Mundy showed, actually, this

21  morning where you can find the first filter, the second

22  filter, and then, finally, the face detection components in

23  the Viola-Jones paper.

24           And then just sort of a last word on this, which is,

25  I mean, even Omron recognized the importance of the '163

1     patent.  I showed this to Dr. Darrell on Monday.  And we look

2     and see this is an Omron patent, and it cites to Viola-Jones.

3     And interesting -- I'm sorry, try that again.  It cites to

4     the '163 patent in this case.  And interestingly, it does not

5     cite to Viola-Jones.

6             Again, I submit that that is a recognition by Omron

7     as to the pioneering nature of the '163 patent.

8             All right.  Turning to validity.  So you saw this

9     slide from Dr. Darrell, and it had -- this is the timeline

10    there.  Whole host of references there.  But then,

11    interestingly, when asked, Well, what is the first prior art

12    reference that you considered?  He ignores almost all of

13    them.  Right?  He says, I'm only actually considering these

14    two Yow materials.

15            And you need to ask yourself, why would they do

16    that?  Are they trying to bolster Yow in some way?  Why would

17    he not even address those and say that they would inform his

18    invalidity opinion?

19            Okay.  And then another internal contradiction.  Dr.

20    Darrell relied heavily, of course, on the Yow thesis.  He

21    spent an enormous amount of time on it.  But, yet, when I

22    cross-examined him on this on Monday, he said he didn't

23    believe there were any major problems with Yow.  Any major

24    problems.  And apparently, was not even familiar enough with

25    Yow to recall that Yow has an extensive discussion of two

1    major problems.  And then, you may recall, he was then

2    redirected by Nikon's counsel.  And he said at that point in

3    time that he hadn't even looked at the Yow reference for

4    weeks.

5           So again, I believe the Court will instruct you that

6    it will have to be a showing of invalidity by clear and

7    convincing evidence.  Is this clear, or is this convincing?

8    That is for you to decide.  But, you know, given his -- just

9    his lack of familiarity with the reference that he says is so

10   critical to his analysis, we submit no.

11          And then, as you heard this morning, and I won't

12   spend much time on this, you heard this morning that Yow's

13   own data shows that it was a failure.  You know, it was

14   getting sort of 20 percent success rate, a very high failure

15   rate.  And as Dr. Mundy explained, you've got to be, like,

16   90 percent in order for something to be of interest.

17          So the notion that anybody would look at the Yow

18   thesis and say, Wow, I want to use this, when they would

19   actually study the data and see all the major problems, we

20   submit is just not at all credible.

21          All right.  And then just lastly, I mean, on this

22   issue, you know, I would ask, check your notes, check your

23   recollections.  We've got this thing that I say looks like a

24   little flying saucer, this picture, that he says that is the

25   all-important image.  First, he said, Well, that is

1    representative of parts of a face, features of a face.  Later

2    he said, Well, it's representative of a face.  And then he

3    said, Well, it's kind of both.

4           Your eyes can tell you the answer on that.  But I

5    would submit, consider his testimony and the lack of

6    consistency, just internal inconsistency on what that even is

7    supposed to represent.

8           Okay.  Turning to marketing.  I'll be real brief on

9    this.  This is an issue concerning these five HP cameras.

10   Sort of the timeline here, I think, says it all.  You know,

11   Dr. Darrell did not base his analysis on source code.  He

12   didn't base it on conversations or information from

13   Hewlett-Packard.  He based his information on two articles,

14   one from 2003 and one from 2004.  And just as a matter of

15   just logic, I mean, those articles could not have been

16   describing cameras that hadn't even been launched and

17   wouldn't be launched for two years.

18          And then there is the issue of just what those

19   cameras did.  This was a red eye detection, not face

20   detection.  Red eye detection.  It's funny, or interesting,

21   that in his initial testimony, where he was talking about

22   what came before, sort of the state of the art before the

23   '163 patent, he said that those face detection algorithms

24   took seconds.

25          Well, that is the same for the red eye detection in

```
 1    these HP cameras.  They, too, were slow, just like the stuff
 2    that came before the '163 patent.  Clear evidence that these
 3    cameras could not have been using the '163 technique with its
 4    10 times faster solution when the red eye detection was just
 5    as slow as the stuff that the '13 patent was trying to
 6    improve on.
 7          Willfulness.  We contend that Nikon not only
 8    infringed but that they willfully infringed these patents.
 9    This is a timeline that I showed pieces of in my opening.
10    And I just wanted to hit on some of the key points here,
11    because you've seen now sort of the pieces of this.
12          So Nikon has an IP policy.  I've shown that through
13    a few witnesses.  It applies to all Nikon companies.  That
14    policy requires that everyone at Nikon, not just the senior
15    people, everybody at Nikon is supposed to know about this IP
16    policy.  Except you have heard testimony now from
17    Mr. Vannatter -- who was here live yesterday.  We played his
18    depo -- or read his depo last week.  And he's -- he was their
19    most senior guy from Nikon, Inc.  And he says, I don't think
20    I've ever heard of it.  Okay?
21          Mr. McBride, you heard his testimony as well.  He
22    said something similar.  So even though they have a policy,
23    doesn't seem like anybody knows what it is.
24          But what is the policy?  The policy says that Nikon
25    must use best efforts to avoid infringement.  Okay?  And what
```

1    you've seen now is that Nikon became aware of both the '163

2    patent and the '335 patent during some searching that it was

3    doing in 2009.  And then the '312 patent, the last one in the

4    set here -- I'm sorry, the other family, the other sensor

5    family -- they learned of the '312 patent in March of 2013.

6            So I touched on this in my preliminary remarks, but

7    what were Nikon's best efforts here?  Did they use them?

8    Well, the evidence doesn't show that they used any efforts at

9    all, actually.  It doesn't show that they contacted any of

10   their sensor suppliers, or that they contacted Omron, or that

11   they informed their development teams.

12           We just haven't seen anything in this case about any

13   single thing that they did in order to ensure that they

14   avoided infringing any of the patents in this case.

15           And despite their awareness of these patents, they

16   launched 43 cameras.  They didn't pursue a license from

17   anybody.  Since learning of these patents, they have sold

18   well over 6.5 million units of cameras, $4.4 billion worth,

19   in the United States alone.

20           That is not best efforts, ladies and gentlemen.

21   That is no effort at all.

22           Damages.  All right.  So you know, you've heard --

23   you heard last week from Dr. Singer about all of the effort

24   that Zeiss -- and then the money, frankly, that Zeiss has

25   spent to bring this camera to market this year.  This is the

1    Zeiss ZX1.  And you've heard that this camera implements all

2    of the features that are covered by all of the patents in

3    this lawsuit.  And overall, Zeiss has spent on the order of

4    $50 million developing that camera.

5            You've seen this before, but just to sort of sum up,

6    Nikon, for its sales, they have sold -- in terms of dollars

7    and units, they have sold 6.5 units all told, as I said a

8    moment ago, of cameras that infringe these patents.  Revenues

9    of 4.4 billion, and gross profits of 1.7 billion.

10           Let's talk about value.  '335 patent.  This is

11   about -- amongst other things, the '335 patent allows you to

12   get better resolution.  So more megapixels.  And you heard

13   yesterday from Mr. Vannatter.  He testified that the

14   so-called megapixel race is over.  Nobody cares about

15   megapixels any longer.

16           Well, that is just not consistent at all with their

17   own most recent product launch, where they called the Z7 --

18   which is called The Perfectionist, I think it's called.  And

19   the very first thing they tout, not surprising, are the high

20   megapixel count, 45.7.

21           And we see this, you know, in the Etchells article.

22   It talks, as well, about the importance of avoiding dark

23   current or addressing dark current charge, which is another

24   aspect of the '335 patent.

25           So over and over again, we see issues where the

1    evidence clearly shows the value of this technology.

2         And Dr. McDuff, you know, he looked at this, and he

3    looked at this from the perspective of, How much space do I

4    save in the sensor?  What is the resolution improvement?

5    Valued all of that, and then presented multiple different

6    analyses on this.  He looked at cost savings.  As I said, he

7    shows a reduction in the area of 10.7 percent.

8         Again, to be careful, he looked at this from

9    multiple different perspectives and concluded that for this

10   patent, the '335, the correct measure of damages is

11   $11.2 million.

12        '312 patent.  This is the one where you can

13   improve -- amongst other things, you can improve the ISO

14   range.  And again, here is -- here again we see a lot of

15   inconsistency.  They say, on the one hand, nobody cares about

16   low ISO.  You've heard that over and over again.  Well, here,

17   too, that is not consistent with the evidence.

18        We look in this most recent pair of cameras, they

19   tout an ISO range of -- that goes all the way down to 64 for

20   one, and down to 100 for the other.

21        Mr. Kitaoka last Friday testified that low ISO

22   settings would not be important.  Here, too, we go back to

23   Mr. Etchells' article.  What does he report?  He reports that

24   one of Sanbongi-san's -- that is Mr. Sanbongi -- one of his

25   team's proudest achievements were the 850's true ISO 64

first.  Okay.

     So when they say these features aren't important,
again, fundamental inconsistencies with what they have said
publically.  And frankly, not just what they have said, but
what they are proud of.

     And so for the -- Dr. McDuff takes all this evidence
into account, and again, offers an opinion of $2.6 million
for this patent.

     And then lastly, on the '163, again the face
detection patent, here, too, the testimony you heard from
Mr. Kitaoka was, No, nobody cares about face detection.  You
can bring your own common sense to bear on this, too.  And we
showed you pieces of evidence, after pieces of evidence where
Nikon actually touts face detection as an important feature,
just as your common sense would tell you.

     And when Dr. McDuff looked at all of that evidence,
he concluded that the appropriate damage is $10.1 million.
And then tying it all together, 23.9 million.

     Very briefly, I wanted to comment on Ms. Davis'
analysis from yesterday.  And her analysis, quite simply, was
you take the purchase price and then you divide by the number
of patents.  And as Dr. McDuff explained, this is just
fundamentally the wrong approach.  I mean, it's confusing
price with value.

     Now, we all know those are two very different

1    things.  You buy a house, and when you put it on the market,

2    nobody says that you are capped -- to use her word, you are

3    capped in what you can charge for your house based on what

4    you paid for it 10 years ago.  Doesn't matter if you did any

5    improvements or anything.

6          And that is just -- that is a fundamental different

7    view that Dr. McDuff has, that valuation is valuation.  And

8    valuation, as Dr. -- I'm sorry -- as Ms. Davis testified

9    yesterday, she agreed that conducting a valuation exercise --

10   which is really what needs to happen here -- in conducting a

11   valuation exercise, you need to look at a number of different

12   factors.

13         You know, you look at the patent from a technical

14   perspective, which could include validity and infringement;

15   the size of the market; the potential for design-around;

16   consider the benefits of the patent.  None of those

17   considerations are taken into account if you just simply say,

18   Well, you bought 10 patents.  There is $10 million, a million

19   bucks apiece, whatever her math was.

20         That is not the right mindset.  It's not the mindset

21   that we bring to bear in any other transaction that I'm aware

22   of.  And what transaction is there in the world where

23   somebody says, Well, you are capped by what you paid for it.

24   None that I can think of.

25         And then lastly, on this point, she was asked

1       yesterday -- Ms. Davis was asked yesterday, said, You are not

2       an expert in valuing patents for purposes of sale, correct?

3       And then she says, Yeah, I agree with that.  She's an

4       accountant.  And you heard testimony about what you do --

5       what do accountants do?  Well, you know, they are not charged

6       with having to assign a value.  Patent damages analyses

7       require figuring out value.  Accountants just divide.  And

8       dividing is not value.  Those are just fundamentally

9       different things.

10              And, Your Honor, I will reserve the balance of my

11      time.

12              THE COURT:  Okay.  Thank you, Counsel.

13              Okay.  Ladies and gentlemen, as I said before, a

14      little different time.  We are going to be taking our break

15      at this time.  Come back in in 15 minutes, and we'll finish

16      the defense argument and the rebuttal.

17              Remember the admonishment not to discuss the case

18      among yourselves, with anybody else, or form or express any

19      opinions about the matter until it's submitted to you and you

20      retire to the jury room.  You are probably sick of me saying

21      that, but I've got to say that every time we leave.

22              We'll see you back in 15 minutes.

23              (Thereupon, the jury retired from the courtroom.)

24              THE COURT:  All the jurors are in the respective

25      seats in the jury box.

1          And, Counsel, closing for the defense.

2          MR. BELUSKO:  Thank you, Your Honor.  Ladies and

3   gentlemen, good afternoon.

4          Let me first thank you very much for your service

5   here.  I have noticed -- this is a fairly technical trial at

6   times, but you've really concentrated and paid attention to

7   some things.  And some of those concepts are probably a

8   little more difficult, but I hope that you feel that you

9   learned something about digital cameras and things as part of

10  the process.

11         But on behalf of my client, Nikon, and my team, I

12  want to thank you for the special attention that you paid to

13  this case throughout.  Very much appreciated.

14         This will be the last time I get to talk to you.

15  They get the last word.  Now, at the beginning of the trial,

16  as you may recall, I told you a couple of things.  I said,

17  Apply your common sense here.  Apply your common sense to the

18  things you hear.  And I believe that what I told you the

19  evidence would show, it has.

20         And there are a couple of main things I said.  I

21  said that there is no infringement here because at least one

22  element, one thing, is missing from each of the accused

23  products.  That claim element cannot be found there.  And I

24  think I mentioned to you that there has to be each and every

25  element of a claim found in an accused product.  And that has

1     not been shown here by the plaintiff.  And therefore, there

2     is no infringement.

3          Now, you've heard a lot of times from them that,

4     Well, it's close enough.  Well, close enough is not the legal

5     standard you are going to see here.  So as the Court

6     instructed you at the beginning of the case, you have to take

7     the facts, and now you've got to apply the law to those

8     facts, and the law that exists.

9          Now, the other thing I told you was that I believe

10    that the only way plaintiffs could try to cover the accused

11    products was to stretch the claim so much beyond what they

12    showed that they would be invalid in view of the prior art.

13    Meaning that they would cover some prior art, and that would

14    invalidate them.  Or they would be so stretched that they

15    would no longer be supported by the written description of

16    the patent that is required.  And we'll talk about those

17    things.

18         Now, I believe the evidence highlighted that

19    plaintiffs consistently overreached here a bit and

20    exaggerated the value and the import of their purported

21    inventions.

22         And we'll go through those.  But I want to say that

23    I'm a little disturbed by the innuendo about somehow that my

24    client didn't care about things, and is aware of everything.

25    There is something pervasive in the opening that kind of

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1       stood for the idea that, Well, you knew you were infringing,

2       or something, and therefore, you went forward.  But let me

3       ask you:  If some neighbor came along and told you, you know,

4       That fruit tree you have in your backyard, that is mine, you

5       would kind of go, No, it's not, and I don't have to do

6       anything about it really.

7              And that is kind of what happened here.  We had a

8       situation where there is -- there is literally thousands of

9       sensor patents out there, as you can imagine.  And there is

10      no ill will or bad intent here or anything else on behalf of

11      Nikon.  They went forward with their business believing that

12      they could go forward honestly and legally.

13             So let's talk about the '335 patent, if I may.

14      Claim language, always important.  Heard a lot about this

15      one.  It's a really long claim, meaning there is a lot of

16      elements that have to be found in any accused method here.

17      And let's not lose sight of the fact that it's a method

18      claim.

19             What does it say right up front?  A method for

20      driving a unit pixel.  It's not a claim to a unit pixel.

21      It's a claim to a method for driving a unit pixel.  It's also

22      very restricted, because it has to be a very specific type of

23      unit pixel that has all the particular connections, and then

24      you have to follow each and every step of the claim.

25             Now, I believe that you've heard that the plaintiff

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

```
1    doesn't claim that everything is literally there, as we call

2    it, that each and every step was performed.  They say it's

3    only under what they call the doctrine of equivalents.  But I

4    want to show you something about that.  And I think it's

5    likely you will be instructed on this issue of doctrine of

6    equivalents, something like this.

7            But I want to show you that they admitted no literal

8    infringement.  So for the '335, it's only doctrine of

9    equivalents.  And that is very important.  So it's only

10   doctrine of equivalents.  And what does doctrine of

11   equivalents involve?  Well, on the right there, kind of

12   pointed out portions of this.

13           And that is the test, something like that, I think

14   you will be instructed on, about what is an equivalent.  But

15   I want to point out, it's -- you still have to go through

16   every one of those elements one by one.  It specifically

17   points out the focus is on individual elements of the claim

18   and not on the invention as a whole.  Meaning you have to go

19   through each one of those steps of the method and see if each

20   one is there.

21           Now, but doctrine of equivalents, because it's not

22   literal now, it's something a little outside what the claim

23   requires, is pretty narrow.  So it requires this

24   insubstantial differences.  They have to be very little.  And

25   we are going to show you that they are not very little.  As a
```

1    matter of fact, I think that in looking at these steps, C, D,

2    E, and F, which have already been determined are missing

3    here -- they are literally not here -- these differences are

4    important differences.  They are meaningful.

5            Now, the key thing is in each of these steps, when

6    do you turn them on and when do you turn them off?  That may

7    sound -- well, you know, what difference does it make?  Well,

8    in the claim it makes a difference, because you have to look

9    at each step of the claims.  And in this one step, you turn

10   it on.  In another step, you turn it off.  You can't say,

11   Well, if it gets turned on in this step and gets turned off

12   later in another step, that is the same thing.  It isn't.

13           This is important.  There is a temporal aspect here,

14   and that was highlighted by the Court's construction.  They

15   have to be performed in sequence.  It's important.  Turning

16   on and turning off means transitioning from off to on and on

17   to off, respectively, and in sequence.  So the order here

18   matters.

19           And you heard a lot about, Well, it's close enough.

20   But the order then got all out of whack, because these things

21   weren't being turned on when they should be, and they weren't

22   turned off when they should be.  And all of a sudden, it

23   became a mush.  You no longer were following each and every

24   step of the claim.  And by definition, that is

25   noninfringement, if you weren't following these particular

1    steps.

2          Now, there was a lot of stuff about, Well, they're

3    close enough, close enough.  But again, if you listen to Dr.

4    Carley's testimony, he said several times, Well, that was

5    done in the prior step.  That was done in the prior step

6    already.  The claim requires it be done in these individual

7    steps.  Not before, not after.  Right in that step.  That is

8    what is required for infringement.

9          And what is interesting about that is, that is what

10   they told the patent office, too.  It's very important to

11   keep that in mind.  They thought it was important.  And I

12   think you saw this before.  This is just where they talk

13   about this method.  And what do they do?  They go through it,

14   and they talk about these very important things:  Next.

15   Next, do this.  Next, do that.  Got to transition.  Got to

16   transition at that time, in that step.

17         That isn't done here.  Dr. Carley, himself, admitted

18   it wasn't done here.  And as a matter of fact, many of these

19   steps were just simply not done in the order required.  And

20   that is what we showed you as we walked through those steps.

21   And there was not one of the accused image sensors that Dr.

22   Carley or plaintiffs found followed those steps exactly.  And

23   those steps do matter exactly.

24         That is what the claim requires.  That is what I

25   believe the jury instruction will require you to look at.

1    Are they done?  And if they are not done exactly, you can't

2    just say, I'm going to look at the whole thing and say, It's

3    close enough.  No, you've got to look at them one element at

4    a time.  Even under the doctrine of equivalents.

5          So let me go on to another thing.  I told you there

6    is another issue here that came up dealing with the structure

7    of the pixel that this method is to be used on.  It has to be

8    a very specific pixel layout, and a very specific orientation

9    of transistors, and where they are.  And you heard a lot

10   about "coupled between."  And that was defined by the Court

11   as "directly connected."

12         And there is a bunch of these sensors.  There's the

13   D5, and a bunch of the Aptina ones that were accused, that,

14   as you will recall, they admitted they are not directly

15   connected.  There is another transistor there.

16         And they said, Well, that is close enough again.

17   Well, let me show you those a little bit, because the element

18   really required that between the power supply and the sensing

19   node that there were direct connections to the reset

20   transistor, it was called there.  And I showed those all in

21   green.  This is something Dr. Kleinfelder went through with

22   you.

23         But there is actually something else in between, in

24   both the D5 and these Aptina sensors.  So there is not a

25   direct connection.  And they acknowledged there is no direct

1    connection.  And again, we are back to the doctrine of

2    equivalents.  It's not literal.  But why the heck do you put

3    in another transistor?  They are saying, Oh, it's all

4    equivalent.  I suggest to you, no, it isn't equivalent.  It

5    provides a different circuit that does different things in a

6    different way.

7            And what does it do?  It's added capacitance.  And

8    you heard a lot about added capacitance to deal with these

9    overflowing charges.  So all of a sudden this added

10   structure, this different circuit, does something different.

11   And it was said, Adding capacitance of the sensing node

12   impacts the gain of the pixel, correct?  Yes, I agree.

13           So now we've got a different result.  It's

14   different.  It's no longer like it was.  And that is more

15   than an insubstantial difference.  So those -- for that

16   additional reason, there is an element missing.  And

17   remember, defendants only have to show one element missing.

18   They don't have to show multiple.  And I've already gone

19   through and shown you multiple things for these accused

20   products.

21           So next we talked about this reset issue.  Remember,

22   on the particular issue of infringement, you are going to

23   hear who has the burden of proof on that issue.  And that is

24   the plaintiff.  The plaintiff is the one that needs to show

25   that each and every step of this method is, in fact,

1     performed.  And as to that, what did we learn about this

2     noise floor?  And you heard a bunch of stuff about the noise

3     floor and everything.

4           But the first step requires this idea of fully

5     depleting.  And on that, we had some agreement from the

6     experts, that fully depleting meant getting to at or below

7     the noise floor.  That floor, which you can never, because of

8     physics or whatever, get rid of all the charges that are

9     found.  So that is what it meant.  Get rid of them all.

10    Didn't mean get rid of most of them.  It says fully.  The

11    word is "fully."

12          It doesn't just say depleting.  It says fully

13    depleting.  And what evidence did you hear about fully

14    depleting?  Well, I was told that -- you heard evidence today

15    by Dr. Carley about, Well, I checked that in some TechInsight

16    reports.  Do you recall that term, "TechInsight reports"?

17    But did you notice where everybody else put in TechInsight

18    reports, this page or that page, to show a timing chart,

19    there was no reference to any pages of TechInsight reports

20    here.  Nothing.  No evidence in the record at all of that,

21    and that is our point.

22          But what did we show?  Well, we showed that, as a

23    matter of fact, there is some residual charges that are there

24    that are above the noise floor in the accused devices.  So we

25    never get down there.  And is that a big problem not to get a

1    great image?  It's not going to cause all these problems that

2    they show by being above the noise floor.  And so there is

3    just no evidence that that first step is actually done by the

4    accused Nikon devices or, for that matter, necessary to get a

5    great image.  A high quality image is possible without it.

6    On this one, I just have to say there is just no evidence

7    that we've seen.

8          Now, there was also a statement that, Well, we don't

9    do any testing on these things.  We don't have any evidence.

10   Well, I suggest to you that is not true, in view of what

11   Mr. Sanbongi said.  There is also quite a few, I guess,

12   almost attacks on Mr. Sanbongi somehow, because he's the

13   person that testified here.

14         Well, do you recall that they showed two people that

15   had been designated earlier in the case as people

16   knowledgeable here from our side, Mr. Mori and a Mr. Shima.

17   And they covered different sensors.  Well, Mr. Sanbongi

18   testified to you, he has assumed the position of Mr. Mori,

19   and he has been involved with these sensors for many years.

20   So we brought Mr. Sanbongi because he's in the right position

21   to talk about these things.

22         Now, there is also something else about the law

23   here, and I just want to make sure you understand this.  And

24   that is that with respect to the dependent claims.  Remember

25   those other claims, claims 2 and 3 here?  When you are

1       looking at infringement, if there are elements missing in

2       that independent claim, then by definition there is elements

3       missing in a dependent claim that adds something to it.  It's

4       the -- kind of the situation.

5               The first claim included elements A, B, C, D, E, and

6       F, and the next claim added G.  But if D is already missing,

7       adding G doesn't put D there.  So you are already done with

8       those.  And that is basically why I wanted to give you an

9       idea of what, again, a dependent claim, you will likely be

10      instructed on.  It just adds new things that have to be found

11      in order for infringement.

12              So if there is missing things from an independent

13      claim, then there is no infringement of the dependent claims.

14      And here I suggest there is no infringement of any claim of

15      the '335 patent by any of these cameras.  And we put up our

16      evidence on why this was with respect to those sensors that

17      were specifically analyzed here in this case.  And that is

18      that whole group.

19              And there is something important here that I want to

20      keep in mind.  And that is there is different sensors from

21      different companies.  There is different companies that sell

22      sensors, image sensors, to our client.  And those are

23      different.  You've got to look at each one.

24              And we did go through those, and we explained to you

25      why these steps of C through F were missing in all of them,

1    explained that there is no evidence of full depletion of all

2    of them.  And then on the D5 and those Aptinas, there is also

3    the problem with the specific structure of pixel that is to

4    be operated on by those methods.

5          Now, I also want to go on and talk a little about

6    some of the, what I call, hand waving that went on with

7    respect to, Well, I looked at all these other things, too,

8    and they are all the same.  Well, let me suggest to you, no,

9    they are not.  The D4 camera, the one on the left there --

10   you may remember Mr. Vannatter had an actual D4 here -- is

11   not representative of every camera.

12         And that is not surprising, since the sensors are

13   different, the sizes of sensors are different.  And you even

14   heard the testimony that, for particular cameras, even if you

15   use the same sensor, there is other ways to program what

16   happens on the steps of using it.  So you can't assume that

17   this one is like that one.  You have to analyze them

18   separately.

19         And in that respect, I would say that for many of

20   these, there is nothing done.  And those are particularly the

21   ones that were from Aptina.  You are not going to see they

22   ever put up anything.  They just say those are there.  But

23   there was never any evidence.

24         And then there was some more that they said, These

25   operate similarly.  But there really was no evidence

1    established that they operated similarly to the others.  So

2    you can't really say that they are representative of

3    anything.

4            So in those two groups, I just want to point out,

5    the ones on the right are the Aptina ones.  There was really

6    nothing ever put in on these.  And the ones on the left,

7    there really wasn't an analysis done at the level to show

8    that each and every step of the method was performed on

9    those.  I suggest to you, timing diagrams would not have

10   shown that each and every method is performed on those.

11           Let me go on and talk about the next thing.  There

12   has been a lot of discussion about this.  And this is this

13   idea of, What the heck is this claim about?  Well, as I

14   already pointed out to you, it's a method claim.  And it's a

15   method claim that has to be applied to a very specific

16   structure.

17           In that vein, what I wanted here to point out to you

18   was there is no doubt they tried to get just a sensor claim.

19   And this is what they tried to get:  A unit pixel in a CMOS

20   complementary metal oxide semiconductor image sensor

21   comprising.  And it had all these parts in it.  They tried to

22   get it on just that image sensor.  But they did not get it

23   because somebody else already had it.

24           And so those claims, including claim 12, were

25   rejected based on this prior art patent to Kodak in the

1    patent office.  And that happens a lot.  You come in with an

2    application.  You are not sure what is all out there.  It's

3    hard to know.  There is many, many image sensors.  And you

4    come in and the patent office says, No, that one you can't

5    have, because it's already out there.

6            And what is interesting about Guidash, and this was

7    brought up with you before, is that description.  And that

8    description is talking about the sensor itself now, and what

9    are advantages to the sensor itself.  Well, the advantages,

10   of course, of we are going to share components, we are going

11   to take up less space.  And there is going to be cost

12   savings.

13           Now, I heard a lot about that, that they are saying

14   the '335 patent does that.  But actually, that is not

15   correct, because Kodak already did that.  And they couldn't

16   get this claim.  So what did they do?  They canceled claims 1

17   to 15.  That claim 12 you saw, which is the sensor image

18   claim, they canceled it.  They abandoned it.  So they never

19   got a patent on just that.

20           And it's kind of a little misleading to say that

21   that is what their patent covers.  No, their patent covers a

22   method of using a particular sensor.  It's the method of use.

23   But methods, whatever they are, they don't save space on a

24   sensor.  So that is just kind of misleading to even bring

25   that up.

1            Now, they also brought up, as you recall, something

2       from the summary of invention.  It said, Look, this is what

3       we intended to do.  Well, let me point out to you how it

4       works.  The summary of invention, and we put this up today,

5       that was filed with the original application in 1999.  And

6       there is no doubt, when they filed this, it was an object of

7       the present invention to provide a CMOS image sensor that may

8       reduce this chip area by decreasing the number of transistors

9       for a pixel array.

10           They tried to do that.  That was what claim 12 was

11      about.  But unfortunately -- and they didn't know it at the

12      time.  It wasn't theirs to have.  So they canceled it.  So

13      that object, which was put in in the filing in 1999, well, at

14      this time, in 2003, they gave up on that.  So the fact that

15      that language carried through to the patent doesn't show they

16      ever got any protection on that at all.  It's misleading to

17      even say they did.

18           Let's talk about invalidity a little bit.  Now, you

19      recall in opening, again, I said the only way they could

20      stretch the claims here to cover an accused device was to

21      stretch them so far beyond what they should be that they

22      would cover prior art.

23           What did I mean by that?  Well, let me show you a

24      little bit about this Takahashi reference.  Interesting

25      enough, Takahashi -- which, again, is prior art -- earlier,

1       it shows this pixel configuration, too, right down to every

2       little piece that is in that preamble.  Every little piece is

3       there and is connected as it's supposed to be.  So not only

4       did Kodak come up with it first, and that was Guidash, but

5       also Canon came up with it before they did in Takahashi.

6               So it was old.  They may not have known about that,

7       but it was already old.  But then Takahashi did other things.

8       It actually had a way of using that pixel.  And that use of

9       that pixel covered almost every step of the method here,

10      except for step A, the fully depleting step.  But step A was

11      admitted in prior art in the patent itself.  You see,

12      sometimes you put in things in the patent, and you put

13      "admitted prior art."  And that is what they did here.  They

14      admitted there was prior art of step A.

15              And so everything was there, if you want to look at

16      it this way, but in effect, Takahashi had everything in the

17      preamble.  The very structure of the pixel needed to be

18      operated on, they had steps B, D, E, F, exactly the way they

19      should be.  Not maybe turning on, turning off at a different

20      time.  Step A was provided by the -- by the admitted prior

21      art in the patent.  And step C, as Dr. Kleinfelder pointed

22      out, was something that had been obvious to do and based on

23      what Takahashi explains.

24              So Takahashi is pretty darn close to what the claim

25      is here.  Close enough for obviousness, in combination with

1  their very own prior art admission.  But what I want to point

2  out is it's a lot closer than the accused device.  And by

3  that I mean, if you look at plaintiffs' claim in the little

4  white picket fence there, that is what they really have.  And

5  by trying now to reach all the way to Nikon, way far away

6  there, well, when they try to build that fence, they are

7  going to grab Takahashi.  And that is a way to show covering

8  the prior art.  And if you do that, then it's invalid.  You

9  can't go that far.

10         So we have here a situation where I think

11  noninfringement is clear on specific grounds.  And you are

12  going to have to apply the law as you are instructed by the

13  Court.  And I've told you what I think is likely in the kind

14  of instruction you've got to get.  But you are going to have

15  to do it element by element, not just looking at the whole

16  thing at one time.  You have to do it element by element,

17  make sure it's there.

18         And those transition on and transition offs are

19  meaningful.  That is an active thing, as the Court itself

20  construed it.  Turning on means transition from off to on.

21  Turning off, from off -- from on to off.  It's not just

22  walking into a room and seeing the lights on and saying, Oh,

23  I'm done.  If you are coming into a room to turn it on,

24  that -- and that is your step, you've got to turn on the

25  lights.

1          So there is no infringement here.  But if they are

2     going to try to run it to that kind of degree, then you are

3     going to -- you are going to get the problem of getting to

4     the prior art first, and then you will invalidate the claim.

5          So let's go on and talk a little bit here about the

6     '163 patent.  Now, I think the '163 patent's more technically

7     difficult, but I want to make some simple references here.

8     Let's talk about what's going on.

9          First off, the particular accused software or the

10    hardware implementations all come from what we call Omron

11    here.  And you may recall that this Omron is a -- it's pretty

12    well known in this area.  And I think that Dr. Darrell

13    testified to that, that they have been around for many years

14    providing this type of face detection software.  For many

15    applications.  Not just cameras.

16         And with respect to this, we can look at these three

17    implementations, the OKAO, pine, and parfait as basically

18    doing the same thing.  And I think the parties do agree to

19    that.  Certainly, Dr. Mundy pointed that out.  And I think

20    that is -- that is accurate.  They all kind of work the same

21    way.

22         And we pointed out to you that, and that it's really

23    based on something called Viola-Jones.  And you may recall

24    during the opening statement, I referred to Viola-Jones as

25    kind of that leap in technology that occurred.  The DVD

1      compared to the laser disk, or the Facebook compared to the

2      MySpace.  It was a big deal.  And that is what Omron uses,

3      this Viola-Jones algorithm.

4            And in connection with that, Dr. Darrell pointed

5      that out, that it was groundbreaking.  It's been used by

6      many, many others.  It's implemented in many, many things.

7      Probably right down to the layer of your smartphones.

8      Viola-Jones on there, too.  And, yes, it was a lot faster

9      than the old ways of doing facial detection.  And even Dr.

10     Mundy said, Yeah, it's 50 times faster than the old way.  So

11     it was a very useful thing.  That's how come Omron became so

12     important here.

13           Now, I also want to point out to you that there has

14     been this assertion that somehow the '163 patent covers

15     Viola-Jones.  Well, I want to point out to you, HP developed

16     that.  You will remember that.  HP owned the '163 patent.

17     And we pointed out to you that -- and Dr. Darrell pointed out

18     that -- HP never went after anybody with respect to

19     Viola-Jones.  They never licensed anybody else with -- that

20     was using Viola-Jones under the '163 patent.

21           So this idea that somehow the '163 patent covers

22     Viola-Jones certainly is nothing that HP ever raised with

23     anybody.  And remember, Viola-Jones was out in around 2002.

24     It's a long time before they ever sold these patents.  And it

25     was implemented on many, many things.  So that seems a little

1    weird.

2          Now, they also pointed out, Well, look, you cited --

3    Omron is citing our patents in some of their patents.  Well,

4    as this points out, that is true.  There is a lot of prior

5    art cited in patents.  But Omron has their own patents.  So I

6    think these patents are Omron patents.  And that is the type

7    of patent that is covering the products such as were used by

8    Nikon in the cameras.

9          Now, I want to talk about this infringement issue

10   now a little bit with the '163.  Here we have a little

11   different situation, where I think you are going to be

12   instructed on what literal infringement is.  And you've

13   already got the doctrine of equivalents.  Because you can

14   either show something is literally infringed or you can show

15   it's under the doctrine of equivalents.

16         And literal means each and every element of that

17   claim can be found exactly in the accused product.  Doctrine

18   of equivalents means you may not have one of those elements,

19   or more, and you have to do something that's very close,

20   insubstantially different, for that element.

21         So you are going to get an instruction like this.

22   And it, again, shows you must find each and every element of

23   the patent claim is found in defendant's product.  That is

24   just the -- that is the basis of what infringement is about.

25   Each and every element.  Not enough to find most of them.

1        Got to find every single one for infringement.  Any one

2     missing, no infringement.  And as I've pointed out when

3     dealing with the '335, we think there are several missing

4     there.

5            Well, let's talk about this patent.  Well, you heard

6     about a lot of things.  And in connection with that, you have

7     two claims here.  You have claim 15 and 16.  Now, they assert

8     16.  But remember, 16 is a dependent claim.  So they've got

9     to show every element in claim 15, as well as the additional

10    element in claim 16, for infringement.  So if any element of

11    those is missing, there is no infringement.

12           Let's first start with the elements that I think you

13    are going to see are missing.  Now, we gave you a bunch of

14    them.  We only have to show one.  Any one of those you find

15    is missing, that is the end of the infringement inquiry.  But

16    we gave you a bunch of them here.  And I want to talk about a

17    few of those.  We went through it all.  Dr. Darrell went

18    through and talked about these.  But again, if any one of

19    them is missing, no infringement.

20           So let's talk about those.  There is these three

21    steps.  And one talked about a linear filter, and then a

22    nonlinear filter.  And you probably heard more about linear

23    and nonlinear than you've heard in years, and may never want

24    to hear again.  But that being said, they are different.  And

25    we need to talk about that difference, because that is very

1    important here.  There is a requirement for a linear filter

2    and a nonlinear filter.  Two separate things in these claims.

3         And the first one is this linear filter with linear

4    correlation.  And on that, we got the two experts to agree.

5    It's both has to be linear.  Now we have the issue of, what

6    is linear?  And you heard a lot about proportionality.  And I

7    would suggest to you that what it -- what it means here is

8    simply that if I -- if I double my input, my output is

9    doubled.

10        So if I start with a one, I get a two.  If I start

11   with a two, I get a four.  And if I start with five, I get

12   ten.  And if I start with, let's say, $10 and I double it, I

13   get $20.  That is what a linear output is, of something that

14   is proportional.  But when you start having these

15   less-than-or-equal-to functions, that indicator in the middle

16   there, and all you get out of it is a one or a zero, it never

17   matters what the input is, other than -- because the output

18   is going to be a one or a zero.  It's not linear anymore.

19        And I think the best way to show that is that this

20   granule comparison done in the Omron in the first stage, it's

21   not linear, because whatever the input is, you don't get

22   something proportional.  You get either a one or a zero.  And

23   that is what Dr. Darrell was talking about, it's nonlinear.

24   So that one is already missing here from the accused Omron

25   software, hardware, that parties agree operates the same.

1          So let's go on and talk about the different

2     structures for the first and the second filtering means.  And

3     you will recall that those were discussed about got to have a

4     linear one, now I've got to have a nonlinear one.  They've

5     got to be different things.  And that is where we have

6     another problem with their infringement analysis.

7          And that is that they describe the very same code as

8     providing both the linear and the nonlinear.  So one day they

9     looked at it and said, This is linear.  And the next time

10    they said, Oh, no, this is nonlinear.  Well, it can't be

11    both.  It's one or the other.  Which one is it?

12         Well, I suggest to you it's nonlinear, as I talked

13    about.  But because it's done in these -- in the Omron code,

14    the same structure for coarse search and fine search, it's --

15    it's a nonlinear thing done twice.  So we don't have the

16    first thing of linear.  And we don't have something separate

17    between the first one, the coarse, and the fine.  They have

18    to be different.  They are not.

19         And that, let me show you -- the best way to show

20    that is, it's exactly the same.  The very same code is used

21    in both.  So on one day, they call it, Oh, well, that is

22    linear here.  But on the next day, it's not.  It's nonlinear.

23    So it's, you know, whatever I say it is.

24         I have a famous saying.  I like Alice in Wonderland,

25    but Alice in Wonderland talks to Humpty Dumpty at one point,

1    and he tells her, Well, words mean what I say they mean, no

2    less and no more.  Well, that is kind of what you are hearing

3    here.  It means linear when I'm over here.  And now I'm over

4    here, and it's nonlinear.  That can't be.  They have to be

5    different.  So that isn't there.

6         So Dr. Mundy even says, Well, the processing flows,

7    they are the same.  But the problem with his saying that is,

8    then, he's admitting that they -- they both can't -- one

9    can't be linear and the other one nonlinear.  So that is

10   enough for noninfringement right there.

11        Now, we also talked about these things kind of in

12   terms of stretching things to what I'm going to tell you is

13   the nonsensical.  Because what happens here is, claim 16, the

14   dependent claim that adds another limitation, has a reference

15   image pattern representative of a human face.

16        Now, Dr. Mundy points to the thing on the right

17   there as the Omron code and says that -- that is the

18   reference image pattern representative of a human face.  Now,

19   I don't think that looks like a human face on the right.  I

20   think you can use your common sense and judge that.  But I

21   want to show you something, how crazy it is.  I can take that

22   whole thing and put it on a mushroom, too.  Is a mushroom the

23   same as a human face?  I don't think so.

24        So let's move on now and talk a little about

25   invalidity, because I think we've established that at least

1    an element, if not more than one element, is missing from

2    each and every claim -- each and every accused device here.

3    And that is the Omron code, the three versions, which

4    everybody says they are represented.

5              So invalidity.  Well, it's important to look at the

6    timeline of facial detection software.  Nobody is saying that

7    any of these patents are the first one.  This is -- there is

8    things that happen for many years out there.  But a couple of

9    things that are important did happen.  And that is why we

10   brought up these Yow papers and a thesis, both of them

11   treated as prior art here.

12             Now, Yow does, in fact, have each and every element

13   of these claims.  And let's talk about Yow a little bit.  The

14   Yow paper and the Yow thesis, they were published before the

15   '163 patent was filed.  And both disclose an algorithm for

16   human face detection that uses the exact same idea of the

17   '163 patent.  A two-stage filter followed by an image pattern

18   detector.  Linear, nonlinear, and then the image pattern

19   detector.

20             Now, what is interesting about this -- okay.  There

21   it is.  What is interesting about this is it has all of these

22   things, but I also want to show you that this is one of those

23   instances where -- and I mentioned this to you beforehand,

24   too, during the opening, that sometimes the patent office

25   doesn't have everything in front of it before they issue a

1    patent.  And that is -- that is what happened with Yow.  They

2    didn't even know about Yow when they issued the patent.  It's

3    a piece of prior art they never saw before.  That's nobody's

4    fault.  It's just -- it is a fact.

5         So patent office didn't have it to look at.  And

6    with respect to that, the Yow prior art -- and I think this

7    came up today.  You know, one of the things that was shown

8    was this idea of a face that I've highlighted there on the

9    left.  That is one of the things that you can find in Yow,

10   and that is something that I would say looks like mouth,

11   eyes, and eyebrows anyway.  And that is from Yow.

12        But Dr. Mundy says, Well, that is not representative

13   of a human face.  When I'm looking at Yow, that is not good

14   enough.  But yet, on the right was something he said was

15   representative of a human face -- and I've also shown is

16   representative of a mushroom -- but that is good enough.

17        Now, let me ask you, using your common sense, which

18   one is more representative of a human face?  Yow or the one

19   on the right that they assert when they want to find

20   infringement?  I would suggest to you it's the one on the

21   left.  And this is, again, this problem that they have of

22   stretching the claim so broad in order to try to get

23   infringement that they run into the prior art, and they

24   invalidate their own claim.

25        So let's move on.  The marking thing.  Heard a fair

1        amount about this in terms of HP.  HP, who they say is the

2        innovator of this incredible '163 patent, which they now

3        claim covers Viola-Jones.

4               Now, HP, as you heard, they did sell this patent to

5        some entity, Tarsium.  And then it ended up at some weird

6        convoluted change of ownership to the plaintiffs that are

7        here today.  But when they sold it, they did something very

8        smart.  They said, Well, we've got to have a grantback

9        license.  And I told you about this in opening as well.  All

10       that meant is we need to be able to continue to sell our

11       cameras that may be taking advantage of our inventions.

12       Because once you sell a patent, you -- if you sell it without

13       that grantback license, you can't sell your own products

14       anymore.

15              So they wanted to make sure they could do that.  And

16       they did it.  It was wise.  It was the thing to do.  But they

17       didn't have any requirement to mark the patents on those.

18       And that is important, because if there isn't patent marking,

19       then you can't get any damages for patent infringement when

20       you are the owner of the patent, until such time as you give

21       actual notice of infringement.

22              And that requires either some kind of a letter, a

23       demand that you are -- you, Nikon, are infringing this claim.

24       They never did that, as you heard.  So all we know is that

25       they sued Nikon.  2017.  So that is the first, what you would

1    call, actual notice of infringement ever given to Nikon

2    regarding this patent.

3        So because HP was out there with their cameras

4    before that time, no obligation to mark the license number on

5    it.  Never did.  There can't be any damages before the

6    lawsuit started here.  So that is where we brought that up.

7        Now, I did hear an interesting thing about, Well,

8    the HP cameras, they are no -- they don't really implement

9    it, because they are too slow.  Well, let me talk to you a

10   little about that.  They referred to a red eye feature.  Do

11   you remember that?  The red eye feature.  Well, what does the

12   red eye feature do?  You saw the pictures.  It detects red

13   eye.  Then it removes the red eye and processes to give an

14   image that gets rid of the red eye in the eyes.

15       And they said, Well it's not fast enough.  It takes

16   two seconds.  Well, the facial detection part doesn't take

17   two seconds.  They didn't tell you how much time that takes.

18   It's the processing to take out the red eyes that takes the

19   time.  So to say that that somehow shows that it doesn't

20   incorporate the claim here is ridiculous.  It's comparing

21   apples to oranges.

22       And I also would suggest to you, if they are the

23   inventor of this great Viola-Jones, why would HP not use it

24   in their own products?  That doesn't make any sense.

25       So let me show you what I think would happen on the

1        instructions here.  I anticipate some instruction like this.

2        And they have the burden of establishing that they

3        substantially complied with the marking requirement.  But

4        it's without dispute, HP never marked anything.  So there

5        aren't going to be any damages at all for noninfringement, I

6        hope you will find, or that the patent's invalid, or both.

7        But even if you did find something, you can't have any

8        damages before they actually filed this lawsuit on the '163.

9              Okay.  Kwon patents.  We heard about those.  The

10       Kwon patents are three patents that are related.  '312, '017,

11       '574.  They are all based on the same written description.

12       Meaning they have the same figures, the same description of

13       those figures.  They just have some different claims.  And

14       here, we have some claim construction.  That as issued -- the

15       claims as issued, now.  And I want you to keep that in mind.

16       As issued, they have one or more photodiodes.  That is really

17       important.  So the -- as issued, they have been construed as

18       having one or more photodiodes in a pixel.

19              But the problem is, here, that the written

20       description of these patents doesn't support the more than

21       one.  And that means they are invalid, because the rules are

22       you've got to -- you've got to show people when you file your

23       patent what the scope of your claim is.  And if you claim --

24       if the claims change later, and you don't have that

25       supported, then those claims are invalid.  And that is where

1    all this -- one photodiode support, and more than one

2    photodiode claim construction, they don't match.  They have

3    to match.

4         So let me talk to you about that and this

5    requirement a little bit.  And, again, I anticipate you will

6    get an instruction that is somewhat like this:  "The written

7    description requirement is satisfied if a person having

8    ordinary skill, reading the original patent application,

9    would have recognized that it describes the full scope of the

10   claimed invention as it is finally claimed in the issued

11   patent, and that the inventor actually possessed the full

12   scope by the filing date of the original application."  And

13   that is the key thing.  So what are we looking at?  We

14   compare the application as filed; we compare it to this claim

15   later.

16        Now, you are going to also find out, there is other

17   parts of this instruction that I think are going to be

18   important as far as amending claims later.  But the point is,

19   we've got to start with what is in that original application

20   as filed.

21        Now, for shorthand, because in each of these

22   patents, '312, '017, and '574, they have the same written

23   description in the body of the patent.  I'm going to just

24   pull up what is in the '312, but you heard the testimony of

25   Dr. Cunningham, who said that matches what was in the

1    original application as filed.  Those figures, that

2    description.  So we have to look at those things.

3         And he also said that he looked at the original

4    claims as filed.  Because that is part of the written

5    description, too.  So he's going to look at all those things.

6    And you remember, he did that.  And he started by saying,

7    Figure 4, that is the so-called embodiment here, showing the

8    invention.

9         And this is where seeing is believing.  Each pixel

10   here -- and there is three, and it says there are three --

11   has one photodiode.  It doesn't have more than one

12   photodiode.  It has one.  That is all it shows.  Now, that is

13   described here, first off, as three unit pixels, and then it

14   talks about one of those unit pixels, of the Nth row, the one

15   in the middle, is configured with a photodiode.  It doesn't

16   say it's configured with two.  It doesn't say it's configured

17   with more than one, or one or more.  It says one.

18        But I also think it's important that you can look

19   anywhere in that written description, and where else is this

20   idea of a unit pixel discussed?  Well, it talks about related

21   art.  And in that related art, which is prior art here, it

22   talks about a unit pixel 2.  And there are two there.  100,

23   the one on the top, 120 on the bottom.  And again, it says

24   each unit pixel, one photodiode.  One and only one.  That is

25   all that it shows.

1          So we go on.  What about the original claims as

2     filed?  What about them?  Well, that is an interesting thing,

3     because the original claim as filed was written in that

4     language you've heard about, means plus function.  And you

5     probably go, What the heck is that?  But you've heard about

6     that.  It's a special language you can put in a claim.

7          But what it requires you to do is identify the

8     function that is there.  And what's the function?  It's a

9     generating photocharges by absorbing external light.  And now

10    finding the means, the structure, back in the specification,

11    those figures and drawings, that actually performs that.

12         And, of course, we did that here, where it says we

13    have a photocharge generator PD2 for receiving a light from

14    an object to generate photocharges.  That is the thing that

15    matches that original claim.  So because that goes back and

16    you end up in the same place as I have already gone with you

17    through, all that this patent, as filed, disclosed was a

18    single photodiode.  Not one or more, one.

19         Now, they also say, Well, look at this claim.  Well,

20    claim 7 on the left is also a means plus function claim and

21    has the same means that we just went through.  And it tells

22    you that it's a photodiode in claim 14.  Again, you have to

23    go back to the spec and say, What is this?  And it's a

24    photodiode.  So what happened here is that, as filed, there

25    is only one photodiode.  No matter how you look at these

1    drawings, and no matter what you turn them around and look at

2    them, it has a photodiode.

3         And I think it's interesting that even -- even when

4    we look at figure 4 there, in the description of it, they

5    even number them PD1, PD2, PD3.  PD1 in the first pixel, PD2

6    in the second, PD3 in the third.  Again, one photodiode per

7    pixel.  That's all that -- that is all that has ever been

8    shown here.

9         So let's move on and talk about what happens.  Well,

10   what they are doing here today is saying, Well, we want to

11   expand that now.  They want -- all they have is a written

12   description with one, but they want to expand.  And they try

13   to do that, and what happens?  They can't do that, because

14   it's not supported.  So that invalidates these claims.

15        And the other thing that happened here is that they

16   changed the claim.  The claim that actually issued was

17   changed many, many years later.  Four years after it was

18   filed.  Four years later.  And when you do that, and that is

19   what gets you now to one or more photodiodes, well, you are

20   out of luck.  You don't have a written description that

21   supports the breadth of that claim.

22        So I'm just showing that here, that they went

23   through and did this four years later, after the claim was

24   filed.  So it's not in the original application.  And then

25   they did very similar things with the '017 and the '574.  And

1        as a matter of fact, what's really important about those two

2        is that Kwon, they never filed a new inventor declaration

3        with the '017.

4                And the import of that is, you can't say the

5        inventor possessed anything in those claims they filed with

6        the 5 -- with the '017, because all they did is put in the

7        six-year-old declaration.  He never saw those claims.  And

8        then what happened in the '574, which I want to -- this is

9        the '017.  The '574, even more interesting.  Kwon said, I'm

10       not signing anything.  So all three of these don't have an

11       adequate written description.

12               Let's move on.  And I want you to understand, what

13       did Zeiss do to run this down?  Nothing.  Never talked to the

14       inventor.  So Mr. Kwon wasn't involved in all of these claims

15       that came about years later.  What he filed on, and what one

16       in the ordinary skill, looking at that, no matter how you cut

17       it, it's one photodiode per pixel.  So now saying that it's

18       two invalidates all of these.

19               Talk about infringement quickly here.  Previous scan

20       line and in response to a line select signal.  I heard a lot

21       about those.  And what happens here with respect to these

22       elements?  '312, we say neither of them are there.  They

23       agree on the first one, that it's not literal infringement,

24       it's only doctrine of equivalents.  And that gets to this

25       previous versus subsequent issue.

1          But in that respect, we say they are different.

2     Yes, we do.  And the reason that Dr. Kleinfelder said they

3     are different is because you could have -- by going to the

4     next one, the subsequent one, you have a fresh node.  It's

5     better to go to the next one, rather than have something else

6     that could be dirty yet and isn't cleaned out.  So that is

7     what happened there.

8          And I saw the Shima testimony, and I want to show

9     you something on that quickly.  And they showed you one part

10    of it, but they didn't show you this part.  And that is in

11    the record, too.  So why would you use a floating diffusion

12    that is not used?  Because it is fresh.  And he goes, I

13    believe that there may be instances when past signals

14    remaining in a used floating diffusion.

15         That is exactly what Dr. Kleinfelder talked to you

16    about.  There is a difference.  And it's a meaningful

17    difference.  It's not insubstantial.  And that, enough, gets

18    you out of infringement of this claim.

19         But let's go on to -- I want to talk about the

20    selective sharing thing.  Because there isn't selective

21    sharing here of whether to have pixels connected.  There is

22    only selective sharing of which pixels are selected.  You

23    always share two.  And that is shown in this figure.  When

24    you do the current scan line in, you get the previous one, N

25    minus one.  When you go down to the next one, and you do --

1    you are reading out of N plus one, then you get N.  But you

2    always have two shared.

3         And that is actually not so good, because you lower

4    your sensitivity there.  You always keep it in a lower ISO by

5    doing that.  And that is what this invention talks about

6    doing.  They never talk about, Well, you can turn the one on

7    or off.  Sometimes you use the sharing, sometimes not.  Never

8    talked about that.  So let's move on to -- and Dr.

9    Kleinfelder pointed that out.

10        THE COURT:  About 10 minutes left.

11        MR. BELUSKO:  Thank you, Your Honor.

12        Okay.  In response to a line select signal.  Well,

13   this is one versus two.  And let me say on previous and

14   subsequent, I want you to think about this:  Is yesterday the

15   same as tomorrow?  That is what they are effectively telling

16   you.  I suggest no.  That is a difference.

17        Here, we've got one versus two.  And what we know is

18   they told us what a select signal or line select signal is.

19   It is the signal that selects the current scan line.  And

20   that is always the signal that operates that select

21   transistor.  You heard a lot about select transistors.

22        And in connection with that, he is saying it's

23   the -- Subramanian said it's the FDSW signal.  And that is

24   not the SEL signal of the select transistor.  And he agreed

25   with that.  So what he's really saying is, I'm going to

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    ignore the SEL one.  There is one there, but that is not

2    used, ever, to connect those floating diffusions or sensing

3    nodes.  It's a totally independent, and separate signal.

4           So what I suggest to you, that this is really

5    simple.  One is not two.  Common sense.  To say that an

6    independent signal now is the -- is the equivalent of using

7    your select signal, which they do, it is not the case.  It's

8    a totally different signal.

9           So last one was, I thought, kind of interesting.

10   They make all this big deal about a pixel having two

11   photodiodes.  You heard that.  In every one.  But what do

12   they do when they get to claim 30?  Remember, they are

13   different colors.  Those photodiodes are different colors.  I

14   used a red and a green one here.

15          Okay.  And he agreed with this.  The sharing is

16   between two pixels.  Each of these pixels individually has

17   two photodiodes.  He said, Well, so the photocharge you need

18   to generate a photocharge at the first pixel, and you have to

19   generate an output signal that is indicative of the

20   photocharge generated at the first pixel.

21          Well, the first pixel has two photodiodes.  Two

22   photodiodes, charges on both of them.  Is there any signal in

23   the accused products that comes out indicative of charges on

24   two photodiodes?  Of course not.  And why is that?  Because

25   one is red, and one is green.  You don't mix those together.

1     You get garbage.  You would get nothing by doing that.  So

2     this is never done.

3            So let me move on, then, if I may.  Patents are not

4     infringed, no damages.  You understand that.  Patents are

5     invalid, no damages.  So I don't think there should be

6     anything here, because I believe that we have established

7     there is not infringement of any claim, and the claims are

8     invalid for one reason or another.

9            But if you find that this one is not infringed, and

10    this one is not -- this one is invalid, as long as there is

11    either infringement or invalidity on each claim, then there

12    are no damages here.  And both of the experts agreed to that.

13           Now, were we ever accused of infringement?  Not by

14    HP.  Were we ever accused of infringement by Nikon?  No.  We

15    never were accused of infringement by -- excuse me -- IV, who

16    was actually involved in -- on these patents.  Had accused

17    Nikon of infringing other ones, but when they owned these,

18    they never said anything about them.

19           So what they are really telling you is this:  HP,

20    who owned this great patent, covers Viola-Jones, IV, which is

21    in the business of licensing, is out there looking at every

22    way to get anything, magically, these guys who aren't in the

23    digital camera business -- remember when I got Mr. Singer to

24    admit they hadn't sold any digital cameras?  They want to be

25    in it, but they aren't in it -- that they somehow came along

1     and they found gold in somebody else's backyard.  We suggest

2     to you that is not common sense.

3              So let's go on and talk about the value of these

4     patents.  Certainly HP had an idea about the value of its own

5     patents.  And I would also say that IV did, too.  As a matter

6     of fact, they've put the value on these patents, '335 at

7     100,000, and '312 at 50,000.  They, themselves, valued these

8     patents.

9              And, of course, HP, when they sold these, just said,

10    We are giving you -- these are all basically the same value.

11    They came to that 370,000.  So that is the '163.

12             And what did IV do?  Well, IV goes out and licenses

13    patents every way they could.  And you heard they licensed

14    Sony.  And then after they finished licensing, they sold off

15    the rest of the orange there.  After they squeezed a lot of

16    the value out of it, they sold the rest off.

17             And how did these HP and IV patents get booked?  How

18    did they account for them within Zeiss?  You heard that.  All

19    the same.  They didn't say this one is more valuable than

20    that.  They put them down in the accounting record as saying,

21    This is what it's worth.

22             Now, Sony license.  Well, you've heard a lot about

23    this Sony license.  And the bottom line is, there is one.

24    Sony said there is one.  And I would think they know best

25    what license they have.  And you heard that testimony.  And

1    all the affiliates of Sony are licensed, including the one

2    that makes image sensors for Nikon.

3            And what did Mr. Sanbongi point out to you?  He went

4    through -- and you may recall, he was asked about the

5    particular image sensors that are accused here under the '335

6    patent.  And he said, as to those, Sony designed them.

7    Didn't have anything to do with the pixel layouts or the

8    innards of them.  Now, that is very important, because those

9    are the only ones that are at issue here on whether they are

10   licensed or not, and all this foundry rights stuff.  Those

11   are the only ones.

12           And we pointed those out here.  Those are the very

13   ones that we asked Mr. Sanbongi about.  Did Nikon -- did

14   you -- did you design these particular sensors that you get

15   from Sony?  No.  Didn't have anything to do with it.  Don't

16   know what the pixel layouts are.  Didn't do the pixel

17   schematics.

18           Now, there is a whole bunch of discussion of

19   Mr. Etchells.  Mr. Etchells said this, and Mr. Etchells -- I

20   want you to keep this in mind:  The Etchells article refers

21   to two sensors.  One is the D850 -- for the D850 camera.  And

22   you've heard that is a great camera.  The camera of the year.

23   And the other was for a D5.  Well, the D5 is a Renaissance

24   sensor, so this whole licensing issue doesn't matter.

25           But on the D850, it's a Sony.  It's a Sony sensor.

1     But the D850 isn't an accused product here on the '335

2     patent.  So it really is irrelevant to the whole issue.  That

3     whole article talks about the D850, and that is not an issue

4     here under the '335.  And a Renaissance patent that we are

5     not claiming any Sony license for.

6           So commencement of damages.  We talked about this

7     already with respect to the HP issue.  They have to deal with

8     the marking, if you are going to find anything.  And the

9     grantback, we have been through.  And all these unmarked HP

10    cameras, that they want you to believe somehow HP, the great

11    inventor of this wonderful face detection, doesn't use it on

12    its own product.  Now, that doesn't meet common sense.  So at

13    marking, that is limited.  And then you get rid of half of

14    the stuff on the -- of the Sony license as well.

15          So let me go on to just say this:  I don't think

16    there is any liability here whatsoever.  My clients did

17    nothing wrong in continuing to make and sell products that

18    they believed are okay to make and sell.  They had no intent

19    to walk on anybody else's rights.  And I think we have shown

20    that they certainly could have had a reasonable basis for not

21    doing so.  They didn't infringe.  And if they are going to

22    stretch those claims, like they are talking about, then they

23    are, indeed, invalid.

24          So there should be no damages here.  But sure as

25    heck, you don't put the damage on something that is sold in

1    this -- sold for a very small amount and say, Well, if you

2    want to rent it, it's 10 times more, 20 times more.  Who does

3    that?

4         Moreover, if all you are doing is licensing a

5    patent, you can license it over and over and over to many

6    people.  So this idea that the value should be more than the

7    370,000 or the 250,000 makes absolutely no sense.  No common

8    sense.

9         So let me just do this:  Thank you very much.

10   Mr. Cavanaugh, Mr. Daxiola, Mr. Sacaro, Ms. Castillo,

11   Mr. Rotor, Mr. Look, Ms. Pickering, and Ms. Amos, thank you

12   for your attention and your careful consideration you have

13   given to Nikon here.  And literally, their fate is in your

14   hands at this point.  Thank you very much.

15        THE COURT:  Thank you, Counsel.

16        Counsel, you have about a 15-minute rebuttal.

17        MR. GLITZENSTEIN:  Thank you, Your Honor, yes.

18        Mr. Ang, can we get PDX780 up, please?

19        I'll start where Mr. Belusko started, which is what

20   did Nikon know, when did they know it, and what did they do

21   about it?  All three of those are important questions that

22   shed a tremendous amount of light on how Nikon has presented

23   this case and the inconsistencies it has been forced to

24   embrace.

25        Nikon wants you to believe that what happened back

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

1    in 2009 was akin to a neighbor walking up to you and saying,

2    You are -- the fruit tree in your backyard is mine.  That is

3    not even remotely close to what happened here, in fact.

4    There is no fruit tree here.  There is no neighbor walking up

5    to Nikon.

6        What happened in 2009 was Nikon, itself, set out to

7    engage in what it calls a freedom to operate patent search.

8    That means Nikon decided that it would actively look at

9    whether there is intellectual property of other companies

10   that it needed to worry about.  Freedom to operate.

11       This was not a fruit tree in the yard, where Nikon

12   was being pestered by an unreasonable neighbor.  This was

13   Nikon's decision and was Nikon's process in that freedom to

14   operate that led it to discover two of the three patent

15   families in this case, the '163 and the '335.

16       Now, what you were told in Nikon's closing argument

17   was that Nikon believed it could go forward honestly and

18   legitimately.  That is what you were told.  Now, let's

19   consider the evidence on this issue.  Did Mr. Kitaoka, who

20   has been at Nikon for many, many years, did he say that to

21   you?  No.  Did Mr. Sanbongi, the other senior member of Nikon

22   who was here this week?  Did he say that to you?  No, no, he

23   didn't.  Did Mr. Vannatter say that to you?  No.

24   Mr. Vannatter didn't even know they had to worry about

25   patents at Nikon.  So, no.  No.

1        And what is the basis for saying that they believed

2    that they could go forward honestly and legitimately, anyway?

3    What you have heard over the past week is complex.  We agree

4    with that.  It requires talking to people like Mr. Shima to

5    understand the technology.  They didn't do that.  It requires

6    going to companies like Omron and finding out what they do.

7    They didn't do that either.  It requires going to companies

8    like Sony, Renaissance, Aptina, Toshiba, all the companies

9    you have heard about throughout this case, and they did none

10   of that either.

11       This was something that they found.  They wanted to

12   understand if they had the freedom to operate.  And they

13   haven't shown you anything to show that they had formed any

14   belief that they could go forward on any basis, let alone

15   honestly and legitimately.  And it was that failure, it was

16   the failure to do the right thing ten years ago, that put

17   them into this lawsuit.  Because they thought they could get

18   away with it.

19       Everything that you've heard, riddled with

20   inconsistencies.  There are inconsistencies even with what

21   their own experts have said in this case.  I'll take this

22   just as an example.  I'll take this full depletion issue.

23   There is no -- there was no disagreement amongst the experts

24   that you would have to strip out all of the charge.  Right?

25   Dr. Kleinfelder conceded on cross-examination yesterday that

1    that would be actually a physical impossibility.  And he,

2    himself, said, No, no, I'm not -- I don't consider that is

3    what the claim means.  Yet that is what Nikon is telling you

4    today the claim means.

5            Dr. Darrell.  Let's try their other expert.

6            MR. BELUSKO:  Let's put up -- let's put up this

7    slide, please, Mr. Ang.

8            I showed you this.  You've seen all of this, or

9    heard all of this previously.  You heard from Dr. Darrell

10   over and over again on direct and cross-examination that the

11   thing that he found to be interesting, important, and

12   relevant here, frankly, was this thing that looks like a

13   grainy flying saucer from a 1950s movie.  That is what he

14   said was important to his analysis.

15           And he said over and over again, sometimes it's the

16   face, sometimes it's features of the face.  But what you were

17   shown in Nikon's close was not that.  At least they didn't

18   draw your attention to it.  What they drew your attention to

19   was something completely different.  It's in evidence.  You

20   are welcome to look at it.  It's JTX1908.  They represent

21   that it's Yow thesis figure 1.

22           That is not what Dr. Darrell based his opinion on in

23   this case.  Check your notes.  Check your memory.  Check your

24   recollections of what Dr. Darrell said about that this

25   morning.  They are changing their story here in the middle of

1    trial.  Just like they changed their defense on the '574

2    patent in the middle of trial.

3         The last expert, Dr. Cunningham.  They are asking

4    you -- let me remind you who Dr. Cunningham is.  Dr.

5    Cunningham is the man who came here yesterday and testified

6    that he applied the wrong law, didn't consider the right

7    facts, and changed his testimony.  But they are saying, Trust

8    him.  Trust Dr. Cunningham, even though he didn't do anything

9    the way he should have done.  And then the issues with regard

10   to the evidence here.  Dr. Cunningham didn't even consider

11   the relevant evidence.

12        They say that our doctrine of equivalents

13   analyses -- they suggest that somehow that is like a lesser

14   form of infringement.  You will see -- and hear, I should

15   say -- the jury instructions.  I do not believe that you will

16   see or hear anything in those jury instructions that will

17   suggest anything that doctrine of equivalents is somehow a

18   lesser form of infringement, or that a method claim is

19   somehow a lesser form of claim.  I don't think you will see

20   that in the jury instructions.  And yet, those have been

21   reoccurring themes.

22        And as to our doctrine of equivalents analysis,

23   check your notes, check your memories.  But have we ever said

24   close enough is good enough?  We never said that in this

25   case.  That has been their characterization in their

1       argument.  But check your notes, check your memories.

2               Recall Dr. Carley telling you exactly why, from a

3       technical perspective, and engineering perspective, and a

4       user perspective, these differences are not germane.  And he

5       analyzed it claim element by claim element.  And he went

6       through and he explained function, way, result, and why the

7       differences just simply weren't substantial; that the

8       suggestion that we took the position that close is good

9       enough is not an accurate characterization of what happened.

10              I could go on.  I have many notes.  But the evidence

11      that has come in through the experts, Zeiss's and ASML's

12      experts, they have presented it clearly, cogently, fully, and

13      forthrightly.

14              And we, too, trust that you have seen that evidence,

15      you've seen that the infringement issues in this case are

16      clear, that these patents are valid, and that the damages

17      that we are asking for is more than fair, is more than just.

18              All we are seeking here is a reasonable royalty.

19      And when you look at the extent of Nikon's infringement, when

20      you look at just how important these features are, when you

21      actually look at what they say and what they do when they are

22      not in a court of law, when you look at that evidence, we

23      submit that tells a very, very clear picture of the true

24      value of this intellectual property.

25              And I will conclude there, and I will conclude the

1   way I started last Tuesday.  And I, too, on behalf of myself,

2   my team, and my clients, we thank you as well.  We appreciate

3   your service.  And thank you.

4          THE COURT:  Okay.  Thank you, Counsel.

5          Ladies and gentlemen, we are going to be breaking at

6   this time.  You've heard the evidence, you've heard the

7   argument.  The only thing you have left is the instructions

8   that I'm going to give you.  And they take probably around

9   45 minutes, so I'm not going to go into them now.  We are

10  going to do that tomorrow morning when you come in.

11         So remember the admonishment.  Don't think about

12  this case, don't form or express any opinions about the

13  matter until you get the instructions and you get back in the

14  jury room and you deliberate with everybody else.  With that

15  admonishment, have a pleasant evening, and we'll see you back

16  here tomorrow at?  8:15.  No, wait -- yeah, 8:15.  You are

17  right.  Okay.  Okay.  Thank you very much.

18         (Thereupon, the jury retired from the courtroom.)

19         (Thereupon, the Court was in recess.)

20                *****     *****     *****

21

22

23

24

25

1

2    I certify that the foregoing is a correct transcript from the

3    record of proceedings in the above-titled matter.

4

5

6

7    ---------------------------

8

9    Amy C. Diaz, RPR, CRR                December 12, 2018

10   S/  Amy Diaz

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25